IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CARDINAL HEALTH, INC.,<br>7000 Cardinal Place,<br>Dublin, OH 43017<br><br>    Plaintiff,<br><br>    v.<br><br>ERIC H. HOLDER, JR., in his official capacity as the Attorney General of the United States,<br>950 Pennsylvania Avenue, NW,<br>Washington, DC 20530,<br><br>U.S. DEPARTMENT OF JUSTICE,<br>950 Pennsylvania Avenue, NW,<br>Washington, DC 20530,<br><br>MICHELE M. LEONHART, in her official capacity as Administrator of the Drug Enforcement Administration,<br>8701 Morrissette Drive,<br>Springfield, Virginia 22152,<br><br>DRUG ENFORCEMENT ADMINISTRATION,<br>8701 Morrissette Drive,<br>Springfield, Virginia 22152,<br><br>    Defendants. | No. 1:12-cv-_____ |

**COMPLAINT AND PRAYER FOR
DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Cardinal Health, Inc. ("Cardinal Health"), for its complaint against Defendants the Honorable Eric H. Holder, Jr., in his official capacity as Attorney General of the United States, the U.S. Department of Justice, the Honorable Michele M. Leonhart, in her official

capacity as Administrator of the Drug Enforcement Administration, and the Drug Enforcement Administration ("DEA"), alleges as follows:

## INTRODUCTION

1. This is an action under the Administrative Procedure Act, 5 U.S.C. §§ 551-706 ("APA"), challenging an Order To Show Cause and Immediate Suspension of Registration ("the "Immediate Suspension Order" or "ISO") issued on February 2, 2012 and served on Cardinal Health on February 3, 2012, with respect to Cardinal Health's Lakeland, Florida prescription drug distribution facility ("the "Immediate Suspension Order" or "ISO"). Asserting that suspension of the Lakeland facility is necessary to prevent dispensing of the drug oxycodone by the Lakeland facility's pharmacy customers to illegitimate users, the ISO required the Lakeland facility to *immediately* halt shipment of *all* controlled substances to about 2,700 pharmacies, hospitals, and other customers serving hundreds of thousands of patients. Immediate relief from the ISO—which was issued and took effect without any notice or opportunity to be heard—is necessary to prevent irreparable injury to Cardinal Health, Cardinal Health's customers, and the public.

2. The Controlled Substances Act ("CSA") permits the DEA (exercising authority delegated from the Attorney General) to issue an immediate suspension only where necessary to prevent "imminent danger to the public health or safety." 21 U.S.C. § 824(d). Unless this heightened standard is met, DEA cannot circumvent mandatory administrative procedures designed to give a registrant notice and an opportunity to be heard before it is suspended. *Id.* § 824(c). DEA cannot meet the heightened standard here for at least four reasons:

3. *First*, it is undisputed that Cardinal Health has distributed controlled substances only to DEA-registered pharmacies and health care facilities. DEA does not allege that the Lakeland facility has sold or distributed a single dose of oxycodone outside this closed system of

authorized distribution. The sole basis for DEA's ISO against the Lakeland facility is the allegation that certain of Cardinal Health's pharmacy customers have filled illegitimate prescriptions for oxycodone. But any concerns about these pharmacies can be addressed by suspending their DEA registrations to distribute controlled substances. Suspension of Cardinal Health's distribution facility is not necessary to address harm caused by the actions of pharmacies subject directly to DEA regulation.

4. *Second*, immediate suspension of the Lakeland facility is unnecessary because it no longer supplies controlled substances to the pharmacies identified in the ISO. Cardinal Health already suspended distributions to the two named independent pharmacies months ago, and Cardinal Health has temporarily suspended distributions to the two named CVS pharmacies while the court considers this motion. Additionally, Cardinal Health has pledged promptly to terminate sales of controlled substances to any pharmacy or other customer that DEA identifies as engaged in diversion.

5. *Third*, Cardinal Health maintains a vigorous and robust anti-diversion system, which has been described by DEA's own inspectors and investigators as one of the best among wholesale distributors nationwide. Indeed, Cardinal Health's anti-diversion system is more comprehensive than DEA's own enforcement efforts. Of the 315 pharmacies nationwide to which Cardinal Health ceased distribution since the beginning of 2009, 216 retained their registrations as of February 3, 2012. Of the more than 149 pharmacies in Florida to which Cardinal Health has suspended controlled substance shipments during the same time period, 113 retained their DEA registrations as of February 3, 2012.

6. *Fourth*, the ISO will not halt or reduce diversion of controlled substances by anyone and therefore does not diminish the "imminent danger" that DEA alleges. The customers

of the Lakeland facility that retain DEA registrations will continue to receive controlled substances from other distributors. In fact, because these distributors may not have the same robust anti-diversion controls as Cardinal Health, the ISO likely will exacerbate the risk of diversion, if it has any effect at all.

7. For the reasons set forth herein, the Court should issue a temporary restraining order precluding enforcement of the ISO, preliminarily enjoin the ISO, declare the ISO unlawful, vacate the ISO, and remand this matter to the DEA.

## PARTIES

8. Plaintiff Cardinal Health is an Ohio corporation headquartered at 7000 Cardinal Place, Dublin, OH 43017.

9. Defendant Eric H. Holder, Jr., is named in his official capacity as the Attorney General of the United States. Under 21 U.S.C. § 824(d), it is the Attorney General that is given the authority to "suspend any registration simultaneously with the institution of proceedings under this section, in cases where he finds that there is an imminent danger to the public health or safety." The Attorney General has delegated that authority to the DEA Administrator. *See* 28 C.F.R. § 0.100.

10. Defendant U.S. Department of Justice is an executive department of the United States. *See* 5 U.S.C. § 101; 28 U.S.C. § 501. The head of the Department of Justice is the Attorney General. *See* 28 U.S.C. § 503.

11. Defendant Michele M. Leonhart is named in her official capacity as the Administrator of the DEA. The Attorney General's authority to immediately suspend a registrant pursuant to 21 U.S.C. § 824(d) has been delegated to her. *See* 28 C.F.R. § 0.100.

12. Defendant DEA is a component of the U.S. Department of Justice. It was created by Executive Order 11,727. *See* 38 Fed. Reg. 18357 (July 10, 1973).

## JURISDICTION AND VENUE

13. This action arises under the Constitution of the United States, the CSA, and the APA. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331. The Court is authorized to issue the non-monetary relief sought herein pursuant to 5 U.S.C. §§ 702, 705, and 706.

14. Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against officers and agencies of the United States and Defendants Holder and Department of Justice reside in this judicial district.

15. This Complaint is timely under 28 U.S.C. § 2401(a).

## FACTUAL ALLEGATIONS

**A.     Regulatory Scheme**

16. The CSA and its implementing regulations establish controls and restrictions on the import, export, manufacture, and distribution of controlled substances. 21 U.S.C. § 801 *et seq.*; *id.* § 951 *et seq.*; 21 C.F.R. Part 1300 *et seq.* The distribution of controlled substances without a DEA registration is a felony offense. 21 U.S.C. § 841(a). DEA is tasked with enforcing the CSA in a balanced manner that prevents the diversion of controlled substances from legitimate channels while ensuring their availability for legitimate medical purposes. 76 Fed. Reg. 39,318 (July 6, 2011).

17. Under the CSA, DEA can revoke, restrict, or suspend a registration upon one of five findings, only one of which is relevant here—that the registrant has committed acts that render the registration inconsistent with the public interest. 21 U.S.C. § 824(a)(4). Prior to revoking or restricting a DEA registration, DEA must generally follow procedures designed to provide a registrant with notice and an opportunity to be heard. It must issue an order to show cause setting forth the basis for the agency's proposed action and providing the registrant with

the opportunity to request a hearing. *See id.* § 824(c). At such a hearing, the government has the burden of proving by a preponderance of evidence that registration is inconsistent with the public interest. 21 C.F.R. § 1301.44(d).

18. The DEA may issue an ISO—without providing a registrant with prior notice or an opportunity to respond to the allegations against it—only if the continued registration poses an imminent danger to the public health and safety. The relevant statutory provision states:

> The Attorney General may, in his discretion, suspend any registration simultaneously with the institution of proceedings under this section, in cases where he finds that there is an *imminent danger to the public health or safety*. ... A suspension under this subsection shall continue in effect until the conclusion of such proceedings, including judicial review thereof, unless sooner withdrawn by the Attorney General or dissolved by a court of competent jurisdiction.

21 U.S.C. § 824(d) (emphasis added).

19. The governing regulation specifies:

> The Administrator may suspend any registration simultaneously with or at any time subsequent to the service upon the registrant of an order to show cause why such registration should not be revoked or suspended, in any case where he/she finds that there is an *imminent danger to the public health or safety*. If the Administrator so suspends, he/she shall serve with the order to show cause pursuant to § 1301.37 an order of immediate suspension *which shall contain a statement of his findings regarding the danger to public health or safety*.

21 C.F.R. § 1301.36(e) (emphasis added).

### B. Cardinal Health And Its Lakeland Facility

20. Cardinal Health, a Fortune 500 company with its corporate headquarters in Dublin, Ohio, is one of the largest prescription drug wholesale distributors nationwide. It has distribution centers located throughout the United States.

21.  In one month in 2011, the Lakeland facility, which has held a DEA registration since 2003, shipped 3.95 million dosage units of prescription drugs, including about 473,000 dosage units of controlled substances, to 5,200 customer accounts in Florida, Georgia, and South Carolina. The volume of prescription drugs distributed makes the Lakeland facility the largest prescription drug wholesaler in Florida. The percentage of controlled substances sold by the Lakeland facility (12%) is within the range that DEA considers normal (5% to 20%).

### C.  The 2008 Memorandum Of Agreement With DEA

22.  In 2007, DEA issued immediate suspension orders and orders to show cause directed at certain distribution centers of the three largest wholesale distributors (including Cardinal Health) alleging, among other things, that the companies had failed to maintain effective controls against diversion by Internet pharmacies. In September 2008, Cardinal Health and DEA reached a settlement of those matters, which was memorialized in a Memorandum of Agreement ("MOA"). The MOA required Cardinal Health "to maintain a compliance program designed to detect and prevent diversion of controlled substances as required under the CSA and applicable DEA regulations." The MOA also provides that "either party may seek judicial enforcement of this agreement upon a material breach by the other party."

### D.  Cardinal Health's Commitment To Detecting And Preventing Diversion

23.  Cardinal Health has established and implemented a comprehensive compliance program—the Suspicious Order Monitoring ("SOM") program. A total of 16 employees are dedicated full-time to controlled substance compliance, and another 25 compliance officers are based in the field. Under the program, Cardinal Health first gathers information about its potential customers under its "Know Your Customer" procedure. It then establishes, on a customer-specific basis, appropriate ordering thresholds for classes of controlled substances and evaluates whether to adjust a given customer's thresholds based on changed circumstances. If a

customer's order would exceed the established threshold, Cardinal Health conducts an investigation to determine whether the order appears to be justified. These investigations can include a site visit by seasoned Cardinal Health investigators with law enforcement or regulatory investigation experience. To encourage diligence and candor, Cardinal Health also assures its sales representatives that the company will not reduce their commissions because of lost sales to pharmacies suspected of diversion.

24. DEA reviewed Cardinal Health's SOM program and was provided further information about the program on multiple occasions. DEA's own inspectors have described Cardinal Health's SOM program as one of the best among wholesale drug distributors nationwide.

25. Since December 1, 2007, Cardinal Health has suspended shipment of controlled substances to more than 375 customers, including more than 180 pharmacies in Florida that it believed posed an unreasonable risk of diversion. More recently, Cardinal Health's anti-diversion program resulted in the suspension of controlled substance shipments to another 30 pharmacies in Florida in the last three months. In 2011 alone, Cardinal Health rejected at the initial review stage applications of 55 pharmacies seeking to obtain controlled substances.

26. In many respects, Cardinal Health's compliance program is more stringent than DEA's: a large percentage of pharmacies suspended by Cardinal Health still retain their DEA registration. Of the 315 pharmacies suspended by Cardinal Health nationwide since January 1, 2009, 216 maintained an active DEA registration as of February 3, 2012, even though Cardinal Health notified DEA about each termination. Of the 149 pharmacies that Cardinal Health suspended in Florida since January 1, 2009, 113 are active registrants today.

27. Cardinal Health continues to strive to improve its systems. For instance, it recently began coordinating its anti-diversion efforts with the oxycodone manufacturer Mallinckrodt, Inc. In fall 2011, Mallinckrodt shared information (previously unknown to Cardinal Health) about purchases of controlled substances by specific Florida pharmacies through multiple wholesalers. That information prompted Cardinal Health to suspend sales of controlled substances to certain customers that presented an unreasonable risk of diversion. Mallinckrodt has agreed to Cardinal Health's request to continue this cooperation.

28. DEA has even better data than Mallinckrodt, because *all* distributors are required to regularly report to DEA their total distributions to pharmacies of Schedule II drugs and narcotic Schedule III drugs. DEA, however, has declined to provide this information in response to Cardinal Health's and the wholesale industry's frequent requests.

29. In addition, over three months ago, Cardinal Health requested that DEA inform it "of the identity of any Cardinal Health customer that the agency has determined is engaged in the diversion of controlled substances." In that letter, Cardinal Health made clear to DEA that it would "immediately cease distribution of controlled substances to any customer that DEA so identifies." On December 22, 2011, Cardinal Health reiterated its request for information about customers that DEA believes are likely involved in diversion. DEA refused to provide the requested information.

30. Even without assistance from DEA, Cardinal Health continues to combat potential oxycodone diversion by its customers. Because of reports of oxycodone abuse in Florida, in November 2010 Cardinal Health sent teams of compliance investigators and pharmacists to gather data on and perform inspections of 53 of its largest retail independent pharmacy customers in Florida. This investigation resulted in suspension of shipments of

controlled substances to several of the Florida pharmacies to which Cardinal Health temporarily halted such sales in the last three years.

### E.     The February 2, 2012 Immediate Suspension Order

31.    Despite Cardinal Health's extensive compliance program, on February 2, 2012, DEA issued the ISO. DEA then served the ISO on February 3, 2012, immediately suspending the Lakeland facility's controlled substances registration. In the same notice as the ISO, the DEA also served an Order to Show Cause initiating DEA administrative procedures to revoke the Lakeland facility's controlled substances registration.

32.    The ISO alleges that continued registration of the Lakeland facility presents an imminent danger to the public health or safety because, according to the ISO, Cardinal Health's compliance program has been ineffective. The sole basis for this assertion is DEA's contention that four pharmacy customers of Cardinal Health have distributed oxycodone for illegitimate uses. The ISO does not allege that Cardinal Health itself has distributed controlled substances to any entity not permitted to purchase them. Rather, it alleges that Cardinal Health should have known about the potential diversion by its customers.

33.    Cardinal Health has already suspended controlled substance shipments to all of the pharmacies identified in the ISO as posing a risk of diversion. One of the pharmacies was suspended on September 26, 2011, one of the pharmacies was suspended on October 5, 2011, and the remaining two pharmacies were temporarily suspended on February 3, 2012.

34.    DEA cannot dispute the fact that Cardinal Health has suspended distribution to all four pharmacies named in the ISO. It alleges merely that the company should have ceased distribution to these and other pharmacies earlier. DEA relies primarily on the volume of controlled substances ordered by the pharmacies. But the agency itself recently held that the volume of controlled substances alone, even in an area notorious for oxycodone abuse, was

inconclusive evidence of diversion. *Carlos M. Gonzalez, M.D.*, 76 Fed. Reg. 63,118, 63,138 (DEA Oct. 11, 2011). High volumes of controlled substances sales to a pharmacy might mean only that the pharmacy serves a higher-than-average volume of legitimate acute pain patients (for example, if a pharmacy is located near an oncology clinic or a hospice or has a higher than average proportion of elderly customers).

35.     To determine whether high sales volumes are suspicious, a distributor must consider other information. Here, Cardinal Health monitored and investigated orders placed by both the two retail independent pharmacies and the two CVS pharmacies named in the ISO and formed reasonable conclusions that continued sales to them were appropriate.

### F.     Cardinal Health's Due Diligence Of Retail Independent Pharmacies

36.     Cardinal Health makes decisions to distribute controlled substances to a retail independent pharmacy based on myriad factors. It considers (among other things) a pharmacy's size, history of dispensing, and location (including whether hospitals, pain clinics, orthopedic clinics, or hospices are nearby). The information available to Cardinal Health about a pharmacy's dispensing practices, however, is limited. Unlike DEA and pharmacists, Cardinal Health investigators cannot obtain individual patient's prescriptions to determine whether they were issued for a legitimate medical purpose.

37.     In this case, Cardinal Health sent an investigator to every retail independent pharmacy named in the ISO (repeatedly, with some pharmacies) long before learning of DEA's specific concerns. Based on the results of those investigations and the information available to it, Cardinal Health concluded that continued shipment to those pharmacies was reasonable. Cardinal Health considered precisely the kinds of factors that DEA endorsed in *Carlos M. Gonzalez, M.D.*, 76 Fed. Reg. 63,118, and elsewhere: the specialties and credentials of prescribing practitioners; volumes of certain controlled substances believed to be indicative of

likely diversion; percentage of cash transactions for those medications; proximity of medical establishments with high volumes of patients with legitimate need for controlled substances; percentages of controlled substances to overall prescription drugs ordered by the pharmacy; and others. Accordingly, no imminent danger exists based on Cardinal Health's distributions of controlled substances to these pharmacies.

### G. Cardinal Health's Due Diligence of CVS Pharmacies

38. Cardinal Health's distribution to 2 CVS pharmacies similarly provides no basis for the ISO. Any diversion of oxycodone by these pharmacies cannot be attributed to a lack of diligence by Cardinal Health. The company's anti-diversion personnel work in cooperation with CVS, a large chain of retail pharmacies (about 7,000 nationwide) that sell prescription drugs, over-the-counter drugs, and other retail goods. As it does with independent pharmacies, Cardinal Health sets order thresholds for CVS and reviews orders for controlled substances that exceed the thresholds. Cardinal Health held and investigated 1,690 orders from CVS pharmacies in the first ten months of 2011.

39. When Cardinal Health identified potentially unusual oxycodone-ordering patterns in fall 2010 at the CVS pharmacies identified in the ISO (and others), it requested that CVS investigate those orders. CVS compliance personnel conducted what appeared to be adequate investigations at the relevant pharmacies, and the findings from those investigations were reported to Cardinal Health. Based on those findings, Cardinal Health reasonably concluded that continued distributions to these stores were appropriate.

40. Cardinal Health had good reason to believe that the CVS anti-diversion program was reliable. Large chains like CVS have the resources to investigate potential diversion, and chain pharmacists do not share directly in any profits from diversion. The head of Cardinal Health's compliance department, Michael Moné, had extensive contacts with CVS pharmacy

officials at numerous levels whom he reasonably believed to be diligent professionals of high integrity and good judgment. The response to Cardinal Health's inquiries about the Florida stores in 2010 appeared credible. Indeed, Cardinal Health had previously informed DEA in 2009 that it relied on CVS compliance personnel to conduct these kind of investigations, and DEA never expressed any objection.

41. Focusing almost entirely on volume alone, DEA alleges in the ISO that the Lakeland facility should not have shipped 5 million doses of oxycodone in a 48-month period to a CVS pharmacy located in Sanford, Florida. The agency claims that the amount shipped was higher than the national average.

42. But the volume of oxycodone distributed by Cardinal Health to this CVS pharmacy appeared reasonable in light of information available to Cardinal Health about the pharmacy's size, location, and operating hours. The pharmacy is open seven days a week and is much larger than most retail independent pharmacies. The amount of oxycodone Cardinal Health distributed to this CVS store was sufficient to fill only about 33 prescriptions per day, as estimated by Mr. Moné. Because of the large volume of prescriptions typically filled at large CVS stores, Mr. Moné reasonably believed that the relatively small volume of oxycodone prescriptions filled on a daily basis did not place this store in the same category as the "pill mills" that DEA has publicly warned distributors about.

**H.   The ISO's Effects on Cardinal Health**

43. Unless the ISO is enjoined, Cardinal Health will be forced to reroute controlled substances previously distributed from its Lakeland distribution center to its distribution centers in Greensboro, North Carolina; Madison, Mississippi; and Denver, Colorado. This rerouting would cause delays in the receipt of controlled substances by Cardinal Health's Florida customers, beginning immediately. Those customers, who are accustomed to receiving next

day shipments from the Lakeland facility, will have to wait up to three days for shipments from the Denver facility and two days for shipments from other facilities.

44. The ISO's effects will be severe because the Lakeland facility's primary customers include hospitals, nursing homes, retail independent pharmacies, and urgent care centers that place orders on a daily basis. Because there is currently a shortage of certain controlled substances in the United States, those customers may not always be able to secure needed medications from secondary vendors. For Cardinal Health's customers, disruptions in supply can equate to disruption in patient care and delays in treatment for seriously ill or terminal patients.

45. As a result of the delays, some Lakeland facility customers will likely leave Cardinal Health permanently for other distributors. Most customers prefer to order pharmaceuticals from a single large distributor because it is not cost effective to order controlled substances and non-controlled substances from different distributors. Some portion of the Lakeland facility's customers thus are expected to take their entire pharmaceutical business to Cardinal Health's competitors.

## COUNT I

### (No Statutory Authority)

46. Cardinal Health incorporates the preceding paragraphs as if fully set forth herein.

47. The ISO is agency action made reviewable by 21 U.S.C. § 824(d).

48. Cardinal Health is adversely affected and aggrieved by the ISO.

49. The ISO is not authorized under 21 U.S.C. § 824(d) because defendants did not demonstrate that immediate suspension of Cardinal Health's Lakeland facility, without prior

notice or an opportunity to be heard, was necessary to prevent "imminent danger to the public health or safety."

50. Defendants accordingly did not have the statutory authority to issue the ISO.

51. The ISO also therefore exceeds the statutory jurisdiction of defendants and the limits imposed in 21 U.S.C. § 824(d).

52. As a result, the ISO is not in accordance with law, in violation of 5 U.S.C. § 706(2)(A), and is in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C).

## COUNT II

### (Due Process)

53. Cardinal Health incorporates the preceding paragraphs as if fully set forth herein.

54. The ISO is agency action made reviewable by 21 U.S.C. § 824(d).

55. Cardinal Health is adversely affected and aggrieved by the ISO.

56. The ISO denied Cardinal Health prior notice of the allegations against it and a meaningful opportunity to contest those allegations prior to its suspension.

57. Depriving Cardinal health of prior notice of the allegations against it and a meaningful opportunity to contest those allegations prior to its suspension was not necessary to further any governmental interest, increased significantly the prospect of an erroneous deprivation of Cardinal Health's rights, and impaired important property interests of Cardinal Health.

58. Accordingly, the ISO is contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B).

## COUNT III

### (Arbitrary and Capricious)

59. Cardinal Health incorporates the preceding paragraphs as if fully set forth herein.

60. The ISO is agency action made reviewable by 21 U.S.C. § 824(d).

61. Cardinal Health is adversely affected and aggrieved by the ISO.

62. Defendants' decision to issue the ISO was arbitrary and capricious. Defendants failed to engage in reasoned decision-making; to consider important aspects of the problem they believed they faced; to consider more narrowly tailored remedies and the impact that the ISO would have on the public health; and to provide an adequate explanation for their decision. The ISO is also premised upon data that Cardinal Health has not had adequate opportunity to review.

63. Accordingly, the ISO is arbitrary, capricious, and otherwise are not in accordance with the law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT IV

### (Inadequate Findings)

64. Cardinal Health incorporates the preceding paragraphs as if fully set forth herein.

65. The ISO is agency action made reviewable by 21 U.S.C. § 824(d).

66. Cardinal Health is adversely affected and aggrieved by the ISO.

67. An order under 21 U.S.C. § 824(d) immediately suspending a registrant "shall contain a statement of his findings regarding the danger to public health or safety." 21 C.F.R. § 1301.36(e).

68. The ISO lacked an adequate statement of the Administrator's findings regarding the danger to public health or safety that allegedly would be caused by continued registration of Cardinal Health's Lakeland facility.

69. Therefore, the ISO was issued "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## PRAYER FOR RELIEF

WHEREFORE, Cardinal Health prays that this Court:

1. Declare the ISO unlawful.

2. Vacate and set aside the ISO.

3. Issue all process necessary and appropriate to postpone the effective date of the ISO and to maintain the status quo pending the conclusion of this case, including issuance of a temporary restraining order and a preliminary injunction.

4. Award Cardinal Health its costs and reasonable attorney's fees as appropriate.

5. Grant such further and other relief as this Court deems just and proper.

Respectfully submitted,

/s/ Randolph D. Moss

| | |
|---|---|
| Douglas B. Farquhar (Bar No. 386573) | Randolph D. Moss (Bar No. 417749) |
| Delia A. Stubbs | Brian M. Boynton (Bar No. 483187) |
| Hyman, Phelps & McNamara, P.C. | Wilmer Cutler Pickering Hale and Dorr LLP |
| 700 13th Street, N.W. | 1875 Pennsylvania Avenue, N.W. |
| Suite 1200 | Washington, D.C. 20006 |
| Washington, D.C. 20005 | Tel.: (202) 663-6000 |
| Tel.: (202) 737-9624 | Fax: (202) 663-6363 |
| Fax: (202) 737-9329 | randolph.moss@wilmerhale.com |
| dfarquhar@hpm.com | |

*Attorneys for Cardinal Health, Inc.*

Dated: February 3, 2012