# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CARDINAL HEALTH, INC.,<br>7000 Cardinal Place<br>Dublin, OH 43017 | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| ERIC HOLDER, JR., in his official<br>capacity as the Attorney General of the United<br>States,<br>950 Pennsylvania Avenue, NW,<br>Washington, DC 20530 | )<br>)<br>)<br>)<br>) |
| U.S. DEPARTMENT OF JUSTICE<br>950 Pennsylvania Avenue, N.W.<br>Washington, DC 20530 | )   Case No. 1:12-cv-185 (RBW)<br>)<br>)<br>)<br>) |
| MICHELE M. LEONHART, in her official<br>capacity as Administrator of the Drug<br>Enforcement Administration<br>8701 Morrissette Drive,<br>Springfield, Virginia 22152 | )<br>)<br>)<br>)<br>)<br>) |
| DRUG ENFORCEMENT<br>ADMINISTRATION<br>8701 Morrissette Drive<br>Springfield, Virginia 22152 | )<br>)<br>)<br>)<br>)<br>) |
| Defendants, | )<br>)<br>) |

**Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction**

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF THE ARGUMENT ....................................................1

FACTUAL AND LEGAL BACKGROUND ...............................................................................5

PROCEDURAL HISTORY.........................................................................................................11

STANDARD OF REVIEW .........................................................................................................13

ARGUMENT ..............................................................................................................................14

    I.     Cardinal has failed to demonstrate a likelihood
           of success on the merits ......................................................................................15

        A.     DEA reasonably determined that cardinal lakeland
             posed an imminent danger to public health or safety based on the
             evidence before it when it issued the suspension order ...........................16

             1.     History of inadequate controls against unlawful diversion...........16

             2.     Large and sharply increasing volumes of oxycodone
                    shipped to top  customers................................................................18

             3.     Low numbers of suspicious orders reported .................................20

             4.     Cardinal's violations of its own guidelines intended to prevent
                    diversion........................................................................................22

              5.     Inadequate site visits. ...................................................................24

         B.     Cardinal's Arguments are Unpersuasive ...................................................24

             1.     Cardinal misapprehends the scope of DEA's concerns ................25

             2.     Cardinal's primary arguments on the merits are based
                    on evidence and representations that were not before
                    DEA when it issued the suspension order......................................26

              3.      DEA did not unduly delay issuing its ISO to cardinal.................27

             4.     DEA's decision not to take other, less drastic
                    measures was not arbitrary and capricious ....................................29

i

5.        Cardinal's remaining arguments constitute an improper attempt to litigate the administrative hearing in this forum ............................ 30

II.      PLAINTIFF HAS NOT ESTABLISHED THAT IT IS LIKELY TO SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION ...................................... 31

III.     DEA would be substantially injured by entry of a preliminary injunction ...................................................................................... 37

IV.     The public interest requires that cardinal follow the dispute resolution  procedures congress established …………………………..… 49

CONCLUSION .....…………………………………………………………………………… 42

## TABLE OF AUTHORITIES

### CASES

*Air Transport Ass'n of America, Inc. v. Export-Import Bank of the United States*,
    No. 11-2024, 2012 WL 119557 (D.D.C. January 13, 2012)......................................... 36, 37

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
    486 U.S. 492 (1988)........................................................................................................... 40

*ALRA Laboratories, Inc. v. Drug Enforcement Admin.*,
    54 F.3d 450 (7th Cir. 1995) ........................................................................................... 30, 31

*Apotex, Inc. v. FDA*,
    449 F.3d 1249 (D.C. Cir. 2006)........................................................................................... 15

*Berman  v. DePetrillo*,
    No. 97-70, 1997 WL 148638 (D.D.C. Mar. 20, 1997) ...................................................... 36

*Boston Carrier, Inc., v. ICC*,
    746 F.2d 1555 (D.C. Cir. 1984) ................................................................................. 7, 14, 15

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)...................................................................................................... 16, 17

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
    58 F.3d 738 (D.C. Cir. 1995)....................................................................................... 15, 34

*City of Las Vegas v. Lujan*,
    891 F.2d  927 (D.C. Cir. 1989) .......................................................................................... 15

*Clipper Cruise Line, Inc. v. U.S.*,
    855 F. Supp. 1 (D.D.C. 1994) ............................................................................................ 36

*Coal. for Common Sense in Gov't Procurement v. United States*
    576 F. Supp. 2d 162 (D.D.C. 2008) ................................................................................... 37

*Easy Returns Worldwide, Inc. v. United States*
    266 F. Supp. 2d 1014 (E.D. Missouri 2003)...................................................................... 28

*Keysource Med., Inc. v. Holder*,
    No. 11-cv-393, 2011 WL 3608097 (S.D. Ohio 2011) ................................................. 16, 17

iii

*Mathews v. Eldridge*,
　　424 U.S. 319 (1976)......................................................................................... 15

*Mazurek v. Armstrong*,
　　520 U.S. 968 (1997)......................................................................................... 14

*MediPharm-Rx, Inc. v. Gonzales*,
　　No. 06-cv-2223-T-24, 2007 WL 601722 (M.D. Fla. Feb.16, 2007)........................ 16, 17

*Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
　　463 U.S. 29 (1983)....................................................................................... 16, 18

*National Ass'n of Mortg. Brokers v. Bd. of Governors of the Fed. Reserve Sys.*,
　　773 F. Supp. 2d 151 (D.D.C. 2011) .................................................................. 36, 37

*National Mining Ass'n v. Jackson*,
　　768 F. Supp. 2d 34 (D.D.C. 2011) .................................................................... 32, 36

*National Shooting Sports Found., Inc. v. Jones*,
　　No. 11-1401, 2011 WL 3875241 (D.D.C. Sept. 2, 2011)................................................ 37

*Neil Laboratories v. Ashcroft*,
　　217 F. Supp. 2d 80 ......................................................................................... 28, 29

*Norman Bridge Drug Co. v. Banner*,
　　529 F.2d 822 (5th Cir. 1976) ................................................................................. 29

*Novelty Distrib., Inc. v. Leonhart*,
　　562 F.Supp.2d 20 (D.D.C.  2008) ..................................................................... 14, 15, 16

*PRSI Acquisition Group v. Ashcroft*,
　　No. 02-cv-1020 (D.D.C. May 30, 2002)...................................................................... 26

*U.S. Postal Serv. v. Gregory*,
　　534 U.S. 1 (2001).......................................................................................... 16, 17

*Power Mobility Coal. v. Leavitt*,
　　404 F. Supp. 2d 190 (D.D.C. 2005) ................................................................... 32, 34

*Pyramid Real Estate Servs., LLC v. United States*,
　　95 Fed. Cl. 125 (2010) ......................................................................................... 40

*Randolph-Sheppard Vendors of Am. v. Weinberger*,
　　795 F.2d 90 (D.C. Cir. 1986)........................................................................... 38, 40

*Sampson v. Murray,*
    415 U.S. 61 (1974)..................................................................................... 36

*Sears, Roebuck & Co. v. NLRB.,*
    473 F.2d 91 (1973)..................................................................................... 38

*United Prescription Services, Inc. v. Gonzalez,*
    No. 07-cv-316, 2007 WL 1526654 (M.D. Fla. 2007)................................ 16, 28

*Walter O. Boswell Mem'l Hosp. v. Heckler,*
    749 F.2d 788 (D.C. Cir. 1984) ......................................................... 14, 27, 31

*Winter v. Nat'l Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)................................................................................... 32, 43

*Wisconsin Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) ................................................................... 32

## STATUTES

21 C.F.R. § 1301.11 .......................................................................................... 5

21 C.F.R. § 1301.37(c)..................................................................................... 26

21 C.F.R. § 1301.73(c)................................................................................... 7, 13

21 CFR § 1301.74 ............................................................................................. 6

21 C.F.R. § 1309.44(a)....................................................................................... 6

21 C.F.R. §§1316.65(c), 1316.67....................................................................... 5

28 C.F.R. § 0.104 .............................................................................................. 5

21 U.S.C. § 801.................................................................................................. 5

21 U.S.C. §§ 812(b), 812(2)(A)-(C) .................................................................. 6

21 U.S.C. § 823(b) ............................................................................................. 7

21 USC §§ 823(b), 823(b)(1)........................................................................ 6, 39

21 U.S.C. § 824(b) ........................................................................................... 32

21 U.S.C. § 824(d) ..................................................................................... passim

v

21 U.S.C. §§ 824(d), 871(a) ................................................................................................... passim

H.R. Rep. No. 91-1444, 1979 U.S.C.C.A.N. at 4572 .................................................................... 5

## FEDERAL RULES & REGULATIONS

73 Fed. Reg. 30630, 30640-41 .................................................................................................. 14

75 Fed. Reg. 66138, 66146 ....................................................................................................... 14

76 Fed. Reg. 63,118 ............................................................................................................... 20

**<u>INTRODUCTION</u>**

Prescription drug abuse in the United States occurs at an alarming rate.  Approximately seven million Americans abuse controlled substance pharmaceuticals for non-medical purposes. Florida is the center of this growing epidemic.  According to the Florida Medical Examiner's Office, Florida suffered a 346% increase in the number of overdose deaths associated with oxycodone between 2005 and 2010.  For 2010, its data showed that approximately 4,091 persons died from an overdose caused by just five drugs: methadone, oxycodone, hydrocodone, benzodiazepines, or morphine — an average of over 11 deaths per day.

To address this rampant problem, the Drug Enforcement Administration ("DEA") has focused its efforts on stopping diversion at all of its various sources, including distributors (wholesalers) of controlled substances.  Through its distribution facility ("Lakeland" or "Cardinal Lakeland") in Lakeland, Florida, Plaintiff Cardinal Health, Inc. ("Cardinal"), distributes controlled substances to retail customers in Florida and other areas of the southeastern United States.  DEA investigated Lakeland's distribution of oxycodone between October 2008 and December 2011 to its top four Florida retail customers, CVS #219, CVS #5195, Gulf Coast Pharmacy, and Caremed.  Based on its investigation of Lakeland's distribution practices with respect to these top customers, DEA determined that Lakeland had not taken adequate safeguards to prevent drugs it distributed from being unlawfully diverted.  DEA therefore determined that Lakeland's continued distribution of controlled substances posed an "imminent danger to public

health or safety," and, based on its statutory authority,[1] issued an Immediate Suspension Order ("ISO") to Cardinal Lakeland on February 2, 2012.

This is not the first time Cardinal — or its Lakeland facility — has had problems with adhering to its legal obligations arising out of its distribution of controlled substances. Despite what Cardinal told this Court at the *ex parte* hearing on February 3, 2012, DEA has suspended numerous Cardinal distribution facilities in the past for inappropriate distribution practices. In 2007 and 2008, DEA suspended four Cardinal distribution facilities — including Lakeland — for ten months based on DEA's determination that these facilities had failed to maintain effective controls against diversion, and thus posed an "imminent danger to public health or safety." To resolve these allegations, Cardinal paid a $34 million dollar fine, which was at that time the largest fine in United States history associated with a DEA registration suspension. The Lakeland portion of this fine alone was $16.5 million, which itself would have been the largest fine in history.

DEA restored Lakeland's registration to distribute controlled substances in October 2008 following the execution of a Memorandum of Agreement, in which Cardinal pledged that it would adhere to its legal obligation to "maintain effective controls against the diversion of controlled substances." Notwithstanding this legally binding Agreement, and despite numerous efforts by DEA to assist Cardinal in improving its anti-diversion safeguards since 2008, Lakeland's problems have continued. The DEA investigation revealed that since resuming operations, Lakeland has shipped ***fifty times*** as much oxycodone to its top four customers as it has shipped to its other Florida retail customers. These volumes are not just staggeringly high,

---

[1] 21 U.S.C. § 824(d) authorizes DEA to immediately suspend a registrant's authority to distribute or dispense controlled substances upon a finding that the registrant's operation would pose an "imminent danger to public health or safety."

but have increased over time.  Between 2009 and 2011, Lakeland's shipments to its top customers more than doubled, increasing 241%.

Two of Cardinal's top customers are CVS pharmacies located in Sanford, Florida, population 53,570.  Counting the two CVS stores, Cardinal supplies eight of Sanford's 14 pharmacies.  In total, Cardinal shipped enough oxycodone to supply a population more than eight times Sanford's size.  Cardinal shipped almost all of this volume — 96% — to the two CVS stores.

DEA's investigation has revealed that Cardinal Lakeland repeatedly filled orders that exceeded volume thresholds Cardinal itself had set.  Orders Cardinal flagged as suspicious were overwhelmingly released with little or no explanation why.  Even those few orders that Cardinal refused to fill as suspect it failed to report to DEA, as Lakeland was required to do.  Since it resumed operations in October 2008, Lakeland has not alerted DEA about a single suspicious order for three of its top four customers, even though two of them have surrendered their DEA registrations due to committing the very sort of diversion DEA expects Cardinal and all distributors to police.  During the relevant time, Cardinal never conducted an in-store audit of either CVS, despite DEA having told Cardinal that it could not fulfill its due diligence obligations simply by relying on CVS's corporate controls.

Moreover, when Cardinal's investigations did raise red flags, they were frequently ignored.  In October 2010, for example, a Cardinal investigator suspected that Gulf Coast Pharmacy was illegitimately dispensing oxycodone, and recommended that Cardinal call DEA.  Not only did that call never come, Lakeland increased oxycodone volume to Gulf Coast in the months after this visit, notwithstanding the investigator's warning that Gulf Coast posed a "high risk of diversion."

DEA's investigation provided ample basis to conclude that Lakeland had failed to take adequate anti-diversions precautions generally, and that its continued operation therefore posed an "imminent danger to public health or safety." Although this Court did issue a temporary restraining order, it should now deny Plaintiff's preliminary injunction motion because DEA's decision is subject to APA review, which means this Court should examine whether facts available to DEA at the time it issued its suspension order supported DEA's determination. Under that standard, DEA's conclusion is neither arbitrary nor capricious, nor does it deny Plaintiff due process of law.

Nor can Cardinal — a Fortune 20 company with annual revenues in excess of $100 billion and a network of DEA-registered distribution facilities — seriously argue that it will be irreparably harmed by the closure of a single distribution facility. By its own admission, Cardinal has several other distribution facilities that can serve Lakeland's customers. Re-routing shipments through the most likely alternative facility (in Mississippi, according to Cardinal's CEO), means that shipments that would ordinarily arrive in one day will now arrive in two. Truly exigent shipments can be expedited. DEA has suspended Lakeland before, and yet Cardinal survives. Plaintiff's failure even to attempt to quantify harm that it has suffered from this prior suspension further demonstrates what is already evident from Cardinal's continued existence — namely, that any harm Cardinal may suffer from Lakeland's closure does not threaten its existence.

Granting Plaintiff the relief it seeks would have very real consequences for DEA and the public. If a DEA registrant can fail to uphold its obligations to prevent diversion for an extended period and then parry an "imminent danger" determination with late-arriving promises to do better — including promises that post-date even the ISO — DEA will effectively lose the

immediate suspension power Congress granted it in § 824(d).  Given these reasons, and given the

surpassing public interest in curbing prescription drug abuse, this Court should deny Plaintiff's

motion for preliminary injunction.

## FACTUAL AND LEGAL BACKGOUND

### The Controlled Substances Act Provides a Comprehensive Regulatory Scheme for Combatting Diversion of Illicit Substances

Congress enacted the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, to prevent

"diversion" — the distribution of drugs "out of legitimate channels into the illegal market."  H.R.

Rep. No. 91-1444, 1979 U.S.C.C.A.N. at 4572.  The Act gives the Drug Enforcement

Administration broad authority to prevent the diversion of pharmaceutical drugs for illicit use.

See 21 U.S.C. §§ 824(d), 871(a); 21 C.F.R. §§ 1316.65(c) and 1316.67; 28 C.F.R. § 0.104,

Appendix to Subpart R, Sec. 7(a).

As part of that authority, the DEA Office of Diversion Control regulates every link in the

prescription-drug supply chain.  DEA requires every person who manufactures, distributes,

dispenses, imports, or exports any controlled to obtain a registration with DEA.  21 C.F.R.

§ 1301.11  There are currently more than 1.4 million DEA registrants, and it is the responsibility

of the Office of Diversion Control to ensure that these registrants adhere to all aspects of the

CSA and its implementing regulations.  Declaration of Joseph Rannazzisi, Deputy Assistant

Administrator for DEA's Office of Diversion Control ("Rannazzisi Dec."), ¶ 7.

Wholesale distributors of controlled substances have a number of duties under the CSA.

Distributors of Schedule I or Schedule II drugs — controlled substances with a "high potential

for abuse," 21 U.S.C. §§ 812(b), 812(2)(A)-(C) — must "maintain . . . effective control against

diversion of particular controlled substances into other than legitimate medical, scientific, and

industrial channels," 21 U.S.C. § 823(b)(1).[2]  Wholesale distributors that supply pharmacies with controlled substances must "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21 C.F.R § 1301.74.  Suspicious orders are "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." *Id.*

Registrant compliance at all levels of the distribution chain is essential to ensure that controlled substances are not diverted for illegitimate use.  Because distributors handle such large volumes of controlled substances, it is incumbent on distributors to maintain effective controls.  Should a distributor deviate from the checks and balances of the system, the closed system created by the CSA collapses  Rannazzisi Dec. ¶ 10.

When a distributor is not adhering to its legal obligations, the DEA has authority to revoke or suspend its registration.  *See* 21 U.S.C. § 823(b) and (e).  Ordinarily, the DEA must hold a hearing prior to revocation or suspension of an entity's registration.  But when the DEA has reason to believe that a registrant's continued operation would pose "an imminent danger to the public health or safety," the DEA has discretion to suspend that party's registration immediately, prior to an administrative hearing.  21 U.S.C. § 824(d).  The DEA must provide the basis for its suspension in an order to show cause.  21 U.S.C. § 824(d); 21 C.F.R. § 1309.44(a).  An immediate suspension order need not contain the entire basis for the suspension, but only a non-exhaustive summary.  21 C.F.R. § 1301.73(c) (order need only contain a "*summary* of the matters of fact and law asserted"); *Boston Carrier, Inc., v. ICC*, 746 F.2d 1555, 1560 (D.C. Cir.

---

[2] The Act places controlled substances in one of five "Schedules" depending on their potential for abuse, the extent to which they may lead to psychological or physical dependence, and whether they have a currently accepted medical use in treatment in the United States.  Rannazzisi Dec. ¶ 2.

1984) ("an agency is not required to give every [Respondent] a complete bill of particulars as to every allegation that [it] will confront.").

A § 824(d) suspension remains in effect until the DEA issues a final order, unless the suspension is withdrawn by the Attorney General or dissolved by a court of competent jurisdiction. 21 U.S.C. § 824(d).

### The Rampant Problem Of Controlled Substance Diversion

Prescription drug abuse occurs in the United States at an alarming rate. The 2010 National Survey on Drug Use and Health reveals that approximately 7 million Americans abuse controlled substance pharmaceuticals for non-medical purposes.[3] Rannazzisi Dec. ¶ 13. Of all prescription drugs, narcotic pain relievers such as oxycodone, hydrocodone, and oxymorphone are abused most frequently. Each year, roughly 5.1 million people abuse narcotic pain relievers in the United States. Oxycodone is a Schedule II controlled substance. *Id.* ¶ 14.

Though prescription drug abuse occurs throughout the nation, the problem is particularly acute in Florida. *Id.* ¶ 15. Between 2005 and 2010, the Florida Medical Examiner's Office has seen a 345.9% increase in the number of overdose deaths associated with oxycodone. For 2010, its data showed that approximately 4,091 persons died in Florida alone from an overdose caused by just five drugs: methadone, oxycodone, hydrocodone, benzodiazepines, or morphine. This is an average of 11.2 persons dying from these drugs in the state of Florida every day. *Id.* ¶ 18.

As Florida has cracked down on controlled substance distribution from illicit pain clinics — facilities where rogue doctors doled out significant quantities of controlled substances to drug seekers for illegitimate purposes — the methods by which drug abusers obtain

---

[3] *See* 2010 National Survey on Drug Use and Health Survey, ("2010 Survey") available at http://www.samhsa.gov/data/NSDUH/2k10NSDUH/2k10Results.pdf.

pharmaceuticals has changed.  *Id.*   ¶ 23.  Pain clinics and complicit doctors now write illegal

prescriptions for controlled substances such as oxycodone, which drug abusers must then get

filled at a retail pharmacy.  *Id.*  Retail pharmacies are generally supplied by a DEA-registered

wholesale distributor, such as Plaintiff Cardinal Health.  *Id.* ¶ 24.  Distributors such as Cardinal

have an obligation to ensure that their sales to retail customers are not contributing to diversion

for illegitimate use.  *Id.* ¶ 10.

### Cardinal Health's Lakeland, Florida Distribution Center

Cardinal Health, Inc. is one of the nation's largest wholesale pharmaceutical drug

distributors.  See Plaintiff's Complaint ("Compl.") ¶ 20.  According to DEA records, Cardinal

has 25 distribution facilities registered in the U.S., each with a separate DEA registration

number.  Rannazzisi Dec. ¶ 42.  Cardinal Lakeland in Lakeland, Florida 33805 is a distributor of

Schedules II, III, IV and V controlled substances.  *Id.* ¶ 43.

### Cardinal's Prior Suspension and Memorandum of Agreement with DEA

In 2007 and 2008, DEA issued immediate suspension orders to three Cardinal

distribution facilities — Swedesboro, New Jersey; Auburn, Washington; and Lakeland,

Florida — based on DEA's conclusion that they "failed to maintain effective controls against

diversion."  *Id.* ¶ 48.  DEA also issued an Order to Show cause at a fourth Cardinal facility based

on its "failure to conduct appropriate due diligence."  *Id.*  In total, the DEA also had alleged that

Cardinal "failed to maintain effective controls against the diversion of controlled substances" at

three other facilities (McDonough, Georgia; Valencia, California; and Denver, Colorado), but

did not suspend these three facilities.  *Id.* ¶ 50.  In 2007 and 2008, then, DEA made "allegations

of inappropriate distribution" against 7 of Cardinal's then-27 distribution centers.  *Id.*  ¶ 51.  That

means that within the last five years, DEA had alleged that more than 25% of Cardinal's

distribution facilities were engaged in inappropriate distribution *at the same time. Id.* The suspensions DEA issued to Lakeland and other facilities remained in effect for approximately ten months, until October 2008.  Attachment to Brief ("Att."), 12

As a result of the allegations against these facilities, on October 2, 2008, Cardinal agreed to pay a civil fine of $34 million dollars, which at that time was the biggest fine in U.S. history associated with inappropriate distribution practices by a DEA registrant.  In fact, the portion of this fine attributable to the facility in question here — Cardinal Lakeland — was responsible for almost half of this fine, or $16.5 million.  Rannazzisi Dec. ¶ 55; Att. 12.

In addition to the civil penalty, Cardinal entered into  a Memorandum of Agreement ("MOA") with DEA, in which it agreed to "maintain a compliance program designed to detect and prevent diversion of controlled substances as required under the CSA and applicable DEA regulations."  Att. 12.  Cardinal agreed, among other things, to have a "Cardinal employee trained to detect suspicious orders" review "orders that exceed established thresholds and criteria,"  and acknowledged that "the obligations undertaken in this subparagraph do not fulfill the totality of its obligations to maintain effective controls against the diversion of controlled substances."  *Id.*

### Investigation and Events Leading to the Immediate Suspension of Cardinal Lakeland

Ever since entering into the 2008 MOA, the volume of oxycodone Cardinal has distributed to its top four retail customers — CVS #219, CVS #5195, Gulf Coast, and Caremed — has increased exponentially.  Rannazzisi Dec. ¶¶ 66, 75.

During this same period, DEA has repeatedly notified Cardinal of the need for due diligence at Cardinal Lakeland.  *Id.*  ¶¶ 59, 61, 63, 64.  For example, on July 28, 2009, DEA Staff Coordinator Mike Arpaio communicated to Cardinal's Quality and Regulatory Affairs Vice

President, Michael Moné, that due diligence investigations must be performed on all customers, chain pharmacies included, when it appears that suspicious high volume orders of controlled substances are requested. *Id.* ¶ 59. On July 7, 2011, DEA representatives advised Cardinal to examine its Florida customers, particularly, Cardinal's retail pharmacy chain customers. *Id.* ¶ 61.

On October 18, 2011, based on DEA's evaluation of data regarding the top distributions of oxycodone in the United States — culled from DEA's computerized Automation of Reports and Consolidated Orders System ("ARCOS"), which maintains a record of specific controlled substance inventories and transactions as submitted to DEA by manufacturers and distributors — DEA executed Administrative Inspection Warrants at Cardinal Lakeland's top four retail pharmacy Florida customers of oxycodone:  CVS #219, Gulf Coast, CVS #5195, and Caremed. *Id.* ¶¶ 38, 66. As a result of these inspections, both Caremed and Gulf Coast voluntarily surrendered their DEA registration for cause. *Id.* ¶ 67.

On October 26, 2011, DEA executed an Administrative Inspection Warrant at Cardinal Lakeland. *Id.* ¶ 68. The affidavit supporting the warrant stated that because "DEA is investigating Cardinal Health's top four customers to determine whether the pharmacies are dispensing controlled substances outside the scope of their registration," . . . "DEA also needs to determine whether Cardinal Health has failed to report suspicious orders to DEA." Plaintiff's Exhibit to Motion for Preliminary Injunction ("Pl. Ex.") J at 7. Throughout October and November, Cardinal delivered to DEA documents and information related to DEA's administrative subpoena. Rannazzisi Dec. ¶¶ 69, 70, 71. On November 8, 2011, DEA issued an administrative subpoena to Cardinal Health for information regarding its sales of oxycodone (among other drugs) and its compliance mechanisms. *Id.* ¶ 70. To date, DEA has not received

10

the compliance-related communications responsive to the subpoena.  *Id.*  ¶ 73.  Through counsel,

Cardinal has communicated to DEA that it will not provide the requested information until the

end of February 2012.  *Id.*

### Results of Cardinal Lakeland Investigation and the Issuance of the Suspension Order

DEA's investigation of Cardinal and its top four retail customers revealed a staggeringly

high and exponentially increasing rate of oxycodone distribution from the Lakeland facility.  *Id.*

¶¶ 75, 76.  Coupled with those high volumes, based on the DEA's review of Cardinal's files,

ARCOS data, and the information gathered during inspections of Cardinal Lakeland, CVS #219,

CVS #5135, Gulf Coast, and Caremed, DEA concluded that "Cardinal failed to conduct

meaningful due diligence to ensure that the controlled substances were not diverted into other

than legitimate channels, including Cardinal's failure to conduct due diligence of its retail

pharmacy chain customers."  Att. 9.  Concluding that this conduct violated the CSA as well as

the 2008 MOA, the Administrator signed an immediate suspension order on February 2, 2012.

Att. 9; Compl. ¶ 1.

### PROCEDURAL HISTORY

DEA served its Immediate Suspension Order to Cardinal on February 3, 2012.  Compl.

¶ 1.  That same day, Cardinal filed a Complaint and application for a temporary restraining order.

Although notified that an action and a motion for a TRO were to be filed, neither DEA nor

attorneys at the Department of Justice received adequate notice in time to participate in the

February 3, 2012 hearing.  At this *ex parte* hearing, the Court asked whether there had "been any

other allegations of inappropriate ***distribution*** by the plaintiff" previously.  Plaintiff's counsel

responded that "[t]here have never been any allegations today or previously of improper *diversion* by this company itself."[4]

The Court was presumably seeking to obtain information about whether Cardinal had engaged in the same or similar behavior in the past, as such information would provide meaningful context for this Court's evaluation of DEA's Immediate Suspension Order.  To this, Plaintiffs' counsel responded that Cardinal itself has never been accused engaging in "improper diversion," *i.e.*, distributing controlled substances to an entity without a valid DEA registration. But that is not what this Court asked.  This Court asked whether Cardinal had ever been alleged to have engaged in "inappropriate distribution," of which "improper diversion" is only one form. The answer to the question the Court actually asked is an unqualified "yes."  The DEA, less than five years earlier, had suspended operations at four Cardinal distribution facilities through a series of Immediate Suspension Orders issued between November 28, 2007 and January 30, 2008, *including Lakeland*.

---

[4] The hearing transcript reflects the following colloquy:

> THE COURT: How long has this company been in existence approximately?
>
> MR. FARQUHAR: Thirty or 40 years.
>
> THE COURT: Have there been any other allegations of *inappropriate distribution* by the plaintiff?
>
> MR. MOSS: There have never been any allegations today or previously of *improper diversion* by this company itself.

Att. 45, TRO Hr'g. Tr. 5: 9-16 (emphasis added).

Undersigned counsel first learned of this representation on February 7, 2012, when one of Plaintiff's counsel provided the transcript from the February 3 hearing following its preparation by the Court Reporter.

A review of the TRO hearing transcript does not indicate that these prior allegations of inappropriate distribution were meaningfully disclosed at any point.  Following this hearing, this Court granted Plaintiff's TRO application "with reluctance," Att. 45, Hr'g. Tr. 15: 24, and set a preliminary injunction hearing.  This briefing followed.

## STANDARD OF REVIEW

In order to issue an Immediate Suspension Order pursuant to § 824(d), DEA must determine that a registrant's continued operation would pose "imminent danger to public health or safety."  21 U.S.C. § 824(d).  In this case, based on its investigation of Cardinal Lakeland's distribution to its top four oxycodone customers, DEA concluded that Lakeland had failed to "maintain effective controls against the diversion of controlled substances" generally, in violation of its obligations as a DEA-registered distributor as well as its obligations arising out of the 2008 Administrative Memorandum of Agreement between Cardinal and DEA.  Att. 9.

Consistent with federal regulations and case law, DEA's ISO provided to Cardinal "a statement of the legal basis for such hearing and for the denial, revocation, or suspension of registration and a *summary* of the matters of fact and law asserted."  21 C.F.R. § 1301.73(c) (emphasis added).  The D.C. Circuit has held that "an agency is not required to give every [Respondent] a complete bill of particulars as to every allegation that [it] will confront."  *Boston Carrier, Inc., v. ICC*, 746 F.2d 1555, 1560 (D.C. Cir. 1984).[5]

This Court reviews DEA's "imminent danger" determination under an arbitrary and capricious standard.  *See Novelty Distributors, Inc. v. Leonhart*, 562 F. Supp. 2d 20, 29 (D.D.C.

---

[5] *See also George Mathew, M.D.*, 75 Fed. Reg. 66138, 66146 (DEA Oct. 27, 2010) (suspension order need only give recipient "notice of those acts which the Agency intends to rely on in seeking the revocation of its registration"); *Paul H. Volkman, M.D.*, 73 Fed. Reg. 30630, 30640-41 (DEA May 28, 2008) (endorsing notion of suspension order as notice pleading and citing *Boston Carrier*).

2008) ("In a challenge to an § 824(d) suspension, "the underlying question on the merits is

whether DEA acted arbitrarily and capriciously in suspending [Plaintiff's] registration based on a

preliminary finding that its continued operation posed an 'imminent danger to public health or

safety.'")  This Court's review, therefore, is confined to events up to the date DEA issued its ISO

on February 2, 2012, and what information DEA had before it in making its determination.  *See*

*Walter O. Boswell Memorial Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984) ("If a court is

to review an agency's action fairly, it should have before it neither more nor less information

than did the agency when it made its decision.").  Reviewing "more than the information before

the [Administrator] at the time she made her decision risks our requiring administrators to be

prescient."  *Id.*

## ARGUMENT

Cardinal seeks the "extraordinary and drastic remedy" of a preliminary injunction, which

this Court cannot grant "unless the movant, *by a clear showing*, carries the burden of

persuasion."  *Mazurek v. Armstrong*, 529 U.S. 968, 972 (1997) (original emphasis).  For Cardinal

to prevail on its motion, it must demonstrate: (1) that it has a substantial likelihood of success on

the merits; (2) that it would suffer irreparable injury if the injunction is not granted; (3) that an

injunction would not substantially injure other interested (non-moving) parties; and (4) that the

public interest would be furthered by the injunction.  *CityFed Fin. Corp. v. Office of Thrift*

*Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995).  Cardinal must satisfy all four factors, *CityFed*,

58 F.3d at 747, but its failure to show either irreparable harm or a likelihood of success on the

merits obviates the need for the Court to address the remaining factors, *Apotex, Inc. v. Food &*

*Drug Admin.*, 449 F.3d 1249, 1253-54 (D.C. Cir. 2006); *City of Las Vegas v. Lujan*, 891 F.2d

927, 935 (D.C. Cir. 1989).  Cardinal has not carried its burden to show that any of these

factors — let alone all of them — favor issuing a preliminary injunction.

## I.     Cardinal Has Failed To Demonstrate A Likelihood Of Success On The Merits

Cardinal alleges that DEA's decision to suspend Lakeland's registration pursuant to

§ 824(d) violated various provisions of Section 706(2) of the APA, including its right to due

process.  Compl. ¶¶ 52, 58, 63, 69.  "The fundamental requirement of due process is the

opportunity to be heard at a meaningful time and in a meaningful manner."  *Mathews v.

Eldridge*, 424 U.S. 319, 333 (1976) (citation omitted).  With respect to § 824(d) suspensions,

Congress has specified that the "time" and "manner" at which an aggrieved party will be heard is

a post-suspension hearing.  Courts in this jurisdiction and elsewhere have repeatedly recognized

that there is nothing inherently suspect or constitutionally infirm about DEA suspending a

party's registration prior to a hearing, provided DEA adequately supports its fears of harm to

public health or safety.  *See, e.g.*, *Novelty Distributors*, 562 F. Supp. 2d at 28 ("§ 824(d) in

particular, was designed to ensure that a party is not deprived of its property interest in its

registration without due process of law in violation of the Fifth Amendment"); *Keysource

Medical, Inc. v. Holder*, 2011 WL 3608097, at *8 (S.D. Ohio 2011) (denying preliminary

injunction request to enjoin § 824(d) suspension and noting that party was unlikely to succeed on

its due process challenge); *MediPharm–Rx, Inc. v. Gonzales,* 2007 WL 601722, at *4–6 (M.D.

Fla. Feb.16, 2007) (rejecting due process challenge in same context).

In a challenge to an § 824(d) suspension, "the underlying question on the merits is

whether DEA acted arbitrarily and capriciously in suspending [Plaintiff's] registration based on a

preliminary finding that its continued operation posed an 'imminent danger to public health or

safety.'" *Novelty Distributors*, 562 F. Supp. 2d at 29.[6]  Under this "extremely narrow" standard

of review, *U.S. Postal Service v. Gregory*, 534 U.S. 1, 7 (2001), "[t]he court is not empowered to

substitute its judgment for that of the agency."  *Citizens to Preserve Overton Park, Inc. v. Volpe*,

401 U.S. 402, 416 (1971).  The court must apply a "presumption of regularity" and "consider

whether the decision was based on a consideration of the relevant factors and whether there has

been a clear error of judgment."  *Id.*  A decision is arbitrary and capricious only "if the agency

has relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or is so implausible that it could not be ascribed to a difference in

view or the product of agency expertise."  *Motor Veh. Mfgrs. Ass'n v. State Farm Mut. Auto. Ins.*

*Co.*, 463 U.S. 29, 43 (1983).

    Here, the dispute between the parties focuses on whether DEA had a valid basis to

determine that Lakeland's continued operation posed an "imminent danger to the public health or

safety."  DEA's issued an ISO to Cardinal on February 2, 2012, after a lengthy investigation into

Cardinal's distribution practices dating back to when Lakeland resumed operations after its prior

suspension.  Rannazzisi Dec. ¶ 82; *see generally id.* at ¶¶ 66-81.  DEA considered not only

voluminous evidence that Cardinal produced in response to the Administrative Investigation

Warrant DEA served on October 25, 2011, but also DEA's experience with and knowledge of

Lakeland's distribution practices over time.  *Id.*  ¶ 82.  To show a likelihood of success on the

merits, Cardinal must show that DEA's determination reflects "a clear error of judgment" or is

---

[6] Other courts have similarly reviewed § 824(d) suspensions under an arbitrary and capricious
standard.  *See, e.g.*, *Keysource Medical, Inc. v. Holder*, 2011 WL 3608097, *6 (noting Plaintiff's
"high burden"); *United Prescription Services, Inc. v. Gonzalez*, 2007 WL 1526654, *2 (M.D.
Fla. 2007) ("In reviewing agency action in cases such as this, district courts apply the arbitrary
and capricious standard.").

"implausible" in view of the evidence that DEA had before it when it issued the ISO.  Plaintiffs

simply cannot carry this demanding burden.

> **A.  DEA Reasonably Determined that Cardinal Lakeland Posed An Imminent Danger To Public Health Or Safety Based On The Evidence Before It When It Issued The Suspension Order**

In reaching its decision to suspend Cardinal Lakeland, DEA relied on several factors, the

totality of which led DEA to conclude that Lakeland's continued operation would pose an

"imminent danger to the public health or safety."  Rannazzisi Dec. ¶¶ 82-83.  The most important

factors are summarized below.

> **1.  History of inadequate controls against unlawful diversion.**

Cardinal Lakeland has a checkered history of implementing and enforcing safeguards

against unlawful diversion of the controlled substances it distributes.  In the approximately eight

years since Lakeland first obtained its DEA registration in 2003, Plaintiff's Brief in Support of

Motion for Preliminary Injunction ("Br.") 6, Lakeland has, in DEA's view, maintained

inadequate controls against diversion for five.  *See* Rannazzisi Dec. ¶¶ 49, 74.

Based on a prior investigation of Lakeland, DEA alleged that between August 2005 and

October 2007, Cardinal Lakeland distributed over 8,000,000 dosage units of combination

hydrocodone products to customers that it knew or should have known were diverting

hydrocodone into other than legitimate medical, scientific, and industrial channels."  *Id.*  ¶ 49.

Based on these allegations, DEA suspended Lakeland (along with other Cardinal distribution

facilities) in December 2007.  *Id.*  This suspension remained in effect until October 2, 2008,

when Cardinal entered a settlement agreement with DEA.  *Id.*  ¶ 57.

Although Cardinal claims, its problems are in the past,[7] according to evidence before the DEA, Lakeland's anti-diversion efforts appear deficient.  Thus, in making its suspension determination, DEA reasonably considered the fact that Lakeland failed to fix problems that have plagued it previously.

## 2.  Large and sharply increasing volumes of oxycodone shipped to top customers.

Between October 2008 and December 2011, Lakeland's top four customers of oxycodone in order of volume shipped, were Holiday CVS, LLC, Store # 219; Gulf Coast Pharmacy; Holiday CVS, LLC, Store # 5195; and Caremed.  Att. 9 at ¶ 4(a)-(e).  Lakeland shipped over 12.9 million dosage units to these four pharmacies combined over this time, including 10.9 million units in 2010 and 2011 alone.  *Id.* at ¶ 4a.  The volume of oxycodone Lakeland shipped to these pharmacies was staggering:  Between October 2008 and December 2011, Lakeland distributed to these top customers approximately *fifty times* the amount of oxycodone that the average Florida pharmacy received over this time from Cardinal.  Rannazzisi Dec. ¶ 76.  These volumes were not only exceedingly large, but sharply increasing.  Between 2009 and 2011, Cardinal increased its shipments to these top customers by 241%. *Id.*  ¶ 75.  On numerous occasions, the sum total of Cardinal's recorded reasons for increasing the threshold were short, conclusory statements such as "not unreasonable quantity, pattern and/or frequency."  Declaration of Group Supervisor Ruther Carter ("Carter Dec.") ¶¶ 10, 19, 28, 38.

---

[7] Cardinal touts its "robust anti-diversion system" with reference to Mr. Moné's statement that DEA employees have praised Cardinal Health as an industry leader.  Moné Dec. ¶ 29.  First, even assuming the accuracy of Mr. Moné's unattributed statement, the statement appears to refer to the company *as a whole*.  It says nothing about the controls in place at Cardinal Lakeland, the only facility at issue here.  DEA has documented evidence that those controls were inadequately implemented and often disregarded.  See *supra* at pp. 20-24.

The following chart summarizes the oxycodone volumes (in dosage units) shipped to each of these top customers:[8]

| Customer | 2008 Volume | 2009 Volume | 2010 Volume | 2011 Volume | 2009-2011 % Change | Grand Total by Customer |
|---|---|---|---|---|---|---|
| CVS #219 | 135,000 | 1,258,600 | 2,048,100 | 1,802,100 | 43% | *5,243,800* |
| Gulf Coast | 32,820 | 213,100 | 1,073,540 | 2,063,100 | 868% | *3,382,560* |
| CVS #5195 | 11,700 | 104,500 | 885,900 | 1,210,400 | 1058% | *2,212,500* |
| Caremed | 20,700 | 231,740 | 724,500 | 1,097,300 | 374% | *2,074,240* |
| Grand Total/Year | *200,220* | *1,807,940* | *4,732,040* | *6,172,900* | *241%* | *12,913,100* |

To put this in perspective, in 2011 Cardinal distributed over 3 million dosage units to the two CVS pharmacies, both of which are located in the town of Sanford, Florida.  Rannazzisi Dec. ¶ 77.  Sanford has a population of 53,570, and 14 other pharmacies with DEA registrations besides the two CVS stores.  *Id.*  Including sales to the 6 other Sanford pharmacies it supplied, Cardinal shipped enough oxycodone for every man, woman, and child in Sanford to have 59 dosage units in 2011.  *Id.*  ¶¶ 77, 78.  By comparison, the cumulative annual oxycodone per capita volume shipped by *all distributors* is approximately 7 dosage units.  *Id.* ¶ 78.  These volumes look similarly suspect on a relative basis: Cardinal shipped *24 times* as much oxycodone in 2011 to the two CVS stores as its other Sanford customers.  *Id.* ¶ 78.  In the face of these incredible volumes, Cardinal's assertion that such amounts "appeared reasonable" (Br. 22) says more than anything DEA could possibly say about the effectiveness of the quality of Lakeland's due diligence.

---

[8] Data from Att. 2; see also Carter Dec. ¶¶ 7, 16, 25, 35.

Although Cardinal quibbles with DEA's calculation of the amount of oxycodone used by average Florida pharmacies, Moné Dec. ¶ 53, it offers no alternative.  More fundamentally, Cardinal does not even attempt to explain how under any calculation of what is average, the volumes it distributed to its top customers would not be suspect.  On this point, Cardinal protests that high-volume distributions alone cannot be suspicious, a determination a distributor can only make by considering "other evidence."  Br. 17.  Cardinal is wrong.  DEA has explained to Cardinal and to all its distributors that, when considering whether an order is suspicious "[t]he size of an order alone, whether or not it deviates from a normal pattern is enough to trigger the registrant's responsibility to report the order as suspicious."  Rannazzisi Dec. ¶ 33.

In persisting to the contrary, Cardinal relies primarily on DEA's recent decision in *Carlos Gonzalez, M.D.*, 76 Fed. Reg. 63,118 (DEA Oct. 11, 2011).  In *Gonzalez*, DEA revoked a medical doctor's DEA registration, but the ALJ did not find DEA evidence about the volume of total prescriptions the doctor wrote "persuasive on this record," because "the data was presented in something of a contextual vacuum," with raw numbers that "reflect[ed] only volume; not high volume or low volume."  *Id.* at 63,138.  From this fact-bound decision about distribution practices of a *physician*, Cardinal extrapolates a general principle that evidence of volume alone can never be enough to conclude that a *distributor*'s practices create an imminent threat of harm.  That error aside, Cardinal does not explain what additional context or other information could possibly be needed for it to infer that something is deeply amiss when Cardinal shipped to Sanford, Florida enough oxycodone to supply a population 8 times its size.  Rannazzisi Dec. ¶ 78.

### 3.  Low numbers of suspicious orders reported.

Cardinal's Electronic Suspicious Ordering Monitoring System flagged certain orders as suspicious, which requires Cardinal to place a "hold" on the order until it decides whether to release the order or to cancel or "cut" the order.  *Id.*  ¶ 81(d).  With respect Cardinal's top four customers, data produced to DEA reflected the following for the time period between October 2008 and December 31, 2011:

a.  CVS # 219: Held 68 shipments, ultimately released 53 (78%).  Of the 15 not released, 11 were duplicates, 1 was not shipped at the request of the customer.  3 orders were never released and never reported as suspicious to DEA.  Cardinal made 2 suspicious order reports to DEA regarding CVS # 219, both coming after DEA served Cardinal with an investigative warrant.  Carter Dec. ¶ 10.

b.  CVS # 5195: Held 22 shipments, ultimately released all 22 (100%).  Cardinal never made a suspicious order report to DEA regarding CVS # 5195.  *Id.* ¶ 19.

c.  Gulf Coast: Held 61, ultimately released 52 (85%).  Of the 9 orders Cardinal did not ship, four were duplicate orders.  Of the five remaining orders, the customer file Cardinal provided to DEA did not contain any information regarding why Cardinal did not fill these orders.  Cardinal did not make any suspicious order reports to the DEA regarding Gulf Coast, including with respect to the five non-duplicate orders it did not fill for Gulf Coast.  *Id.*  ¶ 28.

d.  Caremed:  Held 54, ultimately released 47 (88%).  Of the 7 orders Cardinal did not ship, 3 were duplicate orders.  Of the 4 remaining orders, the customer file Cardinal provided to DEA indicated that Cardinal did not fill these orders because "the data did not support the quantity ordered."  Cardinal did not make any suspicious order

reports to the DEA regarding Caremed, including with respect to the four non-duplicate orders it did not fill for Caremed.  *Id.*  ¶ 38.

As to the released orders discussed above, the due diligence file Cardinal produced to DEA frequently contained only conclusory statements that provided no insight into why Cardinal decided to releases the orders.  Most held orders were released based on a Cardinal employee's apparently rote conclusion that the shipments were "not unreasonable quantity, pattern and/or frequency."  *Id.*  ¶¶ 10, 19, 28, 38.

### 4.  Cardinal's violations of its own guidelines intended to prevent diversion.

Cardinal boasts at length about the strength of its anti-diversion policies and practices.  But based on evidence DEA had before it when it issued the ISO, Cardinal appeared to have violated its own internal safeguards intended to guard against diversion.

Cardinal sets volume thresholds on a customer-by-customer basis, and reviews such thresholds periodically.  Br. 8.  Yet the data Cardinal provided to DEA indicated that, for these top customers, Cardinal filled orders that exceeded the applicable threshold on at least 44 separate occasions.  Although Cardinal claims that it might approve a modest overage to prevent supply shortages due to an extra business day or holiday in a month, Moné Dec. ¶ 48, DEA could discern no pattern in terms of the overage amounts.  Rannazzisi Dec. ¶81(a)(i).  Some exceeded the applicable threshold by a large percentage; others did not.  *Id.*  Based on the evidence it reviewed, DEA was unable to conclude that Cardinal's stated threshold volumes served as a reliable and consistent constraint against diversion.  *Id.* ¶ 81(a)(ii).

Cardinal provided its Suspicious Order Monitoring ("SOM") Policies to DEA.  Those policies state that a site visit must occur once Cardinal attaches a "red flag" to a particular customer, which is precipitated by the following two events:  1) sales increased by 15% (at least

$10,000) and 2) at least 20% or more in dosage units.  Once these two events occur, a Cardinal

sales person must visit the customer within thirty (30) days to investigate for potential diversion

and provide a report to Quality and Regulatory Affairs ("QRA").  Rannazzisi Dec. ¶ 81(b)(i).

According to a review of Cardinal's due diligence files, Cardinal should have red-flagged its top

four customers on a number of occasions, but Cardinal did not conduct a site visit within thirty

(30) days, in violation of its own SOM Policy.  *Id.* ¶ 81(b)(ii) & n.1.

On those occasions when Cardinal did conduct a site visit to its biggest customers,

evidence produced to DEA indicated that Cardinal disregarded recommendations of its

inspectors who raised red flags about improper diversion.  On October 5, 2010, Mr. Vincent

Moellering and Mr. Lenny Moro conducted a site visit to Gulf Coast.  Carter Dec. ¶ 30(d).

Cardinal's notes from this particular site visit produced to DEA reflected the following:

> CAH, PBC, Lenny Moro, has observed groups of white males and females,
> coming into the pharmacy during his late afternoon visits, to have their scripts
> filled; they leave in small groups.  The report further stated: "Owner requested
> increase his oxycodone threshold even higher. . . .  I am not convinced that the
> owner is being forthright pertaining to his customers' origin or residence.  I have
> requested permission to contact DEA to resolve this issue."  "High Risk of
> Diversion."  *Id.* ¶ 30(d).

Despite Mr. Moellering's findings and recommendations, Lakeland did not contact DEA.

Carter Dec. ¶ 30(e).  Cardinal not only continued to ship oxycodone 30 mg tablets to Gulf Coast,

but substantially increased shipments to Gulf Coast shortly afterwards.  *Id.*  On November 24,

2010, Cardinal adjusted monthly volumes of oxycodone to Gulf Coast from 141,000 to 207,200.

*Id.*

On February 17, 2011, a Cardinal representative conducted a site visit to Gulf Coast.  *Id.*

¶ 30(h).  The meeting notes reflect that the representative concluded that Gulf Coast posed a

"Medium Risk for Diversion."  *Id.*  Nonetheless, Cardinal increased Gulf Coast's order threshold

23

3 times in the following four months after that visit.  *Id.*  Based on records Cardinal produced to

DEA, the date and amount of the adjustments were:

  a. April 26, 2011:  207,200 to 245,000

  b. April 27, 2011: 245,000 to 265,000

  c. May 26, 2011: 265,000 to 317,000

*Id.*  These increases constituted a 65% increase in Cardinal's authorized shipment volumes of

oxycodone over a two month period.  *Id.*  ¶ 30(i).

  **5.**  <u>**Inadequate site visits.**</u>

   Based on the evidence provided to DEA, Cardinal did not conduct any on-site store

investigations of either CVS #219 or CVS # 5195 prior to being served with the investigative

warrant.  Carter Dec. ¶¶ 12, 21.  Cardinal responds that it simply relied on CVS's anti-diversion

program, Br. at 21-22, even though DEA had expressly told Cardinal that it did not fulfill its due

diligence obligations simply by relying on CVS's anti-diversion program, and that it should

conduct on-site audits.  Rannazzisi Dec. ¶ 59.  Cardinal provided no evidence that it ever

conducted an in-store visit of CVS # 5195 or CVS # 219 prior to receiving the Administrative

Inspection Warrant.[9]

  **B.**  **Cardinal's Arguments are Unpersuasive**

---

[9] Cardinal now acknowledges that these pharmacies were engaged in diversion "from May
[2011] through October 2011."  Moné Dec. ¶ 55.  Mr. Moné says that he has concluded that
these CVS stores were engaged in improper diversion, noting that "22 doctors accounted for
more than 64% of the oxycodone dispensed by these stores" between May and October 2011.  *Id.*
Although Mr. Moné does not specify when he learned about these practices, he implies that he
only did so after-the-fact (*i.e.*, post-October 2011).  These are the sorts of glaring irregularities
that can go undetected when distributors do not conduct in-store audits — as Cardinal did not for
these CVS pharmacies prior to being served with the investigative warrant.

Cardinal offers a number of arguments as to why DEA's conclusion that its Lakeland

facility poses an "imminent danger to public health or safety" is incorrect.  21 U.S.C. § 824(d).

None is persuasive.

### 1.  Cardinal misapprehends the scope of DEA's concerns

Cardinal's principal argument is that "immediate suspension. . . is not necessary" because

Cardinal "eliminat[ed] any arguable danger to the public health," by suspending distributions to

its top four pharmacies and promising to take action against any pharmacies with suspicious

practices in the future.  Br. 16.  To begin with, Cardinal fails to acknowledge that the DEA's

concerns about Lakeland are not limited to its top four customers.  On its face, the ISO states that

its summary of facts is "non-exhaustive," and further states that Cardinal's conduct "violated the

provisions of the Administrative Memorandum of Agreement" between Cardinal and DEA, in

which Cardinal promised to "maintain effective controls against the diversion of controlled

substances."  This more than meets DEA's obligations to put Cardinal on notice of its concerns,

which is all DEA regulations and case law require.  21 C.F.R. § 1301.37(c) (ISO need only

include a factual "summary").  Cardinal Lakeland's failings with regard to its top four retailers

are only a symptom of its inadequate anti-diversion controls, not the full extent.  Rannazzisi Dec.

¶ 82.  DEA permissibly used the information about Cardinal's practices with respect to its top

four customers to make a broader conclusion about the Lakeland facility's deficiencies.

Cardinal cannot suggest that it was unaware of DEA's broader concerns.  It has had

actual notice of these concerns long before DEA issued its ISO or executed the administrative

investigative warrant.  *Id.*. ¶¶ 59, 61.  Plaintiff, then, gets nowhere by relying on *PRSI

Acquisition Group v. Ashcroft*, No. 02-cv-1020, (D.D.C. May 30, 2002), where the Court granted

a preliminary injunction because the employer had previously fired the "only employee alleged

to have diverted drugs for illegal purposes."  Here, there is no indication that the problems that led DEA to suspend Lakeland are the work of a single rogue employee.  Rather, Lakeland's problems are serious and recurring, giving DEA ample reason to believe that they would continue absent an immediate suspension.[10]

### 2. __Cardinal's Primary Arguments on the Merits Are Based On Evidence And Representations That Were Not Before DEA When It Issued The Suspension Order.__

With respect to the four pharmacies listed in the ISO, Cardinal bases much of its argument against DEA's suspension decision on facts that the agency did not have before it and could not have considered in reaching its decision.  In its papers, Cardinal says that it "temporarily suspended distributions to the two named CVS pharmacies" pending this Court's decision.  Br. 16.  But as the representations of Cardinal's counsel confirm, Cardinal decided to "temporarily shut down" its distributions "*[a]fter receiving* the *order* from the DEA [on Friday] morning*,*" February 3, 2012.  *See* Att. 45, TRO Hr'g Tr. at 6:18-22.  This after-the-fact gesture

---

[10] Cardinal also attempts to minimize the scope of DEA's concerns by noting that "DEA has not alleged that Cardinal Health or its employees illicitly sold or otherwise distributed controlled substances" to anyone other than "customers with active, valid DEA registrations."  Br. 23.  This proves nothing.  The CSA does not require DEA to show that a distributor has sold drugs to non-registrants prior to issuing an ISO — a fact that surely is not lost on Cardinal.  As discussed, Cardinal saw four of its facilities — including Lakeland — suspended for 10 months and paid the biggest civil fine in U.S. history to settle allegations even though DEA did not allege that Cardinal had distributed controlled substances to customers without valid registrations.

Cardinal's duties under both agency regulations and under its settlement agreement with DEA encompass far more than simply ensuring that all of its customers are DEA-registered.  Just as Cardinal cannot rely on the due diligence of one of its customers to satisfy its due diligence obligations, *see* Rannazzisi Dec. ¶ 59, Cardinal cannot rely on its customers' DEA registrations to conclude that its distributions do not pose a risk of diversion, *Id.* ¶ 30.

has no bearing on whether DEA's conclusion about imminent harm was arbitrary and capricious. *See Walter O. Boswell Memorial Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984).[11]

This is not to suggest that all of Cardinal's efforts to shore up its anti-diversion practices have come in the wake of the ISO, as Cardinal's suspensions of Gulf Coast and Caremed attest. At the same time, its recent efforts to bolster its anti-diversion controls must be viewed in context.   Many of Cardinal's compliance efforts occurred only after Cardinal unmistakably knew it was in serious trouble, when DEA issued its investigative warrant.  *See, e.g.*, Rannazzisi Dec. ¶ 81(d)(iii) (Cardinal's only 2 suspicious order reports to DEA regarding CVS both post-date the DEA administrative warrant).  For obvious reasons, Cardinal minimizes the broader past and emphasizes the very recent.  But there is simply nothing arbitrary and capricious about DEA basing its harm determination on the longer view.  *See Easy Returns Worldwide, Inc.*, 266 F. Supp. 2d 1014, 1021 (E.D. Missouri 2003) (rejecting argument that recent reforms undermine DEA's grounds for issuing a suspension order).

### 3. <u>DEA Did Not Unduly Delay Issuing Its ISO to Cardinal.</u>

Shifting course, Cardinal next argues that if DEA were going to suspend it, it should have done so long before now.  This "delay in imposing the ISO," Cardinal argues, "alone is reason enough to grant the preliminary injunction.  Br. 24-25.  But courts have previously rejected similar arguments that delay on the part of the DEA in issuing a suspension order undermines its justification for doing so.  See *United Prescription Services*, 2007 WL 152664, at *4 (rejecting

---

[11] In a similar vein, the fact that DEA issued a suspension order against the two CVS pharmacies the day after the Cardinal ISO has no bearing on this Court's analysis of Cardinal's ISO.  Br. 25 at n.11.  It is true that DEA knew of its plans to suspend CVS at the time it issued the Cardinal ISO.  But just because DEA knew it would take action against two of Cardinal's primary customers does not mean that Cardinal itself did not pose an imminent threat to public safety.  Holding otherwise would thwart DEA's ability to undertake a concerted enforcement effort against a distribution chain where multiple parties have inadequate diversion controls.

argument that year-long agency delay proved that registrant's operations posed no danger to the public when delay was attributable to "DEA's ongoing negotiations with [registrant's] counsel); see also *Neil Laboratories v. Ashcroft*, 217 F. Supp. 2d 80, 87 (six-month agency delay did not undermine agency's showing of imminent public harm when delay was "justified by [an] ongoing criminal investigation.").

DEA does not take the decision to issue an ISO lightly.  As with any registrant, DEA's first course of action was not to suspend Lakeland.  Rather, DEA preferred to continue to work with Lakeland in the hopes that its anti-diversion efforts would become consistently adequate. Rannazzisi Dec. ¶¶ 35, 59, 61.[12]  But once DEA did decide that more drastic action might be necessary, it needed time to gather information to support an Administrative Investigation Warrant, evaluate the data it received from that warrant, investigate suspicious sales at Cardinal's pharmacy customers, and coordinate its enforcement efforts in the months leading up to the Cardinal and CVS ISOs.  Rannazzisi Dec. ¶ 82; see also *id.* at ¶¶ 66-73 (describing materials received).  Cardinal does not mention that it *still* has not compiled in full with DEA's request for documentation, and that it has failed to produce compliance-related communications, documents DEA believes are important to its investigation. Rannazzisi Dec. ¶73.  Based on previous statements made by Cardinal employees relative to suspicious customers and their response, DEA believes that these documents will corroborate those statements and provide evidence critical to DEA's investigation of the Cardinal Lakeland facility.  Cardinal did, however, produce voluminous other documents.  *Id.* ¶ 72.  DEA can hardly be faulted for taking

---

[12] Cardinal's suggestion that DEA has rebuffed its repeated requests for assistance (Br. 10) is unfounded.  *See* Rannazzisi Dec. ¶ 35.

time to evaluate these documents before making the weighty decision to suspend Lakeland's registration.

This reasonable explanation for a comparatively short delay distinguishes this case from *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822 (5th Cir. 1976), where an *unexplained* six- to seven-month delay in DEA's issuance of a suspension order precluded a finding of imminent danger. 529 F.2d at 826, 829; *see also Neil Laboratories*, 217 F. Supp. 2d at 86-87 (distinguishing *Norman Bridge* on grounds that the "DEA present[ed] a reasonable explanation for [its] six-month delay" in issuing the ISO).

### 4. **DEA's Decision Not to Take Other, Less Drastic Measures Was Not Arbitrary and Capricious.**

Cardinal claims that "DEA's ISO is arbitrary and capricious because DEA failed to consider alternative actions more reasonably tailored to addressing its diversion concerns." Br. 25.  Cardinal suggests, for example, that DEA could have revoked the practitioner's registrations or taken action only against the pharmacies.  This attempt to pass Cardinal's due diligence requirements down to a lower level of the supply chain is not enough to show that the agency acted unreasonably.  Cardinal has its own set of obligations as one of the state's largest controlled substance distributors, Rannazzisi Dec. ¶¶ 9, 10 (citing regulations), and DEA permissibly chose to cut the supply chain off at the level where the threat to public harm was greatest.

Cardinal also maintains that DEA could have addressed the oxycodone abuse problem in Florida by "providing information to Cardinal Health . . . to help them identify diverters of controlled substances."  Br. 25.  DEA cannot, however, distribute proprietary business information to the public, both because of its obligation to respect DEA registrants'

confidentiality and because doing so could interfere with ongoing law-enforcement measures.

Rannazzisi Dec. ¶40.

Cardinal next argues that the Court should find DEA's decision regarding imminent harm arbitrary and capricious because Cardinal now pledges to "stand[] ready and willing to cease distributions to any customer that poses an undue risk of diversion."  Br. 16.  But in light of Cardinal Lakeland's persistent compliance problems, which began with the events leading up to the 2008 settlement agreement and continue to the present, DEA "rationally . . . conclud[ed] that past performance is the best predictor of future performance." *ALRA Laboratories*, 54 F.3d at 452.  DEA's decision not to take Cardinal's word for it when it promised to improve rested well within the bounds of agency discretion.  *ALRA Laboratories, Inc. v. Drug Enforcement Admin.*, 54 F.3d 450, 452 (7th Cir. 1995) (agency was not arbitrary and capricious in denying manufacturer's application for a new license, despite the manufacturer's insistence that it had resolved its past compliance issues).[13]

### 5.  Cardinal's Remaining Arguments Constitute An Improper Attempt To Litigate the Administrative Hearing In This Forum.

In the remainder of its likelihood-of-success argument, Cardinal elaborates on its anti-diversion policies in great detail.[14]  But whatever the validity of Cardinal's claims, they go to the

---

[13] For good reason, Cardinal does not argue that DEA acted arbitrarily and capriciously in failing to limit its suspension order to oxycodone.  The scope of the suspension order is vested to DEA's discretion, *see* 21 U.S.C. § 824(b), and DEA hardly abuses its discretion in concluding that one who inadequately monitors the distribution of one controlled substance would behave similarly in distributing other controlled substances.

[14] Cardinal argues that its anti-diversion measures are more rigorous than DEA's, Br. 2, observing that it has terminated dealings with various entities that retain DEA registrations.  It is unclear whether all of the terminations Cardinal touts were based on its concern about improper diversion, or for other unrelated reasons.  More fundamentally, as a private party Cardinal is not

question the ALJ must decide.  The merits question before this Court is different.  All the Court

must decide here is whether the DEA unreasonably concluded, on February 2, 2012, that

Cardinal's distributions posed an imminent threat to public health or safety.  That does not

require this Court to explore the extensive evidence Cardinal presents about its company-wide

policies.  It requires only that the Court consider what the DEA knew at the time it issued the

order, and determine whether its conclusion about imminent harm was arbitrary and capricious.

*See Walter O. Boswell Memorial Hosp.*, 749 F.2d at 792.  The failings identified in the preceding

section are sufficient to clear that modest hurdle.  The Court should decline Cardinal's invitation

to conduct any inquiry more searching than that.  Accordingly, Plaintiff has not demonstrated a

likelihood of success on the merits.

## II.    PLAINTIFF HAS NOT ESTABLISHED THAT IT IS LIKELY TO SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

Equitable relief is an "extraordinary remedy that may only be awarded upon a clear

showing that the plaintiff is entitled to such relief."  *Winter v. National Resources Defense*

*Council, Inc.*, 555 U.S. 7, 22 (2008).  A plaintiff seeking a preliminary injunction must overcome

the "considerable burden" of putting on "proof that the movant's injury is *certain, great and*

*actual* — not theoretical — and *imminent,* creating a clear and present need for extraordinary

equitable relief to prevent harm."  *National Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50

(D.D.C. 2011) (Walton, J.) (quoting *Power Mobility Coal. v. Leavitt,* 404 F. Supp. 2d 190, 204

(D.D.C. 2005) (Walton, J.)) (emphasis in original).  "Bare allegations of what is likely to occur

are of no value since the court must decide whether the harm will *in fact* occur."  *Wisconsin Gas*

*Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (emphasis in original).

---

bound by the strictures of due process, which enables it to terminate entities (for whatever
reason) with much greater ease than the DEA.

"In this Circuit, it is 'well settled that economic loss does not, in and of itself, constitute irreparable harm.'" *National Min. Ass'n*, 768 F. Supp. 2d at 50 (quoting *Wisc. Gas*, 758 F.2d at 674). As this Court has stated, "*only* economic loss that threatens the survival of a movant's business amounts to irreparable harm." *Power Mobility Coal. v. Leavitt,* 404 F. Supp. 2d at 204 (emphasis added). Plaintiff comes nowhere close to meeting its "considerable burden" to demonstrate irreparable harm, nor could it.

Plaintiff is one of the twenty largest companies in America.[15] According to its filings with the Securities and Exchange Commission for fiscal year 2011, Cardinal has revenues in excess of $102 billion,[16] and profits in excess of $1.5 billion.[17] Cardinal has 25 distribution facilities that currently hold DEA registrations, of which Lakeland is only one. *Cf.* Compl. ¶ 43 (other distribution centers include Greensboro, North Carolina; Madison, Mississippi; and Denver, Colorado). The ISO is limited to Plaintiff's Lakeland facility, and thus, even in the absence of an injunction, it will remain free to distribute controlled substances from these and any other of its facilities that also hold the requisite DEA registration. The most that will occur is that Plaintiff may have to re-route controlled substances through Plaintiffs' other distribution facilities. *Id.* This re-routing, Plaintiffs argue, will cause "delays in the receipt of controlled substances by Cardinal Health's Florida customers," and "[t]hose customers, who are accustomed to receiving next day shipments from the Lakeland facility, will have to wait up to

---

[15] *See* http://ir.cardinalhealth.com/phoenix.zhtml?c=105735&p=irol-irhome (Cardinal Health, Inc. website describing itself as "a Fortune 19 company").

[16] Cardinal Health, Inc. 10-K for FY 2011, page 22, *available at*: http://ir.cardinalhealth.com/phoenix.zhtml?c=105735&p=irol-reportsAnnual.

[17] Cardinal Health, Inc. 10-K for FY 2011, page 25, *available at*: http://ir.cardinalhealth.com/phoenix.zhtml?c=105735&p=irol-reportsAnnual.

three days from the Denver facility and two days for shipments from other facilities." *Id.* "As a result," Plaintiffs predict, "some Lakeland facility customers will likely leave Cardinal Health permanently for other distributors." *Id.* ¶ 44.

In support of its assertions of irreparable harm, Plaintiffs rely on the Declaration of Jon Giacomin, President of U.S. Pharmaceutical Distribution for Cardinal Health ("Giacomin Dec."). Mr. Giacomin's declaration does not transcend speculation, as it is states that it is "anticipated that some of Cardinal Health's Florida customers experiencing service delays will leave Cardinal Health for other distributors . . ." Giacomin Dec. ¶ 20.

To begin with, Mr. Giacomin does not explain why *any* delays would necessarily occur, given Cardinal's extensive network of distribution facilities. Cardinal notes that shipments that Lakeland would normally fill within 24 hours could take up to three days if Cardinal has to re-route shipments through Denver. But Cardinal does not explain why it would be logical to serve Lakeland's customers, who are located in Florida, Georgia, and South Carolina, Compl. ¶ 21, out of its Denver, Colorado facility, when Cardinal has distribution facilities much closer, including in Mississippi and North Carolina. *Id.* ¶ 43. Even Cardinal's CEO, George Barrett, does not seem to think that makes any sense: He has already stated that in the event of Lakeland's suspension, Cardinal would serve customers out of its Mississippi distribution facility. Att. 46. In any case, the "remote and speculative" nature of these asserted harms is reason enough alone to deny the preliminary injunction. *Power Mobility Coal.,* 404 F. Supp. 2d at 204-05 (noting that "a plaintiff's failure to meet its burden of establishing irreparable harm is sufficient, in itself, to deny emergency relief" and denying preliminary injunction) (citing *City Fed.*, 58 F.3d at 747).

Even if this Court were to credit Mr. Giacomin's speculation about the potential loss of "some customers," Br. 27, Cardinal still would not have carried its burden to show that the

economic harm it predicts will befall it would be irreparable.  Indeed, Mr. Giacomin does not allege that any customer loss that may occur due to re-routing will "threaten[] the survival of [Plaintiff's] business," *Power Mobility Coal. v. Leavitt,* 404 F. Supp. 2d at 204, nor could he credibly do so.

First, just hours after DEA issued its ISO, and before this Court issued the temporary restraining order, Cardinal CEO George Barrett informed investors that Cardinal was *not* adjusting its fiscal guidance for FY 2012. *See 3rd Update: Cardinal Health Protests DEA Suspension For Florida Facility*, <u>Wall Street Journal</u>, February 3, 2012 (Att. 47).[18]  In other words, Cardinal did not believe that even its short-term financial interests would be materially affected by the suspension of a single distribution facility, to say nothing of its longer-term viability.

Second, and more importantly, Cardinal has previously survived an even more widespread suspension.  DEA previously suspended three of Cardinal's distribution facilities — including Lakeland — for approximately ten months.  *See* Giacomin Dec. ¶ 3 (suspension of "several" distribution centers).  Plaintiff's continued existence as a going concern in 2012 attests that this suspension was not irreparable.

As a Cardinal executive who "oversaw pharmaceutical distribution operations" the year DEA suspended the registrations of three Cardinal facilities, Giacomin Dec. ¶ 22, Mr. Giacomin is in a position to provide more than speculation about the effect of the current ISO in terms of customer defection or other harm to Cardinal.  Tellingly, however, he demurs.  He does not attempt to quantify the economic impact of this lengthy prior suspension of multiple facilities.

---

[18] Wall Street appeared similarly nonplussed by news of the ISO.  Cardinal's shares were essentially flat on February 3, 2012, the day the public learned of the ISO, closing down just 0.4%, to $42.05.  *See id.*

All he says is that Cardinal lost "some" customers due to these suspensions.  Giacomin Dec.

¶ 22.  He provides no information about the costs Cardinal claims will be associated with re-

routing, other than to forecast that they will be "substantial" in terms of "effort and resources."

*Id.* ¶ 7.  In short, Cardinal has provided no detail about the harm that might result — *even though*

*Cardinal has suffered this precise harm (and more) before.*  Cardinal's unwillingness or inability

to provide specific financial details regarding the economic impact of the prior suspensions

suggests that any harm it might suffer will not, in fact, be irreparable.

    All of this is perhaps why Plaintiffs characterize their injuries in substantial part in terms

of lost goodwill.  *See* Giacomin Dec. ¶ 20 (reputational injury).  This argument fares no better.

The Supreme Court has held that claims of loss of income and damage to reputation do not

establish irreparable harm in the context of a motion for emergency injunctive relief.  *Sampson v.*

*Murray*, 415 U.S. 61, 91-92 (1974).  Consistent with *Sampson*, courts in this jurisdiction have

repeatedly held that "[t]he loss of business opportunities, market share, and customer goodwill

are typically considered to be economic harms."  *Air Transport Association of America, Inc. v.*

*Export-Import Bank of the United States*, 2012 WL 119557 at *6 (D.D.C. January 13, 2012)

(citing *National Ass'n of Mortgage Brokers v. Board of Governors of the Federal Reserve*

*System*, 773 F. Supp. 2d 151, 182 (D.D.C. 2011) (regulation that "will cause many mortgage

brokers to lose their jobs or close their business" identified as "purely economic injury");

*Berman v. DePetrillo*, No. 97-70, 1997 WL 148638, at *2 (D.D.C. Mar. 20, 1997) ("loss of

market" and "loss of business opportunity" identified as "purely economic injury"); *Clipper*

*Cruise Line, Inc. v. U.S.*, 855 F. Supp. 1, 4 (D.D.C. 1994) (identifying loss of "profits" and

"goodwill" as economic loss)).  No different rule can or should obtain.  Virtually every adverse

determination (whether a non-selection, a suspension, a censure, or a revocation) involving a

business has a detrimental impact on that business, which could always be phrased in terms of goodwill or reputational harm.  If this sort of labeling were enough to render such injuries non-economic in nature, the general rule that monetary injury does not constitute irreparable harm for preliminary injunction purposes would be an empty formality.

Plaintiffs also suggest that because their economic loss may not be recoverable, it is therefore irreparable.  Br. 30.  But that is not the law.  As this Court held in *National Min. Ass'n v. Jackson*, 768 F. Supp. 2d at 53, "the mere fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm."  Cardinal's proposed standard for irreparable harm "would also effectively eliminate the irreparable harm requirement," in government cases, as "[a]ny movant that could show any damages against an agency with sovereign immunity — even as little as $1 — would satisfy the standard."  *Air Transport Association of America*, 2012 WL 119557 at *7.  Courts in this jurisdiction have repeatedly rejected this argument.  *See National Shooting Sports Foundation, Inc. v. Jones,* No. 11–1401, 2011 WL 3875241, at *3 n.5 (D.D.C. Sept. 2, 2011) ("Taken out of context, the district court's statement [in *Smoking Everywhere*] that 'any loss of income' that cannot be recovered is irreparable is overbroad.  The Circuit clearly requires that harm be both certain and great.") (citing *Wisconsin Gas,* 758 F.2d at 674); *Coalition for Common Sense,* 576 F. Supp. 2d at 170 n.3 (D.D.C. 2008) (rejecting argument that financial losses rendered unrecoverable by sovereign immunity constituted irreparable injury in that case).

Finally, Cardinal also argues that Lakeland's suspension would irreparably harm the legitimate end consumers Lakeland serves who might have to delay treatment due to distribution delays.  Giacomin Dec. ¶¶ 10-13.  In light of the modest delays Cardinal forecasts — getting shipments in 2 days rather than 1 — Cardinal's customer harm arguments are overstated.  And in

truly dire, time-sensitive situations, Cardinal does not explain why expedited delivery would be out of the question.  When the Cardinal Lakeland facility was previously suspended, Cardinal was able to fill and distribute orders to its Florida-based customers.  Rannazzisi Dec. ¶ 47. Furthermore, other suppliers could easily fill whatever need for controlled substances that Cardinal could not adequately meet.  Att. 7 at 2 (other distributors in Florida who control approximately 75% of distribution volume).  Accordingly, Plaintiff has failed to demonstrate that it will suffer irreparable harm in the absence of an injunction.[19]

## III.    DEA Would Be Substantially Injured By Entry Of A Preliminary Injunction

As the party seeking relief, Cardinal must show that the DEA would not be unduly harmed by the entry of a preliminary injunction.  In this respect, Cardinal advances two arguments.  First, it argues that the continued operation of its Lakeland facility would harm "no one, including DEA," because Cardinal no longer distributes controlled substances to the pharmacies identified in the ISO."  Br. 28.  As discussed previously, this argument misapprehends the scope of DEA's concerns regarding Lakeland in issuing the ISO.

Cardinal responds that "it stands ready and willing to suspend shipments to any pharmacy DEA identifies as likely to be engaged in diversion."  But that is not how due diligence works. Lakeland has a continuing, affirmative obligation to police its retail customers to ensure that

---

[19] Cardinal also argues that "[t]he harm to [itself] and its customers cannot be repaired if Cardinal Health . . . must wait to seek restoration of its registration through DEA's administrative process."  Br. 28.  Absent some lengthy and unexplained delay not present here, "[t]he usual time and effort required to pursue an administrative remedy does not constitute irreparable injury."  *Randolph-Sheppard Vendors of America v. Weinberger*, 795 F.2d 90, 108 (D.C. Cir. 1986); *see also Sears, Roebuck & Co. v. NLRB.*, 473 F.2d 91, 93 (1973) ("Irreparable harm cannot be established by a mere reliance on the burden of submitting to agency hearings. This is a risk of litigation that is inherent in society, and not the type of injury to justify judicial intervention.").  Nor is there any reason to credit Cardinal's speculation that it may languish indefinitely in the administrative process.  DEA has scheduled an administrative hearing for April 3, 2012, just two months after serving Cardinal with the ISO.  Rannazzisi Dec. ¶ 84.

controlled substances it provides are not being unlawfully diverted — an obligation Lakeland in no way fulfills by asking DEA to perform the very due diligence that Lakeland is both legally and contractually obligated to perform.  21 U.S.C. § 823(b)(1); Att. 12.   The CSA and its implementing regulations require distributors such as Lakeland to be a proactive line of defense against diversion, not an entity that waits for DEA to tell it who and where to investigate.

In addition to misapprehending the full measure of DEA's concerns, Cardinal's arguments raise troubling implications more generally.  If a distributor could thwart an ISO by pledging to stop distributing controlled substances to retailers named in an ISO — even after the fact, as was the case here with the two CVS facilities — DEA's § 824(d) powers would be gutted.  DEA would have to marshal its entire case before issuing a pre-hearing suspension.  That is plainly not what Congress intended, as it expressly gave DEA the authority to suspend a registrant's authority to distribute controlled substances before an administrative hearing if the registrant's continued operation would pose an "imminent danger to public health and safety." 21 U.S.C. § 824(d).

Cardinal next argues that DEA's argument about the Lakeland's danger to the public is undercut by DEA's failure to suspend Lakeland promptly, noting that DEA waited "over three months" to issue the ISO after it served the Administrative Inspection Warrant on October 25, 2011.  Br. 31.  As discussed more fully above, *see supra* at I.B.3, the agency's reasonable delay does not undermine the danger to the public created by Cardinal's inadequate anti-diversion controls.  As to any harm to Cardinal, DEA has previously explained why any harm Cardinal might suffer due to a pre-suspension hearing will be slight, if any.  *See supra* at II.  For these reasons, Cardinal has failed to demonstrate that the balance of harms cuts in its favor.

**IV.     The Public Interest Requires That Cardinal Follow The Dispute Resolution Procedures Congress Established**

The final factor this Court must consider is the public interest.  The illegal diversion of prescription drugs is a problem of surpassing importance in general and in Florida in particular. Rannazzisi Dec. ¶ 15.  DEA, in combating this epidemic, is "presume[d]" "to act in the public interest."  *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988); *Pyramid Real Estate Services, LLC v. United States*, 95 Fed. Cl. 125, 140 (2010) ("longstanding presumption that government officials act in good faith and in the public interest when carrying out their duties").  For its part, Cardinal surely disputes the validity of the DEA's underlying reasons for declaring its Lakeland facility's continued operation an imminent threat to public health or safety.  But in the absence of bad faith or gross negligence not even alleged here, such disagreement does not overcome the presumption that DEA officials acted in good faith and in the public interest in making this determination.

Cardinal's disagreement with DEA's suspension decision is reason why it should seek to vindicate itself through the administrative process, not a reason for disregarding the administrative process altogether.  As the D.C. Circuit made clear in *Weinberger*, "the statutory dispute resolution mechanism is properly viewed as part and parcel of the right granted appellants under the Act.  By creating such a statutory [] scheme, Congress must have contemplated that with the benefit of the statutory right, appellants should accept the relative burden of an administrative, as opposed to an immediate judicial, remedy."  *Weinberger*, 795 F.2d at 109.  Having chosen to distribute substances regulated by Congress, it must accept the dispute resolution system Congress expressly established to resolve disagreements arising out of such distribution.

Where, as here, the DEA exercises its congressionally-granted discretion to suspend the registration of a distributor of a controlled substance pursuant to § 824(d), Congress has required that the DEA immediately initiate administrative proceedings.  *See* 21 U.S.C. § 824(d) (prehearing suspension requires "simultaneous . . . institution of proceedings under this section"). While DEA regulations flesh out the contours of the administrative review process, Congress has established by statute the basic process by which challenges to § 824(d) suspensions should be resolved.  Plaintiff has not demonstrated any reason why this Court should effectively allow Plaintiffs to opt out of the administrative process Congress has designed, particularly given DEA's expectation that it will complete administrative proceedings within six months of issuing the ISO. Rannazzisi Dec. ¶ 84.

Unable to rebut either of the presumptions discussed above, Cardinal tries a different approach.  The crux of Plaintiffs' argument is that because diversion will continue even if Lakeland ceases operations, and because Lakeland is less bad than other distributors in preventing illegal diversion, the public would be served by allowing it to retain its registration. Br. 30.  Needless to say, this argument fails.  Plaintiff's assertion that Lakeland's suspension "would not stem the diversion of controlled substances in Florida" is beside the point.  Br. 32.  It is not DEA's burden to show that this suspension will end the problem of prescription drug diversion statewide.  As Cardinal tacitly concedes, DEA does not act improperly by taking steps to *reduce* diversion.  Rather, Cardinal disputes that suspending Lakeland would actually accomplish this objective.  Cardinal speculates that "because Cardinal Health's anti-diversion program is one of the best in the company," "the shift [from Lakeland] to other distributors could actually harm the public."  *Id.* at 30.  Whatever the validity of Cardinal's boasts about its anti-diversion measures more broadly, that is not at issue.  Lakeland's efforts are.  Lakeland has a

demonstrated track record of inadequate anti-diversion efforts, which problems evidently continue.  Rannazzisi Dec. ¶¶ 47-51, 82-84.  Cardinal's argument about the relative effectiveness of other distributors' anti-diversion measures, apart from being purely speculative, is also dubious.  When Lakeland lost its registration in 2007 and 2008, problems related to hydrocodone drug diversion in Florida decreased.  *Id.* ¶ 47.  As before, DEA has ample reason to believe that the public would be better served by Lakeland's ceasing operations unless and until it can adequately fulfill its responsibilities to prevent diversion of control substances it distributes.  For all of these reasons, the public interest cuts decisively in favor of denying Plaintiff's request for a preliminary injunction.  *Winter v. Natural Resources Def. Council*, 555 U.S. 7, 24 (2008) ("[C]ourts of equity should pay particular regard for public consequences in employing the extraordinary remedy of injunction.") (citations omitted).

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully ask that this Court deny Plaintiff's

Motion for a Preliminary Injunction.

Dated:  February 10, 2012


Washington, D.C.                    Respectfully submitted,

                                    TONY WEST
                                    Assistant Attorney General
                                    ARTHUR R. GOLDBERG
                                    Assistant Branch Director
                                    United States Department of Justice
                                    Civil Division, Federal Programs Branch

                                    *C. Lee Reeves*
                                    C. LEE REEVES
                                    LAURA EDDLEMAN HEIM
                                    Trial Attorneys
                                    United States Department of Justice
                                    Civil Division, Federal Programs Branch
                                    20 Massachusetts Ave., N.W., Room 7308
                                    Washington, D.C.  20530
                                    Tel: (202) 514-4805
                                    Fax: (202) 616-8470

                                    *Counsel for Defendants*