## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CARDINAL HEALTH INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:12-cv-185 (RBW) |
| | ) | |
| | ) | |
| ERIC HOLDER, JR., ATTORNEY | ) | |
| GENERAL, et al., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF JOSEPH RANNAZZISI

I, Joseph Rannazzisi, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1. I am currently the Deputy Assistant Administrator for DEA's Office of Diversion Control. In that capacity I coordinate the day-to-day operations of the Diversion Control Program; brief representatives from the pharmaceutical industry, members of Congress, executive staff at the Department of Justice and the Office of National Drug Control Policy, as well as the general public on the national epidemic of prescription drug abuse and the diversion of controlled substance pharmaceuticals.

2. I am a Special Agent of the United States Department of Justice, Drug Enforcement Administration (DEA) and have been employed by the DEA since 1986. Additionally, I have a Bachelor of Science Degree in Pharmacy and am a licensed pharmacist. I also hold a Juris Doctorate from the Detroit College of Law at Michigan State University.

3.  The matters contained in this declaration are based upon my personal knowledge, training, and experience, and upon conclusions and determinations reached by me.  I participated in the decision-making process that led to the issuance of an Immediate Suspension Order against Plaintiff Cardinal Lakeland.  The contents of the declaration, including history, facts, conclusions, and determinations, formed the basis for the Administrator's decision to issue the ISO.

## Regulatory Scheme

4.  The Food and Drug Administration generally regulates pharmaceutical drugs. Congress, however, recognized the need for greater scrutiny over controlled substances, due to their potential for abuse and danger to public health and safety.  As such, it established a separate framework under the Controlled Substances Act (CSA), 21 U.S.C. § 801 *et seq.*, and implementing regulations, that creates a closed system of distribution for all controlled substances and listed chemicals.  *See* H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566

5.  Congress therefore established a comprehensive regulatory scheme in which controlled substances are placed in one of five "Schedules" depending on their potential for abuse, the extent to which they may lead to psychological or physical dependence, and whether they have a currently accepted medical use in treatment in the United States.  *See* 21 U.S.C. § 812(b).  Controlled substances in "Schedule I" have a "high potential for abuse," "no currently accepted medical use in treatment in the United States," and a "lack of accepted safety for use under medical supervision." 21 U.S.C. § 812(b)(1)(A)-(C).  Controlled substances in Schedule II do have "a currently accepted medical use in treatment in the United States or a currently

2

accepted medical use with severe restrictions, but still have "a high potential for abuse." "Abuse of the drug or other substances may lead to severe psychological or physical dependence." 21 U.S.C. § 812(b)(2)(A)-(C).

6. The CSA gives the Drug Enforcement Administration broad authority to prevent the diversion of pharmaceutical drugs for illicit use. *See* 21 U.S.C. §§ 824(d), 871(a); 21 C.F.R. §§ 1316.65(c) and 1316.67; 28 C.F.R. § 0.104, Appendix to Subpart R, Sec. 7(a).

7. As part of that authority, the DEA Office of Diversion Control regulates every link in the prescription-drug supply chain and is responsible for regulating more than 1.4 million DEA registrants. Every person who manufactures, distributes, dispenses, imports, or exports any controlled substance or who proposes to engage in the manufacture, distribution, dispensing, importation or exportation of any controlled substance shall obtain a registration with DEA. 21 C.F.R. § 1301.11. It is the responsibility of the Office of Diversion Control to ensure that these registrants adhere to all aspects of the CSA and implementing regulations and to take action against them when they are out of compliance.

8. The closed system of the CSA is specifically designed with checks and balances between registrants to ensure that controlled substances are not diverted from this closed system.

9. Specifically, with respect to distributors, registrants are required to "maintain ... effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels...." 21 U.S.C. § 823(b)(1) (detailing the obligation of distributors of controlled substances in Schedule I or II).

3

*See also* 21 U.S.C. § 823(e)(1) (detailing the obligation of distributors of controlled

substances in Schedules III, IV, or V, to include "maintenance of effective controls

against diversion of particular controlled substances into other than legitimate

medical, scientific, and industrial channels").   With respect to distributors, "The

registrant shall design and operate a system to disclose to the registrant suspicious

orders of controlled substances.… Suspicious orders include orders of unusual size,

orders deviating substantially from a normal pattern, and orders of unusual

frequency." 21 C.F.R. § 1301.74(b).

10. When registrants at every level—practitioners, pharmacies and distributors—fail to

fulfill their obligations, these necessary checks and balances collapse. Because

distributors handle such large volumes of controlled substances, and are the first

major line of defense in the movement of legal pharmaceutical controlled substances

and List I Chemicals from legitimate channels into the illicit market, it is incumbent

on distributors to maintain effective controls to prevent diversion of controlled

substances.  Should a distributor deviate from these checks and balances, the closed

system created by the CSA collapses.

11. When a distributor maintains multiple locations for distributing and selling controlled

substances, it generally must obtain a separate registration for each location. *See* 21

U.S.C. § 822(e); 21 C.F.R. § 1301.12(a).  This is necessary so that the DEA can

identify and inspect all locations from which controlled substances are distributed.

12. When a distributor is not adhering to its legal obligations, the DEA has authority to

revoke or suspend its registration. *See* 21 U.S.C. § 823(b) and (e) (describing that

issuance of a distributor's registration must be consistent with the public interest, as

determined by the following five factors: (1) maintenance of effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels; (2) compliance with applicable State and local law; (3) prior conviction record of applicant under Federal or State laws relating to the manufacture, distribution, or dispensing of such substances; (4) past experience in the distribution of controlled substances; and (5) such other factors as may be consistent with the public health and safety). Ordinarily, DEA must hold a hearing prior to revocation or suspension of an entity's registration. But when the DEA has reason to believe that a registrant's continued operation would pose "an imminent danger to the public health or safety," DEA has discretion to suspend that party's registration immediately, prior to an administrative hearing. 21 U.S.C. § 824(d). DEA must provide the basis for its suspension in an Order to Show Cause. 21 C.F.R. § 1309.44(a). A § 824(d) suspension remains in effect until the DEA issues a final order, unless the suspension is withdrawn by the Attorney General or dissolved by a court of competent jurisdiction. 21 U.S.C. § 824(d).

### The Rampant Problem of Controlled Substance Diversion for Illicit Use

13. Prescription drug abuse occurs in the United States at an alarming rate. The 2010 National Survey on Drug Use and Health reveals that approximately 7 million Americans abuse controlled substance pharmaceuticals for non-medical purposes. *See* 2010 National Survey on Drug Use and Health Survey, (2010 Survey) available at http://www.samhsa.gov/data/NSDUH/2k10NSDUH/2k10Results.pdf. Second only

to marijuana, controlled substance prescription drugs are abused by more people than cocaine, heroin, hallucinogens and inhalants combined.

14. Of all prescription drugs, narcotic pain relievers such as oxycodone, hydrocodone, and oxymorphone are abused most frequently. Each year, roughly 5.1 million people abuse narcotic pain relievers in the United States. Oxycodone is a Schedule II controlled substance.

15. Over the past several years, DEA has seen two major schemes used to divert powerful and addictive controlled substance pharmaceuticals. First, between 2005 and 2009, hydrocodone, a Schedule III controlled substance, was illegally diverted through rogue Internet pharmacy schemes. Florida was the epicenter for many of the illegal operations whereby tens of millions of dosage units of hydrocodone were diverted to locations across the United States. For reference, a dosage unit is most commonly applied to a tablet. It is the main ingredient, expressed in milligrams or milliliters (liquids), in combination with other ingredients, binders and fillers. Congress reacted to the plethora of rogue Internet pharmacies with the passage of the Ryan Haight Online Pharmacy Consumer Protection Act that took effect in April 2009. This action along with intensified law enforcement actions virtually eliminated domestic-based rogue Internet pharmacies.

16. Second, beginning in late 2008 and continuing to the present, there has been a significant rise in the number of rogue pain clinics whose complicit doctors initially dispensed millions of dosage units of oxycodone, a Schedule II controlled substance, 21 C.F.R. § 1308.12(b)(1)(xiii), more potent than the hydrocodone that was previously dispensed through the rogue Internet operations. Again, Florida was and

remains the epicenter for these illegal pain clinics.   DEA, State and local law
enforcement investigations reveal that thousands of drug seekers flock to these
Florida-based pain clinics to obtain their supply of oxycodone, and other controlled
substances such as alprazolam, which is in turn illegally redistributed in states along
the entire east coast and Midwest.

17. Florida has attempted to address this problem through a patchwork of legislation.
Some of the more current state legislation has placed a restriction on a physician's
ability to dispense oxycodone from the clinic.   The illicit pain clinics responded by
issuing prescriptions for oxycodone rather than dispensing directly to the drug seeker.
DEA and other law enforcement agencies saw an immediate and significant increase
in the volume of oxycodone dispensed from various pharmacies across the state.
DEA registered pharmacies are generally supplied by DEA registered wholesale
distributors such as Cardinal Lakeland.

18. The illicit pain clinics, the pharmacies that fill their scripts, and the wholesale
distributors who supply pharmacies without appropriate due diligence (including
Cardinal Health's Lakeland, Florida, distribution center), have caused, and continue
to cause, millions of dosage units of oxycodone and other controlled substances to be
diverted and pose an imminent threat to the public health and safety.   According to
the Florida Medical Examiner's Office, they have seen a 345.9% increase in the
number of overdose deaths associated with oxycodone between 2005 and 2010.   For
2010, their data showed that approximately 4,091 persons died in Florida alone from
an overdose caused by just five drugs: methadone, oxycodone, hydrocodone,

benzodiazepines, or morphine. This is an average of 11.2 persons dying in the state of Florida every day from just these five drugs alone.

19. Furthermore, the abuse of prescription drugs is not isolated to just one drug. Abusers and addicts routinely abuse prescription drugs in combination with one another to enhance the effects. This activity significantly increases the risk of potential harm to the individual. This combination is often referred to as the "trinity" or "holy trinity," hydrocodone or oxycodone used in combination with alprazolam (a benzodiazepine) and carisoprodol. According to the Florida Medical Examiner's Office, they have seen a 127% increase in the number of deaths associated with benzodiazepines in the State of Florida between 2005 and 2010.

20. From approximately February 2009 through June 2010, monthly oxycodone sales to Florida practitioners steadily increased and well-surpassed the monthly oxycodone sales in the remaining states. In June 2010, DEA took action on wholesale distributors supplying Florida practitioners at rogue pain clinics. Once DEA took action on wholesale distributors, monthly oxycodone sales to practitioners in Florida substantially decreased. Despite this decrease in monthly oxycodone sales beginning in June 2010, Cardinal's sales to its top four Florida retail pharmacy customers, on average, continued to increase. Attachments 1 and 2.

21. During the same time period, Florida has tried to rein in prescription-drug abuse by enacting laws that limit Florida physicians' ability to dispense controlled substances. Until 2010, FLA. STAT. § 465.0276 allowed a practitioner to dispense drugs in the usual course of professional practice so long as s/he was registered as such and paid a $100 fee. The practitioner was subject to the same record-keeping requirements and

periodic inspections as a pharmacy. In 2010, the Florida legislature amended FLA. STAT. § 465.0276 to prohibit a registered practitioner from dispensing more than a 72-hour supply of any controlled substance for any patient who paid for the medication with cash, check or credit card. The law became effective October 1, 2010. Finally, in 2011, the Florida legislature amended the statute a second time to prohibit a practitioner, except in very limited circumstances, from dispensing any controlled substances in Schedules II and III. The law became effective July 1, 2011.

22. On July 1, 2011, the State Health Officer and Surgeon General, Dr. Frank Farmer issued a statewide public health emergency declaration in response to the ongoing problem of prescription drug abuse and diversion in Florida, titled "State Surgeon General Declares Public Health Emergency Regarding Prescription Drug Abuse Epidemic." The press release noted that "In 2010, 98 of the top 100 doctors dispensing Oxycodone nationally were in Florida;" that "In 2010, 126 million Oxycodone pills were dispensed through the top 100 dispensing pharmacies in Florida;" "More Oxycodone is dispensed in the state of Florida than in the remaining states combined." Attachment 3.

23. The changes in the law have changed the way drug abusers obtain oxycodone. Rather than dispensing the drug directly to "patients," pain clinics and complicit doctors now write prescriptions for oxycodone. Drug abusers wanting their prescriptions filled must take their script to a retail pharmacy.

24. Following these changes in the law, law enforcement saw immediate and significant increases in the volume of oxycodone dispensed from retail pharmacies across the state of Florida. Retail pharmacies are generally supplied by a DEA-registered

wholesale distributor.   One such distributor, Cardinal Lakeland, continued to distribute significant amounts of oxycodone to its top four retail pharmacy customers that well-exceeded the average distributions to their own Florida retail pharmacy customers following the changes in the law.  Attachment 4.

25. The doctors and clinics that prescribe oxycodone inappropriately, the pharmacies that dispense their prescriptions, and the wholesale distributors who supply them have caused, and continue to cause, millions of dosage units of oxycodone to be diverted for unlawful use thereby creating an imminent threat to the public health and safety.

## DEA Efforts to Stop Diversion of Prescription Drugs Through Education/Outreach to Distributors:

26. To inform distributors of their obligations under the CSA, the DEA periodically sends guidance letters to all registered distributors and periodically meets with registered distributors as part of its "Distributor Initiative Program." The Program was designed to cut off the source of supply to rogue operations by ensuring that registrants understand and comply with their requirements under the CSA and its accompanying regulations.

27. As stated above, wholesale distributors are required to design and operate a system that would detect suspicious orders and report those suspicious orders to DEA. Through DEA's Distributor Initiative Program, DEA has discussed with registrants, including Cardinal Health, the firm's due diligence responsibilities under the CSA, including:  knowing one's customers, suspicious order monitoring programs, trends in controlled substance abuse, theft and diversion, a thorough review of the distributor's own sales of controlled substances data obtained through DEA Automation of

Reports and Consolidated Orders System (ARCOS), a review of previous civil, administrative and criminal cases against DEA registrants, and how DEA expects the distributor to assist in the fight against the abuse and diversion of legitimately manufactured controlled substances. During these briefings DEA has thoroughly explained the problems in Florida associated with pain clinics, the drugs of abuse, such as oxycodone, hydrocodone, and others used in combination by drug seekers, the cost of this abuse to society, and what the distributor should look for when visiting customers in Florida to determine the legitimacy of their orders.  DEA thoroughly explains what red flags the distributor needs to look for when determining whether to ship controlled substances.  During the briefing DEA further states they expect the distributor to be a good corporate citizen and abide by all the provisions in the CSA and work hand in hand with DEA in fighting the abuse and diversion of controlled substances.

28. DEA provided the distributor briefing to Cardinal Health on or about August 22, 2005.

29. In addition, on or about September 27, 2006, DEA sent a letter to Cardinal Lakeland detailing the distributors' responsibility to ensure that their products are not diverted for illicit use.  The letter reminded distributors that they have "a statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into [illegitimate] channels," and warned that "failure to exercise such due diligence could . . . provide a statutory basis for revocation or suspension of a distributors registration."   Attachment 48

11

30. The September 2006 letter cautioned that "a distributor may not simply rely on the fact that the person placing the suspicious order is a DEA registrant and turn a blind eye to the suspicious circumstances." *Id.* "[M]aintain[ing] effective controls against diversion," the letter continued, requires that "the distributor . . . exercise due care in confirming the legitimacy of all orders prior to filing." *Id.*

31. The September 2006 letter also identified "circumstances that might be indicative of diversion," including customers ordering the same controlled substances from multiple distributors, suggested what distributors might ask to determine whether an order is suspicious, and encouraged distributors to "consider the totality of the circumstances when evaluating an order for controlled substances." *Id.* at 3-4.

32. Customers ordering the same controlled substances from multiple distributors may be indicative of diversion due to the customer ultimately acquiring large amounts of controlled substances through multiple sources. Distributors are unable to access other distributor's information regarding distributions due to the proprietary nature of the information. The customer having multiple sources of distribution may avoid scrutiny by maintaining several sources to obtain controlled substances.

33. The DEA sent a similar letter on or about December 27, 2007. The letter reminded all distributors of their obligation "to maintain effective controls against diversion," and emphasized that "it is the sole responsibility of the registrant to design and operate" a "system to disclose to the registrant suspicious orders of controlled substances." The December 2007 letter highlighted the definition of "suspicious order" in the regulations: Suspicious orders are "orders of unusual size, orders deviating substantially from a normal pattern, and orders of an unusual frequency."

The letter stressed that "[t]hese criteria are disjunctive and are not all inclusive." It explained that "[t]he size of an order alone, whether or not it deviates from a normal pattern is enough to trigger the registrant's responsibility to report the order as suspicious." Attachment 5.

34. The letter also noted that "[r]egistrants that rely on rigid formulas to define whether an order is suspicious may be failing to detect suspicious orders. For example, a system that identifies orders as suspicious only if the total amount of a controlled substance ordered during one month exceeds the amount ordered the previous month by a certain percentage or more is insufficient." *Id.*

35. Additionally, DEA has maintained open communications with Cardinal Health in its efforts to improve its anti-diversion controls at Lakeland and other Cardinal facilities. Since November 3, 2008, Barbara Boockholdt, Office of Diversion Control, Regulatory Section Chief, has received at least sixty-six (66) emails from Cardinal employees Michael Moné and Steve Reardon. Additionally, Ms. Boockholdt has sent at least twenty-seven (27) emails to Cardinal employees. Between February 4, 2009 and October 3, 2011, Cardinal and DEA have exchanged dozens of phone calls. Following a DEA site visit at Cardinal Health in Dublin, Ohio the week of January 26, 2009, DEA and Cardinal have held at least three (3) other face to face meetings with Ms. Boockholdt (November 20, 2009, March 15, 2011, and July 7, 2011).

36. In addition, DEA offers a variety of conferences which are open to DEA registrants, including distributors. In fact, records indicate that Cardinal sent three (3) representatives (including Mr. Moné and Mr. Reardon) to DEA's Pharmaceutical Industry Conference October 14-15, 2009. This conference promotes a closer

13

cooperation between the pharmaceutical industry and DEA. It provides an invaluable forum in which the pharmaceutical registrant community and DEA can engage in candid discussions concerning emerging diversion trends, interpretations of existing regulations and policies, issues requiring regulatory change, and clarifications of DEA policy.

37. DEA also provides presentations to and holds meeting with the industry trade group, Healthcare Distribution Management Association (HDMA) of which Cardinal Health is an active member. Between May 6, 2008 and December 31, 2011, DEA representatives gave presentations to and held meetings with HDMA in Maryland, the District of Columbia, Florida, and Virginia on eleven (11) occasions. And in November 2008, HDMA published a document entitled Industry Compliance Guidelines for use by its members which provided guidance on identifying and reporting suspicious orders and preventing diversion of controlled substances.

## DEA's Collection of Proprietary Data and Monitoring:

38. To monitor the sale and distribution of controlled substances, manufacturers and distributors of controlled substances are required to report to DEA sale and distribution data for Schedule I and II materials; Schedule III narcotic and gamma-hydroxybutyric acid (GHB) materials; and selected Schedule III and IV psychotropic drugs (manufactures only). DEA collects large amounts of this data from its registrants using a computer system known as the Automation of Reports and Consolidated Orders System, or "ARCOS." Manufactures and distributors are not however required to report data on sale or distribution of all controlled substances to

the ARCOS system. All manufacturers and distributors registered with DEA must submit the required data to ARCOS on either a monthly or quarterly basis. ARCOS software enables the government to maintain current and historical data of selected controlled substance inventories and transactions from the point of manufacture to the point of sale, distribution, or other disposition, and finally, to the dispensing (consumption) level.

39. The data that DEA collects and maintains from these manufacturers and distributors is treated as privileged and confidential commercial information. Disclosure of company-specific information could cause competitive harm to the registrant from whom it was obtained and therefore is not permitted to be disclosed to the public. If a formal request for ARCOS information is made pursuant to the Freedom of Information Act (FOIA), the request is evaluated pursuant to the disclosure requirements under the law. *See* 5 U.S.C. 552(b)(4). While DEA has disclosed limited ARCOS data that is not proprietary in nature pursuant to both FOIA and non-FOIA requests as required by law, requests for proprietary information are routinely denied

40. The information that registrants submit to ARCOS is often proprietary, as it includes information about a registrant's sales and customer base. Because of the sensitive nature of the information, the DEA does not permit registrants to access other registrant's information in ARCOS. DEA does not disclose law enforcement sensitive information that may jeopardize on-going investigations and the release of information to a manufacturer or distributor regarding other registrants may jeopardize the due process rights of the registrant at issue. Because of each

15

registrant's right to due process under the CSA, the agency cannot tell a distributor or manufacturer that it cannot distribute controlled substances to another registrant. If, based on that information, a registrant could no longer find a supply of controlled substances, the agency has *de facto*, without due process, impermissibly denied it of its right to handle controlled substances.

### Cardinal Health

41. Plaintiff Cardinal Health, Inc. is one of the nation's largest wholesale pharmaceutical drug distributors. *See* Compl. ¶ 20. Cardinal distributes pharmaceuticals and medical products for dispensing and retail sale. Oxycodone is one of the pharmaceutical drugs that Cardinal distributes.

42. According to DEA's records, there are twenty-five (25) Cardinal Health distributors registered with DEA in the United States, each possessing a separate DEA registration number. In addition to the Lakeland facility, at least two other distribution facilities, by Cardinal's own admissions, possess the requisite standards to meet Florida's pedigree requirements for the distribution of controlled substances into Florida.Giacomin Dec. at ¶ 7.

43. Cardinal Lakeland, located at 2045 Interstate Drive, Lakeland, Florida 33805 is registered with the DEA as a distributor in Schedules II, III, IV and V controlled substances under DEA Registration Number RC0182080. DEA Registration Number RC0182080 expires by its terms on August 31, 2012.

44. In total, 836 controlled substances distributors are registered with DEA, forty-nine (49) of which are registered in the state of Florida.

45. From January through December 2010, the top 25 distributors located in Florida distributed 597,215,253 dosage units of oxycodone to retail registrants in the state of Florida.  For reference, a dosage unit is most commonly applied to a tablet.  It is the main ingredient, expressed in milligrams or milliliters (liquids), in combination with other ingredients, binders and fillers.  Cardinal Lakeland distributed 132,281,020 dosage units of the total oxycodone distributed, or approximately 22% of the total 2010 distributions by the top 25 Florida distributors..  Attachment 6.

46. From January through December 2011, the top 25 distributors located in Florida distributed 572,274,402 dosage units of oxycodone to retail registrants in the state of Florida.  Cardinal Lakeland distributed 146,577,480 dosage units of the total oxycodone distributed, or approximately 25% of the total 2011 distributions by the top 25 Florida distributors.  Attachment 7.

### Cardinal's Prior Suspensions

47. DEA suspended operations at four Cardinal distribution facilities through a series of Immediate Suspension Orders issued between November 28, 2007 and January 30, 2008 based on the DEA's conclusion that they "failed to maintain effective controls against diversion."  Attachments 8, 9, 10.  Following Cardinal Lakeland's suspension, problems related to hydrocodone diversion in Florida decreased in 2007 and 2008.  When the Cardinal Lakeland facility was previously suspended, Cardinal was able to fill and distribute orders to its Florida-based customers through its other distribution centers.

48. DEA also issued an Order to Show Cause to revoke the registration of the Stafford, Texas facility based on "failure to conduct appropriate due diligence." Attachment 11.

49. DEA immediately suspended Cardinal Lakeland based on its conclusion that, for approximately 2 years and two months, between August 2005 and October 2007, the facility "distributed over 8,000,000 dosage units of hydrocodone combination products to customers that it knew or should have known were diverting hydrocodone into other than legitimate medical, scientific and industrial channels." Attachment 9. The ISO noted that, although the average retail pharmacy in Florida distributes "less than 8,400 dosage units of hydrocodone per month," the ten retail pharmacies that Cardinal Lakeland supplied distributed considerably more. Monthly averages at those ten pharmacies ranged from 11,075 dosage units to a high of 287,025 dosage units. The ISO alleged that the "unusual size" of some of the orders, among other factors, should have prompted Cardinal to conclude that the orders "were 'suspicious' as that term is used in" the regulations. *Id.* Cardinal Lakeland and the other facilities ceased all distributions of controlled substances on the date they received the ISOs.

50. In addition to the four Cardinal distribution facilities that received ISOs, DEA also alleged that Cardinal "failed to maintain effective controls against the diversion of controlled substances" at three other facilities. *See* Attachment 12.

51. In total, the DEA had reason to believe that 7 of Cardinal's 27 distribution centers— roughly 25%--were not adhering to their responsibilities as registrants.

## Cardinal's 2008 Memorandum of Agreement with DEA

52. Rather than continue administrative proceedings, Cardinal entered into an Administrative Memorandum of Agreement (MOA) with the DEA on September 30, 2008. Attachment 12.

53. The MOA settled DEA claims against Cardinal arising out of its investigation of the seven (7) distribution centers.

54. In the MOA, Cardinal agreed to "maintain a compliance program designed to detect and prevent diversion of controlled substances as required under the CSA and applicable DEA regulations." Attachment 12. Cardinal agreed, among other things, to have a "Cardinal employee trained to detect suspicious orders" review "orders that exceed established thresholds and criteria," and acknowledged that "the obligations undertaken in this subparagraph do not fulfill the totality of its obligations to maintain effective controls against the diversion of controlled substances." *Id.*

55. The MOA and corresponding settlement also required that Cardinal pay $34 million in civil penalties "in settlement of claims or potential claims for civil penalties made by the United States of America for failing to report suspicious orders of controlled substances." *Id.* at 5. Of that sum, Cardinal agreed to pay $16 million "for conduct alleged to have occurred within the Middle District of Florida," where Cardinal Lakeland is located. *Id.* The remainder was apportioned among the six other districts housing the Cardinal distribution centers at issue, in amounts ranging from $1-8 million. *Id.*

56. Prior to the DEA and Cardinal Health 2008 MOA, the largest civil monetary penalty paid by a DEA registrant pursuant to violations of the CSA was a $13.25 million civil

penalty assessed against McKesson in April 2008.  Standing alone, the civil penalties

assessed against the Lakeland distribution facility surpassed the existing record

settlement in the McKesson case.

57. Cardinal Lakeland's ISO was lifted on October 2, 2008, the effective date of the

MOA Attachment 12.  In total, the Lakeland facility was suspended from distributing

controlled substances for nearly ten months, between December 5, 2007, and October

2, 2008.  During that time, two Cardinal distribution centers were also prohibited

from distributing controlled substances because of their suspensions.

### Notice to Cardinal Health of Diversion Problem

58. At the time of the initial investigation, Cardinal Lakeland's top four retail pharmacy

customers were Holiday CVS, L.L.C., d/b/a CVS/Pharmacy # 00219 ("CVS 219"),

located at 3798 Orlando, Sanford, Florida 32773; Gulf Coast Pharmacy, located at

3685 Doctor's Way, Ft. Myers, Florida 33912; Holiday CVS, L.L.C., d/b/a

CVS/Pharmacy # 05195 ("CVS 5195"), located at 4369 West 1st Street, Sanford,

Florida 32771; and Caremed Health Corporation, d/b/a Brooks Pharmacy

("Caremed"), located at 3501 Health Center Boulevard, Bonita Springs, Florida

34135.

59. DEA has communicated to Cardinal that it is required to conduct its own due

diligence on its retail pharmacy chain customers.  On July 28, 2009, DEA conducted

a compliance review at Cardinal's distribution center located in Peabody,

Massachusetts.  DEA investigators asked the distribution center for due diligence files

from a number of chain pharmacies, but Cardinal could not produce the requested due

diligence files.  Consequently, investigators spoke to Michael Moné, Quality and

Regulatory Affairs ("QRA") Vice President, Anti-Diversion & Supply Chain Services, Dublin, Ohio, via teleconference.  During the teleconference, Mr. Moné stated that Cardinal Health communicates with the loss prevention individuals of chain pharmacies when an order is approaching or exceeding set thresholds and maintains e-mails of the communications.  DEA Staff Coordinator Mike Arpaio communicated to Mr. Moné that due diligence investigations must be performed on all customers, chain pharmacies included, when it appears that suspicious high volume orders are requested of controlled substances and questionnaires should be sent to these chains.  Mr. Moné in turn, stated that QRA is unable to look at chain pharmacy systems in order to identify problem areas when there is not an order of interest or their threshold is not exceeded.  Staff Coordinator Mike Arpaio communicated to Cardinal that chain store due diligence reviews must not be treated any differently than independent retail pharmacy customers.  Mike Arpaio specifically stated that Cardinal's due diligence responsibilities included conducting site visits at chain stores.

60. U.S. distributor registrants are subject to scheduled investigations by Diversion Investigators every three years.  Since 2008, DEA has conducted nineteen (19) scheduled investigations which have resulted in two (2) Letters of Admonition, including further investigation of one of these facilities' due diligence program, an additional two investigations for failure to report suspicious orders, and one investigation for shipping to a registrant other than the registrant that ordered the controlled substances.

61. On July 7, 2011, DEA representatives from DEA Headquarters and the Seattle Field
    Division met with Cardinal Health at DEA Headquarters to discuss the firm's theft
    and loss reporting and conducting due diligence to maintain effective controls against
    diversion, with respect to Cardinal's Auburn, Washington distribution facility.  DEA
    representatives further advised Cardinal with respect to their due diligence
    responsibilities, that Cardinal should examine their Florida customers, particularly,
    Cardinal's retail pharmacy chain customers.  DEA did not indicate that its concern
    with Cardinal's Florida distributions was limited only to Cardinal's top few
    customers.

62. On August 23, 2011, DEA Headquarters representatives met with representatives of
    Mallinckrodt LLC, a manufacturer that sells oxycodone to Cardinal for distribution.

63. About three weeks after meeting with DEA, on September 16, 2011, Mallinckrodt
    sent a letter to forty-three (43) distributors, including Cardinal.  The letter stated that
    it was no longer processing "charge backs" from distributor sales of Mallinckrodt's
    products to certain pharmacies, including Gulf Coast, which were identified in an
    included Attachment. "Charge backs" are credits that a pharmacy may receive from a
    manufacturer via a distributor in exchange for pharmacy dispensing information.
    Attachment 13.  Mallinckrodt told its distributors that it "made our decision based on
    our recent site visits to these locations" and suggested that "if you have sold
    controlled substances to any of these pharmacies, you consider conducting an on-site
    audit as part of your [Suspicious Order Monitoring] program." *Id.*

64. Mallinckrodt met with Cardinal on September 30, 2011 to discuss levels of sales of
    Mallinckrodt's products to Cardinal in Florida. As part of the meeting, Mallinckrodt

gave Cardinal two lists – a list containing the top twenty (20) pharmacies by volume located in state and a second list based on the top twenty (20) pharmacies by volume located out of state, based on Cardinal's distributions of oxycodone thirty milligram and oxycodone fifteen milligram manufactured by Mallinckrodt. Attachment 14. Mallinckrodt advised Cardinal that they had suspended charge backs to those pharmacies. For Mallinckrodt to resume charge backs, Mallinckrodt stated to Cardinal that it must provide documentation of Suspicious Order Monitoring due diligence audits and conduct site visits within sixty (60) days for all forty (40) customers.

65. Based on the September 30, 2011 meeting with Mallinckrodt and Cardinal, Cardinal's own supplier gave notice to Cardinal of Cardinal's level of sales of thirty and fifteen milligram oxycodone, a controlled substance known to be abused in Florida.

### DEA Investigation of Cardinal Lakeland and its Top Four Customers

66. On October 18, 2011, based on DEA's evaluation of ARCOS data regarding the top distributions of oxycodone in the United States, DEA executed Administrative Inspection Warrants ("AIWs") at Cardinal Lakeland's top four retail pharmacy Florida customers of oxycodone: CVS 219, Gulf Coast, CVS 5195, and Caremed.

67. Both Caremed and Gulf Coast voluntarily surrendered their DEA registration for cause. (Caremed surrendered when it received the AIW; Gulf Coast surrendered following the execution of a federal search warrant on November 5, 2011.)

68. On October 26, 2011, DEA executed an AIW at Cardinal Lakeland. The affidavit supporting the warrant stated that because "DEA is investigating Cardinal Health's top four customers to determine whether the pharmacies are dispensing controlled

23

substances outside the scope of their registration," "DEA also needs to determine whether Cardinal Health has failed to report suspicious orders to DEA." R. 3-12 at 7. DEA investigators gave Cardinal Lakeland a list of documents that needed to be provided to DEA.

69. On October 27, 2011, Cardinal sent DEA a letter asking the agency to "inform [Cardinal] of the identity of any Cardinal Health customer that the agency has determined is engaged in the diversion of controlled substances" and promising to "immediately cease distribution of controlled substances to any customer that DEA so identifies. R. 3-6 at 2.

70. On October 28, 2011, Cardinal Health provided 2 computer discs ("CDs") to DEA. The discs contained Cardinal's due diligence files, item audit reports, standard operating procedures, a Power Point presentation containing an overview of the facility, and a spreadsheet containing Cardinal's top fifty (50) customers from December 1, 2010 through October 26, 2011.   On November 8, 2011, DEA issued an administrative subpoena to Cardinal Health for information regarding its sales of oxycodone (among other drugs) and its compliance mechanisms.

71. On November 18, 2011, Cardinal Health delivered a CD to DEA containing additional due diligence files, Excel spreadsheets of Cardinal's sales of oxycodone, alprazolam, and carisoprodol; and an Electronic Suspicious Order Monitoring spreadsheet.

72. In total, the information provided by Cardinal in response to the AIW, consisted of 1020.44 megabytes of information, which is a volume consistent with a distributor of Cardinal Lakeland's size.

73. To date, DEA has not received the compliance-related communications responsive to the November 8, 2011 administrative subpoena. Through counsel, Cardinal has communicated to DEA that it will not provide the requested information until the end of February 2012. Based on previous statements made by Cardinal employees relative to suspicious customers and their response, DEA believes that these documents will corroborate those statements and provide evidence critical to DEA's investigation of the Cardinal Lakeland facility.

<strong><u>Results of Cardinal Lakeland Investigation</u></strong>

**<u>Exponentially Increasing High-Volume Sales:</u>**

74. Based on its review of the documents Cardinal provided in response to the October 26, 2011 AIW and the November 8, 2011 administrative subpoena, the investigation at Cardinal Lakeland revealed a persistent failure to exercise due diligence to ensure that controlled substances were not being diverted. DEA concluded that over a period of approximately 3 years, November 2008 to December 2011, Cardinal's anti-diversion controls were inadequate to meet their due diligence responsibilities. This conclusion was based on the totality of several factors. Some of the most important factors were: (i) exceedingly large increasing volume of shipments of oxycodone to its largest Florida retail customers, which volumes were supported by inadequate documentation; (ii) a low number of suspicious orders reported; (iii) a low number of on-site visits to these top retailers and no site visits to retail chain pharmacy customers; and (iv) evidence that Cardinal's due diligence practices were inconsistent with both the 2008 MOA and Cardinal's own policies the purpose of which was to reduce diversion.

75. Between November 1, 2008 and December 31, 2011, Cardinal Lakeland sold over 12.9 million dosage units of oxycodone to its top four customers. From 2008 to 2009, Cardinal's oxycodone sales to its top four retail pharmacy customers increased approximately 803%. From 2009 to 2010, Cardinal's oxycodone sales increased approximately 162%. Attachment 15. Between 2009-2011, Cardinal's oxycodone sales to its top four retail pharmacies increased 241%. Attachment 2; see also Carter Decl. ¶¶ 7, 16, 25, 35

76. Compared to the average number of dosage units distributed monthly to Cardinal's other Florida retail pharmacies, the average monthly distribution at Cardinal's top four customers is staggering. Cardinal's other Florida retail pharmacies received, on average, 5,364 dosage units per month from October 1, 2008 through December 31, 2011 based on 66,286 pharmacies, which equates to 64,368 dosage units, annually. In contrast, CVS 5195 received approximately 58,223 dosage units per month from Cardinal; Caremed received 59,264 dosage units per month from Cardinal; Gulf Coast received 96,644 dosage units per month from Cardinal; and CVS 219 received 137,994 dosage units per month from Cardinal. Attachment 16. In total, Cardinal distributed approximately 3.225 million to each of its top four retail pharmacy customers from November 1, 2008 through December 31, 2011, based on a total distribution of 12.9 million dosage units from November 1, 2008 through December 31, 2011. Put another way, Cardinal's top four retailers received approximately 50 times the amount of oxycodone compared to the average Florida retailer that Cardinal services. Attachment 2, 4, 16.

77. CVS 219 and 5195, two of Cardinal's top four retail pharmacy customers are located in Sanford, Florida.  During 2011, Cardinal Lakeland supplied 6 of the 16 pharmacies with DEA registrations located within the city limits of Sanford, Florida with approximately 3,144,120 dosage units of oxycodone.  According to the 2010 U.S. Census Bureau Facts Sheet, Sanford, Florida has a population of 53,570.  Based on these numbers, Cardinal Lakeland's distribution of oxycodone could supply every resident of Sanford, Florida with approximately 58.6 dosage units of oxycodone.

78. In 2011, Cardinal collectively distributed 3,144,120 dosage units of oxycodone to six Sanford, Florida pharmacies.  Of this volume, Cardinal shipped 3,012,500 dosage units (96%) to the two CVS stores named in the ISO.  This volume dwarfs the oxycodone volume purchased by other chain pharmacies in Sanford, such as Walgreens, located in close proximity.  *See supra*, ¶ 80; Attachment 17..  An analysis of oxycodone distributions to state populations resulted in the following examples: Michigan averaged 8.26 dosage units per capita; Texas averaged 2.81 dosage units; Louisiana averaged 12.48 dosage units; Illinois averaged 3.69 dosage units, and California averaged 7.98 dosage units.  This reflects distributions by all distributors.  These states were chosen to give a geographic cross-sample of the United States.  Based on this analysis, Cardinal's oxycodone shipments to Sanford would have been sufficient for a population more than 8 times greater than Sanford.

79. In close proximity to CVS 5195, located in Sanford, Florida, which purchased 1.2 million dosage units of oxycodone in 2011, stands a Publix Pharmacy #0641, located at 5240 West State Road 46, Sanford, Florida 32771.  The Publix Pharmacy, as

compared to CVS 219, only purchased 25,700 units of oxycodone in 2011. The two

pharmacies are located within two (2) miles of one another. Attachment 18.

80. Additionally, in close proximity to CVS 219, located in Sanford, Florida, which

purchased 1.8 million dosage units of oxycodone in 2011, stand two pharmacies –

Walgreens #6970, located at 3803 S. Orlando Drive, Sanford, Florida, and Wal-Mart

Pharmacy #10-0857, located at 3653 Orlando drive, Sanford, Florida. Walgreens

#6970 purchased 176,500 dosage units of oxycodone in 2011. Wal-Mart Pharmacy

#10-0857 purchased 30,500 dosage units of oxycodone in 2011. Walgreens and Wal-

Mart are each located within one (1) mile of CVS 219. Attachment 19.

**Inadequate Due Diligence:**

81. A comparison of the 2008 ISO/OSC and the 2011 ISO/OSC revealed the same

concerns in 2008 and in 2011. Only the specific drugs of abuse had changed.

Cardinal completed these high-volume sales without appropriate due diligence to

assure that diversion did not occur. The following points outline some of

Cardinal's failings:

   a. **Regularly exceeding the distribution thresholds it established for
   itself.**

      i. Cardinal set monthly thresholds for oxycodone distributions to
      each of its stores. But from April 2009 to August 2011, Cardinal
      disregarded the oxycodone thresholds for its top four retailers at
      least 44 times, sometimes by a few thousand pills and sometimes
      by tens of thousands. This unexplained disregard for its own
      thresholds suggests that Cardinal did not take its own policies

seriously.[1]  Based on this evidence, DEA was unable to conclude that Cardinal's stated threshold volumes served as a reliable and consistent constraint against diversion.

b. **Failing to follow its own Suspicious Order Monitoring Policies**

i. According to a review of Cardinal's Suspicious Order Monitoring ("SOM") Policies, a site visit is triggered once Cardinal attaches a "red flag" to a particular customer, which is precipitated by the following two events:  1) sales increased by 15% (at least $10,000) and 2) at least 20% or more in dosage units. Once the two events occur, a Cardinal sales person must visit the customer within thirty (30) days to investigate for potential diversion and provide a report to Quality and Regulatory Affairs ("QRA").  Attachment 20.

---

[1] Cardinal exceeded its own thresholds ("TH") in the following instances:

Caremed:  January 2010 – 37,800 (TH  of 26,000); February 2010 – 28,200 (TH of 26,000); March 2010 – 28,000 (TH of 26,000); April 2010 – 34,900 (TH of 32,001); May 2010 – 41,400 (TH 37,000); July 2010 – 67,200 (TH 60,000); September 2010 – 100,200 (TH 75,000); October 2010 – 90,900 (TH 75,000); December 2010 - 134,990 (TH 90,001); January 2011 - 131,920 (TH 90,001); February 2011 – 124,250 (TH 124,000); April 2011 – 149,200 (TH 124,000); May 2011 – 131,720 (TH 124,000).

Gulf Coast:  April 2009 – 28,300 (TH 20,000); September 2009 – 18,000 (TH 11,000); November 2009 – 37,700 (TH 33,000); December 2009 – 33,300 (TH 33,000); July 2010 – 115,750 (TH 58,000); August 2010 – 156,100 (TH 95,001); September 2010 – 164,040 (TH 141,000); October 2010 – 144,900 (TH 141,000); March 2011 – 222,800 (TH 207,200); April 2011 – 231,600 (TH 207,200); June 2011 – 279,500 (TH  265,000); August 2011 – 277,380 (TH 265,000).

CVS 219:  June 2009 – 118,310 (TH 112,000); August 2009 – 140,500 (TH 112,000); September 2009 – 161,150 (TH 112,000); October 2009 – 135,780 (TH 112,000); December 2009 – 123,000 (TH 118,000); January 2010 – 141,950 (TH 118,000); February 2010 – 142,100 (TH 118,000); March 2010 – 147,600 (TH 140,000); April 2010 – 156,580 (TH 148,000); May 2010 – 172,450 (TH 148,000); June 2010 – 200,000 (TH 148,000); July 2010 – 207,000 (TH 148,000); August 2010 – 242,100 (TH 148,000); September 2010 – 281,600 (TH 235,000).

CVS 5195:  June 2010 – 53,300 (TH 27,000); July 2010 – 70,500 (TH 27,000); August 2010 – 108,600 (TH 50,000); September 2010 – 108,800 (TH 105,000); October 2010 – 157,600 (TH 120,000).

ii.  Assuming an average cost of $0.75/pill (based on the CVS

investigations, CVS told DEA investigators that they sold

oxycodone thirty milligram for $1.44/pill), a number of sales

would have triggered a "red flag" event under Cardinal's standard

operating procedures, thus requiring Cardinal to make an on-site

visit within 30 days.[2]

---

[2] The following data was taken from Cardinal's ESOM database, provided in response to the AIW, and establishes the following red flag events. The events are based on monthly accruals of controlled substances.

**CVS 219:**
1.  April 2009: CVS purchased 103,390 dosage units of oxycodone from Cardinal, which amounted to at least, a 15% increase in sales and at least, a 20% increase in dosage units compared to the previous month.
2.  June 2009: CVS purchased 126,310 dosage units of oxycodone from Cardinal, which amounted to at least, a 15% increase in sales and at least, a 20% increase in dosage units compared to the previous month.
3.  March 2010: CVS purchased 151,600 dosage units of oxycodone from Cardinal, which amounted to at least, a 15% increase in sales and at least, a 20% increase in dosage units compared to the previous month.
4.  June 2010: CVS purchased 186,000 dosage units of oxycodone from Cardinal, which amounted to at least, a 15% increase in sales and at least, a 20% increase in dosage units compared to the previous month.
5.  August 2010: CVS purchased 242,100 dosage units of oxycodone from Cardinal, which amounted to at least, a 15% increase in sales and at least, a 20% increase in dosage units compared to the previous month.
6.  Cardinal made no site visits to CVS 219 upon these red flag event occurrences.

**CVS 5195:**
7.  June 2010: CVS purchased 43,500 dosage units of oxycodone from Cardinal, which amounted to at least, a 15% increase in sales and at least, a 20% increase in dosage units compared to the previous month.
8.  July 2010: CVS purchased 80,300 dosage units of oxycodone from Cardinal, which amounted to at least, a 15% increase in sales and at least, a 20% increase in dosage units compared to the previous month.
9.  August 2010: CVS purchased 119,400 dosage units of oxycodone from Cardinal, which amounted to at least, a 15% increase in sales and at least, a 20% increase in dosage units compared to the previous month.
10. October 2010: CVS purchased 157,600 dosage units of oxycodone from Cardinal, which amounted to at least, a 15% increase in sales and at least, a 20% increase in dosage units compared to the previous month.
11. Cardinal made no site visits to CVS 5195 upon these red flag event occurrences.

**Caremed:**

30

c. **No on-site visits for chain retailers**

    i. According to DEA review, Cardinal's SOM Policies do not exclude chain retailers from the site-visit requirement. Indeed, the written policies made available to DEA do not indicate any company policy of treating chain retailers differently than independent retailers in terms of the diligence Cardinal's distribution centers are required to conduct.

    ii. Cardinal failed to conduct site visits for its retail chain pharmacy customers, thus failing to maintain effective controls to prevent diversion of controlled substances. Cardinal's Suspicious Order Monitoring Policies list "Potential Indicators of Diversion." Many

---

12. July 2010: Caremed purchased 67,200 dosage units of oxycodone from Cardinal, which amounted to at least, a 15% increase in sales and at least, a 20% increase in dosage units compared to the previous month.

13. September 2010: Caremed purchased 100,200 dosage units of oxycodone from Cardinal, which amounted to at least, a 15% increase in sales and at least, a 20% increase in dosage units compared to the previous month.

14. Cardinal made no site visits to Caremed upon these red flag event occurrences.

**Gulf Coast:**

15. July 2010: Gulf Coast purchased 115,750 dosage units of oxycodone from Cardinal, which amounted to at least, a 15% increase in sales and at least, a 20% increase in dosage units compared to the previous month.

16. August 2010: Gulf Coast purchased 156,000 dosage units of oxycodone from Cardinal, which amounted to at least, a 15% increase in sales and at least, a 20% increase in dosage units compared to the previous month.

17. March 2011: Gulf Coast purchased 222,800 dosage units of oxycodone from Cardinal, which amounted to at least, a 15% increase in sales and at least, a 20% increase in dosage units compared to the previous month.

18. June 2011: Gulf Coast purchased 279,500 dosage units of oxycodone from Cardinal, which amounted to at least, a 15% increase in sales and at least, a 20% increase in dosage units compared to the previous month.

19. Cardinal made no site visits to Gulf Coast upon these red flag event occurrences.

of these indicators of diversion could only have been ascertained by conducting a site visit.[3]

**d.   Low numbers of suspicious orders reported:**

 i. Cardinal's electronic suspicious order monitoring system flagged certain orders as suspicious, which required Cardinal to place a "hold" on the order until it decides whether to release the order or to cancel or "cut" the order.  From October 1, 2008 through October 26, 2011, Cardinal Lakeland has reported only 41 suspicious orders to DEA.  Based on information provided by Cardinal, Cardinal Lakeland suspended sales of controlled substances to 19 DEA registrants from December 1, 2010 through October 26, 2011, at the service of the AIW. Only three of the 41 suspicious orders reported were orders from the 19 customers Cardinal suspended.

 ii. Between October 26, 2011 (the day following the execution of the AIWs) and January 31, 2012, Cardinal terminated twenty-eight (28) customers.  However, based on DEA's own investigation, during 2010 and 2011, Cardinal continued to sell controlled

---

[3]

a. Customers of the licensed customer exhibit drug seeking behaviors.

b. Cars full of pharmacy customers.

c. Pharmacy customers who appear to be from outside the reasonable drawing area for the facility.

d. Evidence of illicit drug use around the facility (e.g., used syringes, empty prescription containers).

e. Mailing materials or other evidence of operation of an Internet pharmacy.

f. High ratio of prescriptions for regulated drugs versus other drugs.

g. High ratio of regulated prescription stock to other prescription stock.

h. Primarily cash transactions for regulated drug prescriptions.

i. One employee responsible for the ordering, monitoring, and invoicing of products.

j. High number of customers compared to their peers.

k. For practitioner offices:  does the practitioners dispense directly to the public?

l. Lack of auditing processes around purchases.

substances to twelve (12) customers even after Cardinal claimed to have terminated those customers.

iii. Cardinal reported no suspicious orders at either of its CVS facilities or the independent retail pharmacy locations, Caremed and Brooks, except for two suspicious orders made to DEA on December 1, 2011 for CVS 219, well-after the service of the AIW. But DEA records reveal that the stores dispensed prescriptions issued by practitioners that later became the subject of DEA administrative actions, many of which resulted orders suspending the doctors from dispensing controlled substances. Attachment 21.

iv. Following the service of the AIW, from January 1, 2012 through February 3, 2012, the date of service of the ISO, Cardinal reported 173 suspicious orders, none of which concerned its top four retail pharmacy customers.

e. **Mallinckrodt response**

i. After Mallinckrodt's letter, Cardinal contacted CVS's corporate offices and asked that CVS go to three (3) of its pharmacies, including CVS 5195, to ensure that the oxycodone purchases were legitimate. Cardinal had not flagged the high oxycodone sales independently.

## DEA Issues Immediate Suspension Order for Cardinal Lakeland

82. Based on the DEA's review of Cardinal's files, DEA's experience and knowledge of Lakeland's distribution practices over time, the 2008 Memorandum of Agreement,

ARCOS data and the information gathered during inspections of Cardinal Lakeland, CVS 219, CVS 5135, Gulf Coast, and Caremed, DEA concluded that "Cardinal failed to conduct meaningful due diligence to ensure that the controlled substances were not diverted into other than legitimate channels, including Cardinal's failure to conduct due diligence of its retail pharmacy chain customers." Attachment 15, at 3. DEA used information about Cardinal Lakeland's failings with regard to its top four retailers to make a broader conclusion about the Lakeland facility's deficiencies as a whole. DEA timed its issuance of the ISO on February 3, 2012, to coordinate with the ISO served on CVS 219 and 5135 the following day, February 4, 2012.

83. Through my training and experience as both a law enforcement officer and as a licensed pharmacist, I believe that the Cardinal Health Lakeland facility's continued DEA registration to handle and distribute any type of controlled substance poses an imminent danger to the public health and safety. I participated in the decision-making process leading up to the issuance of the ISO. The information in all the foregoing paragraphs informed my decision to recommend to the Administrator that an ISO was the appropriate course of action against Cardinal Lakeland.

84. DEA has scheduled an administrative hearing in the Cardinal matter for April 3, 2012. Absent any request for delay by Cardinal and assuming that the Court does not enjoin the ISO, DEA expects to conclude agency proceedings by August.

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed on:  2/10/12

JOSEPH T. RANNAZZISI

34