## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CARDINAL HEALTH INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>ERIC HOLDER, JR., ATTORNEY )<br>GENERAL, et al., )<br><br>Defendant. ) | Civil Action No. 1:12-cv-185 (RBW) |

### DECLARATION OF RUTH A. CARTER

I, Ruth A. Carter, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1. I am the Group Supervisor (GS) assigned to the Drug Enforcement Administration (DEA) Seattle Division Office in Seattle, Washington.

2. As part of my duties for DEA, I oversee investigations into alleged violations of the Controlled Substance Act. I have served in this role since December of 1999. Prior to my current position, I served as a DEA Diversion Investigator. I have worked for DEA since 1988.

3. Most recently, I have served as the lead case agent assigned to the investigation of Cardinal Lakeland. This included an investigation of Cardinal Lakeland's top four retail pharmacy customers.

4. The matters contained in this declaration are based upon my personal knowledge, training, and experience, and upon conclusions and determinations reached by me. The matters contained in this declaration were part of the record considered

1

by Joseph Rannazzisi and others at DEA and formed the basis for the
Administrator's decision to issue the Immediate Suspension Order ("ISO")
against Cardinal Lakeland.

### Individual Investigation Results at Each of Cardinal's Top Four Retailers

### CVS 219:

5. **Total Volume:**  Between November 1, 2008 and December 31, 2011, Cardinal
   sold CVS 219, its top customer, over 5 million dosage units of oxycodone, for an
   average of 137,994 dosage units per month.  Attachment 2.

6. **Cash payments:**  Between January 1, 2010 and October 18, 2011, 42% of the 30
   mg-strength oxycodone prescriptions at CVS 219 were paid for in cash, using no
   insurance to pay for the medication.  At this particular location, the pharmacy
   charged $239 for a prescription for 180 30 mg-strength oxycodone.  Had Cardinal
   conducted a site visit at CVS 219, it would have learned of the 42% of oxycodone
   sales paid in cash, which is an indicator of potential diversion under Cardinal's
   own SOM policy, "Potential Indicators of Diversion," -- "Primarily cash
   transactions for regulated drug prescriptions."  Data from the IMS Institute for
   Healthcare Informatics indicates that approximately 6.9% of prescriptions were
   paid for in cash in 2010.  Attachments 22 and 23.

7. **Increases in Volume:**  Cardinal's distributions to CVS 219 increased
   exponentially between 2008 and 2011.

   a. 2008-2009: Cardinal increased the monthly oxycodone distributions to
      CVS by approximately 832% (135,000 to 1,258,600 million dosage units).

In 2008, the average Florida retail pharmacy customer purchased 18,283 dosage units of oxycodone per year.  Attachments 2 and 4.

b.  2009-2010:  Cardinal increased the monthly oxycodone distributions to CVS by approximately 63% (1,258,600 to 2,048,100 million dosage units).  In 2009, the average Florida retail pharmacy customer purchased 112,068 dosage units of oxycodone per year.  *Id.*

c.  2011:  CVS 219 purchased 1,802,100 million dosage units of oxycodone from Cardinal.  *Id.*

d.  These quantities surpassed the amount of oxycodone purchased by Cardinal's own pharmacies, on average, and in the State of Florida. Attachment 4.

8.  **Cardinal Raises Threshold Amounts:**  Cardinal not only was aware of the dramatic increase in oxycodone supplies, but it specifically approved it.  Between November 25, 2009 and November 24, 2010, Cardinal adjusted the threshold for oxycodone sales five times, allowing CVS's monthly allowance of dosage units to increase from 112,000 to 319,000 per month.  Attachment 24.

a.  Cardinal offered little rationale for raising its threshold amounts.

9.  **Cardinal Disregards Threshold Amounts:**  Cardinal also routinely disregarded the threshold amounts it set for CVS, as demonstrated in Mr. Joseph Rannazzisi's Declaration, fn. 1.

10.  **Suspicious Order Monitoring:**  Cardinal's Electronic Suspicious Order Monitoring file revealed that, although Cardinal held 68 shipments for further inquiry, 53 of those shipments were ultimately released.  The due diligence file

3

contains only a cursory explanation as to why Cardinal released the orders.  Most
held orders were released based on a Cardinal employee's conclusion that the
shipments were "not unreasonable quantity, pattern and/or frequency."  Out of the
15 shipments that Cardinal would not deliver, 11 of them were duplicate orders
and one was not shipped by customer request.  At bottom, Cardinal cut shipments
on only 3 orders for reasons other than duplicate ordering or customer request.
Attachment 25.

11. **Suspicious Order Reports to DEA**:  Prior to receiving the Administrative
Inspection Warrant, Cardinal did not make any suspicious order reports to the
DEA regarding CVS 219.  On December 1, 2011, Cardinal reported to DEA two
suspicious orders from CVS 219, well after the service of the Administrative
Inspection Warrant.  The reported suspicious orders were placed on November
28, 2011 for 1000 dosage units of 5 milligram oxycodone hydrochloride tablets
and 4000 dosage units of thirty milligram oxycodone hydrochloride tablets.

12. **Cardinal's Inadequate Investigation**:  Despite the high volume of oxycodone
and the exponentially increasing sales, Cardinal investigators never visited CVS
219. Cardinal Lakeland's failure to conduct a site visit at CVS 219 evidence
Cardinal Lakeland's failure to "maintain effective controls against diversion," an
obligation under the Controlled Substances Act (CSA).  21 U.S.C. § 823(b)(1).

13. **What Cardinal Knew or Should Have Known**:  Had Cardinal conducted
appropriate due diligence, there is reason to believe that it would have known that
sales to CVS 219 posed a risk of diversion for illicit use.

a. Cardinal significantly increased oxycodone distributions to CVS without adequate due diligence.

b. On September 30, 2010, Cardinal Health QRA Vice President in Anti-Diversion & Supply Chain Services Michael Moné learned by email that another Cardinal employee had spoken with CVS corporate regarding CVS's oxycodone purchases.  CVS responded that "none of [its] stores show significant growth or shrink issues," but suggested that Florida's efforts to "crack[] down on 'pill mills' . . . is driving more legitimate traffic to CVS stores."  Attachment 26.

c. Cardinal should have recognized that CVS's explanation was inadequate. Just thirteen days before receiving this information, Cardinal increased CVS 219's oxycodone monthly threshold by 87,000 dosage units (from 148,000 to 235,000).  CVS's claim that "none of [its] stores" had significant changes in oxycodone distribution, then, is false—Cardinal's own decision to change the allowable threshold proves as much.  Further, CVS cannot justify its increase in sales by arguing that state efforts to shut down pill mills drove new, legitimate traffic to CVS.  A crack down on pill mills dispensing oxycodone illegitimately would increase both illegitimate and legitimate oxycodone traffic to CVS stores.  Attachment 24.

d. CVS's inadequate responses to Cardinal inquiries should have prompted Cardinal to look into the matter further.  Instead, Cardinal improperly relied on CVS's assurances.

e. A site visit would have revealed that a significant portion of CVS 219's oxycodone customers were not using the drug for legitimate purposes.

    i. On October 28, 2011, DEA spoke with CVS 219 Pharmacist in Charge Paras Priyadarshi. Priyadarshi told investigators that 30 mg oxycodone was the pharmacy's fastest moving controlled substance. He admitted that the majority of the diagnosis codes listed by the prescribing practitioners for the oxycodone prescriptions were the same, indicating potentially illegitimate prescriptions, which should have raised a red flag to the pharmacist. Priyadarshi further admitted that customers often requested certain brands of oxycodone using street slang. He told investigators that he did not see anything wrong with two individuals living at the same address receiving the exact prescriptions for controlled substances from the same practitioner.

    ii. While investigators were present at CVS 219, during the AIW on October 18, 2011, approximately every third car that came through the drive-thru lane had prescriptions for oxycodone or hydrocodone. Priyadarshi knew that his store filled more oxycodone prescriptions than any other CVS in his district, but he reported that no one from CVS corporate had said anything to him about the high volume at his store.

    iii. Despite the high volume of oxycodone and exponentially increasing orders, Cardinal Lakeland never conducted a site visit

that examined the store's practices or procedures, choosing instead to rely on CVS's own internal controls. Based on DEA's review of Cardinal's files, Cardinal failed to investigate the practices at CVS 219.

**CVS 5195:**

14. **Total Volume**:  From November 1, 2008 through December 31, 2011, CVS 5195 purchased over 2.2 million dosage units of oxycodone from Cardinal Lakeland for an average of 58,223 dosage units per month.  Attachment 2.

15. **Cash payments**:  Between January 1, 2010 and October 18, 2011, 58% of all oxycodone sales were paid for in cash.  Had Cardinal conducted a site visit at CVS 219, it would have learned of the 58% of oxycodone sales paid in cash, which is an indicator of potential diversion under Cardinal's own policy, "On-Site Investigations" – "Pharmaceutical Distribution."  Attachment 22.  "Potential Indicators of Diversion," -- "Primarily cash transactions for regulated drug prescriptions."  *Id.* at 7.

16. **Increases in Volume**:  Cardinal's distributions to CVS 5195 increased exponentially between 2008 and 2011.

   a.  2008-2009: Cardinal increased the monthly oxycodone distributions to CVS by approximately 793% (11,700 to 104,500 dosage units).  In 2008, the average Florida retail pharmacy customer purchased 18,283 dosage units of oxycodone per year.  Attachments 2 and 4.

   b.  2009-2010:  Cardinal increased the monthly oxycodone distributions to CVS by 748% (104,500 to 885,900 dosage units.).  In 2009, the average

Florida retail pharmacy customer purchased 112,068 dosage units of
oxycodone per year. *Id.*

c.  2011: CVS 5195 purchased over 1,210,400 million dosage units of
oxycodone from Cardinal. *Id.*

d.  These quantities surpassed the amount of oxycodone purchased by
Cardinal's own pharmacies, on average, and in the State of Florida.
Attachment 4.

17. **Cardinal Raises Threshold Amounts**: Cardinal not only was aware of the
dramatic increase in oxycodone sales to CVS, but it specifically approved it.
Between August 11, 2010, and November 24, 2010, Cardinal adjusted the
threshold for oxycodone sales four times, allowing CVS's monthly allowance of
dosage units to increase from 27,000 to 177,700 dosage units.   Attachment 27.
Cardinal offered little rationale for raising its threshold amounts.

a.  For example, on August 11, 2010, Cardinal increased CVS 5195's
threshold to 50,000 based on a CVS Loss Prevention Review, concluding
"No Concerns with Growth," based on CVS' own assessment.  The
following month, Cardinal doubled CVS 5195's threshold to 105,000
dosage units of oxycodone, with a notation of "Adjusted Based on Recent
Purchase – Approved by MAM."  Again, only one month later, Cardinal
adjusted CVS 5195's threshold upward to 120,000 with a notation of
"Minor Adjustment – No Evidence of Diversion."  Cardinal adjusted CVS
5195's threshold a final time on November 24, 2010 to 177,700 with the
notation "Mass Upload Process." *Id.*  Cardinal's notations make no note

8

of due diligence conducted on site or a questioning of CVS 5195's need
for the increase in monthly oxycodone levels.

18. **Cardinal Disregards Threshold Amounts:**  Cardinal also routinely disregarded
the threshold amounts it set for CVS 5195, as demonstrated in Mr. Rannazzisi's
Declaration, fn. 1.

19. **Suspicious Order Monitoring**:  Cardinal's Electronic Suspicious Order
Monitoring file revealed that, although Cardinal held 22 shipments for further
inquiry, all of those shipments were ultimately released.  The due diligence file
contains only a cursory explanation as to why Cardinal released the orders.  Most
held orders were released based on a Cardinal employee's conclusion that the
shipments were "not unreasonable quantity, pattern and/or frequency."
Attachment 28.

20. **Suspicious Order Reports to DEA**:  Cardinal did not make any suspicious order
reports to the DEA regarding CVS 5195.

21. **Cardinal's Inadequate Investigation:**  Despite the high volume of oxycodone
and the exponentially increasing sales, Cardinal investigators never conducted an
official site visit of CVS 5195.  The only visit that Cardinal made to CVS 5195
was to take a picture of the exterior on a Sunday afternoon.  Cardinal Lakeland's
failure to conduct a site visit at CVS 5195 evidence Cardinal Lakeland's failure to
"maintain effective controls against diversion," an obligation under the CSA.  21
U.S.C. § 823(b)(1).

9

22. **What Cardinal Knew or Should Have Known:**  Had Cardinal conducted appropriate due diligence, there is reason to believe that it would have known that sales to CVS 5195 posed a risk of diversion for illicit use.

    a.  A site visit would have revealed that a significant portion of CVS 219's oxycodone customers were not using the drug for legitimate purposes.

    b.  While executing the AIW, DEA spoke with CVS 5195 Pharmacist in Charge Jessica Merrill.  Merrill explained that she set a daily limit on the number of oxycodone 30 milligram prescriptions the pharmacy would fill each day.  She put the limit in place because, among other reasons, she wanted to ensure that the pharmacy had enough oxycodone 30 milligram to fill the prescriptions for "real pain patients."

    c.  Merrill described the pharmacy's oxycodone customers as "shady" and admitted that some of the prescriptions were probably not legitimate.

    d.  Despite the high volume of oxycodone and exponentially increasing orders, Cardinal Lakeland never conducted a site visit that examined the store's practices or procedures, choosing instead to rely on CVS's own internal controls.  Based on DEA's review of Cardinal's files, Cardinal failed to investigate the practices at CVS 5195.

## Gulf Coast Pharmacy:

23. **Total Volume:**  Between January 1, 2008 and September 30, 2011, Cardinal sold Gulf Coast Pharmacy, its second largest customer, approximately 3.4 million dosage units of oxycodone, for an average of 96,644 dosage units per month during this time period.  Attachment 2.

24. **Cash payments**: As of April 30, 2009, based on the pharmacy owner's own response in a QRA site visit, 40% of oxycodone purchases were paid for in cash. On December 11, 2009, based on the pharmacy's owner's own response in a QRA site visit, 30% of oxycodone purchases were paid for in cash.

25. **Increases in Volume** Cardinal's distributions to Gulf Coast increased exponentially between 2008 and 2010.

    a. 2008-2009: Cardinal increased the monthly oxycodone distributions to Gulf Coast by 549% (32,820 to 213,100 dosage units).  In 2008, the average Florida retail pharmacy customer purchased 18,283 dosage units of oxycodone per year.  Attachments 2 and 4.

    b. 2009-2010: Cardinal increased the monthly oxycodone distributions to Gulf Coast by 404% (213,100 to 1,073,540 dosage units).  In 2009, the average Florida retail pharmacy customer purchased 112,068 dosage units of oxycodone per year.  *Id.*

    c. 2011:  Gulf Coast purchased over 2,063,100 million dosage units of oxycodone from Cardinal.  *Id.*

    d. These quantities surpassed the amount of oxycodone purchased by Cardinal's own pharmacies, on average, and in the State of Florida. Attachment 4.

26. **Cardinal Raises Threshold Amounts:**  Cardinal not only was aware of the dramatic increase in oxycodone supplies, but it specifically approved it. According to the data Cardinal provided to DEA, Between April 13, 2009 and May 26, 2010, Cardinal adjusted the threshold for oxycodone sales eleven (11)

times.  The net increase of these adjustments was, over the course of approximately 13 months, to raise Gulf Coast's monthly allowance of dosage units to increase from 20,000 to 317,400.  Cardinal offered little rationale for raising its threshold amounts.  Attachment 29.

27. **Cardinal Disregards Threshold Amounts:** Cardinal also routinely disregarded the threshold amounts it set for Gulf Coast, as demonstrated in Mr. Rannazzisi's Declaration, fn. 1, above.

28. **Suspicious Order Monitoring**:  Cardinal's Electronic Suspicious Order Monitoring file revealed that, although Cardinal held 61 shipments for further inquiry, 52 of those shipments were ultimately released.  The due diligence file contains only a cursory explanation as to why Cardinal released the orders.  Most held orders were released based on a Cardinal employee's conclusion that the shipments were "not unreasonable quantity, pattern and/or frequency."  Of the 9 orders Cardinal did not ship, four were duplicate orders.  Of the five remaining orders, the customer file Cardinal provided to DEA did not contain any information regarding why Cardinal did not fill these orders.  Attachment 30.

29. **Suspicious Order Reports to DEA**:  Cardinal did not make any suspicious order reports to the DEA regarding Gulf Coast, including with respect to the five non-duplicate orders it did not fill for Gulf Coast, occurring on April 14, 2009, September 21, 2009, December 3, 2009, August 27, 2010, and October 4, 2011. *Id.*

30. **Visits to Gulf Coast:**  Based on information Cardinal provided to DEA in response to the administrative warrant dated October 25, 2011, Cardinal

12

conducted five QRA site visits between August 28, 2008 and February 17, 2011.
Vincent Mollering, an employee of Cardinal in its Quality and Regulatory Affairs
Department, conducted four of the visits; and Steve Morse, an employee of
Cardinal in its Quality and Regulatory Affairs Department, conducted the fifth
visit. Information Cardinal provided to DEA reflects the following about those
visits:

 a. On August 12, 2008, Mr. Moellering conducted a site visit wherein he
noted that the site was a "Low risk of Diversion." Attachment 31.

 b. On April 30, 2009, Mr. Moellering conducted a second site visit wherein
he noted: "Owner states higher cash sales due to loss of insurance by
customers; Reported hearsay from individuals claiming that this pharmacy
would only accept cash for oxycodone and sold by the pill; Twice during
the interview, I specifically asked Mr. Green how most of the customers
paid for pain medications. He related some had insurance while others
have to pay cash due to losing their insurance. He would not say anything
about charging by the pill or only accepting cash." Attachment 32.

 c. On December 11, 2009, Mr. Moellering conducted a third site visit. He
noted as per this particular visit: "Does not represent significant risk for
diversion." Attachment 33.

 d. On October 5, 2010, Mr. Moellering and Mr. Moro conducted a site visit.
The notes from this particular site visit reflected the following: "CAH,
PBC, Lenny Moro, has observed groups of white males and females,
coming into the pharmacy during his late afternoon visits, to have their

13

scripts filled; they leave in small groups." The report further stated: "Owner requested increase his oxycodone threshold even higher – dispensing data revealed that 462,776 units of oxycodone dispensed within two months." "I am not convinced that the owner is being forthright pertaining to his customers' origin or residence. I have requested permission to contact DEA to resolve this issue." "High Risk of Diversion." Attachment 34.

e. Despite Mr. Moellering's findings and recommendations, Cardinal Lakeland did not contact DEA.   Cardinal not only continued to ship oxycodone 30 milligram tablets to Gulf Coast, but substantially increased shipments to Gulf Coast shortly afterwards. On November 24, 2010, Cardinal adjusted monthly volumes of oxycodone to Gulf Coast from 141,000 to 207,200. Attachment 29.

f. With respect to Mr. Moellering's October 5, 2010 findings, the PDF customer file Cardinal provided to DEA contained the following notations:  On October 29, 2010, Cardinal stated: "Reviewed, no changes." On the same date, regarding a SOM oxycodone event of 144,700 for October 2010, Cardinal released the shipment, stating: "Not unreasonable, order released, no threshold adjustment." Attachment 35. By releasing this shipment of 144,700, Cardinal appears to have filled an order that exceeded the monthly volume limit for oxycodone (141,000) then in effect for Gulf Coast that Cardinal itself established.

g.  On November 9, 2010, Mr. Morse wrote a memorandum to the file, which stated: "The primary prescribers identified by the pharmacy owner are local, one exception being an orthopedic surgeon. Not unreasonable." The file further reflected: "Pharmacy is medium risk and subject to close monitoring." On January 28, 2011, Gulf Coast owner, Jeff Green, provided a survey response which stated the limit needs to be raised to 450 bottles per week. Attachments 36 and 37.

h.  On February 17, 2011, Mr. Morse conducted the fifth site visit to Gulf Coast, wherein he noted: "Medium Risk for Diversion." Attachment 38. Nonetheless, Cardinal increased Gulf Coast's order threshold 3 times in the following four months. The date and amount of the adjustments were:

   i.  April 26, 2011:  207,200 to 245,000

   ii.  April 27, 2011: 245,000 to 265,000

   iii.  May 26, 2011: 265,000 to 317,000

   Attachment 29.

i.  These increases constituted a 65% increase in Cardinal's authorized shipment volumes of oxycodone over a two month period.

31. On October 5, 2011, Cardinal suspended its distributions to Gulf Coast.

32. On November 4, 2011, Gulf Coast voluntarily surrendered its DEA registration for cause.

**Caremed:**

33. **Total Volume**:  Between January 1, 2008 and September 30, 2011, Cardinal sold Caremed Health Corporation (d/b/a Brooks Pharmacy), its fourth largest

15

customer, approximately 2.1 million dosage units of oxycodone, for an average of approximately 59,264 dosage units per month during this time period. Attachment 2.

34. **Cash payments**:  As of September 21, 2011, Cardinal reported that 40% of 30 mg-strength oxycodone prescriptions at Caremed were paid for in cash.

35. **Increases in Volume**:

 a. 2008-2009: Cardinal increased the monthly oxycodone distributions to Caremed by 1020% (20,700 to 231,740 dosage units).  In 2008, the average Florida retail pharmacy customer purchased 18,283 dosage units of oxycodone per year.  Attachments 2 and 4.

 b. 2009-2010: Cardinal increased the monthly oxycodone distributions to Caremed by 213% (231,740 to 724,500 dosage units).  In 2009, the average Florida retail pharmacy customer purchased 112,068 dosage units of oxycodone per year.  *Id.*

 c. 2011:  Caremed purchased approximately 1.1 million dosage units of oxycodone from Cardinal.  *Id.*

 d. These quantities surpassed the amount of oxycodone purchased by Cardinal's own pharmacies, on average, and in the State of Florida. Attachment 4.

36. **Cardinal Raises Threshold Amounts:**  Cardinal not only was aware of the dramatic increase in oxycodone supplies, but it specifically approved it. According to the data Cardinal provided to DEA in response to the administrative subpoena, between April 14, 2010 and May 26, 2011, Cardinal adjusted the

threshold for oxycodone sales nine (9) times. The net increase of these adjustments was, over the course of approximately 13 months, to raise Gulf Coast's monthly allowance of dosage units from 26,000 to 158,300, an increase of approximately 609%. Attachment 39.

    a.  Based on information Cardinal provided to DEA, Cardinal made these threshold increases despite having actual knowledge that Caremed obtained controlled substances from other distributors besides Cardinal, and had done so since 2008. On November 18, 2008, Caremed's owner, Roscoe Heim, stated on a Survey Response that he used the following distributors: Cardinal, API, Expert Med, Spectrum, PCCA, Hawkins, and Masters. On March 29, 2010, Mr. Heim sent a letter to Cardinal's representative, Steve Morse, which stated that Cardinal and API were his primary sources for controlled substances. On April 15, 2010, Cardinal's representative, Chris Forst, acknowledged via e-mail that he was aware that Caremed had another distributor. Attachment 40.

37. **Cardinal Disregards Threshold Amounts.** Cardinal also routinely disregarded the threshold amounts it set for Caremed, as demonstrated in Mr. Rannazzisi's Declaration, fn. 1.

38. **Suspicious Order Monitoring**: Cardinal's Electronic Suspicious Order Monitoring file revealed that, although Cardinal held 54 shipments for Caremed for further inquiry, 47 of those shipments (88%) were ultimately released. The due diligence file contains only a cursory explanation as to why Cardinal released the orders. Most held orders were released based on a Cardinal employee's

conclusion that the shipments were "not unreasonable quantity, pattern and/or frequency." Of the 7 orders Cardinal did not ship, 3 were duplicate orders. Of the 4 remaining orders, the customer file Cardinal provided to DEA indicated that Cardinal did not fill these orders because "the data did not support the quantity ordered." Attachment 41.

39. **Suspicious Order Reports to DEA**:  Cardinal did not make any suspicious order reports to the DEA regarding Caremed, including with respect to the four non-duplicate orders it did not fill for Caremed.

40. **Cardinal Site Visits to Caremed**:  Based on information Cardinal provided to DEA in response to the administrative warrant dated October 26, 2011, Cardinal employee Vincent Mollering conducted three QRA site visits between May 4, 2010 and September 21, 2011.  Information Cardinal provided to DEA reflects the following about those visits:

   a. On May 4, 2010: Mr. Moellering conducted a site visit wherein he noted that the site was a "low risk of diversion." Attachment 42.

   b. On January 13, 2011: Mr. Moellering conducted a second site visit wherein he noted: "high oxycodone totals, which were properly explained/Recommend threshold levels be held at previous month's levels." Attachment 43.

   c. Notwithstanding Mr. Mollering's recommendation to hold oxycodone shipments to Caremed at their current volume, Cardinal increased Caremed's order threshold 2 times in the following four months.  The date and amount of the adjustments were:

      i. February 9, 2011:  90,001 to 124,000

      ii. May 26, 2011: 124,000 to 158,300

Attachment 39.

   d.  These increases constituted a 57% increase in Cardinal's authorized shipment volumes of oxycodone over a four month period.

   e.  On September 21, 2011, Mr. Moellering conducted a third site visit.  After this visit, Mr. Mollering revised his risk assessment to a "high risk of diversion." Attachment 44.

   f.  On September 21, 2011, Respondent suspended its distributions to Caremed.

   g.  On October 18 2011, Caremed voluntarily surrendered its DEA registration for cause.

**DEA Issues Immediate Suspension Order for Cardinal Lakeland**

41. Based on the DEA's review of Cardinal's files, along with ARCOS data and the information gathered during inspections of Cardinal Lakeland, CVS 219, CVS 5135, Gulf Coast, and Caremed, DEA concluded that "Cardinal failed to conduct meaningful due diligence to ensure that the controlled substances were not diverted into other than legitimate channels, including Cardinal's failure to conduct due diligence of its retail pharmacy chain customers." Attachment 15, at 3.

**I declare under penalty of perjury that the foregoing is true and correct.**

**Executed on:** 2.10.2012

**RUTH A. CARTER**

19