**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| CARDINAL HEALTH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:12-cv-00185-RBW |
| v. | ) | |
| | ) | |
| ERIC H. HOLDER, JR., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF CARDINAL HEALTH, INC.'S SUPPLEMENTAL MEMORANDUM
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Douglas B. Farquhar (Bar No. 386573)
Hyman, Phelps & McNamara, P.C.
700 13th Street, N.W.
Suite 1200
Washington, D.C.  20005
Tel.: (202) 737-9624
Fax: (202) 737-9329
dfarquhar@hpm.com

Randolph D. Moss (Bar No. 417749)
Brian M. Boynton (Bar No. 483187)
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
randolph.moss@wilmerhale.com

*Counsel for Cardinal Health, Inc.*

## INTRODUCTION

The Government's submission in response to this Court's February 16, 2012 order confirms that the Drug Enforcement Administration ("DEA") failed to meet its burden of demonstrating that issuance of an immediate suspension order ("ISO") was necessary to prevent "*imminent* danger to the public health or safety."  21 U.S.C. §824(d) (emphasis added).  The sole findings made in the ISO—relating to aggregate sales of oxycodone to four pharmacies from January 1, 2008 through the end of 2011—do not support DEA's suspension of Cardinal Health, Inc. ("Cardinal Health").  The Government now concedes that DEA knew at the time it issued the ISO that: (1) Cardinal Health had months before stopped selling to two of the pharmacies at issue; (2) Cardinal Health had pledged to cease distribution to any customer DEA identified as likely engaged in diversion; (3) the two CVS pharmacies named in the ISO had taken remedial action and were dispensing dramatically less oxycodone than in prior months; and (4) in any event, DEA was itself suspending the CVS stores.  In these circumstances, the prospect of continued oxycodone sales to the four named stores did not pose an "imminent danger" to anyone.  Indeed, strikingly, the Government devotes only a single footnote (at 5) to a defense of "the ISO itself."

Instead of defending the ISO on its own terms, the Government has repeatedly sought to rely on newly articulated rationales for DEA's action.  The Government initially sought to sustain the ISO on the basis of lengthy after-the-fact declarations from DEA staff.  Even that material did not demonstrate any *current* danger from Cardinal Health's continued registration.  But, in any event, the Government's recent submission reveals that the DEA staff declarations did not set forth the basis for the Administrator's decision at issue.  The declaration of the DEA Administrator indicates that much of the material set forth in the prior staff declarations was not even *summarized* for her.  *See* Decl. of Michele M. Leonhart ¶¶ 12-25.

Even the new, more limited set of justifications for the ISO set forth in the Leonhart Declaration stray well beyond the narrow findings made in the ISO—that Cardinal Health previously sold large quantities of oxycodone to four particular pharmacies.  As a result, they cannot sustain DEA's action.  The agency's own regulations mandate that the ISO itself "shall contain a statement of [the Administrator's] findings regarding the danger to public health or safety."  21 C.F.R. §1301.36(e).  Bedrock principles of administrative law also preclude reliance on *post hoc* justifications where an agency's actual rationale was set forth at the time of the decision under review.  Accordingly, this Court need not—and should not—consider the new rationales for the February 2 ISO offered by the Government in this litigation.  Finally, even if the newly articulated justifications of the ISO could be considered, they would fail on their own terms.  Nothing set forth in the Administrator's declaration provides any basis for concluding that Cardinal Health's continued registration poses an imminent danger to public health.  Indeed, the declaration says (¶ 36) that she issued the ISO to prevent the mere "possibility" of harm.

The Administrator has also indicated that in deciding whether to issue an ISO, she "give[s] less weight to remedial measures and decreased sales that occur following the execution" of a warrant.  Leonhart Decl. ¶ 28.  But in deciding whether there is "imminent danger" to the public, the timing of remedial measures is irrelevant as long as they prevent the potential harm.  To the extent DEA simply seeks to hold Cardinal Health accountable for what the agency contends was inadequate due diligence, it will have its chance—in the DEA administrative proceedings that are already under way.[1]  But an ISO is not a club DEA can wield to send a message.  It is an extraordinary remedy that has been specifically reserved to protect the public from "imminent danger."

---

[1]    DEA filed its Prehearing Statement on February 22, 2012.  Cardinal Health's Prehearing Statement is due March 2, 2012.

## ARGUMENT

### I.   DEA MUST SHOW IMMINENT DANGER TO PUBLIC HEALTH OR SAFETY

The Declaration of Michele Leonhart filed by DEA along with the administrative record asserts (¶ 36) that the Administrator believed it was necessary to issue an ISO here "in order to prevent the imminent *possibility* of public harm resulting from further diversion."  (Emphasis added.)  But as the Administrator elsewhere acknowledges, DEA may issue an ISO only if the Administrator finds that there actually "*is* an imminent danger to the public health or safety."  21 U.S.C. §824(d) (emphasis added); *see* Leonhart Decl. ¶ 35 (citing finding in ISO).  The Administrator's qualification that the risk here was a mere "possibility," moreover, was evidently a considered judgment; in the corresponding paragraph of the declaration the Administrator filed in the case brought by two of the pharmacies named in the Lakeland ISO, she explained that she acted "in order to prevent the imminent danger of public harm resulting from further diversion." ECF No. 19-1 ¶ 26 (Case No. 1:12-cv-00191).

To be "imminent," harm must be "about to occur."  ECF No. 16, at 6.  Under an "*imminent* danger" standard, assertions of mere "past injury" are insufficient.  *See Ciarpaglini v. Saini*, 352 F.3d 328, 330 (7th Cir. 2003) (interpreting "imminent danger" provision of Prison Litigation Reform Act); *Abdul-Akbar v. McKelvie*, 239 F.3d 307, 315 (3d Cir. 2001) (en banc) ("'Imminent' dangers are those dangers which are about to occur at any moment or are impending."); *Medberry v. Butler*, 185 F.3d 1189, 1193 (11th Cir. 1999); *Ashley v. Dilworth*, 147 F.3d 715, 717 (8th Cir. 1998).  That an immediate suspension must be supported exclusively by present or future danger—as compared to past conduct—is confirmed by Congress' use of the present tense verb "is" in §824(d)—as opposed to its use of the past tense in §824(a), which governs revocations following an administrative proceeding.  *See Abdul-Akbar*, 239 F.3d at 313 (relying on use of present tense verb "is"); *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay*

*Foundation, Inc.*, 484 U.S. 49, 59 & n.2, 108 S. Ct. 376, 381 & n.2 (1987) (Congress' use of the present tense meant that citizens could not maintain a suit for past violations of the Clean Water Act).

In its Supplemental Brief, DEA continues to invoke (at 13-14) the generally deferential standard of review under the APA, but it cannot reconcile that argument with the due process interests it concedes are at stake. *Compare* ECF No. 5 at 27-28 (demonstrating protectable interest) *with* ECF No. 14 at 15 (acknowledging due process implications of an ISO). As Cardinal Health previously explained (ECF No. 16 at 7), the Court owes no deference to DEA on the inquiry central to the due process claim—whether an imminent danger to the public justifies depriving Cardinal Health of notice and an opportunity to be heard. *See J.J. Cassone Bakery, Inc. v. NLRB*, 554 F.3d 1041, 1044 (D.C. Cir. 2009) ("Turning to Cassone's due process argument, we note that, in contrast with other aspects of a Board decision, which we review deferentially, . . . a reviewing court owes no deference to the agency's pronouncement on a constitutional question. . . .  In other words, we entertain Cassone's due process claim *de novo*." (internal quotation marks omitted)).  Indeed, by its terms, §824(d) does not seem to envision standard arbitrary and capricious review:  It provides that an ISO "shall continue in effect until … dissolved by a court of competent jurisdiction." *See Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 828 (5th Cir. 1976) (internal quotations omitted).

## II.    THE ISO FAILS TO SHOW IMMINENT DANGER

In its Supplemental Brief, DEA devotes only a single paragraph (at 14) to the only findings provided by the Administrator in the ISO—those relating to the aggregate quantities of oxycodone sold by Cardinal Health to four pharmacies from January 1, 2008 through 2011.  The remainder of DEA's defense of the ISO is devoted to alternative rationales first developed in litigation.  *See* Supp. Br. 14-17 (relying on actions before the 2007 ISO, interviews with CVS

pharmacists, alleged violations of internal policies, alleged failures to conduct on-site

investigations of CVS pharmacies, and sales to other CVS pharmacies).  This is unsurprising,

since DEA now concedes (*see* Leonhart Decl. ¶ 31) that the Administrator had before her at the

time of the ISO the following information contained in Cardinal Health's February 20

submission that demonstrates that sales to the four pharmacies named in the ISO posed no

*imminent* danger to the public as of February 2, 2012:

- Cardinal Health had voluntarily terminated distribution of controlled substances to Caremed on September 26, 2011 and to Gulf Coast on October 5, 2011—months before the February 2, 2012 ISO.  ECF No. 18 ¶¶ 1-2.

- Gulf Coast and Caremed did not possess active DEA registrations at the time the ISO was issued.  *Id.* ¶ 4.

- Cardinal Health informed DEA months before the ISO that it would cease distribution of controlled substances to any customer DEA believed was likely engaged in diversion.  *Id.* ¶¶ 5, 10.

- At the same time the Administrator signed the ISO to Cardinal Health's Lakeland facility, she also signed ISOs suspending the two Sanford, Florida CVS pharmacies named in the ISO.  *Id.* ¶ 6.

- Months before the CVS ISOs, CVS had instructed its pharmacies to cease filling prescriptions for 22 doctors that accounted for the majority of the oxycodone dispensed by the Sanford stores.  *Id.* ¶¶ 6-7.

- By December 2011, Cardinal Health's distribution of oxycodone to CVS 219 and CVS 5195 had already decreased by at least 80% from the August/September 2011 levels.  *Id.* ¶ 9.

DEA argues in its Supplemental Brief (at 14) that the Administrator was "concern[ed]"

that the volume of sales to the four pharmacies named in the ISO "were not only large, but also

increasing."  But the Administrator herself has now conceded that the opposite is true—at the

time of the ISO, the volume of sales to these stores was either zero or *decreasing*.  The

Administrator's admission that these facts were before her at the time she issued the ISOs should

be conclusive.  They demonstrate that sales to the four pharmacies named in the ISO posed no

imminent danger to the public as of February 2, 2012.

## III.   DEA MUST DEFEND THE ISO SOLELY ON THE FINDINGS THAT APPEAR WITHIN THE ISO'S FOUR CORNERS

Implicitly recognizing that the rationale set forth in the ISO is insufficient, the

Government argues at length in its Supplemental Brief (at 2-7) that the reasons for DEA's

suspension of Cardinal Health need not be set forth in the ISO itself.  This contention, however,

is foreclosed by both general principles of administrative law and the specific requirements

applicable to ISOs.  It is "a simple but fundamental rule of administrative law" that "a reviewing

court, in dealing with a determination or judgment which an administrative agency alone is

authorized to make, must judge the propriety of such action *solely by the grounds invoked by the

agency*" when it made its decision.  *SEC v. Chenery*, 332 U.S. 194, 196, 67 S. Ct. 1575, 1577

(1947) (emphasis added); *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.*, 463

U.S. 29, 50, 103 S. Ct. 2856, 2870 (1983); *see also* ECF No. 16 at 13-14.  Moreover, where

those grounds appear in a "contemporaneous explanation of [the agency's] decision . . . [,] [t]he

validity of the [agency's] actions must . . . stand or fall on the propriety of th[e] finding[s]" that

appear in that decision.  *Camp v. Pitts*, 411 U.S. 138, 142, 93 S. Ct. 1241, 1244 (1973).  Here,

DEA's own regulations mandate that an ISO "shall contain a statement of [the decisionmaker's]

findings regarding the danger to public health or safety."  21 C.F.R. §1301.36(e).  And the ISO

itself indicates that the Administrator's conclusion with respect to imminent harm was made

"[u]nder the facts and circumstances *described herein*."  Moss Decl., Ex. A (emphasis added).

As a result, *Chenery* and *Camp v. Pitts* establish that the ISO must stand or fall based "solely" on

the grounds stated within the ISO's four corners.

The Government no longer disputes that 21 C.F.R. §1301.36(e) governs an ISO. *Compare* ECF No. 14 at 25. But it now suggests (at 2-3) that another "related" regulation governing what must be set forth in an Order to Show Cause ("OSC") (21 C.F.R. §1301.37(c)) somehow replaces the "statement of … findings" requirement of §1301.36(e) with a requirement that the agency set forth merely a "summary of the matter of fact" at issue. No reasonable interpretation of DEA's regulations supports this conclusion. The Government urges the Court (at 3) to read the two regulations *in pari materia*. If anything, though, an *in pari materia* reading of DEA's regulations leads to a conclusion opposite from the Government's. Another regulation calls for "findings of fact" in a final order after revocation proceedings. 21 C.F.R. §1301.46. DEA ordinarily complies with this requirement by providing detailed explanations that marshal the evidence supporting the relevant factual conclusions. *See, e.g.*, *Southwood Pharms., Inc.*, 72 Fed. Reg. 36,487, 36,488-97 (DEA July 3, 2007). Similarly, the word "findings" in §1301.36(e) calls for a detailed statement of the factual basis for the agency's decision, because "identical words used in different [provisions] . . . are generally presumed to have the same meaning." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34, 126 S. Ct. 514, 523 (2005). Meanwhile, §1301.37(c), unlike those two provisions, uses the word "summary" rather than the word "findings." Given the difference in word choice, §1301.36(e) should not be read to have the same meaning as §1301.37(c). "[O]ur usual practice is to make the opposite inference." *Pacific Operators Offshore, LLP v. Valladolid*, 132 S. Ct. 680, 687-88 (2012) (citing *Russello v. United States*, 464 U.S. 16, 23, 104 S. Ct. 296 (1983)). This difference, moreover, makes sense. It is appropriate for a charging document to set forth merely a "summary" of the allegations. A decisional document like the ISO must include the basis for the decision; notice pleading is inapposite.

The need for detailed findings, rather than general conclusions, is further supported by DEA practice relating to "imminent hazard" determinations.  The Controlled Substance Act ("CSA") permits the Attorney General temporarily to schedule a substance in Schedule I where that is "necessary to avoid an imminent hazard to the public safety."  21 U.S.C. §811(h).  When making imminent hazard determinations, DEA provides far greater specificity than the Administrator has provided here.  On September 8, 2011, for example, the DEA issued an order temporarily placing three synthetic cathinones into Schedule I.  *See* 76 Fed. Reg. 55,616 (DEA No. 357).  In that order, the Administrator specifically addressed a number of factors, including the "History and Current Pattern of Abuse," the "Scope, Duration and Significance of Abuse," and "What, If Any, Risk There Is to the Public."  *Id.*

The Government also contends (at 4) that DEA should not have to make the findings required by §1301.36(e) because it would be "crippling" to "have to prepare its entire case before issuing an immediate suspension order."[2]  But a mere week after issuing the ISO, DEA was prepared to file in Court a 34-page declaration from Joseph Rannazzisi, a 19-page declaration of Ruth Carter, 48 exhibits, and a 42-page brief.  In any event, regardless of any burden imposed, to meet with the requirements of due process, as well as §1301.36(e), the Administrator must have a considered basis to make "imminent danger" findings *before* she issues an ISO denying a registrant a pre-suspension hearing.  Moreover, an "imminent danger" finding is not DEA's "entire case" for revocation.  *Compare* §824(d) *with* §824(b) (listing considerations relevant to revocation).  The Government has repeatedly sought to present to the Court additional issues—

---

[2]      The Government also complains (at 4) that Cardinal Health expects the ISO to "include every last bit of evidence that [DEA] considered."  That misstates Cardinal Health's position.  What is required is an explanation of DEA's findings that includes enough detail for the Court to review whether DEA "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  *Morall v. DEA*, 412 F.3d 165, 177 (D.C. Cir. 2005).

such as whether Cardinal Health complied with the MOA—that are relevant, if at all, only to the ongoing administrative proceeding.  The Government's strategic choice—to try to expand the scope of this litigation—is no justification for watering down the requirements of due process and of §1301.36(e).

Relying on *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871 (2011), and *Auer v. Robbins*, 519 U.S. 452, 117 S. Ct. 905 (1997), the Government asserts (at 3) that its contention that §1301.36(e) merely requires a "summary," and not specific findings, is entitled to deference. But the position the Government is now advancing is contrary to the plain text of the regulations and thus cannot be sustained even if the agency is afforded deference.  In any event, deference is not appropriate here.  While the Court deferred in *Chase Bank* and *Auer* to particular interpretations set forth in legal briefs, in neither case did it abandon the longstanding principle disapproving "'post hoc rationalizatio[ns]' advanced by an agency seeking to defend past agency action against attack."  *Chase Bank*, 131 S. Ct. at 881 (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212, 109 S. Ct. 468 (1988)) (emphasis altered from original).  To the contrary, the Court stressed in each case that the circumstances gave it "no reason to suspect" that the agency's brief "[did] not reflect the agency's fair and considered judgment on the matter in question."  *Chase Bank*, 131 S. Ct. at 881 (quoting *Auer*, 519 U.S. at 462); *see also Drake v. FAA*, 291 F.3d 59, 68 (D.C. Cir. 2002) (lack of "reason to suspect" interpretation was not "agency's fair and considered judgment" is "precondition" to deference).  That the agency was "not a party to this case" was a particularly important factor giving the Court that comfort.  *See Chase Bank*, 131 S. Ct. at 881.

The circumstances here give the Court reason to conclude that the Government's interpretation reflects counsel's "*post hoc* rationalization" rather than DEA's "fair and

considered judgment."  Differently from *Chase Bank* and *Auer*, the agency is a party, forcefully

defending its action of issuing an ISO.  Moreover, the Government's new interpretation did not

appear until its Supplemental Brief; the Government's initial response to Cardinal Health's

motion relied solely on §1301.37(c), which applies to OSCs, not ISOs.  "[I]t is likely that a

position ... developed hastily, or under special pressure ... is not the result of the agency's

deliberative processes."  *Nat'l Wildlife Fed. v. Browner*, 127 F.3d 1126, 1129 (D.C. Cir. 1997)

(internal quotation marks and citation omitted).  Finally, so far as Cardinal Health is aware,

"counsel's interpretation is advanced for the first time before this Court," *Farmer v. Hawk*, 991

F. Supp. 19, 30 (D.D.C. 1998) (refusing to defer to Government brief interpreting agency

regulation), *rev'd on other grounds sub nom. Farmer v. Moritsugu*, 163 F.3d 610 (D.C. Cir.

1998).

        Finally, requiring the "findings" contained in an ISO to be sufficiently detailed to permit

judicial review would accord with ordinary administrative procedures, due process, and common

sense.  An ISO is not, as the Government maintains (Govt. Supp. Br. 2), simply the beginning of

a proceeding.  An ISO is agency action with profound and immediate real world consequences,

which, by regulation, must rest on "findings regarding the danger to possible health and safety."

21 C.F.R. §1301.36(e).  The statute, moreover, expressly contemplates judicial review of those

findings.  *See* 21 U.S.C. §824(d).  To facilitate such review, an agency must "take whatever steps

it needs to provide an explanation that will enable the court to evaluate the agency's rationale at

the time of decision."  *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 654, 110 S.

Ct. 2668, 2680 (1990).  Providing factual findings sufficient to permit meaningful judicial review

of ISOs is particularly important because an ISO is issued without first providing the registrant

with an opportunity to be heard.  Absent the constraint of reasoned—and documented—

decisionmaking, the risk of the arbitrary use of the extraordinary power of suspending a registrant without due process crosses the line of fundamental fairness. *See, e.g., Haitian Refugee Center, Inc. v. Nelson*, 872 F.2d 1555, 1563 (11th Cir. 1989) (due process required interviewer at initial stages of immigration process to "set forth the factual basis for his recommendation with sufficient specificity to permit the [agency and court of appeals] to make a decision regarding the recommendation.").

## IV.  DEA MAY NOT RELY ON NEW RATIONALES APPEARING FOR THE FIRST TIME IN AFFIDAVITS PREPARED FOR LITIGATION

As explained above, both general principles of administrative law and the regulation applicable to ISOs require DEA to set forth the *findings* supporting an assertion of imminent harm in the ISO itself.  It is also clear as a matter of administrative law that the ISO can be sustained only on the basis of the *rationales* set forth in the document.  Thus, even if this were a case that required "'obtain[ing] from the agency, either through affidavits or testimony, . . . additional explanations of the reasons for the agency decision,'"—which it is not given the requirement that necessary "findings" be set forth in the ISO—those explanations would have to "be merely explanatory of the original record and should contain no new rationalizations*." Environmental Def. Fund v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981) (quoting *Camp v. Pitts*, 411 U.S. at 142-143).  Because any such "additional explanation[s]" would, by definition, be "*post hoc*," they "must be viewed critically."  *Overton Park*, 401 U.S. at 420; *see also Rodway v. Dep't of Agric.*, 514 F.2d 809, 816 & n.11 (D.C. Cir. 1975).

As a result, the Court should not consider rationales that appear nowhere in the ISO but that the Administrator now indicates she considered.  For example, the Administrator states that "Cardinal's prior compliance problems," pre-dating even the MOA, "played a significant role in" her decision to issue the ISO, Leonhart Decl. ¶ 18, yet those allegations are not mentioned in the

ISO, *compare* Moss Decl., Ex. A at 1-2.  Likewise, the Administrator now refers to "interviews conducted by DEA of certain CVS employees" that she "was made aware of."   Leonhart Decl. ¶ 24.  But although those interviews were included in the ISOs issued to CVS, they were not in the ISO issued to Cardinal Lakeland *on the same day*.  *Compare* ECF No. 14, Att. 21 (CVS 219 and 5195 ISOs), *with* Moss Decl., Ex. A.  The Administrator also now points to "information that was conveyed to [her]" about Cardinal Health's distributions to twenty-five other pharmacies, none of which the ISO mentions.  Leonhart Decl. ¶ 27.

## V.   DEA CANNOT DEFEND THE ISO ON FACTS OUTSIDE OF THE LEONHART DECLARATION

For the reasons set forth above, the ISO must stand or fall on the findings and the rationales articulated in the ISO itself.  But even putting this failing aside, the ISO cannot possibly be sustained on the basis of the *post hoc* rationalizations—never considered by the Administrator—that are set forth in the lengthy declarations by Joseph Rannazzisi and Ruth Carter (ECF Nos. 14-2 & 14-3) previously submitted by the Government and the reams of materials allegedly constituting the administrative "record" that the Administrator did not review in even summary fashion.  Any consideration by the Court of DEA's reasoning that extends beyond the ISO must at least be limited to the Leonhart Declaration submitted with the Government's Supplemental Brief.

As explained above, an agency's decision cannot be sustained on the basis of *post hoc* justifications.  Rather, it must be judged *solely by the grounds invoked by the agency*" when it made its decision.  *Chenery*, 332 U.S. at 196 (emphasis added); *State Farm*, 463 U.S. at 50.  Here, as the Government acknowledges, "'the decision to issue an ISO' was the Administrator's alone" to make.  Govt. Supp. Br. 12 (quoting Leonhart Decl. ¶ 11).  Her decision can only stand if she drew "'a rational connection between the facts found and the choice made.'"  *Morall*, 412

F.3d at 177.  Justifications and rationales offered by Mr. Rannazzisi or Ms. Carter in their

litigation declarations are wholly irrelevant to this Court's review.

Disregarding these settled principles, the Government argues that "the Administrator may

defend her decision based on everything that was 'before the agency at the time the decision was

made,'" including, apparently, facts and evidence the Administrator never considered.  Govt.

Supp. Br. 8 (quoting *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996)).  That

is not the law.  The *James Madison* case simply says that materials before the agency constitute

the record.  It does not say, as the Government suggests, that the Administrator may "defend"

*her* "findings" on the basis of materials she never even knew existed, much less actually

considered.  The other cases the Government cites are no different.  *See* Govt. Supp. Br. 8 (citing

*Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993); *Amfac Resorts, LLC v. Dep't of

Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001); *Pers. Watercraft Indus. Ass'n v. Dep't of

Commerce*, 48 F.3d 540, 546 n.4 (D.C. Cir. 1995)).  The Administrator, of course, could not

have found facts without "examin[ing] the relevant" evidence, at least in summary form.

*Compare Morgan v. United States*, 298 U.S. 468, 56 S. Ct. 906 (1936) ("[O]ne who decides,

must hear.").  Nor could the Administrator have drawn "'a rational connection between the facts

found and the choice made,'" *Morall*, 412 at 177, without considering the relevant facts.

This does not mean the Administrator could not in part "rely on summaries prepared by

agency staff."  *Nat'l Small Shipments Traffic Conf. v. ICC*, 725 F.2d 1442, 1450 (D.C. Cir.

1984).  It does, however, mean that evidence that was never included in any summaries she

*actually* relied on cannot salvage her decision now.  "[An agency's] counsel in the course of this

litigation [cannot] cure the [agency's] failure to articulate a rational explanation by pointing to

various sources that [the agency] possessed but [that the agency] never referred to" when making

- 13 -

its decision. *Penobscot Indian Nation v. Dep't of Housing*, 539 F. Supp. 2d 40, 53 (D.D.C.

2008). For "no matter how thorough counsel may have been in combing through the record and

picking out the materials they think support the [agency head's] finding, that is no substitute for

the [agency head] himself reviewing the record materials, examining the relevant data, and

coherently articulating the decision he made and the bases on which he in fact rested his

finding—which is, of course, his obligation under the APA." *Milk Industry Found. v. Glickman*,

949 F. Supp. 882, 895 (D.D.C. 1996).

　　　Here, the Leonhart Declaration makes clear that she did not consider, in even summary

form, much of the factual material previously submitted by the Government in its opposition to

Cardinal Health's motion for a preliminary injunction. Although the administrative record

submitted by the Government does not appear to contain a memorandum to the Administrator to

guide her decision whether to issue the ISO, the Administrator's declaration describes the

information before her. Paragraph 12 of the Administrator's declaration indicates that "[t]he

paragraphs that follow" in the declaration "outline the summary of information presented to [her]

by Mr. Rannazzisi and other DEA advisors …." Those subsequent paragraphs set forth certain

of the contentions previously relied upon by the Government and described in the Rannazzisi and

Carter declarations. *See* ¶¶ 13-17 (events leading to 2008 MOA); ¶¶ 19-23 (volume of

oxycodone shipped to pharmacies named in the ISO); ¶ 24 (CVS pharmacists). But the

paragraphs do not articulate a number of the allegations previously made by the Government.

For example, they do not describe the *post hoc* factual assertions made by Mr. Rannazzisi and

Ms. Carter regarding Cardinal Health's due diligence of the pharmacies named in the ISO or

provide any factual basis for the assertions that Cardinal Health violated its internal policies and

failed properly to report suspicious orders. These assertions—and the arguments previously

made by the Government in its brief opposing Cardinal Health's motion for a preliminary

injunction (*see, e.g.*, ECF No. 14 at 20-24)—thus are plainly not before the Court.

    For the same reason, most—if not all[3]—of the avalanche of materials submitted by the

Government as part of the certified "record" is not properly before the Court.  For example, the

purported agency record contains almost 7,000 pages of materials described as "Cardinal

Lakeland's Due Diligence Regarding Other Cardinal Lakeland Pharmacies."  *See* ECF No. 21-2

("Administrative Record Index").  But nowhere in her declaration does the Administrator assert

that she reviewed even summaries of that material.  Indeed, the Administrator does not assert

that she reviewed a summary of even the roughly 500 pages of materials relating to "Cardinal

Lakeland's Due Diligence Regarding the Four Named Pharmacies"—which is also included in

the purported record.  Nor does the Administrator state that she ever saw even summaries of

"Cardinal Lakeland's Standard Operating Procedures," which constitute another almost 600

pages of the asserted "record."  Given the press of time, Cardinal Health has not attempted to

identify every document in the asserted record that was not considered—in even summary

form—by the Administrator.  But even a limited review makes clear that the materials

---

[3]    It appears that DEA's Certification of Administrative Record—which is signed by
Deputy Assistant Administrator Rannazzisi—is contrary to applicable regulations.  In relevant
part, DEA regulations re-delegate the Administrator's authority to certify documents on behalf of
DEA to the Chief Counsel: "The Chief Counsel and the Director of DEA's Mid-Atlantic
Laboratory are authorized to execute any certification required to authenticate any documents
pursuant to 28 CFR 0.146."  The DEA has itself taken the position that this delegation of
authority is exclusive: "[O]nly the Chief Counsel has authority to authenticate DEA documents."
67 Fed. Reg. 58,988 (Sept. 19, 2002) (explaining need to add Director of DEA's Mid-Atlantic
Laboratory as delegee).  That Mr. Rannizzisi—not DEA's Chief Counsel—certified the
administrative record is not merely a technical failure, since Mr. Rannizzisi played a prominent
role in the investigation and in the decision to issue the ISO, submitted a sworn declaration in
this case, and has been designated as a witness by DEA in the upcoming administrative
proceedings.

considered by the Administrator were, by any measure, extraordinarily more limited than what DEA has submitted to the Court.

## VI.   THE ISO CANNOT BE SUSTAINED ON THE BASIS OF THE RATIONALES OFFERED BY THE GOVERNMENT IN ITS SUPPLEMENTAL BRIEF

None of the purported justifications for the ISO offered by the Government in its Supplemental Brief—all but one of which DEA offers for the first time in this litigation—supports a reasonable finding of "imminent danger to the public health or safety."

The 2008 MOA.  DEA contends that its allegations of "prior compliance problems" at Cardinal Health in 2007—allegations that were the subject of the 2008 MOA—"played a significant role" in the Administrator's decision to issue the ISO.   Govt. Supp'l Br. 14; *see also* Leonhart Decl. ¶ 18.  This rationale fails for at least five independent reasons.  First, this argument cannot be considered because the ISO itself does not assert that the allegations leading to the 2007 ISOs played any role in the Administrator's decision.  *See* Moss Decl., Ex. A at 1-2. Second, the Administrator fails to explain how compliance-related allegations dating back to 2007 can reasonably support an inference that Cardinal Health presents an "*imminent* danger to the public health or safety" in February 2012.  28 U.S.C. §824(d) (emphasis added); *see also Ciarpaglini*, 352 F.3d at 330 (under an "*imminent* danger" standard, assertions of mere "past injury" are insufficient); *Abdul-Akbar*, 239 F.3d at 315 (similar).  Third, DEA's 2007 and 2008 distributor initiative that lead to the 2007 ISOs principally related to sales to "Internet pharmacies," which is not alleged here.  *See* ECF No. 18 ¶ 11.  Fourth, the only *factual* support the Administrator purports to identify for the contention that Cardinal Health violated the MOA is that "Cardinal Lakeland had been distributing excessive quantities of oxycodone to its top Florida retail pharmacy customers."  Leonhart Decl. ¶ 18.  The 2008 MOA, however, imposed

no cap on the volume of controlled substances that Cardinal Health may distribute.[4]  Finally, in

the MOA, DEA expressly agreed to "[r]efrain from filing any administrative claims against

[Cardinal Health] within DEA's enforcement authority under 21 U.S.C. §§823, 824, and 842,

based on [the allegations contained in the 2007 OSCs]."  Leonhart Decl, Att. G at 7.  It is thus

DEA's resort to those same allegations in this proceeding—not Cardinal Health's conduct—that

violates the MOA.[5]

       The Four Named Pharmacies.  The Government also relies (at 18; Leonhart Decl. ¶¶ 19-

22) on Cardinal Health's aggregate yearly sales to four pharmacies—Gulf Coast Pharmacy,

Caremed, CVS 219, and CVS 5195—between 2008 and 2011.  Although this rationale was at

least articulated in the ISO, it cannot sustain DEA's immediate suspension of Cardinal Health.

       Cardinal Health's *past* sales to the four named pharmacies cannot support a finding of

"imminent danger" because the company is no longer distributing controlled substances to these

pharmacies and made clear before issuance of the ISO that it would cease to distribute to them if

the DEA believed those pharmacies were likely engaged in diversion.  *See supra*.  The

Administrator's reliance on years-old aggregate sales data from 2008, 2009, and 2010 (in

addition to 2011), Leonhart Decl. ¶ 19-22, is plainly unreasonable.  Yet, strikingly, while looking

to this old data in making a determination of "*imminent* danger," the Administrator ignores the

---

[4]      In her declaration, the Administrator also asserts that "Cardinal Lakeland had failed to maintain adequate diversion controls, had violated the terms of its 2008 MOA, and posed an imminent danger to the public health and safety."  Leonhart Decl. ¶ 18.  As noted above, however, the only *factual* finding purportedly identified by the Administrator—in the ISO or in her declaration—for these legal conclusions is her belief that Cardinal Health distributed "excessive volumes to its top Florida retail pharmacy customers." *Id.*

[5]      Under the 2008 MOA, the DEA "reserve[d] the right to seek to admit evidence of the [allegations contained in the 2007 OSCs] for proper evidentiary purposes … in administrative proceedings for non-covered conduct."  Leonhart Decl, Att. G at 7.  That provision is inapplicable where, as here, the Administrator actually uses conduct covered by the MOA as a *basis* for further administrative action.

most recent and relevant data from December 2011.  These data—which were undisputedly

before the Administrator, *see* Leonhart Decl., Att. J—show that Cardinal Health had terminated

*all* shipment of oxycodone to Gulf Coast Pharmacy and Caremed months before the ISO, *id.*

They also show that by December 2011, Cardinal Health's distribution of oxycodone to the CVS

stores had already decreased by at least 80% from the August/September 2011 levels.  *See* ECF

No. 18 ¶ 9; Leonhart Decl. ¶ 31 (acknowledging that evidence was before the DEA at time of

decision).

> Even if stale aggregate distribution data could ever be relevant to the "imminent danger"

inquiry, DEA's reliance on that data here was deeply flawed in several respects.  In her

declaration, the Administrator repeats the ISO's assertion that, "[f]rom 2008 to 2009, Cardinal

Lakeland's oxycodone sales to its top four retail pharmacy customers increased approximately

803%."  Leonhart Decl. ¶ 20; *see also* ISO (Moss Decl., Ex. A) at 2.  But to reach this inflated

percentage, DEA compared just *two months* of data in 2008 (November and December) to an

*entire year's* worth of data in 2009—a fact that was admittedly before the Administrator, *see*

Leonhart Decl., Att. J, and that renders the inflammatory 803% statistic irrelevant at best.  The

Government also contends (at 14) that the Administrator was "concern[ed]" because the volumes

of oxycodone distributed to the four pharmacies "were … increasing."  But Cardinal Health in

fact distributed *no* oxycodone to Gulf Coast Pharmacy or Caremed at the time of the ISO.  *See*

*supra*.  And, by December 2011, Cardinal Health's distribution of oxycodone to the CVS stores

had actually *decreased* by more than 80% compared with September 2011.  While the DEA's

incomplete presentation of the data may be the cause of the Administrator's misconception,[6]

---

[6]     The tabular data considered by the Administrator includes a "Percent Increase" column for 2008-2009 and 2009-2010, but omits a similar column for 2010-2011.  *See* Leonhart Decl., Att. J.

irrational concerns based on nonexistent trends do not meet the standard for reasoned agency decisionmaking.  These errors simply confirm the need for a careful administrative process.

DEA does not dispute that the CVS pharmacies at issue are open seven days a week (indeed, 24 hours a day in one case), and are located in a busy, upscale suburb of a densely populated area.  *See* ECF No. 18 ¶ 45; Leonhart Decl. ¶ 31 (acknowledging that evidence was before the DEA at time of decision).  In these circumstances, comparing sales to these stores to Cardinal Health's "average" sales (*see* Leonhart Decl. ¶ 22) is meaningless.  Indeed, the undisputed record establishes that the number of oxycodone prescriptions filled on a daily basis at the CVS stores likely constituted only a small percentage of total prescriptions dispensed at those stores.  *See* ECF No. 18 ¶ 46; Leonhart Decl. ¶ 31.  Neither the ISO nor the Administrator's declaration, however, grapples with this issue.  Because the Administrator "entirely fail[ed] to consider an important aspect of the problem," her decision does not comport with the APA.  *State Farm*, 463 U.S. at 43.

CVS Interviews.  The Government next attempts to justify its ISO on the basis of a rationale advanced for the first time in its supplemental brief: It claims that, at some point prior to issuing the ISO, the Administrator "was made aware of interviews conducted by DEA *of certain CVS employees*" that "gravely concerned" her.  Leonhart Decl. ¶24 (emphasis added); Govt. Supp. Br. 14-15.  Because this rationale is nowhere mentioned in the ISO, it amounts to an impermissible *post hoc* rationalization and should be disregarded in this proceeding.

These interviews, moreover, are irrelevant for an additional reason:  There is simply no evidence in the record considered by the Administrator reasonably linking Cardinal Health to the information allegedly uncovered by DEA through these interviews.  DEA says it learned that two CVS pharmacists were not sufficiently well-versed in screening out illegitimate prescriptions.

*Id.*  On that basis, the Administrator contends that "*CVS 219 and CVS 5135* [sic] posed a high risk of diversion."  *Id.* (emphasis added).  The Administrator, however, could not—and did not—draw any such conclusion with respect to Cardinal Health.  Nor did the Administrator conclude that Cardinal Health was aware of the information DEA claims to have learned from the CVS employees.

The Government now cites internal Cardinal Health emails it contends show that Cardinal Health had reason to know of problems at the CVS stores.  Govt. Supp. Br. 15.  But this *post hoc* rationalization of the Administrator's *post hoc* rationale merely compounds DEA's problem under *State Farm*.  *See* 463 U.S. at 50.  In any event, the Government's second-order rationalization fails on its own terms.  The emails cited by the Government do not provide a basis to conclude that Cardinal Health was aware of the alleged problems at the CVS stores.  For example, the Government cites one email as proof that Cardinal Health had knowledge that "CVS 219 was 'adamant[ly]' refusing to provide information Cardinal requested in response to Cardinal's inquiries into CVS 219's high oxycodone sales."  Govt. Supp. Br. 15 (citing AR 272-273).  But the full text of the email says:  "They will not provide the *doctor or patient information* you requested unless it is requested by the DEA.  He was quite adamant about this."  AR 273 (emphasis added).[7]

Other *Post Hoc* Justifications Of The ISO.  The Government also attempts to engineer (at 15-16) three additional rationalizations of DEA's decision to issue the ISO, alleging that

---

[7]   Moreover, contrary to DEA's suggestion, another Cardinal Health email cited by the Government does not establish that a CVS pharmacist told Cardinal Health an obviously false statement—that CVS 219 was "the only pharmacy in the [Sanford] area willing to carry" oxycodone.  Govt. Supp. Br. 15 (citing AR 305 (bracket in Government brief)).  The email in question does not identify the relevant area as Sanford; that is a product of the DEA's own bracketed addition to the quote.  Instead, it states, "I think this is the location that said they are the only pharmacy in the area willing to carry" oxycodone.  AR 305

Cardinal Health reported an "unacceptably low level of suspicious order[s]," "violated its own internal safeguards," and "did not conduct any on-site store investigations of either CVS 219 or CVS 5195 prior to being served with the investigative warrant."[8]   None of these considerations was supported by factual findings in the ISO.  Nor are they supported by the newly submitted Leonhart Declaration.  The Administrator's declaration does not set forth any evidence regarding alleged failures to report suspicious orders by Cardinal Health or alleged violations of internal procedures.  *See* Leonhart Decl. ¶¶ 24, 33 (setting forth conclusory assertions).  The declaration also does not indicate that the Administrator considered any specific evidence about whether Cardinal Health conducted site visits of the two CVS stores; it mentions only an alleged Cardinal Health *policy* with regard to chain pharmacies.  *See id.* ¶ 27.  As a result, even if the Court could consider rationales beyond those set forth in the ISO, it could not consider these mere arguments of counsel based on facts never before the Administrator.  *See supra*.  In any event, none of these contentions—even if potentially relevant to an OSC—could credibly be said to support a finding of imminent danger.  Indeed, DEA concedes that it knew about Cardinal Health's policies regarding national chain pharmacies and suspicious order reporting as far back as 2009.  *See* ECF No. 18 ¶¶ 33, 36.

Nor is there any merit to DEA's new *post hoc* theory (at 17) that the Administrator issued the ISO in part because Cardinal Health was distributing above-average amounts of oxycodone to another twenty-five Florida pharmacies.  The ISO does not mention any of these pharmacies, and it is too late for DEA to raise the issue in litigation.  Furthermore, even if those pharmacies were a proper consideration in this proceeding, DEA offers no basis even remotely supporting

---

[8]   DEA chides Cardinal Health for not producing sooner an email that proves Cardinal Health's due diligence efforts (and a site visit) to CVS 219.  But counsel for Cardinal Health told DEA that its production of documents would not be completed until the end of February, and DEA raised no objection.  *See* Declaration of Delia A. Stubbs ¶¶ 3-4 (ECF No. 16-4).

the inference that distribution to these stores poses an "imminent danger." DEA's primary allegation with respect to these pharmacies is that Cardinal Health has distributed above-average quantities of oxycodone to them. But it is simple arithmetic—indeed, it is inherent in the definition of "average"—that at least *some* of Cardinal Health's approximately 2,700 Florida customers will purchase above-average levels of oxycodone. That does not, without more, support an inference that these stores create an unreasonable risk of diversion—much less that Cardinal Health's continued registration at Lakeland poses an "imminent danger to the public health or safety." 21 U.S.C. §824(d). DEA itself has recognized that volume alone, without more, is inconclusive of diversion. *See* ECF No. 5 at 17.

 DEA's Disregard For Cardinal Health's Remedial Efforts. The Government also attempts (at 17-18) to rationalize DEA's decision to dismiss the evidence of Cardinal Health's remedial measures. Again, because this justification came for the first time in litigation, it cannot be considered. In any event, the Administrator's assertion that she "give[s] less weight to remedial measures and decreased sales that occur following the execution of" a warrant simply confirms DEA's disregard of the "imminent danger" standard governing issuance of an ISO. Remedial measures mitigate danger whenever they occur. The Administrator's refusal to credit Cardinal Health's remedial measures also violated the agency's obligation under the MOA to "favorably consider … any remedial actions taken by Cardinal to address [] alleged or perceived violative conduct." Leonhart Decl, Att. G, §II.2.f. Finally, it was also contrary to law for the Administrator to dismiss Cardinal Health's efforts on the ground that Cardinal Health asked the DEA for help in identifying problematic customers. Leonhart Decl. ¶ 30. DEA has conceded that "[d]istributors and their trade associations have repeatedly asked DEA to provide ARCOS Data," ECF No. 18 ¶ 29, and that DEA has in the past flagged customers it believed raised

suspicions, *see id.* ¶ 32.  Cardinal Health never conditioned its continued commitment to anti-diversion on DEA's willingness to cooperate; it simply requested information available exclusively to DEA to further improve its own anti-diversion program.  Such cooperation would enhance the DEA's and Cardinal Health's shared anti-diversion objectives, and it would *diminish* the danger posed by controlled substances to the public health and safety.  DEA cannot reasonably conclude that such requests somehow create an "imminent danger to the public health or safety."

## CONCLUSION

For the foregoing reasons and for the reasons set forth in Cardinal Health's prior pleadings in support of its Motion For Preliminary Injunction, Cardinal Health respectfully requests that this Court issue a preliminary injunction that prevents DEA from enforcing the ISO pending final judgment in this action.

Respectfully Submitted,

/s/ Randolph D. Moss

Douglas B. Farquhar (Bar No. 386573)  
Hyman, Phelps & McNamara, P.C.  
700 13th Street, N.W.  
Suite 1200  
Washington, D.C.  20005  
Tel.: (202) 737-9624  
Fax: (202) 737-9329  
dfarquhar@hpm.com  

Randolph D. Moss (Bar No. 417749)  
Brian M. Boynton (Bar No. 483187)  
Wilmer Cutler Pickering Hale and Dorr LLP  
1875 Pennsylvania Avenue, N.W.  
Washington, D.C.  20006  
Tel.: (202) 663-6000  
Fax: (202) 663-6363  
randolph.moss@wilmerhale.com  

Dated:  February 27, 2012

*Counsel for Cardinal Health, Inc.*