1                IN THE UNITED STATES DISTRICT COURT

2                **FOR THE DISTRICT OF COLUMBIA**

3   CARDINAL HEALTH, INC.,            .
                          Plaintiff,   .
4   vs.                               .   Docket No. CV 12-185
                                      .
5   ERIC H. HOLDER, JR., et al.,      .   Washington, D.C.
                                      .   February 29, 2012
6                    Defendants.       .
    . . . . . . . . . . . . . . . . .  .
7

8                 TRANSCRIPT OF MOTIONS HEARING

9           BEFORE THE HONORABLE JUDGE REGGIE B. WALTON

10                UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  For the Plaintiff:   Randolph D. Moss, Esquire
                         Brian M. Boynton, Esquire
13                       WILMER HALE
                         1875 Pennsylvania Avenue, NW
14                       Washington, D.C. 20006

15                       Douglas B. Farquhar, Esquire
                         HYMAN, PHELPS & McNAMARA, P.C.
16                       700 Thirteenth Street, N.W., Suite 1200
                         Washington, D.C. 20005
17
                         Craig S. Morford, Esquire
18                       CARDINAL HEALTH
                         7000 Cardinal Place
19                       Dublin, OH 43017

20

21

22

23

24

25

```
 1    APPEARANCES:   [Cont'd]

 2    For the Defendant:   C. Lee Reeves, Esquire
                           Laura Eddleman Heim, Esquire
 3                         Arthur R. Goldberg, Esquire
                           U.S. DEPARTMENT OF JUSTICE
 4                         Civil Division
                           20 Massachusetts Avenue, N.W.
 5                         Washington, D.C. 20530

 6                         Dedra S. Curteman, Esquire
                           Larry P. Cote, Esquire
 7                         U.S. DEPARTMENT OF JUSTICE
                           Drug Enforcement Administration
 8                         Office of Chief Counsel
                           8701 Morissette Drive
 9                         Springfield, VA 22152

10

11    Court Reporter:   Cathryn J. Jones, RPR
                        Official Court Reporter
12                      Room 6521, U.S. District Court
                        333 Constitution Avenue, N.W.
13                      Washington, D.C. 20001

14

15

16

17    Proceedings recorded by machine shorthand, transcript
      produced by computer-aided transcription.
18

19

20

21

22

23

24

25
```

                              P R O C E E D I N G S

1                             THE DEPUTY CLERK:  Civil Action No. Cardinal

3      Health versus Eric Holder, et al.

4                             Counsel, please come forward and identify yourself

5      for the record.

6                             MR. MOSS:  Good afternoon, Your Honor.  Randy Moss

7      from Wilmer Cutler Pickering Hale and Dorr on behalf of

8      Cardinal Health.  With me today is Craig Murford, the chief

9      legal counsel with Cardinal Health; Doug Farquhar from

10     Hyman, Phelps and McNamara; and Brian Boynton from Wilmer

11     Cutler Pickering Hale and Dorr.

12                            THE COURT:  Good afternoon.

13                            MR. REEVES:  Your Honor, good afternoon.

14     Lee Reeves of the United States.  With me at counsel table

15     from the Department of Justice are Arthur Goldberg and

16     Laura Heim.  And from the DEA, Larry Cote and

17     Deidra Curteman.

18                            THE COURT:  Good afternoon.  Very well.

19                            We're here on the motion of Cardinal Health for a

20     preliminary injunction.  Counsel for Cardinal may proceed.

21                            MR. MOSS:  Thank you, Your Honor.  There's been a

22     great deal of paper exchanged in this, rather, short-lived

23     case but the issues before the Court are narrow.  This case

24     is not about the merits of the ongoing administrative

25     proceeding.

1          Cardinal Health understands the importance of

2    preventing diversion.  It has invested enormously in people

3    and in sophisticated analytic tools to do so.  It has

4    terminated hundreds of customer accounts over the years.  It

5    works at diversion control everyday and it's constantly

6    striving to do better.  And we intend to have a full

7    exchange of views with the DEA in the administrative

8    proceeding about those issues.

9          The only question that is before the Court today

10   is whether the agency has carried its very heavy burden of

11   dispensing with due process and immediately suspending the

12   Lakeland facilities' registration.  Where doing so will

13   cause enormous injury to Cardinal Health and will cause

14   disruption to the distribution of pharmaceutical products in

15   Florida.

16         As a matter of statute, regulation and due process

17   to do so the administrator was required to make findings

18   showing that immediate action was necessary to avoid an

19   imminent danger to public health or safety.  On numerous

20   grounds the agency has failed to do so.

21         Let me start, Your Honor, with a basic at law

22   principle.  Now the Supreme Court held in *Camp versus Pitt*

23   where an agency provides, quote, a contemporaneous

24   explanation of its decision.  The validity of the agency's

25   decision must stand or fall on the proprietary of the

1   findings that appear in that decision.

2          THE COURT:  And what about the affidavit that's

3   now been submitted?

4          MR. MOSS:  Your Honor, as I would like to discuss

5   in greater detail, we don't believe that the affidavit can

6   properly --

7          THE COURT:  Why not?  I mean, there have been

8   cases from this Circuit and from other Circuits and from

9   other district courts that say that when the Court believes

10  that a remand is appropriate, in order for the agency to

11  provide further explanation for its action, that that's

12  appropriate.

13         MR. MOSS:  Well, Your Honor, here -- this case

14  differs from the circumstance in which a case like Overton

15  Park, where there is some ambiguity with respect to the

16  basis for the agency's action and the agency subsequently

17  provides an affidavit which further explains the basis for

18  them.  And the reason it's different, Your Honor, is that in

19  a case like Overton Park there were not findings.

20         And the Courts are, have been clear is that where

21  the agency actually has made findings, and this is

22  _Camp versus Pitt_, that the decision has to stand or fall

23  based on those findings.  And here it goes beyond the fact

24  that there just happened to have been findings here, Your

25  Honor.  In addition to that, the agency's own regulations

1   require that the ISO contain a statement of the

2   administrator's findings regarding the danger to the public

3   health or safety.  And in fact --

4           THE COURT:  But she did indicate, she indicated in

5   conclusionary terms what her findings were.

6           MR. MOSS:  Right.  Your Honor, but more than

7   conclusory terms are required and for good reason.

8           THE COURT:  But if she only indicates conclusory

9   terms and the case comes before the court and we're talking

10  about public safety, and the Court believes that the factual

11  predicate that is set forth in the order is not sufficient,

12  you're saying that the Court can't ask for a further

13  explanation of why, at that time, when the order was issued

14  the decision was made?

15          MR. MOSS:  I think that's correct, Your Honor, for

16  a couple of reasons.  Here, this is not a case in which

17  there is just an ambiguity, with respect to what the agency

18  found.  Not only did the regulations require that her

19  findings be contained in the ISO --

20          THE COURT:  Well, I don't read all those cases

21  where remand has deemed to be appropriate and the Court

22  considers further explanations provided to only say that

23  there has to be ambiguity as the predicate.

24          MR. MOSS:  Well, what can happen, Your Honor, I

25  believe on those cases is that there can be further

1    explanation under some circumstances, in limited

2    circumstances, of what the agency intended in its finding.

3    But here, Your Honor, not only did the regulations require

4    that the ISO actually contain the findings, but the ISO,

5    itself, says in it, in more than one place, in two places it

6    says that the administrator's decision is based under the

7    facts and circumstances described herein.

8            And the last time we were here the government got

9    up and said, well, Your Honor, well, there's a reference to

10   the memorandum of understanding.  And we ought to understand

11   that then to open the door and to permit us to go back and

12   further explain what that reference to the memorandum of

13   understanding says.

14           But what the ISO actually says is, it says that

15   the administrator's conclusion that there was a violation of

16   the memorandum of understanding was based on, quote, the

17   conduct described herein.  And certainly the, you know, the

18   administrative law is clear, that the agency's decision has

19   to stand based on the rationale the agency has given.  And

20   the agency has given as its rationale and it has said that

21   it was based on the conduct described in that document.

22           And Your Honor, I would submit that it is a

23   dangerous proposition, particularly in the world where an

24   agency is acting without providing prior due process.  To

25   permit an agency to simply include a conclusion in a

1   finding.  And then to come back, after the fact when pressed

2   in litigation, and to say, here's the basis for that

3   conclusion.

4          It invites post hoc rationalization and we've

5   certainly seen a considerable amount of it here, in

6   virtually every other context where the agency is charged

7   with making findings.  It does it and it actually

8   understands what it means to make findings and it makes

9   detailed findings when it does so.

10          It doesn't permit an opportunity for meaningful

11   judicial review as the twist and turns of this case have

12   amply highlighted.  Where an agency simply sets forth a

13   conclusion and then, afterwards, when a case is on judicial

14   review, then goes back in the heat of litigation and then

15   tries to justify that decision.

16          It's a -- you know, in the ordinary course,

17   sometimes there may be ambiguity and the Court may need to

18   address the ambiguity.  But in the ordinary course the

19   Courts don't pick up an administrative agency's decision,

20   where the agency has by law been required to state its

21   reasons and its findings.  And then say, you know, lets give

22   the agency another chance to explain this because it's not

23   adequate.

24          And I would submit that in this context it really

25   does invite arbitrary agency action, where the agency could

1    simply say, we conclude that there was a violation of the

2    requirement of having controls.  I mean, there are not a

3    whole lot of general legal requirements in this area.  There

4    are a handful.  And you say, we conclude that you have

5    violated one of these duties and therefore, we issue the

6    ISO, you know, reasons to follow.

7            That really does invite, particularly where

8    there's not been pre-depravation due process, a real risk of

9    abuse in the process.  It doesn't permit the Court to engage

10   in the judicial review that is actually contemplated by

11   statute.  It's not how the DEA, in other context, has

12   understood the concept of making findings and in this

13   context, if anything, I would submit it's more important.

14           And one final thing I would note about this, Your

15   Honor, is that the regulation actually requires that DEA

16   make findings with respect to the danger to public health or

17   safety.  The regulation actually requires that the agency

18   draw that nexus and connect its finding with respect to what

19   the danger to the public is.

20           And this is not a case in which the agency didn't

21   attempt, purport to make findings.  It made findings.  It

22   made findings that it just turns out are not adequate to

23   justify what it's doing.  And it has since then been trying

24   to back @@felt and come back and come up, back with

25   different rationales.  And that is the reason why there's a

1    very, very strong presumption of the law against permitting

2    post hoc rationalization.  Sure, you know, on occasion,

3    explanation but not post hoc rationalization.

4              And here's what we know about what the

5    administrator of DEA knew at the time that she issued the

6    ISO.  She says and concedes that at the time she issued the

7    ISO -- well, I should just back up.  The ISO contains these

8    findings with respect to the four stores; Caremed, Gulf

9    Coast and two the CVS stores.  That's all the ISO refers to

10   with respect to findings of fact.

11             She then concedes, in her declaration, that she

12   was aware at the time that she issued this truly

13   extraordinary remedy of purporting to close down a facility

14   without due process.  And she says that she was aware or

15   conceded that she was aware that Cardinal Health had

16   voluntarily terminated distribution of controlled substances

17   to Caremed and Gulf Coast months before the ISO issued.

18             And she was also aware that Cardinal Health did so

19   before DEA had served its administrative inspection warrants

20   on Cardinal Health.  She was also aware, at the time that

21   she signed the Cardinal Health ISO, that she was

22   simultaneously suspending the two CVS stores.  So, Cardinal

23   Health's sales to those stores could not have posed an

24   imminent danger to public health or safety.  She was

25   suspending them.

1           She knew that months before the ISO issued

2     Cardinal Health instructed its pharmacies to stop filling

3     prescriptions for 22 doctors that accounted for a majority

4     of the oxycodone dispensing in the two stores.  And she knew

5     that by December, Cardinal Health's distribution of

6     oxycodone to the two CVS stores had decreased by at least 80

7     percent from the August, September time frame.  At pages two

8     to three of our records submission we've made, there's a

9     chart which shows how well before the ISO issued there was a

10    substantial fall off from those two stores.

11          The second problem, Your Honor, with DEA's

12    argument is that it ignores the separate requirement of

13    administrative law, that not only must the ISO stand on the

14    findings it includes or not but in addition to that, it

15    clearly has to rise or fall based on the rationale provided

16    in the decision.  You know, that's Chenery, it's State Farm.

17          You know, as the Supreme Court has said it is a

18    simple but fundamental rule of administrative law, that a

19    reviewing court in dealing with the determination or

20    judgment which an administrative agency alone is authorized

21    to make, must judge the propriety of such action solely on

22    the grounds invoked by the agency in its decision.

23          That's, you know, a bedrock principle.  And here

24    the DEA has attempted to go way beyond the rationale offered

25    in the ISO.  There's nothing, at all, in the ISO about sales

1    to other pharmacies, nothing at all.  There's nothing in the

2    ISO about whether Cardinal Health complies with its own

3    controls.  There's nothing about the interviews, that we're

4    told about now, that DEA conducted with CVS employees.

5    That's post hoc and none of it can support the decision

6    under review.

7           But even if it were appropriate to consider the

8    administrator's post hoc declaration, and we submit that

9    it's not, it would not change things here.  To start with,

10   Your Honor, the administrator's declaration itself, at

11   Paragraph 36, states that she believes that there is an

12   imminent, quote, possibility of public harm.  That's not the

13   standard for this drastic action.

14          The standard for this drastic action is that there

15   actually has to be an imminent danger to public health or

16   safety.  And it's just not, that's not a slip of the pin

17   that she backs off in making that finding with respect to

18   Cardinal Health.  And indeed, in the parallel paragraph in

19   the declaration that she has filed in the case dealing with

20   the two pharmacies that's before this Court, she doesn't

21   make that change.

22          That is, you know, that is a meaningful change

23   backing off from what the statute actually requires.  She

24   also --

25          THE COURT:  She does, she does cite statistics

1   regarding the number of deaths associated with the type --

2   with the use of these types of drugs and also, the

3   significant addiction problem that exists in that part of

4   Florida.

5         MR. MOSS:  She does, Your Honor.  And --

6         THE COURT:  And obviously, with that problem, I

7   think one can reasonably infer that it's resulting from the

8   diversion of drugs that are supposed to be used for

9   appropriate purposes being diverted for other use.

10        MR. MOSS:  Your Honor, and we don't dispute that

11  --

12        THE COURT:  I mean, it seems to me that you're

13  setting a barrier that the DEA probably would never be able

14  to overcome, in order to justify taking action to curve what

15  statistically, clearly is a major problem.

16        MR. MOSS:  Your Honor, it certainly cannot do so

17  in a case where it points to just four stores and there are

18  not sales taking place in those four stores.  That's not

19  saying that the DEA can't take action with respect to --

20        THE COURT:  Well, I guess their position is that,

21  well, there's been a history of problems with your client in

22  reference to diversion or not having in place appropriate

23  controls to make sure diversion isn't taking place.  Now,

24  we've got a significant distribution of a large amount of

25  this substance compared to what is being distributed by

1   other, by other companies.  And we've got this major problem

2   in this part of the world where this distribution is taking

3   place.

4           And she's saying, I guess, that we've got this

5   history.  We've got the current situation and, therefore,

6   under those circumstances, we believe immediate action has

7   to be taken.  Otherwise, you're going to have a significant

8   problem, as far as loss of life and significant addiction

9   problems that we need to address immediately.

10          MR. MOSS:  Right.  Well, Your Honor, first of all,

11  with respect to the history.  What she points to with

12  respect to the history is, are the ISOs from 2007 in the

13  MOA, from 2008.  The events from that period of time cannot

14  possibly support today an imminent danger to the public.

15  But indeed, back then when that occurred, that dealt with a

16  circumstance in which the company stood up to it, recognized

17  it had to do something about it and made very substantial

18  changes.  In light of --

19          THE COURT:  The issue of imminent harm is not

20  today, is it?  It's imminent harm that existed at the time

21  the suspension order was issued.

22          MR. MOSS:  I'm sorry?

23          THE COURT:  The imminent harm that we're talking

24  about is the imminent harm that the administrator perceived

25  existed at the time the order was issued, not today.

1           MR. MOSS:  Well, Your Honor, I think for purposes

2    of the Administrative Procedure Act, that's correct.   I

3    think for purposes of the due process clause, I disagree

4    with that.  And for purposes of just the due process

5    question, about whether the DEA can continue to suspend the

6    registrants' license to practice.

7           THE COURT:  So, if the DEA has reason to believe

8    that a pharmaceutical is putting on the market a large

9    amount of drugs that are being diverted and causing death

10   and havoc to people's lives and the pharmaceutical company

11   becomes aware of the fact that the DEA is investigating them

12   and therefore, they stop everything that they were doing to

13   cause the harm.  Then, you're saying you can come into court

14   and say, well, there's a due process problem.  Because while

15   there may have been a problem previously, there's no problem

16   now based upon these events that have taken place, after the

17   fact?

18          MR. MOSS:  Well, Your Honor, I think the only

19   events, after the fact, that we're pointing to here, and I

20   don't think it's even necessary to even point to it, is the

21   fact that consistent with Cardinal Health's assurances to

22   the DEA, before the DEA acted, that Cardinal Health would

23   cease distribution to any pharmacy that the DEA identified

24   as likely engaged in diversion that Cardinal Health would do

25   so.  And so, the only fact with respect to that is Cardinal

1   Health in fact was true to its word and did that.

2             But the Court doesn't even need --

3             THE COURT:  I'm saying, is that determinative?  I

4   mean, if a pharmacy -- I'm not saying this is the case with

5   your client.  But if a pharmaceutical company was clearly

6   distributing a large amount of drugs without the proper --

7   the appropriate controls in place to avoid diversion and

8   then it comes under investigation by the DEA, and it makes

9   promises that what it won't do in the future, you're saying

10  that that gets them off the hook?

11            MR. MOSS:  Your Honor, I'm not saying that

12  categorically that would, you know, always be the case.  I

13  think that the Court would have to look at the particular

14  circumstances and make a judgment, and in the due process

15  context, its own judgment about whether there in fact is an

16  imminent danger to public health or safety.  And I would

17  submit here, Your Honor, there's not anything that have come

18  close to make -- to supporting that findings.

19            And if I could, Your Honor, I'd like to actually

20  take a minute to walk through exactly what it is that the

21  administrator now says she relied on.  Because I don't think

22  any of it comes close to satisfying what needs -- what's

23  required here, in this extraordinary circumstance of

24  depriving the company of its registration before the hearing

25  which is scheduled to commence promptly.

1            The first thing that she says, Your Honor -- I

2     mean, I should say, by the way, that it's unclear whether in

3     deciding to issue the ISO she reviewed any documents, other

4     than the letter that Cardinal Health submitted to the DEA

5     and the volume information that's actually referred to in

6     the ISO.

7            In fact, other than the congressional testimony,

8     various ISOs, orders to show cause and the MOA that she

9     references and attaches to her declaration, her declaration

10    cites to only six pages from the material, from a record

11    which the DEA asserts contains roughly 10,000 pages of

12    material.  And those six pages deal exclusively with volume.

13           But she starts, Your Honor, by talking at

14    Paragraphs 13 through 18 about the 2007 ISOs and the 2008

15    MOA.  As I mentioned, the events from 2007 and 2008 can't

16    possibly support an imminent danger today.  And, indeed, DEA

17    in 2008 returned to the Lakeland facility its registration.

18    And the DEA could only have done that based on the DEA's

19    determination, at that point in time, that it was in the

20    public's interest for Cardinal Health to possess that.

21           And as I've said, Your Honor, Cardinal Health has

22    made enormous changes since then.  Cardinal Health has faced

23    up to what happened back then, has accepted responsibility

24    and has invested enormous amounts of money, has made very

25    substantial changes in personnel to step and to try an

1    address those issues.

2         At the same time, the MOA actually released DEA's

3    administrative claims against Cardinal Health relating to

4    those past events.  And there's nothing in the ISO to

5    suggest that DEA is acting based on what happened before the

6    2008 Memorandum of Agreement.  To the extent, Your Honor,

7    that what, what the DEA is now saying is, you've violated

8    that MOA and it's the violation of the MOA now that causes

9    us concern.

10        They still have to point to what the violations of

11   the MOA are.  They haven't done that.  It can't simply be

12   that we say -- they come in and they say, we assert that you

13   violated the MOA.  They have to make specific findings about

14   that.

15        The administrator then says --

16        THE COURT:  Well, she -- I mean, she does do that

17   in her Affidavit, Declaration.

18        MR. MOSS:  As I walk through it, Your Honor, I

19   don't think she does.  I -- she makes some general

20   references.  I don't think she talks about any, certainly,

21   about any violations of the MOA where she ties it to any

22   imminent danger to public health or safety.

23        And we completely understand Your Honor's concern.

24   I mean, dealing with these controlled substances is

25   dangerous business.  There is a balance that goes on.

1    There's a balance that goes on that the DEA recognizes, that

2    the public health community recognize.

3           And the balance that goes on, Your Honor, is

4    between ensuring the people who actually need medications,

5    who need pain relief who are suffering, get what they need

6    and preventing diversion.  And in fact the DEA, itself and

7    Mr. Rannazzisi, himself, has referred to and has stressed

8    the tremendous challenge to law enforcement when dealing

9    with pharmaceutical controlled substances is often

10   distinguishing among legitimate medical uses and illicit

11   uses.  The DEA does not regulate the practice of medicine.

12          If anything, a wholesaler is even in less of a

13   position to do so.  It doesn't have access to the patients.

14   It doesn't have access to the doctors in doing so.  And it

15   is an extremely challenging process for it to do so.

16          What the administrator points to is she says,

17   well -- and this is then going on to paragraphs 19 and 23 in

18   of her declaration.  She says, she was aware of volumes of

19   sales to the four stores.  That's what the case is about.

20   That's what's in the MOA.

21          We've discussed that in the volume of sales to

22   those four stores does not support a finding of imminent

23   danger.  And even if the Court didn't, did not examine the

24   fact that Cardinal Health voluntarily agreed as soon as it

25   received notice of the DEA's allegations, with respect to

1    the two stores, to cut it off.  Even if you don't reach

2    that, the oxycodone distribution to those two stores had

3    fallen off by 80 percent before the agency acted.

4              And in any event, the administrator, herself, cut

5    off those two stores.  So, it can't be that any of those

6    fours the stores present a problem.

7              But the DEA's analysis, both in the

8    administrator's declaration and in the ISO itself, are

9    fundamentally flawed.  I mean, there's a lot of attention to

10   averages, a lot of talk about numbers and sky rocketing

11   numbers.  But there's no attempt to actually put that, those

12   numbers into any context of what they actually mean.  And

13   I'll just give you one example, Your Honor.

14             The DEA in the ISO and the administrator in her

15   declaration says, that the Lakeland facility from 2008 to

16   2009 increased its sale of oxycodone to the four pharmacies

17   by over 800 percent.  What it doesn't say is, it's because

18   of the earlier ISO for the first ten months of 2008 that

19   that facility wasn't distributing any oxycodone to the

20   stores in Florida.

21             So, what the DEA is doing, in coming up with this

22   shocking 800 percent figure, is comparing two months of

23   sales in 2008 with 12 months of sales in 2009.  And that's

24   the reason, that's a perfect example of why it's important

25   that the agency actually have to set forth its reason in

1    it's decision.  So you can actually look at it.  And

2    somebody who has been the subject of this extraordinary

3    action by the DEA can look at it and say, oh, there's a

4    problem here.  They've made a mistake.

5            And if the agency only comes back after the fact,

6    in a sort of continuing series of filings and tries to

7    justify what it's done, you don't have that, you don't have

8    that same benefit.  But in any event, what the, what the

9    agency is doing is looking at --

10           THE COURT:  I mean, in that regard, what I'm

11   reading -- now, maybe there's something else that you can

12   cite to in the ISO.  But in the second paragraph it says,

13   the basis for this order to show cause and immediate

14   suspension of registration is set forth in the following

15   non-exhaustive summary of facts.

16           If the Court, as I was, was of the view that the

17   summary of facts set forth in the ISO is not sufficient for

18   me to intelligently assess whether or not there was a

19   sufficient basis for the agency's action, it seems to me

20   that that language clearly would give me the authority to

21   remand, to have the administrator tell me what were these

22   other facts that you had before you that formed the

23   predicate for your action.

24           MR. MOSS:  And two things with respect to that,

25   Your Honor.  First of all, I don't actually think that that

1   is the relevant and operative language here.

2           THE COURT:  Where is it then?

3           MR. MOSS:  Your Honor, I think that if you turn to

4   page three -- because that is general language that refers

5   both to the order to show cause and the immediate

6   suspension.  And it's just general boilerplate language.

7           But if you turn to page three; first of all, in

8   paragraph five, in the last sentence of paragraph five.  It

9   says, In addition, Cardinal Health's conduct described

10  herein violated the provisions of the administrative

11  memorandum agreement.  And the only conduct described herein

12  is the conduct relating to the four stores.  And then,

13  further down, Your Honor, in the paragraph that begins with

14  the bolded in, it says, in view of the foregoing and

15  pursuant to the statutory provisions, it is my preliminary

16  finding that Cardinal Health's continued registration is

17  inconsistent with the public interest under the facts and

18  circumstances described herein.  It is my conclusion that

19  Cardinal Healths' continued registration, you know, and so

20  forth --

21          THE COURT:  But don't you have to read that

22  language in conjunction with the earlier language that I

23  referenced?

24          MR. MOSS:  Your Honor, I think that the language

25  that has to control is the language that is specifically

1    talking about -- and the language I was just reading is the

2    language that specifically deals with the immediate

3    suspension decision, not with the broader boilerplate

4    language about the document which is both an immediate

5    suspension and an order to show cause.

6            But also, Your Honor, this is a decision by the

7    agency.  This is a document which is doing two things.  One

8    is, it is a, it is initiating a proceeding in order to show

9    cause proceeding, in which notice pleading is sensible.

10   Here is a non-exhaustive list of what our problems are.

11           We -- the DEA has now filed, with the

12   administrative law judge, it's prehearing statement.  We're

13   in the process of preparing ours, which is due at the end of

14   the week.  In that, we are required to spell out our

15   respective divisions in greater detail.  That's the way the

16   process makes sense and works.

17           But where the agency is wielding what is an

18   extraordinary power.  It is saying that, we are going to,

19   before we give you a hearing, we are going to shut down your

20   ability to distribute controlled substances out of a

21   facility, in a manner which has enormous consequences for

22   this company and has consequences for the distribution of

23   pharmaceutical products in Florida.

24           I don't think it is by any means asking too much

25   for the DEA to actually specify in that document here is why

1   we think that is appropriate.  Here is what the danger is.

2   I think they've done it here.  I just don't think it stands

3   up.  And the danger they have identified is with respect to

4   these four stores.

5           But even, Your Honor, if you go beyond that.  And

6   you say, okay, let's look to the explanation that the

7   administrator has provided.  I think that when you examine

8   it carefully, it is exceedingly sparse.

9           You know, as we're walking through it before --

10  now, let me see if I can find where I was when walking

11  through this.  So, we start off, Your Honor, where she talks

12  about what happened in 2007 and 2008.  Nothing about current

13  events there.  She's just talking about history of what

14  happened years ago.

15          She then goes on and talks about the four stores.

16  We've talked about that.  In talking about the four

17  stores -- and later, she focuses on volume and volume of

18  sales.

19          Volume of sales is not by any means dispositive.

20  The Court of Appeals has recognized that.  The DEA, itself,

21  has recognized that.  If you have a store which is filling

22  hundreds of prescriptions a day, it is a very different

23  picture of how much oxycodone they're selling versus a store

24  which is filling, you know, dozens of prescriptions a day.

25          You have stores in very busy areas.  You have

1    stores in hospitals.  You have stores that are located near

2    large medical complexes.  You have stores that are located

3    near cancer treatment centers.  So, volume by itself is not

4    dispositive.

5              And in fact, in *Novelty, Inc*., Judge Tale wrote,

6    "I hasten to add that I wouldn't necessarily agree with the

7    deputy administrator's more general treatments of high

8    volume sales as prima facia evidence of diversion."  And

9    Judge Henderson, in a separate opinion --

10             THE COURT:  But what if -- okay, I understand what

11   you're saying.  But what if in addition to what you indicate

12   there's also evidence presented of an extremely high

13   addiction rate in the area where that distribution is taking

14   place and a large number of deaths that are talking place

15   from the substance in question?  And the distributor is the

16   principal distributor of those substances in that area.

17             MR. MOSS:  Your Honor, if that were the standard

18   there would be a massive problem with public health in this

19   country and there would be massive problem with the ability

20   of patients who really need these important pain medications

21   to receive them.

22             THE COURT:  Well, I mean, let's -- again, this is

23   a hypothetical that's not really on point as far as these

24   facts are concerned.  So, I think the absolute statement

25   that you make is flawed.  Because if you had a distributor

1  of pharmaceuticals and it was the only distributor in this

2  particular area and you had a high death rate from that

3  substance and a high addiction rate from that substance, I

4  think those factors, coupled with volume, would be

5  sufficient to show that there's an imminent danger.

6         MR. MOSS:  Well, Your Honor, it would depend, I

7  think, on what types of patients were in the area.  Is it,

8  is there, is it a hospital there?  Is it, as is the case

9  with respect to one of the examples there, is it something

10 that is adjacent to a large medical complex with many, many,

11 many doctors?  Is it a circumstance where you're near a

12 large oncology center?  Is it near a nursing home?

13        I mean, you have to ask those questions.  Averages

14 don't answer the question.  And if averages did ask the

15 question, in sort of getting to what I think Your Honor's

16 question here is, if Your Honor looks at --

17        THE COURT:  So, the government would be impotent

18 based upon my hypothetical, to take any action to curve

19 clearly what is a health issue in that area?

20        MR. MOSS:  No, Your Honor, I don't think the

21 government would be impotent by any means.  And look, we're

22 dealing with a situation here in which we are going to have,

23 you know, promptly have, an administrative proceeding in

24 which we're going to deal with, with these issue.  In the

25 four stores that they have identified we are not selling --

1           THE COURT:  Well, actually, in the Affidavit

2    they -- the deposition -- the Affidavit they do identify

3    other factors other than those four stores.

4           MR. MOSS:  Right.

5           THE COURT:  I understand you say I shouldn't

6    consider that?

7           MR. MOSS:  Yeah and I mean, Your Honor, I don't

8    think that this Court can consider the reference to the

9    additional stores where they say there's high volume in this

10   Declaration.  I mean, that is a classic example of, sort of,

11   post hoc rationalization.  There is nothing about that, at

12   all, in the administrator's decision.  And I should say,

13   there wasn't even anything about that --

14          THE COURT:  So, that presupposes that all I can

15   consider is what's set forth in the ISO?

16          MR. MOSS:  Well, sort of, Your Honor, because I

17   think there are a couple of different questions.  There's

18   one question about whether the Court can go beyond the ISO

19   to receive explanation about what's in the ISO.  There's

20   another question of whether the Court can accept

21   rationalizations or new rationales that appear nowhere in

22   the ISO.

23          And I can say with respect to this issue, with

24   respect to the other stores, Your Honor, this is an

25   important point.  This was not something that was even

1   raised in Mr. Rannazzisi or Ms. Carter's declarations before

2   this Court.  When we went off, after the last appearance

3   before the Court here and submitted information that we

4   could have presented to the DEA, had we been provided the

5   opportunity, that was not something that was, that we were

6   addressing because it wasn't something that was on the radar

7   screen.  It appears in this case for the the first time in

8   that supplemental declaration.

9            And if there is an issue and if the Court is

10  actually concerned with respect to those other stores, I can

11  tell you that there is considerably more that we would have

12  said to the DEA with respect to those stores.  And I think

13  it would alleviate or address the concerns that the Court is

14  raising now.  But that's exactly the problem with, sort of,

15  an evolving process of judicial review in a case like this.

16            But I want to get back to Your Honor's --

17            THE COURT:  I'll give you ten more minutes then

18  I'll have to --

19            MR. MOSS:  No, I understand.  But I want to get

20  back to Your Honor's point though about, what about just,

21  you know, is it enough that you were just a high dosage

22  prescriber?  Is that enough to say, you know what, we need

23  to cut this distributor off.  Paragraph 26, Your Honor, of

24  our submission presents a chart which comes purely from the

25  DEA's own data and data that was attached to

1   Mr. Rannazzisi's declaration, that the DEA admits was in

2   front of it.

3          And when you compare from 2008, November and

4   December 2008 through 2011, Cardinal Health's distribution,

5   average distribution to pharmacies in Florida of oxycodone

6   to the average distribution across all distributors to those

7   pharmacies in Florida.  If you take out the four stores that

8   we're talking about here, Cardinal Health's distribution is

9   significantly lower than the average in the state.  So,

10  there's not a basis to say Cardinal Health, in Your Honor's

11  hypothetical, is distributing so much more oxycodone than

12  others that, that actually justifies taking this dramatic

13  action against the company.  And in fact, quite the contrary

14  is true.

15         Your Honor, the, the other thing is this -- I want

16  to make sure I get a chance to run through what the

17  administrator says because as I said, I don't think there's

18  much there.  The other thing she says is that, she was aware

19  of interviews conducted by the DEA of CVS employees.  But

20  she never suggest that Cardinal Health was aware of the

21  substance of those interviews or failed to act based on

22  information it did not have.  So, that can't possibly form a

23  basis.

24         And in fact, the allegations that she now includes

25  in her declaration with respect to those two CVS stores, she

1    includes in her ISOs with respect to CVS.  She didn't

2    include it in the, with -- in the ISOs, with respect to

3    Cardinal Health and for good reason.  And she can't, now,

4    sneak it, sneak it into the process.  We talked a little

5    bit, Your Honor, about the fact that she refers to these,

6    this, sort of, new information about other large customers.

7    It wasn't in the record.  It is classic post hoc

8    rationalization but in any event, you know, high volume

9    sales, by itself, is not sufficient.  And if provided with

10   the opportunity, I think we could address concerns with

11   respect to those issues.

12          Finally, the administrator says that she knew that

13   Cardinal Health historically applied different due diligence

14   standards to large chains like CVS than to retail

15   independents.  There's no explanation how that finding

16   connects to, you know, a finding of imminent danger.  In any

17   event, as the record shows, DEA has known about this for

18   years.  It is sensible to think that you would actually have

19   different procedures that you would apply to a large

20   national company when dealing with diversion issues than you

21   would apply to independent, retail stores.

22          THE COURT:  What she said, as I understand it, is

23   that, in reference to large chains, that Cardinal is

24   basically letting them police themselves.

25          MR. MOSS:  And I think that it's an overstatement

1   to say that it's purely letting them police themselves but

2   it is a different approach that is taken with respect to the

3   chains, but it is something that DEA has known about for

4   years.  And in fact, we include in the record materials

5   something that is posted on the DEA's own website of a

6   presentation that was made, that talked about taking

7   different approaches with respect to initial due diligence

8   for a chains as compared to others.

9            But the most important point though is,

10  Your Honor, to the extent that there is some issue that is

11  presented with respect to large chain stores, how is it that

12  closing down the Cardinal Health Distribution Facility in

13  Florida is going to curve or address any concern about

14  distribution that is taking place at those large chain

15  stores?  The large chain stores are still distributing.  The

16  ultimate concern here is, Your Honor, deals with doctors who

17  the DEA believes, a DEA -- by the way, DEA registered

18  doctors, that the DEA believes are writing bad

19  prescriptions.

20           Cardinal Health has no access to that information.

21  HIPAA and other laws prevent it.  They're writing bad

22  prescriptions, according to the DEA, that are being filled

23  at pharmacies.  The notion of closing down the Cardinal

24  Health facility without due process doesn't do anything to

25  curve that immediate threat.

1          And I actually thought in the administrator's

2    declaration that, perhaps, the most telling thing she said

3    with respect to these issues, and it's in paragraph nine,

4    she says, "A strategy that fails to attack every link in the

5    chain will only succeed in moving the problem around liken

6    squeezing a balloon."

7          If the DEA were to close down the Cardinal Health

8    facility in Lakeland, it would simply be like squeezing the

9    balloon.  There is no reason to believe that the

10   distribution by the pharmacies or by the DEA -- I mean, I'm

11   sorry, or the doctors would change.  That is --

12         THE COURT:  That can't be the standard, can it?

13   Because you're basically saying that unless they're able to

14   alleviate the problem, they can't show imminent danger.

15         MR. MOSS:  Well, Your Honor, I think it's really

16   important to come back to the proposition here that there is

17   an ongoing administrative proceeding.  We are going to have

18   to deal with these issues in that context.  The only

19   question here is whether the agency can exercise what is a

20   truly extraordinary pouncing.

21         You know what, we're not giving you due process.

22   You don't get a chance to explain this.  And I can tell you

23   that with a lot of the things we've been talking about,

24   there are things that we would very much like to say and

25   explain.  You don't have that opportunity to do that.

1          We're going to shut you down immediately.  We're

2    going to do it despite the consequences for you, enormous

3    consequences for you, despite the consequences of

4    distribution of controlled substances and medications in the

5    state.  We're going to do it.  If you do it, you need to do

6    it because it's necessary to actually stop an imminent

7    danger to public health or safety.  And if it doesn't

8    actually, itself, address that, that extraordinary remedy is

9    not available.

10          That I think is the key here.  This is a very,

11   very limited question about whether the DEA can be using

12   this extraordinary remedy and saying, we are going to shut

13   you down without giving you a chance to be heard.  And the

14   statute is clear about this and it's consistent with due

15   process.  They can only do that where there is an imminent

16   danger to public health or safety and where it would address

17   that imminent danger if everything goes on exactly as it is.

18   It can't possibly be the case that the DEA can exercise --

19          THE COURT:  Well, Congress couldn't have intended

20   that.  I mean, unfortunately, we have a major drug problem

21   in this country and we may not ever be able to solve it.

22   But it seems to me what you're saying that is, unless the

23   DEA can represent that if we shut down this particular

24   pharmaceutical the problems going to go away, that we're

25   really impotent to do anything.

1          MR. MOSS:  No, Your Honor.  I think there has to

2   be, though, some nexus here.  And I'm not saying that they

3   have to show that, guess what, the problem of drug diversion

4   in Florida disappears, by any means.  I'm not coming close

5   to suggesting that, but they do need to show that where --

6   the allegation here is not that Cardinal Health is engaged

7   in diversion.

8          The allegation is is that there are doctors out

9   there who are writing bad prescriptions and the doctors know

10  they shouldn't be writing these prescriptions.  They're

11  going to pharmacies, the pharmacies are filling those

12  prescriptions.  In some cases, perhaps, the DEA were to

13  assert that the pharmacies, that the pharmacies ought to be

14  able to figure that out.

15         We are at the third level here, Your Honor.  And

16  the question is where you're, where you're addressing

17  distribution by the company, to the pharmacies who is then

18  filling the prescriptions by the doctors.  If those doctors

19  are still going to be writing the prescriptions and if the

20  pharmacies are still going to be filling those

21  prescriptions, you know, it would have to be a pretty, darn

22  compelling case to reach the conclusion that cutting off the

23  distributor, without due process, and I'm not saying that

24  there isn't a proceeding, but without due process, is

25  appropriate.  I don't see how that addresses imminent danger

1    in the process of doing that.

2             And finally, Your Honor, let me just say that the

3    DEA has taken months, if not years, to act here.  None of

4    this is new, it's all old.  The administrative proceeding is

5    underway.  The DEA has not explained why it has to suspend

6    Cardinal Health's registration without giving the company an

7    opportunity to be heard, rather than allowing that ongoing

8    administrative proceeding to run its course.

9             THE COURT:  Thank you.  I'll take, take -- give

10   the court reporter a ten-minute break.

11            MR. MOSS:  Thank you, Your Honor.

12            [Thereupon, recess taken at 2:28 p.m., resuming at

13            3:05 p.m.]

14            THE COURT:  Government counsel.

15            MR. REEVES:  Your Honor, I'd like to start with a

16   few points plaintiff's counsel has made.  First, he says

17   that the administrator has not made the requisite finding of

18   imminent danger in her declaration.  That's simply mistaken.

19   In paragraph, the last sentence of paragraph 35 of her

20   declaration she says, collectively these findings led me to

21   conclude that Cardinal Lakeland's, quote, continued

22   registration while these proceedings are pending constitutes

23   an imminent danger to public health and safety, end quote.

24   It's right there in the declaration.

25            Mr. Moss has also suggested that this Court can

1    somehow split the due process and the APA review.  Unless

2    the due process is a @facial challenge to 824(d) then the

3    merits of the due process claim are identical to APA review.

4    Plaintiffs cite no authority to the contrary.

5           THE COURT:  What about his position that, for me

6    to consider the additional information that was presented

7    subsequent to the remand would amount to permitting the

8    government to provide post hoc justification for its

9    actions?

10          MR. REEVES:  I don't believe that those are in any

11   way equivalent, Your Honor.  The information that Mr. Moss

12   provided to the -- that he said was part of the

13   administrative record and was the information before the

14   agency and with one small exception, the agency agrees.

15   Those were, those were all documents -- or are all

16   information and concerns that were part of the agency

17   record.  And that's very different than saying that agency

18   declarations that are offered to explain these, some, 9,000

19   page administrative record and explain the basis for what

20   the Court has done is somehow a post hoc rationalization.

21          Mr. Moss says over and over again that the

22   declarations are a post hoc rationalization but he simply

23   doesn't say why.  It's not clear under Cardinal's analysis

24   when we could ever submit a declaration.

25          THE COURT:  Well, he suggest -- or not even

1   suggest, he argues that, unless there was some ambiguity

2   about why the agency took the action that it took, that it's

3   inappropriate to remand and get additional explanation, that

4   the only way you do that is if you got ambiguity in what the

5   agency did in the first instance.  I don't think the case

6   law supports that proposition.  I think there are cases that

7   do not make that requirement.

8         The one example he cites may, but I think there

9   are other cases where that's not a prerequisite for the

10  Court to take into account, subsequent explanations provided

11  to the Court for the action based upon a remand.

12        MR. REEVES:  I agree whole heartedly with Your

13  Honor and would cite to the Court the DC Circuit's decision

14  in *Clifford versus Pena*.  There's simply nothing wrong with

15  the remand order that Your Honor issued and the declarations

16  that we provided in response to that.

17        THE COURT:  You may proceed.

18        MR. REEVES:  Mr. Moss also raises the argument

19  that because DEA has suspended the CVS stores, that somehow

20  precludes its suspension of Lakeland.  Well, they're trying

21  to put DEA in a bit of a catch-22 here.  Because if we

22  hadn't suspended the CVS stores, they would say, well,

23  you're not doing your job well enough and look how much

24  better at policing diversion we are than you are.  So, it's

25  a bit of, it's a bit of a Catch 22 and simply does not wash.

1          Mr. Moss also says that volumes alone cannot be

2     conclusive.  Well, whatever the validity of that

3     proposition, in general, it certainly does not hold here.

4     And let me, let me do what I can to put some of the volumes

5     in context.

6          Lakeland shipped, some, 12.9 million dosage units

7     of oxycodone to its top four customers.  That is 50 times

8     the amount of oxycodone that Cardinal shipped to its average

9     Florida retailer between 2008 and 2011.  The volumes were

10    not just high, they were increasing 241 percent over this

11    same period of time.  Two of these customers are the CVS

12    pharmacies in Sanford, Florida.

13         THE COURT:  Well, what about, what about his

14    position that that increase does not reflect the fact -- or

15    doesn't take into account the fact that for a period of time

16    Cardinal was able -- unable to engage in any distribution?

17         MR. REEVES:  Which period of time is that, Your

18    Honor, when they were suspended?

19         THE COURT:  Yes.

20         MR. REEVES:  Well the investigation deals with the

21    amount of -- the period of time after Lakeland came back

22    into operation, in 2008.

23         THE COURT:  Right.

24         MR. REEVES:  From its resuming operations in 2008.

25         THE COURT:  Right.

1          MR. REEVES:  -- till December 31st, 2011.

2          THE COURT:  But wouldn't you expect they, after

3     the suspension period, there would be a slower level of

4     distribution that would pick up after they're back in the

5     market for a period of time?

6          MR. REEVES:  There may be a, there may be a slower

7     level of distribution in general, but the distributions over

8     this entire period of time were increasing sharply.  And

9     we're not trying to manipulate the statistics by using

10    specific years or a misleading citation to the date.  We're

11    just saying, over this entire period, the volumes increased

12    241 percent.

13         THE COURT:  The decrease that he references took

14    place prior to DEA taking its action.  Did that decrease

15    occur before it would have been known that DEA was involved

16    in the investigation, the new investigation, regarding the

17    diversion?

18         MR. REEVES:  My understanding is that, the 80

19    percent decrease occurred largely or entirely after DEA

20    issued the administrative investigative warrant.  But in any

21    event, taking that 80 percent decrease at face value,

22    20 percent of a staggeringly high number is still very high.

23    So even after the AIW issues, when Cardinal knows that DEA

24    is watching it, it still shipped very large quantities of

25    oxycodone to the, to the two CVS stores in Sanford.  In late

1    2011, Lakeland shipped to CVS ten times the amount it

2    shipped to its average Florida retail pharmacy customer,

3    down from 50 times but it's still ten times.  And it does

4    this when it knows it's under investigation.

5            But to put, to put the volumes in further context,

6    Cardinal shipped during this period of time, 2008 to 2011 --

7    I'm sorry, excuse me -- strike that.  In 2011, Cardinal

8    shipped enough oxycodone to Sanford to supply a population

9    eight times that size.  Cardinal says, we need to know more

10   about volumes.  Volumes, alone, can't tell the full story.

11           But what more information do they need to say that

12   they shouldn't be shipping enough oxycodone, to a town of

13   53,000 people that would be enough to supply a town of over

14   400,000 people.  But furthermore, virtually all of this

15   supply, some 96 percent, went just to the two CVS stores.

16   Cardinal has other pharmacies it supplies in Sanford.

17           To put this further context, there's a Walgreen's

18   and a Walmart pharmacy within one mile of CVS 219.  In 2011,

19   CVS 219 distributed more than nine times these pharmacies

20   combined.  So, Mr. Moss says, is there a hospital in the

21   area?  What do we need to know more about the population

22   demographics?

23           I would respectfully submit that, it doesn't

24   manner what the answers to those questions are.  Because

25   there is no data that can explain these kinds of incredible

1  red flags that went ignored by Lakeland.  Cardinal also

2  says, there's no evidence that they knew of, of the

3  interviews that the administrator references in her

4  declaration.

5          Well, there's a good reason for that.  Lakeland

6  never did an in-store audit for either CVS until being

7  served with a DEA warrant, even though DEA had told Cardinal

8  that it could not simply rely on CVS's anti-diversion

9  efforts.  Cardinal did do some investigations but it often

10 ignored what it learned.

11         In February of 2011, Cardinal investigator visited

12 Gulf Coast and noted a medium risk of diversion.  What does

13 Lakeland do?  Over the next four months, they increase

14 shipments to Gulf Coast of over 65 percent.  They

15 disregarded other obvious red flags.

16         In September 2010, Cardinal's corporate offices

17 express concern about Lakeland's oxycodone shipments to the

18 Sanford CVS stores that I've discussed previously, with the

19 incredibly high volumes.  So, Lakeland asked CVS 219 for

20 data about its oxycodone sales.  And according to Cardinal's

21 own internal emails, their own documents, CVS adamantly

22 refused.  It's not in my words, those are Cardinal's words

23 that appear in its own documents.

24         Does Lakeland do the reasonable thing?  Do they do

25 the rationale thing?  Do they say, you provide us this data

1   or we're cutting you off?  No, they do not, Your Honor.

2   They just keep shipping.

3           Furthermore, according to Cardinal's internal

4   documents --

5           THE COURT:  You're saying, the pharmacy refused to

6   provide information to, to Cardinal?

7           MR. REEVES:  Yes.  Furthermore, according to

8   Cardinal documents, Cardinal contacted CVS chief pharmacist,

9   Paras Priyardarshi, in January 2010, to find why the

10  oxycodone sales are so large at CVS 219.  Mr. Priyardarshi

11  says, quote, they are the only pharmacy in the area, end

12  quote, to carry oxycodone.  A couple of responses, first,

13  it's patently unbelievable that a pharmacist would say that

14  we're the only pharmacy to carry oxycodone.

15          It's like a pharmacist saying, we're the only

16  pharmacy in the area to carry penicillin or Band-Aids.  It's

17  just not believable.  But setting the credibility aside,

18  Cardinal knows this is false.  Why, because they supply

19  other pharmacies in the area with oxycodone.  Yet, faced

20  with this obvious falsehood, they still keep shipping.

21          Mr. Moss also raises a point that diversion is

22  caused by the doctors and implies that Cardinal is somehow

23  not responsible because DEA should be going after the

24  doctors and not the distributors.  Well, the obvious

25  response to that is Cardinal, by distributing huge amounts

1    of oxycodone and other controlled substances, is

2    facilitating diversion when it does not take adequate

3    measures to prevent diversion.  They are the DEA's first

4    line of defense.  DEA relies -- because of resource

5    limitations, it has 1.4 million registrants to police,

6    approximately, 880,000 of those are doctors.

7          So, DEA just simply does not have the manpower to

8    do all of the investigations, to do all of the work and to

9    let everyone else in the supply chain --

10          THE COURT:  So, if you have a large number of

11   doctors in a particular region that's prescribing a

12   particular drug and obviously, the pharmaceutical company is

13   going to provide the amount of drugs that are needed to

14   satisfy the writing of those prescriptions, what is the

15   pharmaceutical to do under those circumstances?

16          MR. REEVES:  I'm sorry.  Could you repeat the

17   question?

18          THE COURT:  If you've got a large number of

19   doctors who are writing a significant number of

20   prescriptions for a particular drug and obviously, the

21   pharmaceutical is going to provide the amount of drug needed

22   to satisfy that market, what is the pharmaceutical to do?

23   If they, I mean --

24          MR. REEVES:  When you -- I'm sorry, Your Honor.

25   When you say, pharmaceutical, do you mean the distributor or

1    the --

2              THE COURT:  The distributor, yes.

3              MR. REEVES:  The distributor should be doing site

4    visits at the retailer.  It should be auditing their files.

5    It should say, I want to see who's writing these

6    prescriptions.  If there's good explanation for why your

7    writing these high volumes, maybe that's okay.

8              But it, but that's not the case here because

9    Cardinal didn't do any visits, at least, until they got a

10   DEA Warrant letting them know they were under investigation.

11   They're supposed to be proactive.  They're supposed to audit

12   the stores.  They're supposed to visit, they're supposed to

13   do their own investigations, constantly and proactively.

14   That's how they're supposed to police situations like this.

15             Your Honor, I've covered several of the factors on

16   the merits, but there's a few more that I'd like to touch

17   on.  Because in the exercise of its discretion, DEA

18   suspended Lakeland on the totality of five considerations.

19   I've talked about a couple of those, the huge and increasing

20   volumes of oxycodone shipped and also, the inadequate site

21   visits and store audits but I'll talk about the other few

22   right now.

23             Another factor is a demonstrated history of

24   diversion problems.  Mr. Moss strives mightily to say, it

25   simply doesn't matter.  It's not conclusive.  Well, we're

1    never arguing that it's conclusive.  What we're saying is

2    that it's relevant, it's relevant to that determination.

3               DEA suspended Lakeland in 2007, 2008 for 10 months

4    because Lakeland failed to maintain effective controls

5    against diversion.  To resolve diversion related allegations

6    against Lakeland and other distribution facilities, Cardinal

7    paid the largest fine in US history associated with a DEA

8    registration suspension, $34 million.  The Lakeland portion

9    of this fine was $16 million.  That portion, alone, would

10   have been the largest fine in U.S. history at that time.

11              So, Lakeland entered a Memorandum of Agreement

12   with DEA in which it pledged to make its anti-diversion

13   measures adequate.  As Mr. Moss correctly notes, Lakeland

14   did reopen in October of 2008.  In substantial part, based

15   on those legally binding representations that Cardinal and

16   Cardinal Lakeland made about getting their procedures up to

17   snuff, but it appears that Lakeland diversion problems

18   continued.

19              An investigation that we've been discussing of the

20   shipments to its top four customers from 2008 to 2011

21   indicated that these problems continue.  In addition to the

22   factors that I've already discussed, there's also a low

23   number of suspicious orders reported.  Cardinal does have a

24   suspicious order monitoring system and that monitoring

25   system flags, some, in excess of 200 orders for the top

1    customers, the top four customers.  Yet, Lakeland released

2    virtually all of these orders with little or no explanation.

3          The few orders Lakeland cut, @@which as industry

4    calls it for refuse to fill, it did so with, with little or

5    no explanation and it, it almost never -- it never reported

6    these to DEA with one exception.  Cardinal never alerted DEA

7    about suspicious orders for three of the four top customers.

8    Seemingly, in violation of its own policies.  For the

9    fourth, CVS 219, there were two suspicious order reports,

10   both of which came after DEA served a warrant to Lakeland.

11         DEA also had before it, besides the suspicious

12   order reportings, other evidence of a violation, that

13   Lakeland is violating Cardinal's own policy, stated

14   policies, intended to combat diversion.  On 44 separate

15   occasions, Lakeland filled orders that exceeded the volume

16   thresholds it had set for its customers.  Cardinal and

17   Lakeland sets these volume thresholds on a

18   customer-by-customer basis and they periodically evaluate

19   the thresholds, whether it should be monitored up or down.

20   But whatever the, whatever the threshold is at the time,

21   it's supposed to be adhered to.

22         But some -- but there were a number of overages,

23   as I just mentioned.  Sometimes these overages exceeded the

24   thresholds by a little, other times it exceeded the

25   thresholds that applied by a lot.  DEA could discern no

1    particular pattern to these overages and therefore,

2    concluded, that Lakeland's volume thresholds, at least as

3    applied in Lakeland, were not a meaningful constraint on

4    distribution.  Put another way, whatever the sufficiency of

5    the policy for Cardinal generally as written in its

6    application in Lakeland, it was not sufficient.

7          In view of all of this evidence, DEA's suspension

8    of Lakeland was not arbitrary and capricious.

9          THE COURT:  I'm going to ask your opponent about

10   this.  I'll give you an opportunity to address the issue,

11   but what about their argument regarding irreparable harm?

12         MR. REEVES:  I'm happy to address irreparable harm

13   if you'd like for me to go to that?

14         THE COURT:  Yes.

15         MR. REEVES:  As this Court has stated, only

16   economic loss that threatens the survival of a movants

17   business amounts to irreparable harm.  That comes from this

18   Courts decision in Power Mobility at page 204.  There is no

19   allegation, let alone, evidence of that and for good reason.

20   Cardinal's a company with over $100 billion in revenues.

21   Cardinal will be fined in the short term if Lakeland is

22   closed.

23         How do we know?  On the day of Lakeland's

24   suspension, Cardinal's CEO told Wall Street the company

25   wasn't changing its fiscal guidance for 2012.  Cardinal will

1   be fined in the long-term.  How do we know?  Because it's

2   survived Lakeland's closure before.  That point is simply

3   not up to, up for dispute.

4        Yet, Cardinal still hasn't quantified the harm it

5   will suffer when Lakeland is closed.  And its failure to

6   quantify this harm is really telling, because it should know

7   exactly what its harm is when the facility is closed.  They

8   still don't make that showing, even in their reply.  At

9   paragraph three of the Reply Declaration of @@Mr. Jockeyman,

10  he says, that in 2007 the suspensions of four facilities and

11  related remedial measures cost Cardinal, roughly, $1 billion

12  in loss sales.

13       I have three responses to that, Your Honor.  First

14  of all, taking this number at face value, we are talking

15  about less than one-percent of annual revenues but even that

16  tiny percentage is too high.  Money Cardinal spends to fix

17  compliance problems doesn't count.  Otherwise, the worst job

18  they do at compliance and the more money they have to spend

19  to fix it, the easier it is to show irreparable harm.  And

20  that simply doesn't make sense.

21       Third, harm from other facilities doesn't count.

22  This isn't about other facilities.  This is simply about

23  Lakeland.  Cardinal has, some, 25 other distribution

24  facilities at least three of which can serve every single

25  one of Lakeland's customers.

1          One day delivery may now be two day delivery.  But

2     there is nothing, whatsoever, in this record to indicate

3     that that modest delay will severely prejudice customers or

4     if there, if there was an extreme case, that Cardinal

5     couldn't expedite delivery to get it there in one day.  I

6     expect Mr. Moss to get up here and talk to you a lot about

7     longer delays.  About the Colorado facility, because that's

8     one of the three facilities that at least can serve Florida.

9          But it doesn't make any sense to serve customers

10    in Florida, in the Carolina's out of the Rocky Mountains,

11    when you've got facilities in Mississippi and in

12    North Carolina.  Cardinal's CEO doesn't think that makes any

13    sense either.  He says, we're going to serve them out of the

14    Mississippi facility.

15         So, I expect Mr. Moss will also mention to you

16    that this lost, any lost they suffer will not be recoverable

17    because of the government's sovereign immunity.  But

18    regardless of whether loss is recoverable, it must still be

19    certain, actual and great to qualify as irreparable.  In

20    this case -- in this respect, we rely on the *ATA versus*

21    *Expert Import Bank* and the National Sport Shooting Bank

22    mentioned at page 36 of our Brief.  Otherwise, the rule

23    would be, the government always losses on irreparable harm.

24         As this Court recently confirmed in *National*

25    *Mining Association versus Jackson*, that cannot be and is not

1    the law.  At page 53 of that opinion this Court said, the

2    mere fact that economic losses may be unrecoverable does

3    not, in and of itself, compel a finding of irreparable harm.

4    For this reason -- for these reasons, alone, this Court can

5    deny the preliminary injunction.

6            THE COURT:  Thank you.

7            MR. REEVES:  Thank you.

8            THE COURT:  Reply.

9            MR. MOSS:  Your Honor, I want to back up here just

10   for a moment to the question of what it is that is currently

11   before the Court.  What the process actually is here.  My

12   opposing counsel's argument sounded to me very much, like,

13   what their opening could be in the order to show cause

14   proceeding.  Much of what he argued is not even in the

15   @@Lynn Heart Declaration, much less, in the findings in the

16   ISO, itself.

17           You know, there are significant, significant

18   process problems here.  The question is, is whether the

19   government can use this extraordinary power that it has

20   here, in this context, to shut a company down immediately

21   without the opportunity for due process.  We have responses.

22   We have arguments we would like to, would like to be able to

23   make.

24           I mean, just to provide one example, Your Honor.

25   The government refers to these 2500 other stores.  What's

1    not in the record here, but will be in the record in the

2    administrative proceeding, is that in fact Cardinal Health

3    has seized termination to 12 of those 25 stores.

4            THE COURT:  Well, are you making a facial

5    challenge to the statute that authorizes the issue of the

6    ISO?

7            MR. MOSS:  Not, not at all, Your Honor.  And I

8    want to stress, it is not our position here that an ISO is

9    never appropriate.  There are times in which an ISO is

10   appropriate.  But are -- my point is simply that, it is

11   exceedingly important to turn square corners where the

12   government is exercising its extraordinary power of

13   depriving a company of due process.

14           In saying that this situation is so urgent, there

15   is such a danger here, that we can not wait to allow the

16   ordinary process to take place.

17           THE COURT:  What about his argument?  He says that

18   that clearly is the case here.  Because you've got a town of

19   a certain population and yet, you have a distribution rate

20   nine times in excess of what you would expect to have in

21   that particular town based upon other examples.

22           MR. MOSS:  But, Your Honor, you know, as -- well,

23   a couple things.  You know, that is the government's

24   argument here.  Whether in fact you look at the distribution

25   in a populated state like Florida and you say, let's look

1   within the bounds of the city rather than looking at the

2   county, adjoining areas to figure out what the relevant

3   population is, I don't know.  But what I can say is, if you

4   look at the Monet Declaration which we've submitted in the

5   case, it explains that in fact for a very high volume store

6   like the CVS store at issue, when you're dealing with a very

7   high volume store which is writing a large number of

8   prescriptions, the actual percentage of those prescriptions

9   for oxycodone, based on the DEA's number, is actually

10  relatively small.

11          The point here is that, we ought to be provided

12  with an opportunity to develop those arguments, to respond

13  to that, to those arguments.  There are times in which an

14  ISO is appropriate and we're not defending, we're not

15  disputing that.  But this is a case, Your Honor, where you

16  are dealing with a company that truly, truly is committed to

17  anti-diversion.  It is devoted enormous resources to it.  It

18  has cut off hundreds of stores on its own, hundred of stores

19  where the DEA has not actually pulled the registration from

20  those stores.

21          It has cut off stores where, where stores have

22  then turned around and sued Cardinal Health saying, you

23  didn't actually have a basis for cutting us off.  And then,

24  actually, the subject to injunction is requiring us to turn

25  them back on in the process for doing it.  All we want --

1          THE COURT:  Doesn't your due process argument,

2     actually, if adopted, would supplant the APA Standard of

3     Review that I have to apply?

4          MR. MOSS:  Well, I think that there are -- and I

5     think that we cite to a DC Circuit case on this.  That with

6     respect to review of constitutional claims, that the Court

7     should apply a Denova Standard of Review.  So, I think the

8     Court does need to both, examine this from the APA arbitrary

9     and capricious standard of review, but also, from a standard

10    of review under the due process clause.  But I don't think,

11    at the end of the day, Your Honor, that is what is

12    dispositive here.

13         The question is -- you know, and the government

14    comes in and makes arguments as to why it thinks that

15    Cardinal Health over the years has not done its job well.

16    It comes in and it says, you guys are the first line of

17    defense.  You knew what the, what the quantities were being

18    sold here.  Well, guess what, the DEA knew as well.

19         It got monthly reports of the quantities of these

20    sells.  I mean, I'm not sure who the first line of defense

21    is, you know, in this entire process.  But the question is,

22    where you have a company which is doing its best to try and

23    prevent diversion, has devoted enormous resources and

24    efforts to trying to do that, you've got the government

25    which undoubtedly is doing its best to try and prevent

1   diversion; is there such a danger presented by this company,

2   which is a company that really is committed to getting this

3   right.  To say, guess what, guys, you don't lose your

4   registration for this facility without an opportunity to be

5   heard.

6          Where the government has actually not come in and

7   made that nexus and shown and demonstrated that, yes, here

8   is the reason.  Here is the reason why it is a danger to the

9   public tomorrow for you to have that registration.  And I

10  would submit that actually the opposite of anything is true,

11  given the disruption which will occur to patients who are

12  actually in need of care and in need of medications they are

13  getting.

14         This company is scrutinizing these stores.  It has

15  made a number of very significant steps.  You know, it is

16  working very hard to try and get this right.  It wants to do

17  that and it wants and opportunity to be heard in the process

18  and to have its day in court.

19         You know, I can go through and respond to the

20  arguments that my opposing counsel has raised.  Those

21  arguments are, many of which are not even in the

22  administrator's declaration.  They're properly resolved in

23  the context of the Order to Show Cause.  The only question

24  here is whether, if you look at the order -- of the ISO,

25  itself, it supports a finding of imminent danger.  And if

1    the Court concludes that it's appropriate, despite our

2    arguments to the contrary, to look at the administrator's

3    declaration, is there something in that that then shows,

4    yes, there is a real danger if this company's allowed

5    tomorrow to distribute controlled substances.  There is a

6    danger to the public.

7            And I would submit that there is just no basis

8    either in the ISO, itself, or in what the administrator

9    actually says in her declaration and if not, the arguments

10   that we've now heard for making that determination.  We will

11   air all of these arguments.  We will address that.  That is

12   the way the system works.  The system --

13           THE COURT:  I mean, she does relate that there is

14   in this part of the country, a significant problem related

15   to the diversion of oxycodone.  And she does reflect in her,

16   in her declaration that your client was distributing a large

17   amount of this substance in that particular area and that

18   the amount was significantly greater than what you would

19   expect in a city of that, of that size.  And it seems to me

20   that, just like a court can draw reasonable inferences based

21   upon a set of facts, the administrator has the capacity to

22   make that assessment also.

23           MR. MOSS:  But, Your Honor, you know, I, I think

24   there may be a misperception in, to the extent that the view

25   is, that Cardinal Health is distributing the overwhelming

1   majority of oxycodone in Florida.  And that that is, in

2   fact, the source of the problem there.  And in fact, in

3   paragraphs 45 and 46 of Mr. Rannazzisi's Declaration, he

4   makes clear that in -- or he asserts that, in 2010 Cardinal

5   Health distributed only 22 percent of the oxycodone to the

6   top 25 Florida -- I mean, of the top 25 Florida

7   distributors.  And in 2011 that it was approximately 25

8   percent of the total 2011 distribution, by top, by the top

9   25 Florida distributions.  There are other --

10          THE COURT:  Is that the entire state of Florida?

11          MR. MOSS:  Yes, Your Honor.  But also, Your Honor,

12   if you look across, you know, the entire State of Florida,

13   as well, Cardinal Health's average distributions to

14   pharmacies is well below the averages of the, of the state,

15   of statewide.  And so, even if --

16          THE COURT:  Do we know what the approximate --

17   what the percentage of the market they guarded in this

18   particular area, you know, where these pharmacies in

19   question are located?

20          MR. REEVES:  I don't know with respect to these

21   particular pharmacies, Your Honor.  But with respect to

22   Gulf Coast and Caremed, those two pharmacies which are not

23   in the Sanford area, Cardinal Health terminated sells to

24   those two stores.  You know, and @@Ms. Weiser, first, to the

25   story with respect to those two stores, Cardinal Health cut

1    those stores off and it did so before there was an ISO.  It

2    did so before there was an administrative inspection

3    warrant.  That leaves the two CVS stores.  And the question

4    --

5             THE COURT:  So, you're saying Cardinal did not

6    know about the DEA's concern about diversion, alleged

7    diversion, by your client?

8             MR. MOSS:  Well, they -- yeah, I think that -- no,

9    Cardinal Health has known for some time, as is everybody,

10   about concerns about diversion in Florida.  And in fact, the

11   year before, the DEA had come to Cardinal Health and

12   expressed concerns about diversion in Florida.  Cardinal

13   Health went down to Florida, examined top prescribers and

14   cut off a number of stores at the time.

15            In the fall of this year, Your Honor, it's my

16   understanding that one of the manufacturers of oxycodone, a

17   company called Mallinckrodt, had discussions with the DEA.

18   Mallinckrodt then raised issues with respect to particular

19   stores in Florida.  But before Mallinckrodt -- and my

20   understanding, Your Honor, I'll have to confirm this, but I

21   believe that Mallinckrodt -- that even before hearing from

22   Mallinckrodt, Cardinal Health had cut off the Caremed store

23   before Mallinckrodt raised a concern about that store,

24   Cardinal Health had cut it off.

25            And certainly, before the administrative

1   inspection warrant arrived from the DEA, Cardinal Health had

2   cut off the Golf Coast store.  Which leaves just these two

3   CVS stores.  And these are stores, Your Honor, of a, of a

4   prominent national chain where the, where Cardinal Health

5   had reason to believe that it was appropriate for it to rely

6   on the loss prevention and anti-diversion teams at those

7   stores.

8           It, but in any event, to the extent that the

9   imminent harm -- or imminent danger to public health arises

10  with respect to those two stores and that's the focus.

11  Let's talk about Sanford and let's talk about those two

12  stores.  The sales of oxycodone to those two stores

13  plummeted before the ISO issued.  In addition to that

14  though, Cardinal Health can't be in a position in which it

15  can distribute to those two stores.  It's represented to

16  this Court that it will not distribute controlled substances

17  to those two stores.

18          THE COURT:  I might, may be I'm wrong, but as I

19  understand the factual background but those two stores,

20  their decrease occurred after they became aware that DEA was

21  investigating diversion?

22          MR. MOSS:  Well, Your Honor, I mean, this goes to

23  I think, a bigger, a bigger concern.  I think, it probably

24  goes beyond the jurisdiction of this Court.  But in our

25  view, you know, of the world, the way the world ought to

1    work, is there actually ought to be conversations between

2    the DEA and distributors.

3            And the way to actually prevent diversion would be

4    in fact for the DEA to say, if it has a concern to get on

5    the telephone.  Send an email saying, hey, we've got a

6    concern about this store.  And the company has represented

7    that if DEA says, you know, that it believes that a store is

8    likely engaged in diversion, the company will stop selling

9    to that store.

10           But even short of that, if there was a dialogue

11   that occurred with the DEA about, you know, particular

12   stores and particular concerns, this is a company that would

13   be very responsive to it.  It has invited that type of

14   dialogue to occur in the process.  And in fact, we only

15   learned through the papers that the government filed that

16   there were conversations that had occurred between CVS and

17   the government with respect to the stores at issue.  Had we

18   known something, you know, it's something that would have

19   effected how the company approached these issues and what it

20   looked at.

21           You know, it, it, it is looking for a dialogue

22   with the agency.  It is looking to do the right thing.  It

23   is looking to try and prevent diversion.  And to the extent

24   that the question before the Court here is not, what's going

25   to happen in this Order to Show Cause, what the

1    administrative law judge should decide in that process.

2         But the question is, is there an imminent danger

3    to public health or safety.  We think that we have taken

4    steps that can provide the Court with reasonable assurances

5    that the issues that the DEA or the administrator have

6    raised do not present immediate threats to public health or

7    safety.

8         THE COURT:  Thank you.

9         MR. MOSS:  Thank you, Your Honor.

10        THE COURT:  I think the first issue -- and I will

11   follow-up my oral ruling with a written order and we'll try

12   and get that out as soon as possible.  But the first issue,

13   as I see it, that I have to address is, whether I am

14   confined in making my assessment as to whether the

15   administrator acted contrary to the APA, is whether my

16   decision has to be confined to the ISO.  And I think, in

17   reference to the language that I referenced in that second

18   paragraph of the ISO, despite what is indicated subsequent

19   of the ISO, that it seems clear to me that there was

20   additional factual information before the administrator when

21   she made her determination to issue the ISO.

22        And I don't accept the proposition that on remand

23   the only information the court -- or only the circumstance

24   under which the court may consider additional information

25   provided by the agency is if there was ambiguity in the

1    initial determination and the remand was solely for the

2    purpose of having the agency clear up that ambiguity.   I

3    think the case law goes beyond that and does in fact

4    authorize the Court, under other circumstances, to request

5    that the agency provide additional information.   Now,

6    obviously, that additional information has to be predicated

7    on -- that the additional explanation being provided has to

8    be predicated on information that was actually before the

9    agency and actually considered by the agency in making its

10   determination.

11           And I do have the declaration from the

12   administrator and I credit it as being accurate, that she

13   did have additional information before her.   And the

14   information that's provided in that declaration is in fact

15   information that was available to her and information that

16   was in fact considered in making the determination to issue

17   the ISO.   So, I would conclude that the additional

18   information submitted by the government can appropriately be

19   considered by the court in assessing whether or not the the

20   administrator acted within the law, under the APA, when the

21   ISO was issued -- or under the, under the statute that

22   authorized her to issue the ISO.   And then, my review is

23   obviously predicated on whether or not she acted in

24   compliance with -- or in violation of the APA.

25           Having reached that conclusion, I am of the view

1 that I have to -- and I think it's clear, that the case law

2 says, I have to look at what the situation was, as

3 considered by the administrator when she made her

4 determination.  And I think the law clearly permits her to

5 consider the pass history involving a particular party, in

6 assessing whether or not the action that was subsequently

7 taken is appropriate.  And she did have a history of a

8 problem with diversion as it related to Cardinal.  And it

9 was that information, coupled with the situation as

10 presented to her at the time she made the decision, that

11 caused her to issue the ISO.

12    Now, yes, there is some evidence that some

13 remedial actions had been taken by both the several, the

14 pharmacies that are referenced and also by Cardinal, itself.

15 But I think the administrator justifiably discounted that as

16 a basis for concluding that there was not an imminent

17 danger, if the emergency action was not, was not taken.  And

18 while I would agree and obviously, the case law supports

19 what counsel for plaintiff said, that you just can't look at

20 volume and conclude from volume, alone, that you've got

21 diversion in play.  But I think the administrator, as she

22 represents, had more than just volume that came into play

23 and the assessment that immediate action needed to be taken.

24    Because I think the government accurately points

25 out the fact that you can take into account and it is a

1    factor to consider in deciding whether or not the action was

2    taken, to consider the size of the community where the

3    distribution was taking place.  And making a comparison

4    between that community and other communities, in assessing

5    whether the wholesaler, Cardinal, should have been concerned

6    or had suspicion about diversion taking place.  And here,

7    we're talking about a significantly greater volume of

8    distribution in this, in one of the particular communities,

9    at least, as compared to other communities in Florida.  And

10   that should have been a red flag.

11        Now obviously, maybe, the DEA, if they did in fact

12   know that they were, in effect, letting large chains like

13   CVS, in effect, police themselves.  Maybe, that was their

14   election of their responsibility.  Now, but I don't think,

15   even if that is in fact true, that that becomes a

16   determining factor as to whether I conclude that the action

17   taken by the administrator was appropriate.  Because I do

18   agree that while obviously the DEA has a role to play in

19   trying to avoid diversion taking place, I think the

20   government is correct, that the companies that are given

21   authorization to dispense these very dangerous drugs do have

22   an obligation, in the first instance, to self police

23   themselves and to also, take appropriate actions to ensure,

24   to the best of their ability.

25        Obviously, there can't be 100 percent file proof

1   in diverting diversion.  But I think they have an obligation

2   to be proactive in assessing whether or not diversion is

3   taking place and taking action in order to address that

4   problem.  And as the administrator points out in her

5   declaration, based upon the DEA's investigation regarding

6   the four pharmacies that are referenced, clearly that

7   investigation -- or those investigations, disclosed that

8   there was information.

9        That if Cardinal had been engaging in the level of

10  pro-activity to make sure that diversion doesn't occur, that

11  they would have or at least, should have become aware of the

12  fact that there was a problem in reference to these, these

13  particular pharmaceuticals -- I mean, these particular

14  pharmacies.  And that with that knowledge, should have taken

15  some steps, considering the volume that was being provided

16  to those pharmacies.  It should have taken some action,

17  before it did, in making sure that diversion by these

18  pharmacies was not in fact occurring.

19       I find it hard to accept the proposition that in

20  order for the DEA to make a finding that there is imminent

21  danger, that they have to in some way quantitatively show

22  that by taking its action in suspending a pharmaceutical, I

23  mean, a pharmaceutical in, in its distribution of its

24  product, that they have to make a showing that there's going

25  to be a certain impact on the problem, before they can make

1    a finding that there is in fact imminent danger.  If that

2    were in fact the law, it seems to me that that would defeat

3    the purpose for which these emergency orders have been

4    authorized by Congress.  Because if that were the law, it

5    seems to me, DEA would never be able to make a significant

6    showing that imminent danger has in fact been established

7    and therefore, there's a justification for taking immediate

8    action.

9           And I'm not unsympathetic which is why I remanded

10   the case.  Because I was of the view, based upon what was

11   initially submitted to me, that the ISO did not contain

12   sufficient facts for me to make an informed decision, as to

13   whether or not the administrator acted appropriately when

14   she issued the ISO.  And I would hope that in the future

15   when the DEA takes these type of actions, that they provide

16   the type of information that is now being provided in order

17   to show a court, if there's a challenge and inevitably, it

18   seems to me, when you have an order like this issued,

19   there's going to be a challenge.

20          It's going to be brought to the court, that the

21   court is then going to have to make a decision and it should

22   be an informed decision, as to whether or not the action

23   taken by the agency was appropriate.  Because here you are

24   talking about a property interest that Cardinal has in

25   reference to its ability to distribute its product.  And I'm

1   not unsympathetic to the fact that, if the government's

2   going to be given the authority to take this type of action,

3   that it has to be predicated on sufficient evidence to

4   justify the action that's being taken.

5          But as I said, I do conclude that I do

6   appropriately consider this additional information that now

7   has been presented to me.  And with that, I would have to

8   conclude that at the time the administrator made her

9   decision based upon not only what was occurring at or about

10  that time, but also what had taken place in the, in the past

11  in reference to Cardinal.  That there was in fact a

12  sufficient predicate for the issuance of the ISO and that

13  the administrator did not act arbitrarily or a capriciously

14  or contrary to law in issuing, issuing that order.  So, I

15  would have to, based upon that, conclude that there is not a

16  substantial likelihood of success on the merits.

17         In reference to the other issues that I have to

18  address in deciding whether or not the remedy of an

19  injunction is appropriate, obviously, I have to consider

20  whether or not there has been a showing of imminent harm

21  which is a critical component of whether or not injunctive

22  relief is appropriate.  And in my view, there has not been

23  that showing.

24         As the government indicates, this is a

25  multi-billion dollar company.  And that while obviously any

1   loss of business would be a concern of a business involved

2   in generating profits, that the allegations that are made

3   here, in reference to the percentage of loss that would

4   occur is, in and of itself, as far as the monetary loss that

5   would occur, insufficient in order to make out a showing of

6   irreparable harm.

7          Obviously, to some degree, if Cardinal was unable

8   for some period of time to dispense it's pharmaceuticals

9   that's going to have some impact, I would assume, on its

10  reputation.  But I think, based upon what I have before me,

11  it's not sufficient for me to conclude that that, in and of

12  itself, is sufficient to show irreparable harm.  Because the

13  evidence, at least, would support the conclusion.  That

14  although there was a previous ISO issued and therefore, the

15  plaintiff was inhibited from dispensing substances for a

16  period of time, that once they had that lifted and got back

17  in the market, based upon what occurred thereafter, that

18  would tend to support the proposition that the suspension,

19  for some period of time, is not going to impair its ability

20  to garner the market again that it had in the past.  And

21  therefore, I think, that is insufficient also to show

22  irreparable harm.

23         And on the question of the fact that it is the

24  government who the, who Cardinal is challenging their

25  action.  And obviously, the government is protected by

1    sovereign immunity.  So, any losses that Cardinal would

2    incur, obviously, could not be recovered from the

3    government.  But again, as the government counsel points out

4    that's not, in and of itself, sufficient to conclude that

5    there's irreparable harm.

6              And I think, as government counsel says, the harm

7    must nonetheless be great, certain and imminent. And while

8    there's some certainty that there would be some level of

9    loss, I would have to conclude that the amount of loss would

10   not be great.  And therefore, one of the components that has

11   to be shown, hasn't been shown to support the proposition,

12   that because the government has sovereign immunity and

13   therefore, any economic loss that occurred would not be,

14   would not be recoverable.  So, based upon those various

15   factors, I would have to conclude that there has not been a

16   sufficient showing of irreparable harm.

17             And on the question of harm to the customers which

18   I think is a factor to at least take into account.

19   Although, it's not harm that's actually being caused to, to

20   Cardinal, on the issue of irreparable harm.  There are other

21   pharmaceuticals that distribute oxycodone and other

22   substances in this particular area.  And Cardinal has the

23   capacity to ship into Florida from its other facilities, the

24   pharmaceuticals that they otherwise cannot, from this

25   particular facility.

1           So, I don't think there's been a sufficient

2     showing that the harm that would occur is a sufficient harm,

3     that that would be an appropriate factor for me to consider

4     in deciding that the showing of irreparable harm has been

5     made.  And then when it comes to the balancing of the

6     equities and harm to the non-movement.  Again, I think that,

7     obviously, there's some level of harm by taking a major

8     player out of the market that's providing a pharmaceutical.

9     That is something that does address a major health problem

10    in our country.

11          And obviously, that, that is a concern when that

12    occurs.  But again, there are other companies that have the

13    capacity to provide these pharmaceuticals and the Cardinal,

14    itself, from its other distribution facilities, has the

15    capacity to do the same thing.  And I think when you compare

16    that with, as been indicated, the significant problem that

17    relates from the diversion of oxycodone and the harm that

18    that causes, that the equities do balance in favor of the

19    government.  And I think the same is true in reference to

20    the public interest.

21          I can appreciate that there's a public interest on

22    the part of the public to have a pharmaceutical provide

23    these type of pharmaceuticals to the communities, because of

24    the utility that they have.  Now, on the other hand, I can

25    also appreciate that the government, as recognized by

1   Congress in enacting this statute, has a particular interest

2   in ensuring that the public is not harmed when these type of

3   dangerous substances are put into, into society.  So,

4   balancing or considering the various factors that have

5   been -- that I have to consider in assessing whether

6   injunctive relief is appropriate, it is my conclusion that

7   the showing necessary for such relief has not been made.

8   And therefore, the request for a preliminary and permanent

9   injunction will have to be denied.

10          But I will follow-up my oral ruling within a

11   written opinion, hopefully, within the next week or two,

12   setting forth the reasoning for my decision.

13          Anything else?

14          MR. MOSS:  Your Honor, we'd request that the Court

15   issue an injunction, pending appeal?  And if not an

16   injunction pending appeal, at least to continue the

17   injunction in place long enough, both to permit us to file

18   papers in an orderly fashion in the Court of Appeals and

19   also, to permit the orderly transition, just as a matter of

20   the public health and distribution of these pharmaceutical

21   drugs, you know, in Florida.

22          THE COURT:  Government?

23          MR. REEVES:  Your Honor, we strongly oppose that

24   motion.  The state, pending appeals, essentially hands the

25   plaintiff the very victory that this Court has just

1    determined they're not entitled to.  They're going to have

2    prompt administrative proceedings, which are set to be

3    concluded by August.  And if they get a stay pending appeal,

4    they've essentially won, despite the Court's ruling and it

5    would gut 824-D.  So, we strongly oppose that motion.

6            THE COURT:  Okay.  I'll have to deny, deny that

7    request, I guess.  Emergency relief can be sought from the

8    circuit.  If they disagree with my position, obviously, they

9    could issue the appropriate order.

10           Thank you.

11           MR. MOSS:  Okay.  Your Honor, just one, sort of,

12   further related request.  Which is, the Cardinal Health also

13   distributes to a number of non-retail customers in Florida,

14   like hospitals.  And we would request that the Court limit

15   its decision to the retail customers, because that's the

16   only issue that has actually been raised as a concern by the

17   DEA?

18           MR. REEVES:  Your Honor, this is the first I've

19   heard of a challenge to the scope of the suspension order.

20   But to do that, Your Honor would have to conclude that the

21   DEA acted arbitrary and capriciously in revoking Lakeland's

22   registration, generally.  And so, in absent that finding,

23   Your Honor, I don't believe should modify the order as

24   Mr. Moss has requested.

25           THE COURT:  Well, I hadn't considered that issue.

1    It's the first time, I guess, it's been, been raised.  But

2    what about that position?  I mean, the argument or at least

3    the position taken by the administrator solely relates to

4    the distribution to retailers.

5           There's no indication that there's a basis for

6    concluding that distribution to hospitals or other types of

7    medical facilities, that diversion is occurring in that

8    respect.  So, what, what's the government's view in

9    reference to why a limitation as requested would not be

10   appropriate?

11          MR. REEVES:  Your Honor, the first thing is that,

12   Cardinal Health has ample ability to distribute to hospitals

13   through its other facilities.  It has 25 some other

14   facilities that it can distribute to.  So, the closure of

15   Lakeland will not prohibit them from distributing to a

16   hospitals.  So, any suggestion that if Lakeland is closed

17   that they will not be able to distribute to hospitals is, is

18   simply false.

19          And as I said, if there's an issue with just

20   in-time delivery or a need for expedited delivery, there is

21   nothing, whatsoever, in this record that indicates that the

22   other facilities can not send the shipments expedited.  So,

23   this is, yet, another in and around trying to up end the

24   ruling that this Court has just issued.  And I would add, as

25   Your Honor noted, it has not been briefed at all.  This is

1    the first we've heard of it.

2              MR. MOSS:  Well, Your Honor, Your Honor, you know,

3    if it's, obviously, if the Court thought it would be

4    appropriate, we'd be happy to brief the issue.  But we, our

5    papers do actually reflect the fact that its just in-time

6    delivery is something that is important.  Particularly, with

7    respect to hospitals, people who may be going into

8    surgeries, emergency situations, where there's a need to

9    deliver drugs on very short order and that the disruption

10   will present a particular problem in that respect, Your

11   Honor.

12             THE COURT:  Well, I hadn't considered this

13   particular limitation on a ruling I would make.  And I

14   think, at least at this point -- I mean, obviously, I can

15   reconsider, if counsel wants to submit something for

16   reconsideration placing such a limitation on the scope of my

17   order, but the concern I have is that, I think, as the

18   government ably points out, even based upon the record that

19   we have here, I don't see how I would be able to make a

20   irreparable harm determination.  Even if I were able to make

21   a ruling that in reference to the limitation requested,

22   there's a substantial likelihood of success on the merit.

23             MR. MOSS:  Your Honor, I apologize.  I just threw

24   out, there are a number of, sort of, difficult

25   implementation issues that relate to this.  But I'm also

1    thinking now about the fact that it is 4 o'clock in the

2    afternoon.  If the injunction is lifted, I don't know

3    exactly what that means with respect to distributions that

4    are going out tonight.  But there are patients who actually

5    need medications.  For all I know, they're actually already

6    being loaded on trucks with other medications and items that

7    need to be delivered.

8            You know, last time, when the DEA actually issued

9    its immediate suspension order, we had problems because

10   there were trucks, you know, actually out on the road making

11   deliveries.  And we had to discuss with the DEA what to do

12   about those trucks on the road and whether they would have

13   to be pulled back and --

14           THE COURT:  What was the resolution?

15           MR. MOSS:  Well, the resolution with the DEA was

16   that, the trucks that had left they didn't require to pull

17   them back.  But that was, you know --

18           THE COURT:  They would not be --

19           MR. MOSS:  They did not require that we pull them

20   back.

21           THE COURT:  Does the government have a position on

22   this?

23           MR. REEVES:  Your Honor, let me just say, in

24   response to Mr. Moss', sort of, orderly concern about the

25   shipments that are in process, I'm authorized to represent

1    by DEA, that the pharmaceuticals that had been picked for

2    order or they are currently on a truck for delivery, that's

3    fine.  But anything that doesn't fall within those

4    categories and just remains in the warehouse, as of the time

5    this Court lifts its order, that has to stay in the

6    warehouse.

7              THE COURT:  My order will incorporate that

8    concession by the government.

9              MR. REEVES:  Thank you.

10             THE COURT:  Thank you.

11             [Thereupon, the proceedings adjourned at 4:03

12             p.m.]

1                            CERTIFICATE

2              I, Cathryn J. Jones, an Official Court Reporter

3     for the United States District Court of the District of

4     Columbia, do hereby certify that I reported, by machine

5     shorthand, the proceedings had and testimony adduced in the

6     above case.

7              I further certify that the foregoing 75 pages

8     constitute the official transcript of said proceedings as

9     transcribed from my machine shorthand notes.

10             In witness whereof, I have hereto subscribed my

11    name, this the 6th day of March, 2012.

12

13

14

15

                        /s/_____
16                      Cathryn J. Jones, RPR
                        Official Court Reporter
17

18

19

20

21

22

23

24

25

**$**

**$1** [1]  48/11
**$1 billion** [1]  48/11
**$100** [1]  47/20
**$16** [1]  45/9
**$16 million** [1]  45/9
**$34** [1]  45/8
**$34 million** [1]  45/8

**/**

**/s** [1]  76/15

**1**

**1.4 million** [1]  43/5
**10** [1]  45/3
**10,000** [1]  17/11
**100** [1]  63/25
**12** [2]  20/23 51/3
**12-185** [1]  1/4
**12.9 million** [1]  38/6
**1200** [1]  1/16
**13** [1]  17/14
**18** [1]  17/14
**185** [1]  1/4
**1875** [1]  1/13
**19** [1]  19/17

**2**

**20** [1]  2/4
**20 percent** [1]  39/22
**200** [1]  45/25
**20001** [1]  2/13
**20005** [1]  1/16
**20006** [1]  1/14
**2007** [6]  14/12 17/14 17/15 24/12 45/3
48/10
**2008** [18]  14/13 17/14 17/15 17/17 18/6
20/15 20/18 20/23 24/12 29/3 29/4 38/9
38/22 38/24 40/6 45/3 45/14 45/20
**2009** [2]  20/16 20/23
**2010** [3]  41/16 42/9 56/4
**2011** [11]  29/4 38/9 39/1 40/1 40/6 40/7
40/18 41/11 45/20 56/7 56/8
**2012** [3]  1/5 47/25 76/11
**204** [1]  47/18
**20530** [1]  2/9
**219** [5]  40/18 40/19 41/19 42/10 46/9
**22** [4]  11/3 37/21 37/25 56/5
**22152** [1]  2/9
**23** [1]  19/17
**241 percent** [2]  38/10 39/12
**25** [7]  48/23 51/3 56/6 56/6 56/7 56/9
72/13
**2500** [1]  50/25
**26** [1]  28/23
**29** [1]  1/5
**2:28** [1]  35/12

**3**

**31st** [1]  39/1
**333** [1]  2/12
**35** [1]  35/19
**36** [2]  12/11 49/22
**3:05** [1]  35/13

**4**

**4 o'clock** [1]  74/1
**400,000** [1]  40/14
**43017** [1]  1/19
**44** [1]  46/14
**45** [1]  56/3
**46** [1]  56/3
**4:03** [1]  75/11

**5**

**50** [2]  38/7 40/3
**53** [1]  50/1
**53,000** [1]  40/13

**6**

**65 percent** [1]  41/14
**6521** [1]  2/12
**6th** [1]  76/11

**7**

**700** [1]  1/16
**7000** [1]  1/18
**75** [1]  76/7

**8**

**80** [4]  11/6 20/3 39/18 39/21
**800 percent** [2]  20/17 20/22
**824** [1]  36/2
**824-D** [1]  71/5
**8701** [1]  2/8
**880,000** [1]  43/6

**9**

**9,000** [1]  36/18
**96 percent** [1]  40/15

**A**

**ability** [6]  23/20 25/19 63/24 65/25
67/19 72/12
**able** [10]  13/13 32/13 33/21 34/14 38/16
50/22 65/5 72/17 73/19 73/20
**ably** [1]  73/18
**about** [82]
**above** [1]  76/6
**absent** [1]  71/22
**absolute** [1]  25/24
**abuse** [1]  9/9
**accept** [3]  27/20 60/22 64/19
**accepted** [1]  17/23
**access** [3]  19/13 19/14 31/20
**according** [4]  31/22 41/20 42/3 42/7
**account** [4]  37/10 38/15 62/25 68/18
**accounted** [1]  11/3
**accounts** [1]  4/4
**accurate** [1]  61/12
**accurately** [1]  62/24
**across** [2]  29/6 56/12
**act** [4]  15/2 29/21 35/3 66/13
**acted** [7]  11/22 20/3 60/15 61/20 61/23
65/13 71/21
**acting** [2]  7/24 18/5
**action** [32]  3/2 4/18 5/11 5/16 8/25
11/21 12/13 12/14 13/14 13/19 14/6
21/3 21/19 21/23 26/18 29/13 37/2
37/11 39/14 62/6 62/17 62/23 63/1
63/16 64/3 64/16 64/22 65/8 65/22 66/2
66/4 67/25
**actions** [4]  36/9 62/13 63/23 65/15
**activity** [1]  64/10
**actual** [2]  49/19 52/8
**actually** [47]  5/21 7/4 7/14 8/7 9/10 9/15
9/17 12/15 12/23 16/19 17/5 18/2 19/4
20/11 20/12 20/25 21/1 21/25 23/25
27/1 28/10 29/12 30/18 32/1 33/6 33/8
50/11 52/9 52/19 52/23 52/24 53/2 54/6
54/10 54/12 55/9 59/1 59/3 61/8 61/9
68/19 71/16 73/5 74/4 74/5 74/8 74/10
**adamantly** [1]  41/21
**add** [2]  25/6 72/24
**addiction** [4]  13/3 14/8 25/13 26/3
**addition** [6]  5/25 11/14 22/9 25/11 45/21
58/13
**additional** [11]  27/9 36/6 37/3 60/20

**60/24 61/5 61/6 61/7 61/13 61/17 66/6**
**address** [15]  7/18 9/9 18/1 28/13 30/10
31/13 33/8 33/16 47/10 47/12 55/11
60/13 64/3 66/18 69/9
**addresses** [1]  34/25
**addressing** [2]  28/6 34/16
**adduced** [1]  76/5
**adequate** [4]  8/23 9/22 43/2 45/13
**adhered** [1]  46/21
**adjacent** [1]  26/10
**adjoining** [1]  52/2
**adjourned** [1]  75/11
**Administration** [1]  2/7
**administrative** [24]  3/24 4/7 7/18 8/19
10/19 11/13 11/18 11/20 15/2 18/3
22/10 23/12 26/23 32/17 35/4 35/8
36/13 36/19 39/20 51/2 57/2 57/25 60/1
71/2
**administrator** [30]  4/17 10/5 14/24 16/21
18/15 19/16 20/4 20/14 21/21 24/7
29/17 30/12 35/17 41/3 55/8 55/21 60/5
60/15 60/20 61/12 61/20 62/3 62/15
62/21 63/17 64/4 65/13 66/8 66/13 72/3
**administrator's** [11]  6/2 7/6 7/15 12/8
12/10 20/8 25/7 27/12 32/1 54/22 55/2
**admits** [1]  29/1
**adopted** [1]  53/2
**affidavit** [6]  5/2 5/5 5/17 18/17 27/1 27/2
**after** [13]  8/1 15/16 15/19 21/5 28/2
38/21 39/2 39/4 39/19 39/23 42/23
46/10 58/20
**afternoon** [3]  3/6 3/12 3/13 3/18 74/2
**afterwards** [1]  8/13
**again** [5]  25/22 36/21 67/20 68/3 69/6
69/12
**against** [5]  10/1 18/3 29/13 45/5 45/6
**agency** [42]  4/10 4/20 4/23 5/10 5/16
5/21 6/17 7/2 7/19 7/20 7/24 7/25 8/6
8/12 8/20 8/22 8/25 8/25 9/17 9/20
11/20 11/22 20/25 20/25 21/5 21/9 23/7
23/17 32/19 36/14 36/14 36/16 36/17
37/2 37/5 59/22 60/25 61/2 61/5 61/9
61/9 65/23
**agency's** [6]  4/24 5/16 5/25 7/18 8/19
21/19
**ago** [1]  24/14
**agree** [4]  25/6 37/12 62/18 63/18
**agreed** [1]  19/24
**agreement** [3]  18/6 22/11 45/11
**agrees** [1]  36/14
**aided** [1]  2/17
**Aids** [1]  42/16
**air** [1]  55/11
**AIW** [1]  39/23
**al** [2]  1/5 3/3
**alerted** [1]  46/6
**all** [24]  6/20 10/9 11/25 12/1 14/10
21/25 22/7 27/12 27/14 29/6 35/4 36/15
36/15 40/14 43/8 43/8 46/2 47/7 48/14
51/7 52/25 55/11 72/25 74/5
**allegation** [3]  34/6 34/8 47/19
**allegations** [4]  19/25 29/24 45/5 67/2
**alleged** [1]  57/6
**alleviate** [2]  28/13 32/14
**allow** [1]  51/15
**allowed** [1]  55/4
**allowing** [1]  35/7
**almost** [1]  46/5
**alone** [7]  11/20 38/1 40/10 45/9 47/19
50/4 62/20
**already** [2]  45/22 74/5
**also** [26]  10/18 10/20 12/24 13/2 23/6
25/12 35/25 37/18 38/1 41/1 42/21
44/20 45/22 46/11 49/15 53/9 55/22
56/11 62/14 63/23 66/10 67/21 69/25

## A

**also...** [3] 70/19 71/12 73/25
**although** [2] 67/14 68/19
**always** [2] 16/12 49/23
**am** [2] 60/13 61/25
**ambiguity** [6] 6/17 8/17 8/18 37/1 60/25 61/2
**ambiquity** [3] 5/15 6/23 37/4
**among** [1] 19/10
**amount** [13] 8/5 13/24 15/9 16/6 36/7 38/8 38/21 40/1 43/13 43/21 55/17 55/18 68/9
**amounts** [3] 17/24 42/25 47/17
**ample** [1] 72/12
**amply** [1] 8/12
**analysis** [2] 20/7 36/23
**analytic** [1] 4/3
**annual** [1] 48/15
**another** [5] 8/22 27/20 44/23 47/4 72/23
**answer** [1] 26/14
**answers** [1] 40/24
**anti** [4] 41/8 45/12 52/17 58/6
**anti-diversion** [4] 41/8 45/12 52/17 58/6
**any** [31] 15/23 16/22 17/3 18/20 18/21 18/21 20/4 20/5 20/12 20/19 21/8 23/24 24/19 26/18 26/21 30/8 30/16 31/13 34/4 36/10 38/16 39/20 44/9 49/9 49/12 49/16 58/8 66/25 68/1 68/13 72/16
**anything** [9] 9/13 16/17 19/12 27/13 31/24 33/25 54/10 70/13 75/3
**APA** [7] 36/1 36/3 53/2 53/8 60/15 61/20 61/24
**apologize** [1] 73/23
**appeal** [3] 70/15 70/16 71/3
**appeals** [3] 24/20 70/18 70/24
**appear** [3] 5/1 27/21 41/23
**appearance** [1] 28/2
**APPEARANCES** [2] 1/11 2/1
**appears** [2] 28/7 45/17
**application** [1] 47/6
**applied** [3] 30/13 46/25 47/3
**apply** [4] 30/19 30/21 53/3 53/7
**appreciate** [2] 69/21 69/25
**approach** [1] 31/2
**approached** [1] 59/19
**approaches** [1] 31/7
**appropriate** [25] 5/10 5/12 6/21 12/7 13/9 13/22 16/7 24/1 34/25 51/9 51/10 52/14 55/1 58/5 62/7 63/17 63/23 65/23 66/19 66/22 69/3 70/6 71/9 72/10 73/4
**appropriately** [3] 61/18 65/13 66/6
**approximate** [1] 56/16
**approximately** [2] 43/6 56/7
**arbitrarily** [1] 66/13
**arbitrary** [4] 8/25 47/8 53/8 71/21
**are** [87]
**area** [14] 9/3 25/13 25/16 26/2 26/7 26/19 40/21 42/11 42/16 42/19 55/17 56/18 56/23 68/22
**areas** [2] 24/25 52/2
**argued** [1] 50/14
**argues** [1] 37/1
**arguing** [1] 45/1
**argument** [8] 11/12 37/18 47/11 50/12 51/17 51/24 53/1 72/2
**arguments** [9] 50/22 52/12 52/13 53/14 54/20 54/21 55/2 55/9 55/11
**arises** [1] 58/9
**around** [3] 32/5 52/22 72/23
**arrived** [1] 58/1
**Arthur** [2] 2/3 3/15
**as** [71] 4/16 5/4 6/23 7/20 8/11 11/17 14/8 14/8 15/24 17/15 17/21 18/18 19/24 19/24 21/16 24/9 25/8 25/23

25/23 26/8 29/17 30/17 30/22 31/8 33/1 36/16 41/23 47/6 47/53 47/18 49/19 49/24 51/22 53/14 53/18 56/13 57/9 58/18 60/12 60/12 60/13 60/14 61/12 62/2 62/8 62/9 62/15 62/21 63/9 63/16 64/4 65/12 65/22 66/5 66/24 67/4 67/4 68/3 68/6 69/16 69/25 70/19 71/16 71/23 72/9 72/19 72/24 73/17 75/4 76/8
**aside** [1] 42/17
**ask** [4] 6/12 26/13 26/14 47/9
**asked** [1] 41/19
**asking** [1] 23/24
**assert** [2] 18/12 34/13
**asserts** [2] 17/11 56/4
**assess** [1] 21/18
**assessing** [5] 61/19 62/6 63/4 64/2 70/5
**assessment** [3] 55/22 60/14 62/23
**associated** [2] 13/1 45/7
**Association** [1] 49/25
**assume** [1] 67/9
**assurances** [2] 15/21 60/4
**ATA** [1] 49/20
**attached** [1] 28/25
**attaches** [1] 17/9
**attack** [1] 32/4
**attempt** [2] 9/21 20/11
**attempted** [1] 11/24
**attention** [1] 20/9
**audit** [2] 41/6 44/11
**auditing** [1] 44/4
**audits** [1] 44/21
**August** [2] 1/17 71/3
**authority** [3] 21/20 36/4 66/2
**authorization** [1] 63/21
**authorize** [1] 61/4
**authorized** [4] 11/20 61/22 65/4 74/25
**authorizes** [1] 51/5
**available** [2] 33/9 61/15
**Avenue** [3] 1/13 2/4 2/12
**average** [6] 29/5 29/6 29/9 38/8 40/2 56/13
**averages** [4] 20/10 26/13 26/14 56/14
**avoid** [3] 4/18 16/7 63/19
**aware** [11] 10/12 10/14 10/15 10/18 10/20 15/11 19/18 29/18 29/20 58/20 64/11
**away** [1] 33/24

## B

**back** [21] 7/11 8/1 8/14 9/24 9/24 9/24 10/7 14/15 17/23 21/5 28/16 28/20 32/16 38/21 39/4 50/9 52/25 67/16 74/13 74/17 74/20
**background** [1] 58/19
**backing** [1] 12/23
**backs** [1] 12/17
**bad** [3] 31/18 31/21 34/9
**balance** [4] 18/25 19/1 19/3 69/18
**balancing** [2] 69/5 70/4
**balloon** [1] 32/6 32/9
**Band** [1] 42/16
**Band-Aids** [1] 42/16
**Bank** [2] 49/21 49/21
**barrier** [1] 13/13
**based** [24] 5/23 7/6 7/16 7/19 7/21 11/15 15/16 17/18 18/16 28/9 29/21 37/11 45/14 51/21 52/9 55/20 64/5 65/10 66/9 66/15 67/10 67/17 68/14 73/18
**basic** [1] 4/21
**basically** [2] 30/24 32/13
**basis** [13] 5/16 5/17 8/2 21/13 21/19 29/10 29/23 36/19 46/18 52/23 55/7 62/16 72/5
**be** [97]

**became** [1] 58/20
**because** [35] 7/8 21/13 21/20 22/4 24/25 27/16 28/6 29/17 32/13 33/6 37/19 37/21 40/24 42/18 42/23 43/4 44/8 44/17 45/4 48/1 48/6 49/7 49/17 51/18 62/24 63/17 65/4 65/10 65/23 67/12 68/12 69/23 71/15 74/9
**become** [1] 64/11
**becomes** [2] 15/11 63/15
**bedrock** [1] 11/23
**been** [37] 3/21 5/3 5/7 5/20 5/24 8/20 9/8 9/23 13/21 15/15 21/2 28/4 32/23 39/15 45/10 45/19 62/13 63/5 63/10 64/9 65/3 65/6 66/7 66/20 68/11 68/15 69/1 69/4 69/16 70/5 70/7 71/16 72/1 72/1 72/25 75/1
**before** [38] 1/9 3/23 4/9 6/9 10/17 10/19 11/1 11/9 12/20 15/22 16/24 18/5 20/3 21/22 23/19 24/9 28/1 28/3 36/13 39/15 46/11 48/2 50/11 57/1 57/2 57/11 57/19 57/21 57/23 57/25 58/13 59/24 60/20 61/8 61/13 64/17 64/25 67/10
**begins** [1] 22/13
**behalf** [1] 3/7
**being** [13] 13/9 13/25 15/9 31/22 41/6 53/17 61/7 61/12 64/15 65/16 66/4 68/19 74/6
**believable** [1] 42/17
**believe** [9] 5/5 6/25 14/6 15/7 32/9 36/10 57/21 58/5 71/23
**believes** [6] 5/9 6/10 12/11 31/17 31/18 59/7
**below** [1] 56/14
**benefit** [1] 21/8
**besides** [1] 46/11
**best** [3] 53/22 53/25 63/24
**better** [2] 4/6 37/24
**between** [5] 19/4 38/9 59/1 59/16 63/4
**beyond** [6] 5/23 11/24 24/5 27/18 58/24 61/3
**bigger** [1] 58/23 58/23
**billion** [3] 47/20 48/11 66/25
**binding** [1] 45/15
**bit** [4] 30/5 37/21 37/25 37/25
**boilerplate** [2] 22/6 23/3
**bolded** [1] 22/14
**both** [7] 20/7 22/5 23/4 46/10 53/8 62/13 70/17
**bounds** [1] 52/1
**Boynton** [2] 1/12 3/10
**break** [1] 35/10
**Brian** [2] 1/12 3/10
**brief** [2] 49/22 73/4
**briefed** [1] 72/25
**broader** [1] 23/3
**brought** [1] 65/20
**burden** [1] 4/10
**business** [4] 18/25 47/17 67/1 67/1
**busy** [1] 24/25

## C

**called** [1] 57/17
**calls** [1] 46/4
**came** [3] 38/21 46/10 62/22
**Camp** [4] 4/22 5/22
**Camp versus Pitt** [1] 5/22
**can** [46] 5/5 6/24 6/25 12/5 13/7 15/5 15/13 21/1 21/3 21/11 24/10 27/8 27/14 27/17 27/20 27/23 28/10 32/12 32/19 32/22 33/11 33/15 33/18 33/23 35/25 38/4 40/25 48/24 49/8 50/4 50/19 51/15 52/3 54/19 55/20 58/15 60/4 61/18 62/25 64/25 69/21 69/24 71/7 72/14 72/22 73/14
**can't** [14] 6/12 13/19 17/15 18/11 20/5

**can't...** [9] 29/22 30/3 32/12 32/14 33/18 40/10 58/14 62/19 63/25
**cancer** [1] 25/3
**cannot** [5] 13/16 14/13 38/1 49/25 68/24
**capacity** [4] 55/21 68/23 69/13 69/15
**capricious** [2] 47/8 53/9
**capriciously** [2] 66/13 71/21
**CARDINAL** [109]
**Cardinal's** [9] 36/23 41/16 41/20 41/22 42/3 46/13 47/20 47/24 49/12
**care** [1] 54/12
**carefully** [1] 24/8
**Caremed** [4] 10/8 10/17 56/22 57/22
**Carolina** [1] 49/12
**Carolina's** [1] 49/10
**carried** [1] 4/10
**carry** [3] 42/12 42/14 42/16
**Carter's** [1] 28/1
**case** [33] 3/23 3/23 5/13 5/14 5/19 6/9 6/16 8/11 8/13 9/20 12/19 13/17 16/4 16/12 19/19 26/8 28/7 28/15 33/18 34/22 37/5 44/8 49/4 49/20 51/18 52/5 52/15 53/5 61/3 62/1 62/18 65/10 76/6
**cases** [6] 5/8 6/20 6/25 34/12 37/6 37/9
**catch** [2] 37/21 37/25
**catch-22** [1] 37/21
**categorically** [1] 16/12
**categories** [1] 75/4
**Cathryn** [3] 2/11 76/2 76/16
**cause** [11] 4/13 4/13 15/13 17/8 21/13 22/5 23/5 23/9 50/13 54/23 59/25
**caused** [3] 42/22 62/11 68/19
**causes** [2] 18/8 69/18
**causing** [1] 15/9
**cease** [1] 15/23
**center** [1] 26/12
**centers** [1] 25/3
**CEO** [2] 47/24 49/12
**certain** [4] 49/19 51/19 64/25 68/7
**certainly** [6] 7/17 8/5 13/16 18/20 38/3 57/25
**certainty** [1] 68/8
**CERTIFICATE** [1] 76/1
**certify** [2] 76/4 76/7
**chain** [6] 31/11 31/14 31/15 32/5 43/9 58/4
**chains** [5] 30/14 30/23 31/3 31/8 63/12
**challenge** [6] 19/8 36/2 51/5 65/17 65/19 71/19
**challenging** [2] 19/15 67/24
**chance** [4] 8/22 29/16 32/22 33/13
**change** [4] 12/9 12/21 12/22 32/11
**changes** [3] 14/18 17/22 17/25
**changing** [1] 47/25
**charged** [1] 8/6
**chart** [2] 11/9 28/24
**Chenery** [1] 11/16
**chief** [3] 2/8 3/8 42/8
**circuit** [3] 5/8 53/5 71/8
**Circuit's** [1] 37/13
**Circuits** [1] 5/8
**circumstance** [5] 5/14 14/16 16/23 26/11 60/23
**circumstances** [8] 7/1 7/2 7/7 14/6 16/14 22/18 43/15 61/4
**citation** [1] 39/10
**cite** [5] 12/25 21/12 36/4 37/13 53/5
**cites** [2] 17/10 37/8
**city** [2] 52/1 55/19
**Civil** [2] 2/4 3/2
**claim** [1] 36/3
**claims** [2] 18/3 53/6
**classic** [2] 27/10 30/7

**clause** [2] 15/3 53/10
**clear** [8] 5/20 7/18 33/14 36/23 63/14 60/19 61/2 62/1
**clearly** [8] 11/15 13/15 16/5 21/20 26/19 51/18 62/4 64/6
**client** [4] 13/21 16/5 55/16 57/7
**Clifford** [1] 37/14
**close** [5] 10/13 16/18 16/22 32/7 34/4
**closed** [4] 47/22 48/5 48/7 72/16
**closing** [2] 31/12 31/23
**closure** [2] 48/2 72/14
**Coast** [6] 10/9 10/17 41/12 41/14 56/22 58/2
**collectively** [1] 35/20
**Colorado** [1] 49/7
**COLUMBIA** [2] 1/2 76/4
**combat** [1] 46/14
**combined** [1] 40/20
**come** [10] 3/4 8/1 9/24 9/24 15/13 16/17 18/12 32/16 54/6 57/11
**comes** [6] 6/9 16/8 16/22 21/5 28/24 47/17 53/14 53/16 69/5
**coming** [2] 20/21 34/4
**commence** [1] 16/25
**committed** [2] 52/16 54/2
**communities** [4] 63/4 63/8 63/9 69/23
**community** [3] 19/2 63/2 63/4
**companies** [3] 14/1 63/20 69/12
**company** [25] 14/16 15/10 16/5 16/24 23/22 29/13 30/20 34/17 35/6 43/12 47/20 47/24 50/20 51/13 52/16 53/22 54/1 54/2 54/14 57/17 59/6 59/8 59/12 59/19 66/25
**company's** [1] 55/4
**compare** [2] 29/3 69/15
**compared** [3] 13/25 31/8 63/9
**comparing** [1] 20/22
**comparison** [1] 63/3
**compel** [1] 50/3
**compelling** [1] 34/22
**completely** [1] 18/23
**complex** [1] 26/10
**complexes** [1] 25/2
**compliance** [3] 48/17 48/18 61/24
**complies** [1] 12/2
**component** [1] 66/21
**components** [1] 68/10
**computer** [1] 2/17
**computer-aided** [2] 2/17
**conceded** [1] 10/15
**concedes** [2] 10/6 10/11
**concept** [1] 9/12
**concern** [15] 18/9 18/23 31/13 31/16 41/17 57/6 57/23 58/23 59/4 59/6 67/1 69/11 71/16 73/17 74/24
**concerned** [2] 25/24 28/10 63/5
**concerns** [6] 28/13 30/10 36/16 57/10 57/12 59/12
**concession** [1] 75/8
**conclude** [14] 9/1 9/4 35/21 61/17 62/20 63/16 66/5 66/8 66/15 67/11 68/4 68/9 68/15 71/20
**concluded** [2] 47/2 71/3
**concludes** [1] 55/1
**concluding** [2] 62/16 72/6
**conclusion** [9] 7/15 7/25 8/3 8/13 22/18 34/22 61/25 67/13 70/6
**conclusionary** [1] 6/5
**conclusive** [3] 38/2 44/25 45/1
**conclusory** [2] 6/7 6/8
**conduct** [5] 7/17 7/21 22/9 22/11 22/12
**conducted** [2] 12/4 29/19
**confined** [2] 60/14 60/16
**confirm** [1] 57/20
**confirmed** [1] 49/24

**Congress** [2] 13/19 65/4 70/1
**congressional** [1] 19/7
**conjunction** [1] 22/22
**connect** [1] 9/18
**connects** [1] 30/16
**consequences** [5] 23/21 23/22 33/2 33/3 33/3
**consider** [13] 12/7 27/6 27/8 27/15 36/6 60/24 62/5 63/1 63/2 66/6 66/19 69/3 70/5
**considerable** [1] 8/5
**considerably** [1] 28/11
**considerations** [1] 44/18
**considered** [6] 61/9 61/16 61/19 62/3 71/25 73/12
**considering** [2] 64/15 70/4
**considers** [1] 6/22
**consistent** [2] 15/21 33/14
**constantly** [2] 4/5 44/13
**constitute** [1] 76/8
**constitutes** [1] 35/22
**Constitution** [1] 2/12
**constitutional** [1] 53/6
**constraint** [1] 47/3
**Cont'd** [1] 2/1
**contacted** [1] 42/8
**contain** [3] 6/1 7/4 65/11
**contained** [1] 6/19
**contains** [2] 10/7 17/11
**contemplated** [1] 9/10
**contemporaneous** [1] 4/23
**context** [12] 8/6 8/24 9/11 9/13 16/15 20/12 32/18 38/5 40/5 40/17 50/20 54/23
**continue** [3] 15/5 45/21 70/16
**continued** [4] 22/16 22/19 35/21 45/18
**continuing** [1] 21/6
**contrary** [5] 29/13 36/4 55/2 60/15 66/14
**control** [2] 4/5 22/25
**controlled** [8] 10/16 18/24 19/9 23/20 33/4 43/1 55/5 58/16
**controls** [5] 9/2 12/3 13/23 16/7 45/4
**conversations** [2] 59/1 59/16
**corners** [1] 51/11
**corporate** [1] 41/16
**correct** [3] 6/15 15/2 63/20
**correctly** [1] 45/13
**cost** [1] 48/11
**Cote** [2] 2/6 3/16
**could** [13] 8/25 10/23 16/19 17/18 28/4 30/10 36/24 41/8 43/16 46/25 50/13 68/2 71/9
**couldn't** [2] 33/19 49/5
**counsel** [12] 2/8 3/4 3/9 3/14 3/20 35/14 35/16 54/20 62/19 68/3 68/6 73/15
**counsel's** [1] 50/12
**count** [2] 48/17 48/21
**country** [4] 25/19 33/21 55/14 69/10
**county** [1] 52/2
**couple** [5] 6/16 27/17 42/12 44/19 51/23
**coupled** [2] 26/4 62/9
**course** [3] 8/16 8/18 35/6
**court** [67] 1/1 2/11 2/11 2/12 3/23 4/9 4/22 5/9 6/9 6/10 6/12 6/21 8/17 9/9 11/17 11/19 12/20 15/13 16/2 16/13 19/23 21/16 24/20 27/8 27/18 27/20 28/2 28/3 28/9 28/13 35/10 35/25 36/20 37/10 37/11 37/13 47/15 49/24 50/1 50/4 50/11 53/6 53/8 54/18 55/1 55/20 58/16 58/24 59/24 60/4 60/23 60/24 61/4 61/19 65/17 65/20 65/21 70/14 70/18 70/25 71/14 72/24 73/3 75/5 76/2 76/3 76/16
**Court's** [1] 71/4
**courts** [4] 5/9 5/20 8/19 47/18

**C**

covered [1] 44/15
Craig [1] 1/17 3/8
credibility [1] 42/17
credit [1] 61/12
critical [1] 66/21
current [2] 14/5 24/12
currently [2] 50/10 75/2
Curteman [2] 2/6 3/17
curve [4] 13/14 26/18 31/13 31/25
customer [4] 4/4 40/2 46/18 46/18
customer-by-customer [1] 46/18
customers [14] 30/6 38/7 38/11 45/20
46/1 46/1 46/7 46/16 48/25 49/3 49/9
68/17 71/13 71/15
cut [11] 20/1 20/4 28/23 46/3 52/18
52/21 56/25 57/14 57/22 57/24 58/2
Cutler [2] 3/7 3/11
cutting [3] 34/22 42/1 52/23
CV [1] 1/4
CVS [28] 10/9 10/22 11/6 12/4 29/19
29/25 30/1 30/14 37/19 37/22 38/11
39/25 40/1 40/15 40/18 40/19 41/6
41/18 41/19 41/21 42/8 42/10 46/9 52/6
57/3 58/3 59/16 63/13
CVS's [1] 41/8

**D**

D.C [5] 1/5 1/14 1/16 2/5 2/13
danger [34] 4/19 6/2 9/16 9/19 10/24
12/15 14/14 16/16 17/16 18/22 19/23
24/1 24/3 26/5 30/16 32/14 33/7 33/16
33/17 34/25 35/18 35/23 51/15 54/1
54/8 54/25 55/4 55/6 58/9 60/2 62/17
64/21 65/1 65/6
dangerous [4] 7/23 18/25 63/21 70/3
darn [1] 34/21
data [5] 28/25 28/25 40/25 41/20 41/25
date [1] 39/10
day [9] 24/22 24/24 47/23 49/1 49/1
49/5 53/11 54/18 76/11
DC [2] 37/13 53/5
DEA [94]
DEA's [12] 11/11 17/18 18/2 19/25 20/7
28/25 31/5 43/3 47/7 52/9 57/6 64/5
deal [4] 3/22 17/12 26/24 32/18
dealing [8] 11/19 12/19 18/24 19/8
26/22 30/20 52/6 52/16
deals [3] 23/2 31/16 38/20
dealt [1] 14/15
death [2] 15/9 26/2
deaths [2] 13/1 25/14
December [3] 11/5 29/4 39/1
December 2008 [1] 29/4
December 31st [1] 39/1
decide [1] 60/1
deciding [4] 17/3 63/1 66/18 69/4
decision [26] 4/24 4/25 5/1 5/22 6/14
7/6 7/18 8/15 8/19 11/16 11/22 12/5
21/1 23/3 23/6 27/12 37/13 47/18 60/16
62/10 65/12 65/21 65/22 66/9 70/12
71/15
declaration [31] 10/11 12/8 12/10 12/19
17/9 17/9 18/17 19/18 20/8 20/15 27/10
28/8 29/1 29/25 32/2 35/18 35/20 35/24
36/24 41/4 48/9 50/15 52/4 54/22 55/3
55/9 55/16 56/3 61/11 61/14 64/5
declarations [4] 28/1 36/18 36/22 37/15
decrease [5] 39/13 39/14 39/19 39/21
58/20
decreased [1] 11/6
Dedra [1] 2/6
deemed [1] 6/21
defeat [1] 65/2

Defendant [1] 2/2
Defendants [1] 1/13
defending [1] 52/14
defense [3] 43/4 53/17 53/20
degree [1] 67/7
Deidra [1] 3/17
delay [1] 49/3
delays [1] 49/7
deliver [1] 73/9
delivered [1] 74/7
deliveries [1] 74/11
delivery [7] 49/1 49/1 49/5 72/20 72/20
73/6 75/2
demographics [1] 40/22
demonstrated [2] 44/23 54/7
denied [1] 70/9
Denova [1] 53/7
deny [3] 50/5 71/6 71/6
DEPARTMENT [3] 2/3 2/7 3/15
depend [1] 26/6
deposition [1] 27/2
depravation [1] 9/8
depriving [2] 16/24 51/13
deputy [1] 25/7
described [7] 7/7 7/17 7/21 22/9 22/11
22/18
despite [5] 33/2 33/3 55/1 60/18 71/4
detail [2] 5/5 23/15
detailed [1] 8/9
determination [10] 11/19 17/19 45/2
55/10 60/21 61/1 61/10 61/16 62/4
73/20
determinative [1] 16/3
determined [1] 71/1
determining [1] 63/16
develop [1] 52/12
dialogue [3] 59/10 59/14 59/21
did [24] 6/4 6/18 7/3 10/18 16/1 19/23
26/14 29/22 37/5 39/14 41/6 41/9 45/14
46/4 57/1 57/2 57/5 61/13 62/7 63/11
64/17 65/11 66/13 74/19
didn't [6] 9/20 19/23 30/1 44/9 52/23
74/16
different [5] 5/18 9/25 24/22 27/17
30/13 30/19 31/2 31/7 36/17
differs [1] 5/14
difficult [1] 73/24
diligence [2] 30/13 31/7
disagree [2] 15/3 71/8
disappears [1] 34/4
discern [1] 46/25
disclosed [1] 64/7
discounted [1] 62/15
discretion [1] 44/17
discuss [2] 5/4 74/11
discussed [3] 19/21 41/18 45/22
discussing [1] 45/19
discussions [1] 57/17
dispense [2] 63/21 67/8
dispensing [4] 4/11 11/4 67/15
dispositive [3] 24/19 25/4 53/12
dispute [2] 13/10 48/3
disputing [1] 52/15
disregarded [1] 41/15
disruption [3] 4/14 54/11 73/9
distinguishing [1] 19/10
distribute [9] 23/20 55/5 58/15 58/16
65/25 68/21 72/12 72/14 72/17
distributed [3] 13/25 40/19 56/5
distributes [1] 71/13
distributing [8] 16/6 20/19 29/11 31/15
42/25 55/16 55/25 72/15
distribution [34] 4/14 10/16 11/5 13/24
14/2 15/23 20/2 23/22 25/13 29/4 29/5

29/6 29/8 31/12 31/14 32/10 33/4 34/17
38/19 39/4 39/7 45/9
51/24 55/8 63/3 63/8 64/23 69/14 70/20
72/4 72/6
distributions [4] 39/7 56/9 56/13 74/3
distributor [9] 25/15 25/16 25/25 26/1
28/23 34/23 43/25 44/2 44/3
distributors [4] 29/6 42/24 56/7 59/2
district [7] 1/1 1/2 1/10 2/12 5/9 76/3
76/3
diversion [48] 4/2 4/5 13/8 13/22 13/23
15/24 16/7 19/6 25/8 30/20 34/3 34/7
37/24 39/17 41/8 41/12 42/21 43/2 43/3
44/24 45/5 45/5 45/12 45/17 46/14
52/17 52/23 54/1 55/15 57/6 57/7 57/10
57/12 58/6 58/21 59/3 59/8 59/23 62/8
62/21 63/6 63/19 64/1 64/2 64/10 64/17
69/17 72/7
diverted [2] 13/9 15/9
diverting [1] 64/1
Division [1] 2/4
divisions [1] 23/15
do [59] 4/3 4/6 4/17 4/20 13/16 14/17
15/24 16/9 18/16 19/13 19/15 27/2
31/24 32/25 33/2 33/5 33/5 33/5 33/15
33/25 34/5 37/4 37/7 38/4 40/11 40/21
41/9 41/13 41/24 41/24 41/24 41/25
42/1 43/8 43/8 43/15 43/22 43/25 44/9
44/13 47/23 48/1 48/18 53/24 54/16
56/16 59/22 60/6 61/11 63/17 63/21
66/5 66/5 69/15 69/18 71/20 73/5 74/11
76/4
Docket [1] 1/4
doctors [15] 11/3 19/14 26/11 31/16
31/18 32/11 34/8 34/9 34/18 34/18
42/22 42/24 43/6 43/11 43/19
document [4] 7/21 23/4 23/7 23/25
documents [6] 17/3 36/15 41/21 41/23
42/4 42/8
does [27] 8/7 8/9 8/25 9/7 12/25 12/25
13/5 18/16 18/19 19/11 19/22 37/25
38/3 38/14 40/3 41/12 41/24 43/2 43/7
45/23 50/2 53/8 55/13 55/15 61/3 69/9
74/21
doesn't [21] 8/10 9/9 12/20 16/2 19/13
19/14 20/17 31/24 33/7 36/23 38/15
40/23 44/25 48/17 48/20 48/21 49/9
49/12 53/1 64/10 75/3
doing [13] 4/12 9/23 15/12 19/14 20/21
21/9 23/7 35/1 37/23 44/3 52/25 53/22
53/25
dollar [1] 66/25
don't [35] 5/5 6/20 8/19 13/10 15/20
16/21 18/19 18/20 20/1 21/7 21/7 21/25
22/21 23/24 24/2 26/14 26/20 27/7
29/17 32/22 32/25 34/25 36/10 37/5
48/8 52/3 53/10 54/3 56/20 60/22 63/14
69/1 71/23 73/19 74/2
done [6] 17/18 18/11 21/7 24/2 36/20
53/15
door [1] 7/11
Dorr [2] 3/7 3/11
dosage [2] 28/21 38/6
Doug [1] 3/9
Douglas [1] 1/15
down [13] 10/13 22/13 23/19 31/12
31/23 32/7 33/1 33/13 33/23 40/3 46/19
50/20 57/13
dozens [1] 24/24
dramatic [1] 29/12
drastic [2] 12/13 12/14
draw [2] 9/18 55/20
Drive [1] 2/8
drug [6] 2/7 33/20 34/3 43/12 43/20
43/21

**D**

**drugs [8]** 13/2 13/8 15/9 16/6 43/13 63/21 70/21 73/9
**Dublin [1]** 1/19
**due [24]** 4/11 4/16 7/24 9/8 10/14 15/3 15/4 15/14 16/14 23/13 30/13 31/7 31/24 32/21 33/14 34/23 34/24 36/1 36/2 36/3 50/21 51/13 53/1 53/10
**during [1]** 40/6
**duties [1]** 9/5

**E**

**earlier [2]** 20/18 22/22
**easier [1]** 48/19
**economic [3]** 47/16 50/2 68/13
**Eddleman [1]** 2/2
**effect [2]** 63/12 63/13
**effected [1]** 59/19
**effective [1]** 45/4
**efforts [2]** 41/9 53/24
**eight [1]** 40/9
**either [3]** 41/6 49/13 55/8
**election [1]** 63/14
**else [3]** 21/11 43/9 70/13
**email [1]** 59/5
**emails [1]** 41/21
**emergency [4]** 62/17 65/3 71/7 73/8
**employees [2]** 12/4 29/19
**enacting [1]** 70/1
**end [5]** 23/13 35/23 42/11 53/11 72/23
**enforcement [2]** 2/7 19/8
**engage [2]** 9/9 38/16
**engaged [3]** 15/24 34/6 59/8
**engaging [1]** 64/9
**enormous [7]** 4/13 17/22 17/24 23/21 33/2 52/17 53/23
**enormously [1]** 4/2
**enough [7]** 28/21 28/22 37/23 40/8 40/12 40/13 70/17
**ensure [1]** 63/23
**ensuring [2]** 19/4 70/2
**entered [1]** 45/11
**entire [5]** 39/8 39/11 53/21 56/10 56/12
**entirely [1]** 39/19
**entitled [1]** 71/1
**equities [2]** 69/6 69/18
**equivalent [1]** 36/11
**ERIC [2]** 1/5 3/3
**Esquire [9]** 1/12 1/12 1/15 1/17 2/2 2/2 2/3 2/6 2/6
**essentially [2]** 70/24 71/4
**established [1]** 65/6
**et [2]** 1/5 3/3
**evaluate [1]** 46/18
**even [23]** 12/7 15/20 15/20 16/2 19/12 19/23 20/1 24/5 27/13 27/25 36/25 39/23 41/7 48/8 48/15 54/10 54/21 56/15 57/21 59/10 63/15 73/18 73/20
**event [6]** 20/4 21/8 30/8 30/17 39/21 58/8
**events [6]** 14/13 15/16 15/19 17/15 18/4 24/13
**ever [2]** 33/21 36/24
**every [3]** 8/6 32/4 48/24
**everybody [1]** 57/9
**everyday [1]** 4/5
**everyone [1]** 43/9
**everything [2]** 15/12 33/17
**evidence [9]** 25/8 25/12 41/2 46/12 47/7 47/19 62/12 66/3 67/13
**evolving [1]** 28/15
**exactly [5]** 16/20 28/14 33/17 48/7 74/3
**examine [1]** 19/23 24/7 53/8
**examined [1]** 57/13

**example [5]** 20/13 20/24 27/10 37/8 70/2
**examples [2]** 26/9 51/21
**exceeded [3]** 46/15 46/23 46/24
**exceedingly [2]** 24/8 51/11
**exception [2]** 36/14 46/6
**excess [2]** 45/25 51/20
**exchange [1]** 4/7
**exchanged [1]** 3/22
**exclusively [1]** 17/12
**excuse [1]** 40/7
**exercise [3]** 32/19 33/18 44/17
**exercising [1]** 51/12
**exhaustive [2]** 21/15 23/10
**existed [2]** 14/20 14/25
**exists [1]** 13/3
**expect [5]** 39/2 49/6 49/15 51/20 55/19
**expedite [1]** 49/5
**expedited [2]** 72/20 72/22
**Expert [1]** 49/21
**explain [7]** 7/12 8/22 32/22 32/25 36/18 36/19 40/25
**explained [1]** 35/5
**explains [2]** 5/17 52/5
**explanation [13]** 4/24 5/11 6/13 7/1 10/3 24/6 27/19 30/15 37/3 44/6 46/2 46/5 61/7
**explanations [2]** 6/22 37/10
**express [1]** 41/17
**expressed [1]** 57/12
**extent [5]** 18/6 31/10 55/24 58/8 59/23
**extraordinary [9]** 10/13 16/23 21/2 23/18 32/20 33/8 33/12 50/19 51/12
**extreme [1]** 49/4
**extremely [2]** 19/15 25/12

**F**

**face [2]** 39/21 48/14
**faced [2]** 17/22 42/19
**facia [1]** 25/8
**facial [2]** 36/2 51/4
**facilitating [1]** 43/2
**facilities [13]** 45/6 48/10 48/21 48/22 48/24 49/8 49/11 68/23 69/14 72/7 72/13 72/14 72/22
**facilities' [1]** 4/12
**facility [13]** 10/13 17/17 20/15 20/19 23/21 31/12 31/24 32/8 48/7 49/7 49/14 54/4 68/25
**fact [47]** 5/23 6/3 8/1 10/10 15/11 15/17 15/19 15/21 15/25 16/1 16/15 17/7 19/24 21/5 25/5 29/13 29/24 30/5 31/4 38/14 38/15 50/2 51/2 51/24 52/5 56/2 57/10 59/4 59/14 61/3 61/14 61/16 62/25 63/11 63/15 64/12 64/18 65/1 65/2 65/6 66/1 66/17 67/23 73/5 74/1
**factor [5]** 44/23 63/1 63/16 68/18 69/3
**factors [6]** 26/4 27/3 44/15 45/22 68/15 70/4
**facts [8]** 7/7 21/15 21/17 21/22 22/17 25/24 55/21 65/12
**factual [5]** 8/13 31/18 59/18 60/20
**failed [3]** 4/20 29/21 45/4
**fails [1]** 32/4
**failure [1]** 48/5
**fall [6]** 4/25 5/22 11/10 11/15 57/15 75/3
**fallen [1]** 20/3
**false [2]** 42/18 72/18
**falsehood [1]** 42/20
**far [3]** 14/8 25/23 67/4
**Farm [1]** 11/16
**Farquhar [2]** 1/15 3/9
**fashion [1]** 70/18
**favor [1]** 69/18
**February [2]** 1/5 41/11

**felt [1]** 9/24
**few [9]** 4/4 11/4 16/10 44/21 46/3
**figure [3]** 20/22 34/14 52/2
**file [2]** 63/25 70/17
**filed [3]** 12/19 23/11 59/15
**files [1]** 44/4
**filings [1]** 21/6
**fill [1]** 46/4
**filled [2]** 31/22 46/15
**filling [6]** 11/2 24/21 24/24 34/11 34/18 34/20
**final [1]** 9/14
**finally [2]** 30/12 35/2
**find [3]** 24/10 42/9 64/19
**finding [14]** 7/2 8/1 9/18 12/17 19/22 22/16 30/15 30/16 35/17 50/3 54/25 64/20 65/1 71/22
**findings [26]** 4/17 5/1 5/19 5/21 5/23 5/24 6/2 6/5 6/19 7/4 8/7 8/8 8/9 8/21 9/12 9/16 9/21 9/21 9/22 10/8 10/10 11/14 16/18 18/13 35/20 50/15
**fine [4]** 45/7 45/9 45/10 75/3
**fined [2]** 47/21 48/1
**first [21]** 14/10 17/1 20/18 21/25 22/7 28/7 35/16 37/5 42/12 43/2 48/13 53/16 53/20 56/24 60/10 60/12 63/22 71/18 72/1 72/11 73/1
**fiscal [1]** 47/25
**five [3]** 22/8 22/8 44/18
**fix [2]** 48/16 48/19
**flag [1]** 63/10
**flags [3]** 41/1 41/15 45/25
**flawed [2]** 20/9 25/25
**Florida [28]** 4/15 13/4 20/20 23/23 29/5 29/7 31/13 34/4 38/9 38/12 40/2 49/8 49/10 51/25 56/1 56/6 56/6 56/6 56/10 56/12 57/10 57/12 57/13 57/19 63/9 68/23 70/21 71/13
**focus [1]** 58/10
**focuses [1]** 24/17
**follow [3]** 9/6 60/11 70/10
**follow-up [2]** 60/11 70/10
**following [1]** 21/14
**foregoing [2]** 22/14 76/7
**form [1]** 29/22
**formed [1]** 21/22
**forth [6]** 6/11 8/12 20/25 21/14 21/17 22/20 27/15 70/12
**forward [1]** 3/4
**found [1]** 6/18
**four [20]** 10/8 13/17 13/18 19/19 19/22 20/16 22/12 24/4 24/15 24/16 26/25 27/3 29/7 38/7 41/13 45/20 46/1 46/7 48/10 64/6
**fours [1]** 20/6
**fourth [1]** 46/9
**frame [1]** 11/7
**front [1]** 29/2
**full [2]** 4/6 40/10
**fundamental [1]** 11/18
**fundamentally [1]** 20/9
**further [11]** 5/11 5/17 6/12 6/22 6/25 7/12 22/13 40/5 40/17 71/12 76/7
**furthermore [3]** 40/14 42/3 42/7
**future [2]** 16/9 65/14

**G**

**garner [1]** 67/20
**general [7]** 9/3 18/19 22/4 22/6 25/7 38/3 39/7
**generally [2]** 47/5 71/22
**generating [1]** 67/2
**get [12]** 19/5 28/16 28/19 29/16 32/22 37/3 49/5 49/6 54/16 59/4 60/12 71/3
**gets [1]** 16/10

## G

**getting [4]** 26/15 45/16 54/2 54/13
**give [7]** 8/21 20/13 21/20 23/19 28/17 35/9 47/10
**given [5]** 7/19 7/20 54/11 63/20 66/2
**giving [3]** 32/21 33/13 35/6
**go [7]** 7/11 11/24 24/5 27/18 33/24 47/13 54/19
**goes [10]** 5/23 8/14 18/25 19/1 19/3 24/15 33/17 58/22 58/24 61/3
**going [32]** 14/7 19/17 23/18 23/19 26/22 26/24 31/13 32/17 33/1 33/2 33/5 33/12 33/24 34/11 34/19 34/20 42/23 43/13 43/21 47/9 49/13 59/24 64/24 65/19 65/20 65/21 66/2 67/9 67/19 71/1 73/7 74/4
**Goldberg [2]** 2/3 3/15
**Golf [1]** 58/2
**good [9]** 3/6 3/12 3/13 3/18 6/7 30/3 41/5 44/6 47/19
**got [15]** 7/8 13/24 14/1 14/4 14/5 37/4 43/18 44/9 44/11 51/18 53/19 53/24 59/5 62/20 67/16
**government [30]** 7/8 26/17 26/21 35/14 36/8 49/23 50/19 50/25 51/12 53/13 53/24 54/6 59/15 59/17 61/18 62/24 63/20 66/24 67/24 67/25 68/3 68/3 68/6 68/12 69/19 69/25 70/22 73/18 74/21 75/8
**government's [4]** 49/17 51/23 66/1 72/8
**great [4]** 3/22 49/19 68/7 68/10
**greater [4]** 5/5 23/15 55/18 63/7
**grounds [2]** 4/20 11/22
**guarded [1]** 56/17
**guess [7]** 13/20 14/4 34/3 53/18 54/3 71/7 72/1
**guidance [1]** 47/25
**Gulf [5]** 10/8 10/17 41/12 41/14 56/22
**gut [1]** 71/5
**guys [1]** 53/16 54/3

## H

**had [32]** 10/15 10/19 11/6 14/17 20/2 21/22 25/25 26/2 28/4 41/7 46/11 46/16 57/11 57/17 57/22 57/24 58/1 58/5 59/16 59/17 62/13 62/22 63/6 64/9 66/10 67/16 67/20 74/9 74/11 74/16 75/1 76/5
**hadn't [3]** 37/22 71/25 73/12
**HALE [3]** 1/13 3/7 3/11
**hand [1]** 69/24
**handful [1]** 9/4
**hands [1]** 70/24
**happen [2]** 6/24 59/25
**happened [5]** 5/24 17/23 18/5 24/12 24/14
**happy [2]** 47/12 73/4
**hard [2]** 54/16 64/19
**harm [34]** 12/12 14/19 14/20 14/23 14/24 15/13 47/11 47/12 47/17 48/4 48/6 48/7 48/19 48/21 49/3 58/9 66/20 67/6 67/12 67/22 68/5 68/6 68/16 68/17 68/19 68/20 69/2 69/2 69/4 69/6 69/7 69/17 73/20
**harmed [1]** 70/2
**has [94]**
**hasn't [2]** 48/4 68/11
**hasten [1]** 11/22
**have [105]**
**haven't [1]** 18/11
**having [4]** 9/2 13/22 61/2 61/25
**havoc [1]** 15/10
**he [13]** 35/16 36/12 36/22 36/25 37/1 37/8 39/13 48/10 49/13 50/14 51/17 56/3 56/4
**health [68]** 4/1 4/8 4/11 4/12 4/13 4/13 4/19 6/3 9/16 10/15 10/18 10/20 10/21 10/24 11/2 12/2 12/15 12/18 15/22 15/24 16/1 16/16 17/4 17/20 17/21 17/22 18/3 18/22 19/2 19/24 25/18 26/19 29/10 29/20 30/3 30/13 31/12 31/20 31/24 32/7 33/7 33/16 34/6 35/23 51/2 52/22 53/15 55/25 56/5 56/23 56/25 57/9 57/11 57/13 57/22 57/24 58/1 58/4 58/9 58/14 60/3 60/6 69/9 70/20 71/12 72/12
**Health's [9]** 10/23 11/5 15/21 22/9 22/16 29/4 29/8 35/6 56/13
**Healths' [1]** 22/19
**heard [7]** 33/13 35/7 54/5 54/17 55/10 71/19 73/1
**hearing [4]** 1/8 16/24 23/19 57/21
**Heart [1]** 50/15
**heartedly [1]** 37/12
**heat [1]** 8/14
**heavy [1]** 4/10
**Heim [2]** 2/2 3/16
**held [1]** 4/22
**Henderson [1]** 25/9
**her [26]** 6/5 6/18 10/11 17/9 17/9 18/17 19/18 20/14 29/25 30/1 35/18 35/19 41/3 55/9 55/15 55/16 60/21 61/13 61/15 61/22 62/3 62/4 62/10 62/11 64/4 66/8
**here [55]** 3/19 5/13 5/23 5/24 6/16 7/3 7/8 8/5 11/23 12/9 15/19 16/17 16/23 21/4 22/1 23/10 23/25 24/1 24/2 26/16 26/22 28/3 29/8 31/16 32/16 32/19 33/10 34/2 34/6 34/15 35/3 37/21 38/3 44/8 49/6 50/9 50/11 50/18 50/20 51/1 51/8 51/15 51/18 51/24 52/11 53/12 53/18 54/7 54/8 54/24 59/24 63/6 65/23 67/3 73/19
**here's [2]** 8/2 10/4
**hereby [1]** 76/4
**herein [5]** 7/7 7/17 22/10 22/11 22/18
**hereto [1]** 76/10
**herself [1]** 20/4
**hey [1]** 59/5
**high [15]** 25/7 25/12 26/2 26/3 27/9 28/21 30/8 30/18 39/22 39/22 41/19 44/7 48/16 52/5 52/7
**highlighted [1]** 8/12
**himself [1]** 19/7
**HIPAA [1]** 31/21
**his [3]** 36/5 38/13 51/17
**historically [1]** 30/13
**history [10]** 13/21 14/5 14/11 14/12 24/13 44/23 45/7 45/10 62/5 62/7
**hoc [10]** 8/4 10/2 10/3 12/5 12/8 27/11 30/7 36/8 36/20 36/22
**hold [1]** 38/3
**HOLDER [2]** 1/5 3/3
**home [1]** 26/12
**Honor [94]**
**Honor's [5]** 18/23 26/15 28/16 28/20 29/10
**HONORABLE [1]** 1/9
**hook [1]** 16/10
**hope [1]** 65/14
**hopefully [1]** 70/11
**hospital [2]** 26/8 40/20
**hospitals [7]** 25/1 71/14 72/6 72/12 72/16 72/17 73/7
**how [12]** 9/11 11/9 24/23 30/15 31/11 34/25 37/23 44/14 47/23 48/1 59/19 73/19
**huge [1]** 42/25 44/19
**hundred [1]** 52/18
**hundreds [3]** 4/4 24/22 52/18
**HYMAN [2]** 1/21 8/25 3/10
**hypothetical [3]** 25/23 26/18 29/11

## I

**I'd [3]** 16/19 35/15 44/16
**I'll [8]** 20/13 28/17 28/18 35/9 44/21 47/10 57/20 71/6
**I'm [20]** 14/22 16/3 16/4 16/11 21/10 32/10 34/2 34/4 34/23 40/7 43/16 43/24 47/9 47/12 53/20 58/18 65/9 65/25 73/25 74/25
**I've [6]** 17/21 41/18 44/15 44/19 45/22 71/18
**identical [1]** 36/3
**identified [3]** 15/23 24/3 26/25
**identify [2]** 3/4 27/2
**ignored [2]** 41/1 41/10
**ignores [1]** 11/12
**illicit [1]** 19/10
**immediate [11]** 4/18 14/6 21/13 22/5 23/2 23/4 31/25 60/6 62/23 65/7 74/9
**immediately [4]** 4/11 14/9 33/1 50/20
**imminent [32]** 4/19 10/24 12/12 12/15 14/14 14/19 14/20 14/23 14/24 16/16 17/16 18/22 19/22 26/5 30/16 32/14 33/6 33/15 33/17 34/25 35/8 35/23 54/25 58/9 58/9 60/2 62/16 64/20 65/1 65/6 66/20 68/7
**immunity [3]** 49/17 68/1 68/12
**impact [2]** 64/25 67/9
**impair [1]** 67/19
**implementation [1]** 73/25
**implies [1]** 42/22
**Import [1]** 49/21
**importance [1]** 4/1
**important [8]** 9/13 20/24 25/20 27/25 31/9 32/16 51/11 73/6
**impotent [3]** 26/17 26/21 33/25
**in-store [1]** 41/6
**in-time [2]** 72/20 73/5
**inadequate [1]** 44/20
**inappropriate [1]** 37/3
**INC [2]** 1/3 25/5
**include [3]** 7/25 30/2 31/4
**includes [3]** 11/14 29/24 30/1
**inconsistent [1]** 22/17
**incorporate [1]** 75/7
**increase [2]** 38/14 41/13
**increased [2]** 20/16 39/11
**increasing [3]** 38/10 39/8 44/19
**incredible [1]** 40/25
**incredibly [1]** 41/19
**incur [1]** 68/2
**indeed [3]** 12/18 14/15 17/16
**independent [1]** 30/21
**independents [1]** 30/15
**indicate [3]** 6/4 25/11 49/2
**indicated [4]** 6/4 45/21 60/18 69/16
**indicates [2]** 6/8 66/24 72/21
**indication [1]** 72/5
**industry [1]** 46/3
**inevitably [1]** 65/17
**infer [1]** 13/7
**inferences [1]** 55/20
**information [26]** 17/5 28/3 29/22 30/6 31/20 36/6 36/11 36/13 36/16 40/1 42/6 60/20 60/23 60/24 61/5 61/6 61/8 61/13 61/14 61/15 61/15 61/18 62/9 64/8 65/16 66/6
**informed [2]** 65/12 65/22
**inhibited [1]** 67/15
**initial [2]** 31/7 61/1
**initially [1]** 65/11
**initiating [1]** 23/8

# I

injunction [9]  3/20 50/5 52/24 66/19 70/9 70/15 70/16 70/17 74/2
injunctive [2]  66/21 70/6
injury [1]  4/13
inspection [3]  10/19 57/2 58/1
instance [2]  37/5 63/22
instructed [1]  11/2
insufficient [2]  67/5 67/21
intelligently [1]  21/18
intend [1]  4/6
intended [3]  7/2 33/19 46/14
interest [6]  17/20 22/17 65/24 69/20 69/21 70/1
internal [2]  41/21 42/3
interviews [4]  12/3 29/19 29/21 41/3
invested [2]  4/2 17/24
investigating [2]  15/11 58/21
investigation [9]  16/8 38/20 39/16 39/16 40/4 44/10 45/19 64/5 64/7
investigations [4]  41/9 43/8 44/13 64/7
investigative [1]  39/20
investigator [1]  41/11
invite [2]  8/25 9/7
invited [1]  59/13
invites [1]  8/4
invoked [1]  11/22
involved [2]  39/15 67/1
involving [1]  62/5
irreparable [15]  47/11 47/12 47/17 48/19 49/19 49/23 50/3 67/6 67/12 67/22 68/5 68/16 68/20 69/4 73/20
is [324]
isn't [3]  13/23 34/24 48/22
ISO [51]  6/1 6/19 7/4 7/4 7/14 9/6 10/6 10/7 10/7 10/9 10/17 10/21 11/1 11/9 11/13 11/25 11/25 12/2 17/3 17/6 18/4 20/8 20/14 20/18 21/12 21/17 27/15 27/18 27/19 27/22 50/16 51/6 51/8 51/9 52/14 54/24 55/8 57/1 58/13 60/16 60/18 60/19 60/21 61/17 61/21 61/22 62/11 65/11 65/14 66/12 67/14
ISOs [5]  14/12 17/8 17/14 30/1 30/2
issuance [1]  66/12
issue [25]  9/5 14/19 17/3 26/19 26/24 27/23 28/9 31/10 47/10 51/5 52/6 59/17 60/10 60/12 60/21 61/16 61/22 62/11 68/20 70/15 71/9 71/16 71/25 72/19 73/4
issued [18]  6/13 10/5 10/6 10/12 10/17 11/1 11/9 14/21 14/25 37/15 39/20 58/13 61/21 65/14 65/18 67/14 72/24 74/8
issues [13]  3/23 4/8 18/1 30/11 30/20 32/3 32/18 39/23 57/18 59/19 60/5 66/17 73/25
issuing [2]  66/14 66/14
it [219]
it's [57]  4/5 5/18 8/16 8/22 9/11 9/13 9/23 11/16 12/9 12/16 13/7 14/20 15/20 17/2 18/8 20/17 20/24 21/1 21/7 22/6 23/12 30/25 31/1 32/3 32/15 33/6 33/14 35/4 35/24 36/23 37/2 37/24 37/25 40/3 40/4 41/22 42/13 42/15 42/16 44/25 45/1 45/2 45/24 46/21 48/1 55/1 57/15 58/15 59/18 62/1 65/20 67/8 67/11 68/19 72/1 72/1 73/3
items [1]  74/6
its [58]  4/10 4/24 5/11 7/2 7/20 8/20 8/21 9/18 10/19 11/2 11/22 12/2 16/1 16/15 16/24 17/17 20/16 20/25 35/8 36/8 37/20 38/7 38/8 38/24 39/14 40/2 41/20 41/23 44/17 45/12 45/20 46/8 46/16 47/5 47/25 48/5 48/7 51/12 52/18

# J

Jackson [1]  49/25
January [1]  42/9
January 2010 [1]  42/9
job [3]  37/23 48/17 53/15
Jockeyman [1]  48/9
Jones [2]  2/11 76/2 76/16
JR [1]  1/5
judge [7]  1/9 1/10 11/21 23/12 25/5 25/9 60/1
judgment [3]  11/20 16/14 16/15
judicial [1]  8/11 8/13 10/10 28/15
jurisdiction [1]  58/24
just [38]  5/24 6/17 9/22 10/7 12/16 13/17 15/4 20/13 22/6 23/1 24/2 24/13 28/20 28/21 35/2 38/10 39/11 40/15 42/2 42/17 43/7 46/23 50/9 50/24 55/7 55/20 58/2 61/9 62/2 70/9 70/25 71/11 72/19 72/24 73/5 73/23 74/23 75/4
JUSTICE [3]  2/3 2/7 3/15
justifiably [1]  64/23
justification [2]  36/8 65/7
justifies [1]  29/12
justify [5]  8/15 9/23 13/14 21/7 66/4

# K

keep [2]  42/2 42/20
key [1]  33/10
kinds [1]  40/25
knew [4]  10/5 11/1 11/4 30/12 41/2 53/17 53/18
know [52]  7/17 8/16 8/21 9/6 10/2 10/4 11/16 11/17 11/23 12/22 16/12 22/19 24/9 24/24 26/23 28/21 28/22 30/8 30/16 32/21 34/9 34/21 40/9 40/21 44/10 47/23 48/1 48/6 50/17 51/22 51/23 52/3 53/13 53/21 54/1 54/19 55/23 56/12 56/16 56/18 56/20 56/24 57/6 58/25 59/7 59/11 59/18 59/21 63/12 70/21 73/2 74/2 74/5 74/8 74/10 74/17
knowledge [1]  64/14
known [5]  30/17 31/3 39/15 57/9 59/18
knows [1]  39/23 40/4 42/18

# L

Lakeland [36]  4/12 17/17 20/15 32/8 37/20 38/6 38/21 40/1 41/1 41/5 41/13 41/19 41/24 44/18 45/3 45/4 45/6 45/8 45/11 45/13 45/16 45/17 46/1 46/3 46/10 46/13 46/15 46/17 47/3 47/6 47/8 47/21 48/5 48/23 72/15 72/16
Lakeland's [7]  35/21 41/17 47/2 47/23 48/2 48/25 71/21
language [12]  21/20 22/1 22/4 22/6 22/22 22/22 22/24 22/25 23/1 23/2 23/4 60/17
large [21]  13/24 15/8 16/6 25/2 25/14 26/10 26/12 30/6 30/14 30/19 30/23 31/11 31/14 31/15 39/24 42/10 43/10 43/18 52/7 55/16 63/12
largely [1]  39/19
largest [18]  40/17 45/10
Larry [2]  2/6 3/16
last [5]  7/8 22/8 28/2 35/19 74/8
late [1]  39/25
later [1]  24/17

# L (cont.)

Laura [2]  2/2 3/16
law [19]  1/23 28/3 28/20 10/1 11/13 11/18 19/8 23/12 37/6 50/1 60/1 61/3 61/20 62/1 62/4 62/18 65/2 65/4 66/14
laws [1]  31/21
learned [2]  41/10 59/15
least [12]  11/6 44/9 47/2 48/24 49/8 63/9 64/11 67/13 68/18 70/16 72/2 73/14
leaves [1]  57/3 58/2
led [1]  35/20
Lee [2]  2/2 3/14
left [1]  74/16
legal [2]  3/9 9/3
legally [1]  45/15
legitimate [1]  19/10
less [3]  19/12 48/15 50/15
let [8]  4/21 24/10 35/2 38/4 38/4 43/9 47/19 74/23
let's [5]  24/6 25/22 51/25 58/11 58/11
lets [1]  8/21
letter [1]  17/4
letting [4]  30/24 31/1 44/10 63/12
level [6]  34/15 39/3 39/7 64/9 68/8 69/7
license [1]  15/6
life [1]  14/8
lifted [2]  67/16 74/2
lifts [1]  75/5
light [1]  14/18
like [22]  5/4 5/14 5/19 16/19 28/15 30/14 32/8 32/24 35/15 42/15 44/14 44/16 47/13 50/12 50/22 50/22 51/25 52/6 55/20 63/12 65/18 71/14
likelihood [2]  66/16 73/22
likely [2]  15/24 59/8
liken [1]  32/5
limit [1]  71/14
limitation [4]  72/9 73/13 73/16 73/21
limitations [1]  43/5
limited [2]  7/1 33/11
line [3]  43/4 53/16 53/20
link [1]  32/4
list [1]  23/10
litigation [2]  8/2 8/14
little [4]  30/4 46/2 46/4 46/24
lived [1]  3/22
lives [1]  15/10
loaded [1]  74/6
located [3]  25/1 25/2 56/19
long [2]  48/1 70/17
long-term [1]  48/1
longer [1]  49/7
look [14]  16/13 21/1 21/3 24/6 26/21 37/23 51/24 51/25 52/4 54/24 55/2 56/12 62/2 62/19
looked [1]  59/20
looking [5]  21/9 52/1 59/21 59/22 59/23
looks [1]  26/16
lose [1]  54/3
loss [11]  14/8 47/16 48/12 49/18 58/6 67/1 67/3 67/4 68/9 68/9 68/13
losses [1]  49/23 50/2 68/1
lost [2]  49/16 49/16
lot [6]  9/3 20/9 20/10 32/23 46/25 49/6
low [1]  45/22
lower [1]  29/9
Lynn [1]  50/15

# M

machine [3]  2/17 76/4 76/9
made [22]  5/21 6/14 9/21 9/22 11/8 14/17 17/22 17/24 21/4 31/6 35/16 35/17 45/16 54/7 54/15 60/21 62/3 62/10 66/8 67/2 69/5 70/7
maintain [1]  45/4

**M**

**major [5]** 13/15 14/1 33/20 69/7 69/9
**majority [2]** 11/3 56/1
**make [30]** 4/17 8/8 9/16 9/21 11/21
12/21 13/23 16/14 16/18 18/13 25/25
29/16 37/7 45/12 48/8 48/20 49/9 50/23
55/22 64/10 64/20 64/24 64/25 65/5
65/12 65/21 67/5 73/13 73/19 73/20
**makes [7]** 8/8 16/8 18/19 23/16 49/12
53/14 56/4
**making [11]** 8/7 9/12 12/17 51/4 55/10
60/14 61/9 61/16 63/3 64/17 74/10
**Mallinckrodt [6]** 57/17 57/18 57/19
57/21 57/22 57/23
**manipulate [1]** 39/9
**manner [2]** 23/21 40/24
**manpower [1]** 43/7
**manufacturers [1]** 57/16
**many [4]** 26/10 26/10 26/11 54/21
**March [1]** 76/11
**market [7]** 15/8 39/5 43/22 56/17 67/17
67/20 69/8
**Massachusetts [1]** 2/4
**massive [2]** 25/18 25/19
**material [2]** 17/10 17/12
**materials [1]** 31/4
**matter [3]** 4/16 44/25 70/19
**may [15]** 3/20 8/17 8/17 15/15 33/21
37/8 37/17 39/6 39/6 49/1 50/2 55/24
58/18 60/24 73/7
**may not [1]** 33/21
**maybe [4]** 21/11 44/7 63/11 63/13
**McNAMARA [2]** 1/15 3/10
**me [30]** 3/8 3/14 4/21 13/12 21/18 21/19
21/20 21/21 24/10 33/22 35/2 35/20
36/5 38/4 38/4 40/7 47/13 50/12 55/19
60/19 65/2 65/5 65/11 65/12 65/18 66/7
67/10 67/11 69/3 74/23
**mean [27]** 5/7 9/2 13/12 16/4 17/2 18/16
18/24 20/9 20/12 21/10 25/22 26/13
27/7 27/10 32/10 33/20 43/23 43/25
50/24 53/20 55/13 56/6 58/22 64/13
64/23 72/2 73/14
**meaningful [3]** 8/10 12/22 47/3
**means [2]** 8/8 23/24 24/19 26/21 34/4
74/3
**measures [3]** 43/3 45/13 48/11
**medical [1]** 46/10
**medications [6]** 19/4 25/20 33/4 54/12
74/5 74/6
**medicine [1]** 19/11
**medium [1]** 41/12
**memorandum [6]** 7/10 7/12 7/16 18/6
22/11 45/11
**mention [1]** 49/15
**mentioned [3]** 17/15 46/23 49/22
**mere [1]** 50/2
**merit [1]** 73/22
**merits [4]** 3/24 36/3 44/16 66/16
**might [1]** 58/18
**mightily [1]** 44/24
**mile [1]** 40/18
**million [4]** 38/6 43/5 45/8 45/9
**Mining [1]** 49/25
**minute [2]** 16/20 35/10
**minutes [1]** 28/17
**misleading [1]** 39/10
**misperception [1]** 55/24
**Mississippi [2]** 49/11 49/14
**mistake [1]** 21/4
**mistaken [1]** 35/18
**MOA [10]** 14/13 17/8 17/15 18/2 18/8
18/8 18/11 18/13 18/21 19/20
**Mobility [1]** 47/18

**modest [1]** 49/3
**modify [1]** 71/21
**moment [1]** 50/10
**Monet [1]** 52/4
**monetary [1]** 67/4
**money [3]** 17/24 48/16 48/18
**monitored [1]** 46/19
**monitoring [2]** 45/24 45/24
**monthly [1]** 53/19
**months [8]** 10/17 11/1 20/18 20/22
20/23 35/3 41/13 45/3
**more [14]** 6/6 7/5 9/13 25/7 28/11 28/17
29/11 40/9 40/11 40/19 40/21 44/16
48/18 62/22
**Morford [1]** 1/17
**Morissette [1]** 2/8
**Moss [14]** 1/12 3/6 35/25 36/11 36/21
37/18 38/1 40/20 42/21 44/24 45/13
49/6 49/15 71/24
**Moss' [1]** 74/24
**most [2]** 31/9 32/2
**motion [3]** 3/19 70/24 71/5
**MOTIONS [1]** 1/8
**Mountains [1]** 49/10
**movants [1]** 47/16
**movement [1]** 69/6
**moving [1]** 32/5
**Mr [15]** 19/7 28/1 35/25 36/11 36/21
37/18 38/1 40/20 42/21 44/24 45/13
49/6 49/15 71/24 74/24
**Mr. [4]** 29/1 42/10 48/9 56/3
**Mr. Jockeyman [1]** 48/9
**Mr. Priyardarshi [1]** 42/10
**Mr. Rannazzisi's [2]** 29/1 56/3
**Ms [1]** 56/24
**Ms. [1]** 28/1
**Ms. Carter's [1]** 28/1
**much [9]** 23/24 24/23 29/11 29/18 32/24
37/23 50/12 50/14 50/15
**multi [1]** 66/25
**multi-billion [1]** 66/25
**Murford [1]** 3/8
**must [5]** 4/25 11/13 11/21 49/18 68/7
50/11 51/10 54/20 57/15 57/19 60/11
60/14 60/15 61/22 66/22 70/6 70/10
70/12 71/8 73/16 75/7 76/9 76/10

**N**

**N.W [3]** 1/16 2/4 2/12
**name [1]** 76/11
**narrow [1]** 3/23
**national [4]** 30/20 49/21 49/24 58/4
**near [4]** 25/1 25/3 26/11 26/12
**necessarily [1]** 25/6
**necessary [4]** 4/18 15/20 33/6 70/7
**need [20]** 8/17 14/9 16/2 19/4 19/5 19/5
25/20 28/22 33/5 34/5 40/9 40/11 40/21
53/8 54/12 54/12 72/20 73/8 74/5 74/7
**needed [3]** 43/13 43/21 62/23
**needs [1]** 16/22
**never [9]** 13/13 29/20 41/6 45/1 46/5
46/5 46/6 51/9 65/5
**new [4]** 27/21 30/6 35/4 39/16
**next [2]** 41/13 70/11
**nexus [3]** 9/18 34/2 54/7
**nine [3]** 32/3 40/19 51/20
**no [21]** 1/4 3/2 15/15 20/11 26/20 28/19
30/15 31/20 32/6 33/11 34/6 36/4 40/21
42/1 46/2 46/5 46/25 47/18 55/7 57/8
72/5
**non [4]** 21/15 23/10 69/6 71/13
**non-exhaustive [2]** 21/15 23/10
**non-movement [1]** 69/6
**non-retail [1]** 71/13

**none [2]** 12/5 35/3
**nonetheless [1]** 66/20
**North [1]** 49/12
**not [142]**
**note [1]** 9/14
**noted [2]** 41/12 72/25
**notes [2]** 45/13 76/9
**nothing [10]** 11/25 12/1 12/1 12/3 18/4
24/12 27/11 37/14 49/2 72/21
**notice [2]** 19/25 23/9
**notion [1]** 31/23
**Novelty [1]** 25/5
**November [1]** 29/3
**now [25]** 4/22 5/3 12/4 13/23 15/16
16/21 18/7 18/8 21/11 23/11 24/10
28/14 29/24 30/3 44/22 49/1 55/10 61/5
62/12 63/11 63/14 65/16 66/6 69/24
74/1
**nowhere [1]** 27/21
**number [15]** 13/1 25/14 39/22 43/10
43/18 43/19 45/23 46/22 48/14 52/7
52/9 54/15 57/14 71/13 73/24
**numbers [2]** 10/20 20/11 20/12
**numerous [1]** 4/19
**nursing [1]** 26/12
**NW [1]** 1/13

**O**

**o'clock [1]** 74/1
**obligation [2]** 63/22 64/1
**obvious [3]** 41/15 42/20 42/24
**obviously [19]** 13/6 43/12 43/20 61/6
61/23 62/18 63/11 63/18 63/25 66/19
66/25 67/7 67/25 68/2 69/7 69/11 71/8
73/3 73/14
**occasion [1]** 10/2
**occasions [1]** 46/15
**occur [7]** 39/15 54/11 59/14 64/10 67/4
67/5 69/2
**occurred [7]** 14/15 39/19 58/20 59/11
59/16 67/17 68/13
**occurring [3]** 64/18 66/9 72/7
**occurs [1]** 69/12
**October [1]** 45/14
**off [20]** 11/10 12/17 12/23 16/10 20/1
20/3 20/5 24/11 28/2 28/23 34/22 42/1
52/18 52/21 52/23 57/1 57/14 57/22
57/24 58/2
**offered [2]** 11/24 36/18
**Office [1]** 2/8
**offices [1]** 41/16
**official [4]** 2/11 76/2 76/8 76/16
**often [2]** 19/9 41/9
**oh [2]** 1/19 21/3
**okay [5]** 24/6 25/10 44/7 71/6 71/11
**old [1]** 35/4
**once [1]** 67/16
**oncology [1]** 26/12
**one [22]** 7/5 9/5 9/14 13/7 20/13 23/7
26/9 27/18 36/14 37/8 40/18 46/4 48/15
48/25 49/1 49/5 49/8 50/24 57/16 63/8
68/10 71/11
**one-percent [1]** 48/15
**ongoing [3]** 3/24 32/17 35/7
**only [28]** 4/9 6/8 6/18 6/22 7/3 11/13
15/18 15/25 17/10 17/18 21/5 22/11
26/1 32/5 32/18 33/15 37/4 42/11 42/14
42/15 47/15 54/23 56/5 59/14 60/23
60/23 66/9 71/16
**open [1]** 7/11
**opening [1]** 50/13
**operation [1]** 38/22
**operations [1]** 38/24
**operative [1]** 22/1
**opinion [3]** 25/9 50/1 70/11

# O

**opponent** [1] 47/9
**opportunity** [10] 8/10 28/5 30/10 32/25 35/7 47/10 50/21 52/12 54/4 54/17
**oppose** [2] 70/23 71/5
**opposing** [2] 50/12 54/20
**opposite** [1] 54/10
**oral** [2] 60/11 70/10
**order** [34] 5/10 6/11 6/13 13/14 14/21 14/25 21/13 22/5 23/5 23/8 37/15 45/24 46/9 46/12 50/13 54/23 54/24 59/25 60/11 64/3 64/20 65/16 65/18 66/14 67/5 71/9 71/9 71/17 71/23 73/9 73/17 74/9 75/2 75/5 75/7
**orderly** [3] 70/18 70/19 74/24
**orders** [8] 17/8 45/23 45/25 46/2 46/3 46/7 46/15 65/3
**ordinary** [3] 8/16 8/18 51/16
**other** [49] 5/8 5/9 8/6 9/11 12/1 13/9 14/1 14/1 17/3 17/7 21/22 27/3 27/3 27/24 28/10 29/15 29/18 30/6 31/21 37/9 40/16 41/15 42/19 43/1 44/21 45/6 46/12 46/24 48/21 48/22 48/23 50/25 51/21 56/9 61/4 63/4 63/9 66/17 68/20 68/21 68/23 69/12 69/14 69/24 72/6 72/13 72/13 72/22 74/6
**others** [2] 29/12 31/8
**otherwise** [4] 14/7 48/17 49/22 68/24
**ought** [5] 7/10 34/13 52/11 58/25 59/1
**our** [10] 11/8 23/10 23/14 28/24 49/22 51/8 55/1 58/24 69/10 73/4
**ours** [1] 23/13
**out** [19] 9/22 23/14 23/20 29/7 34/8 34/14 49/10 49/13 52/2 60/12 62/25 64/4 67/5 68/3 69/8 73/18 73/24 74/4 74/10
**over** [12] 4/4 20/17 36/21 36/21 38/10 39/7 39/11 40/13 41/13 41/14 47/20 53/15
**overages** [3] 46/22 46/23 47/1
**overcome** [1] 13/14
**overstatement** [1] 30/25
**Overton** [2] 5/14 5/19
**overwhelming** [1] 55/25
**own** [12] 5/25 12/2 16/15 28/25 31/5 41/21 41/21 41/23 44/13 46/8 46/13 52/18
**oxycodone** [29] 11/4 11/6 20/2 20/16 20/19 24/23 29/5 29/11 38/7 38/8 39/25 40/8 40/12 41/17 41/20 42/10 42/12 42/14 42/19 43/1 44/20 52/9 55/15 56/1 56/5 57/16 58/12 68/21 69/17

# P

**P.C** [1] 1/15
**p.m** [3] 35/12 35/13 75/12
**page** [6] 22/4 22/7 36/19 47/18 49/22 50/1
**pages** [5] 17/7 17/10 17/11 17/12 76/7
**paid** [1] 45/7
**pain** [2] 19/5 25/20
**paper** [1] 3/22
**papers** [1] 59/15 70/18 73/5
**paragraph** [12] 12/11 12/18 21/12 22/8 22/8 22/13 28/23 32/3 35/19 35/19 48/9 60/18
**paragraphs** [1] 17/14 19/17 56/3
**parallel** [1] 12/18
**Paras** [1] 42/9
**Park** [2] 5/15 5/19
**part** [7] 13/3 14/2 36/12 36/16 45/14 55/14 69/22
**particular** [23] 16/13 26/2 33/23 43/11 43/12 43/20 47/1 51/21 55/17 56/18

56/21 57/18 59/11 59/12 62/5 63/8 64/13 66/12 68/22 73/25 74/2 74/3 74/8 73/13
**particularly** [3] 7/23 9/7 73/6
**party** [1] 62/5
**pass** [1] 62/5
**past** [3] 18/4 66/10 67/20
**patently** [1] 42/13
**patients** [5] 19/13 25/20 26/7 54/11 74/4
**pattern** [1] 47/1
**Pena** [1] 37/14
**pending** [5] 35/22 70/15 70/16 70/24 71/3
**penicillin** [1] 42/16
**Pennsylvania** [1] 1/13
**people** [5] 4/2 19/4 40/13 40/14 73/7
**people's** [1] 15/10
**perceived** [1] 14/24
**percent** [17] 11/7 20/3 20/17 20/22 38/10 39/12 39/19 39/21 39/22 40/15 41/14 48/15 56/5 56/8 63/25
**percentage** [4] 48/16 52/8 56/17 67/3
**perfect** [1] 20/21
**perhaps** [2] 32/2 34/12
**period** [13] 14/13 38/11 38/15 38/17 38/21 39/3 39/5 39/8 39/11 40/6 67/8 67/16 67/19
**periodically** [1] 46/18
**permanent** [1] 70/8
**permit** [6] 7/11 7/25 8/10 9/9 70/17 70/19
**permits** [1] 62/4
**permitting** [2] 10/1 36/7
**personnel** [1] 17/25
**pharmaceutical** [17] 4/14 15/8 15/10 16/5 19/9 23/23 33/24 43/12 43/15 43/21 43/22 43/25 64/22 64/23 69/8 69/22 70/20
**pharmaceuticals** [8] 26/1 64/13 67/8 68/21 68/24 69/13 69/23 75/1
**pharmacies** [27] 11/2 12/1 12/20 20/16 29/5 29/7 31/23 32/10 34/11 34/11 34/13 34/13 34/17 34/20 38/12 40/16 40/19 42/19 56/14 56/18 56/21 56/22 62/14 64/6 64/14 64/16 64/18
**pharmacist** [2] 42/8 42/13 42/15
**pharmacy** [8] 15/23 16/4 40/2 40/18 42/5 42/11 42/14 42/16
**PHELPS** [2] 1/15 3/10
**pick** [2] 8/19 39/4
**picked** [1] 75/1
**Pickering** [2] 3/7 3/11
**picture** [1] 24/23
**pin** [1] 12/16
**Pitt** [2] 4/22 5/22
**place** [19] 1/18 7/5 13/18 13/22 13/23 14/3 15/16 16/7 25/14 25/14 31/14 39/14 51/16 63/3 63/6 63/19 64/3 66/10 70/17
**places** [1] 7/5
**placing** [1] 73/16
**plaintiff** [5] 1/3 1/12 62/19 67/15 70/25
**plaintiff's** [1] 35/16
**Plaintiffs** [1] 36/4
**play** [3] 62/21 62/22 63/18
**player** [1] 69/8
**pleading** [1] 23/9
**please** [1] 3/4
**pledged** [1] 45/12
**plummeted** [1] 58/13
**point** [12] 15/20 17/19 18/10 25/23 27/25 28/20 31/9 42/21 48/2 51/10 52/11 73/14
**pointing** [1] 15/19
**points** [8] 13/17 14/11 19/16 35/16

62/24 64/4 68/3 73/18
**police** [6] 3/24 41/9/3/5 44/14 63/13 63/22
**policies** [2] 46/8 46/14
**policing** [1] 37/24
**policy** [2] 46/13 47/5
**populated** [1] 51/25
**population** [4] 40/8 40/21 51/19 52/3
**portion** [2] 45/8 45/9
**posed** [1] 10/23
**position** [10] 13/20 19/13 36/5 38/14 51/8 58/14 71/8 72/2 72/3 74/21
**possess** [1] 17/20
**possibility** [1] 12/12
**possible** [1] 60/12
**possibly** [4] 14/14 17/16 29/22 33/18
**post** [10] 8/4 10/2 10/3 12/5 12/8 27/11 30/7 36/8 36/20 36/22
**posted** [1] 31/5
**pouncing** [1] 32/20
**power** [4] 23/18 47/18 50/19 51/12
**practice** [2] 15/6 19/11
**pre** [1] 9/8
**pre-depravation** [1] 9/8
**precludes** [1] 37/20
**predicate** [4] 6/11 6/23 21/23 66/12
**predicated** [4] 61/6 61/8 61/23 66/3
**prehearing** [1] 23/12
**prejudice** [1] 49/3
**preliminary** [4] 3/20 22/15 50/5 70/8
**preparing** [1] 23/13
**prerequisite** [1] 37/9
**prescriber** [1] 28/22
**prescribers** [1] 57/13
**prescribing** [1] 43/11
**prescriptions** [16] 11/3 24/22 24/24 31/19 31/22 34/9 34/10 34/12 34/18 34/19 34/21 43/14 43/20 44/6 52/8 52/8
**present** [3] 20/6 60/6 73/10
**presentation** [1] 31/6
**presented** [7] 25/12 28/4 31/11 36/6 54/1 62/10 66/7
**presents** [1] 28/24
**pressed** [1] 8/1
**presumption** [1] 10/1
**presupposes** [1] 27/14
**pretty** [1] 34/21
**prevent** [6] 31/21 43/3 53/23 53/25 59/3 59/23
**preventing** [2] 4/2 19/6
**prevention** [1] 58/6
**previous** [1] 67/14
**previously** [2] 15/15 41/18
**prima** [1] 25/8
**principal** [1] 25/16
**principle** [2] 4/22 11/23
**prior** [2] 7/24 39/14
**Priyardarshi** [2] 42/9 42/10
**pro** [1] 64/10
**pro-activity** [1] 64/10
**proactive** [2] 44/11 64/2
**proactively** [1] 44/13
**probably** [2] 13/13 58/23
**problem** [27] 11/11 13/13 13/6 13/15 14/1 14/8 15/14 15/15 15/15 20/6 21/4 25/18 25/19 28/14 32/5 32/14 33/20 34/3 55/14 56/2 62/8 64/4 64/12 64/25 69/9 69/16 73/10
**problems** [10] 13/21 14/9 23/10 33/24 44/24 45/17 45/21 48/17 50/18 74/9
**Procedure** [1] 15/2
**procedures** [2] 30/19 45/16
**proceed** [1] 3/20 37/17
**proceeding** [11] 3/25 4/8 23/8 23/9 26/23 32/17 34/24 35/4 35/8 50/14 51/2

## P

**proceedings [6]** 2/17 35/22 71/2 75/11 76/5 76/8
**process [37]** 4/11 4/16 7/24 9/8 9/9 10/14 15/3 15/4 15/14 16/14 19/15 23/13 23/16 28/15 30/4 31/24 32/21 33/15 34/23 34/24 35/1 36/1 36/2 36/3 50/11 50/18 50/21 51/13 51/16 52/25 53/1 53/10 53/21 54/17 59/14 60/1 74/25
**produced [1]** 2/17
**product [2]** 64/24 65/25
**products [2]** 4/14 23/23
**profits [1]** 67/2
**prohibit [1]** 72/15
**prominent [1]** 58/4
**promises [1]** 16/9
**prompt [1]** 71/2
**promptly [2]** 16/25 26/23
**proof [1]** 63/25
**proper [1]** 16/6
**properly [2]** 5/16 54/22
**property [1]** 65/24
**proposition [8]** 7/23 32/16 37/6 38/3 60/22 64/19 67/18 68/11
**proprietary [1]** 4/25
**propriety [1]** 11/21
**protected [1]** 67/25
**provide [12]** 5/11 36/8 41/25 42/6 43/13 43/21 50/24 60/4 61/5 65/15 69/13 69/22
**provided [14]** 6/22 11/15 24/7 28/4 30/9 36/12 37/10 37/16 52/11 60/25 61/7 61/14 64/15 65/16
**provides [2]** 4/23 5/17
**providing [2]** 7/24 69/8
**provisions [2]** 22/10 22/15
**public [27]** 4/19 6/2 6/10 9/16 9/19 10/24 12/12 12/15 14/14 16/16 18/22 19/2 22/17 25/18 33/7 33/16 35/23 54/9 55/6 58/9 60/3 60/6 69/20 69/21 69/22 70/2 70/20
**public's [1]** 17/20
**pull [2]** 74/16 74/19
**pulled [2]** 52/19 74/13
**purely [2]** 28/24 31/1
**purport [1]** 9/21
**purporting [1]** 10/13
**purpose [2]** 61/2 65/3
**purposes [4]** 13/9 15/1 15/3 15/4
**pursuant [1]** 22/15
**put [8]** 20/11 37/21 38/4 40/5 40/5 40/17 47/4 70/3
**putting [1]** 15/8

## Q

**qualify [1]** 49/19
**quantified [1]** 48/4
**quantify [1]** 48/6
**quantitatively [1]** 64/21
**quantities [3]** 39/24 53/17 53/19
**question [23]** 4/9 15/5 25/15 26/14 26/15 26/16 27/18 27/20 32/19 33/11 34/16 43/17 50/10 50/18 53/13 53/21 54/23 56/19 57/3 59/24 60/2 67/23 68/17
**questions [3]** 26/13 27/17 40/24
**quite [1]** 29/13
**quote [7]** 4/23 7/16 12/12 35/21 35/23 42/11 42/12

## R

**radar [1]** 28/6
**raised [7]** 28/1 54/20 57/18 57/23 60/6
71/16 72/1
**raises [2]** 37/18 71/23
**raising [1]** 28/14
**Randolph [1]** 1/12
**Randy [1]** 3/6
**Rannazzisi [2]** 19/7 28/1
**Rannazzisi's [2]** 29/1 56/3
**rate [4]** 25/13 26/2 26/3 51/19
**rather [3]** 3/22 35/7 52/1
**rationale [5]** 7/19 7/20 11/15 11/24 41/25
**rationales [2]** 9/25 27/21
**rationalization [7]** 8/4 10/2 10/3 27/11 30/8 36/20 36/22
**rationalizations [1]** 27/21
**reach [2]** 20/1 34/22
**reached [1]** 61/25
**read [2]** 6/20 22/21
**reading [2]** 21/11 23/1
**real [2]** 9/8 55/4
**really [8]** 8/24 9/7 25/20 25/23 32/15 33/25 48/6 54/2
**reason [14]** 5/18 6/7 9/25 15/7 20/24 20/25 30/3 32/9 41/5 47/19 50/4 54/8 54/8 58/5
**reasonable [3]** 41/24 55/20 60/4
**reasonably [1]** 13/7
**reasoning [1]** 70/12
**reasons [4]** 6/16 8/21 9/6 50/4
**receive [2]** 25/21 27/19
**received [1]** 19/25
**recently [1]** 49/24
**recess [1]** 35/12
**recognize [1]** 19/2
**recognized [4]** 14/16 24/20 24/21 69/25
**recognizes [1]** 17/1
**reconsider [1]** 73/15
**reconsideration [1]** 73/16
**record [13]** 3/5 17/10 30/7 30/17 31/4 36/13 36/17 36/19 49/2 51/1 51/1 72/21 73/18
**recorded [1]** 2/17
**records [1]** 11/8
**recoverable [3]** 49/16 49/18 68/14
**recovered [1]** 68/2
**red [3]** 41/1 41/15 63/10
**Reeves [2]** 2/3 3/14
**reference [14]** 7/9 7/12 13/22 27/8 30/23 60/17 64/12 65/25 66/11 66/17 67/3 69/19 72/9 73/21
**referenced [2]** 42/23 60/17 62/14 64/6
**references [4]** 17/9 18/20 39/13 41/3
**referred [2]** 17/5 19/7
**refers [4]** 10/9 22/4 30/5 50/25
**reflect [3]** 38/14 55/15 73/5
**refuse [1]** 46/4
**refused [2]** 41/22 42/5
**regard [1]** 21/10
**regarding [5]** 6/2 13/1 39/16 47/11 64/5
**regardless [1]** 49/18
**REGGIE [1]** 1/9
**region [1]** 43/11
**registered [1]** 31/17
**registrants [1]** 43/5
**registrants' [1]** 15/6
**registration [13]** 4/12 16/24 17/17 21/14 22/16 22/19 35/6 35/22 45/8 52/19 54/4 54/9 71/22
**regulate [1]** 19/11
**regulation [3]** 4/16 9/15 9/17
**regulations [3]** 5/24 6/18 7/3
**relate [2]** 55/13 73/25
**related [5]** 45/5 48/11 55/14 62/8 71/12
**relates [2]** 69/17 72/3
**relating [2]** 18/3 22/12

**relatively [1]** 52/10
**released [2]** 48/1 66/10
**relevant [4]** 22/1 45/2 45/2 52/2
**relied [1]** 16/21
**relief [5]** 19/5 66/22 70/6 70/7 71/7
**relies [1]** 43/4
**rely [3]** 41/8 49/20 58/5
**remains [1]** 75/4
**remand [9]** 5/10 6/21 21/21 36/7 37/3 37/11 37/15 60/22 61/1
**remanded [1]** 65/9
**remedial [2]** 48/11 62/13
**remedy [4]** 10/13 33/8 33/12 66/18
**reopen [1]** 45/14
**repeat [1]** 43/16
**reply [3]** 48/8 48/9 50/8
**reported [3]** 45/23 46/5 76/4
**reporter [5]** 2/11 2/11 35/10 76/2 76/16
**reportings [1]** 46/12
**reports [2]** 46/9 53/19
**represent [2]** 33/23 74/25
**representations [1]** 45/15
**represented [2]** 58/15 59/6
**represents [1]** 62/22
**reputation [1]** 67/10
**request [6]** 61/4 70/8 70/14 71/7 71/12 71/14
**requested [3]** 71/24 72/9 73/21
**require [5]** 6/1 6/18 7/3 74/16 74/19
**required [5]** 4/17 6/7 8/20 16/23 23/14
**requirement [3]** 9/2 11/12 37/7
**requirements [1]** 9/3
**requires [3]** 9/15 9/17 12/23
**requiring [1]** 52/24
**requisite [1]** 35/17
**resolution [2]** 74/14 74/15
**resolve [1]** 45/5
**resolved [1]** 54/22
**resource [1]** 43/4
**resources [2]** 52/17 53/23
**respect [39]** 5/15 6/17 9/16 9/18 10/8 10/10 12/17 13/19 14/11 14/12 15/25 19/25 21/24 24/3 26/9 27/23 27/24 28/10 28/12 29/25 30/1 30/2 30/11 31/2 31/7 31/11 32/3 49/20 53/6 56/20 56/21 56/25 57/18 58/10 59/17 72/8 73/7 73/10 74/3
**respectfully [1]** 40/23
**respective [2]** 23/15
**respond [2]** 52/12 54/19
**response [3]** 37/16 42/25 74/24
**responses [3]** 42/12 48/13 50/21
**responsibility [2]** 17/23 63/14
**responsible [1]** 42/23
**responsive [1]** 59/13
**resulting [1]** 13/7
**resuming [2]** 35/12 38/24
**retail [5]** 30/14 30/21 40/2 71/13 71/15
**retailer [2]** 38/9 44/4
**retailers [1]** 72/4
**returned [1]** 17/17
**revenues [2]** 47/20 48/15
**review [13]** 8/11 8/14 9/10 12/6 28/15 36/1 36/3 53/3 53/6 53/7 53/9 53/10 61/22
**reviewed [1]** 17/3
**reviewing [1]** 11/19
**revoking [1]** 71/21
**right [10]** 6/6 14/10 27/4 35/24 38/23 38/25 44/22 54/3 54/16 59/22
**rise [1]** 11/15
**risk [2]** 9/8 41/12
**road [2]** 74/10 74/12
**rocketing [1]** 20/10
**Rocky [1]** 49/10

**R**

**role** [1] 63/18
**Room** [2] 2/12
**roughly** [2] 17/11 48/11
**RPR** [2] 2/11 76/16
**rule** [2] 11/18 49/22
**ruling** [6] 60/11 70/10 71/4 72/24 73/13
73/21
**run** [2] 29/16 35/8

**S**

**safety** [13] 4/19 6/3 6/10 9/17 10/24
12/16 16/16 18/22 33/7 33/16 35/23
60/3 60/7
**said** [14] 7/9 9/20 11/17 17/21 28/12
29/17 30/22 32/2 36/12 50/1 62/19 66/5
72/19 76/8
**sale** [1] 20/16
**sales** [15] 10/23 11/25 13/18 19/19
19/21 20/23 20/23 24/18 24/19 25/8
30/9 41/20 42/10 48/12 58/12
**same** [5] 18/2 21/8 38/11 69/15 69/19
**Sanford** [7] 38/12 39/25 40/8 40/16
41/18 56/23 58/11
**satisfy** [2] 43/14 43/22
**satisfying** [1] 16/22
**say** [35] 5/9 6/22 8/2 8/21 9/1 9/4 15/14
17/2 18/12 18/12 20/17 21/3 24/6 27/5
27/9 27/12 27/23 28/22 29/10 31/1
32/24 35/2 36/23 37/22 40/11 41/25
42/13 43/25 44/5 44/24 51/25 52/3 54/3
59/4 74/23
**saying** [25] 6/12 13/19 14/4 15/13 16/3
16/4 16/9 16/11 18/7 23/18 25/11 32/13
33/12 33/22 34/2 34/23 36/17 39/11
42/5 42/15 45/1 51/14 52/22 57/5 59/5
**says** [36] 7/5 7/6 7/13 7/14 7/14 10/6
10/14 16/21 17/1 18/15 19/16 19/18
20/15 21/12 22/9 22/14 29/17 29/18
30/12 32/4 35/16 35/20 36/21 38/1 40/9
40/20 41/2 42/11 48/10 49/13 51/17
53/16 55/9 59/7 62/2 68/6
**scheduled** [1] 16/25
**scope** [2] 71/19 73/16
**screen** [1] 28/7
**scrutinizing** [1] 54/14
**second** [3] 11/11 21/12 60/17
**see** [5] 24/10 34/25 44/5 60/13 73/19
**Seemingly** [1] 46/8
**seems** [8] 13/12 21/19 33/22 55/19
60/19 65/2 65/5 65/18
**seen** [1] 8/5
**seized** [1] 51/3
**self** [1] 63/22
**selling** [3] 24/23 26/25 59/8
**sells** [2] 53/20 56/23
**send** [2] 59/5 72/22
**sense** [4] 23/16 48/20 49/9 49/13
**sensible** [2] 23/9 30/18
**sentence** [2] 22/8 35/19
**separate** [3] 11/12 25/9 46/14
**September** [2] 11/7 41/16
**series** [1] 21/6
**serve** [4] 48/24 49/8 49/9 49/13
**served** [3] 10/19 41/7 46/10
**set** [8] 6/11 20/25 21/14 21/17 27/15
46/16 55/21 71/2
**sets** [2] 8/12 46/17
**setting** [3] 13/13 42/17 70/12
**several** [2] 44/15 62/13
**severely** [1] 49/3
**sharply** [1] 39/8
**she** [68] 6/4 6/4 6/8 10/5 10/6 10/6
10/11 10/11 10/12 10/14 10/14 10/15

10/18 10/20 10/21 10/21 10/24 11/1
11/4 11/14 11/17 11/19 12/20 12/25
12/25 12/25 13/5 14/11 16/21 17/1 17/3
17/8 17/13 18/16 18/16 18/19 18/19
18/20 18/21 19/16 19/18 19/18 24/11
24/15 24/17 29/18 29/18 29/20 29/24
29/25 30/1 30/3 30/5 30/12 30/22 32/2
32/4 35/20 55/13 55/15 60/21 61/12
61/23 62/3 62/7 62/10 62/21 65/14
**she's** [2] 14/4 24/13
**ship** [1] 68/23
**shipments** [5] 41/14 41/17 45/20 72/22
74/25
**shipped** [8] 38/6 38/8 39/24 40/1 40/2
40/6 40/8 44/20
**shipping** [3] 40/12 42/2 42/20
**shocking** [1] 20/22
**Shooting** [1] 49/21
**short** [1] 3/22 47/21 59/10 73/9
**short-lived** [1] 3/22
**shorthand** [2] 2/17 76/5 76/9
**should** [18] 10/7 17/2 27/12 42/23 44/3
44/4 44/5 46/19 48/6 53/7 60/1 63/5
63/10 64/11 64/14 64/16 65/21 71/23
**shouldn't** [3] 17/5 34/10 40/12
**show** [17] 17/8 21/13 22/5 23/5 23/8
26/5 32/14 34/3 34/5 48/19 50/13 54/23
59/25 64/21 65/17 67/12 67/21
**showing** [11] 4/18 48/8 64/24 65/6
66/20 66/23 67/5 68/16 69/2 69/4 70/7
**shown** [3] 54/7 68/11 68/11
**shows** [3] 17/9 30/17 55/3
**shut** [5] 23/19 33/1 33/12 33/23 50/20
**signed** [1] 10/21
**significant** [11] 13/3 13/24 14/7 14/8
43/19 50/17 50/17 54/15 55/14 65/5
69/16
**significantly** [3] 29/9 55/18 63/7
**simple** [1] 11/18
**simply** [17] 7/25 8/12 9/1 18/11 32/8
35/18 36/22 37/14 37/25 41/8 43/7
44/25 48/2 48/20 48/22 51/10 72/18
**simultaneously** [1] 10/22
**since** [2] 9/23 17/22
**single** [1] 48/24
**site** [2] 44/3 44/20
**situation** [5] 14/5 26/22 51/14 62/2 62/9
**situations** [2] 44/14 73/8
**six** [2] 17/10 17/12
**size** [3] 40/9 55/19 63/2
**sky** [1] 20/22
**slip** [1] 12/16
**slower** [2] 39/3 39/6
**small** [2] 36/14 52/10
**sneak** [2] 30/4 30/4
**snuff** [1] 45/17
**so** [54] 4/3 4/12 4/17 4/20 8/9 10/18
10/22 13/16 15/7 15/25 15/25 19/13
19/14 19/16 20/5 20/21 21/1 22/19
24/11 25/3 25/24 26/17 27/14 29/9
29/11 29/22 37/24 39/23 40/20 41/19
42/10 43/7 43/10 45/11 46/4 49/15
51/14 53/7 56/15 57/1 57/2 57/5 61/17
66/14 68/1 68/14 69/1 70/3 71/5 71/22
72/8 72/14 72/16 72/22
**society** [1] 70/3
**sold** [1] 53/18
**solely** [3] 11/21 61/1 72/3
**solve** [1] 47/12
**some** [29] 5/15 7/1 18/19 31/10 34/2
34/12 36/18 37/1 38/4 38/6 40/15 41/9
45/25 46/22 48/23 57/9 62/12 62/12
64/15 64/16 64/21 67/7 67/8 67/9 67/19
68/8 68/8 69/7 72/13
**somebody** [1] 21/2

**somehow** [4] 36/1 36/20 37/19 42/22
**something** [8] 7/22 21/11 26/9 27/25
28/5 28/6 31/3 31/5 55/3 58/16 59/18
69/9 73/6 73/15
**sometimes** [2] 8/17 46/23
**soon** [2] 19/24 60/12
**sophisticated** [1] 4/3
**sorry** [5] 14/22 32/11 40/7 43/16 43/24
**sort** [9] 21/6 26/15 27/10 27/16 28/14
30/6 71/11 73/24 74/24
**sought** [1] 71/7
**sounded** [1] 50/12
**source** [1] 56/2
**sovereign** [3] 49/17 68/1 68/12
**sparse** [1] 24/8
**specific** [2] 18/13 39/10
**specifically** [2] 22/25 23/2
**specify** [1] 23/25
**spell** [1] 23/14
**spend** [1] 48/18
**spends** [1] 48/16
**split** [1] 36/1
**Sport** [1] 49/21
**Springfield** [1] 2/9
**square** [1] 1/15
**squeezing** [2] 32/6 32/8
**staggeringly** [1] 39/22
**stand** [4] 4/25 5/22 7/19 11/13
**standard** [8] 12/13 12/14 25/17 32/12
53/2 53/7 53/9 53/9
**standards** [1] 30/14
**stands** [1] 24/2
**start** [4] 4/21 12/9 24/11 35/15
**starts** [1] 17/13
**state** [9] 8/20 11/16 29/9 33/5 51/25
56/10 56/12 56/14 70/24
**stated** [2] 46/13 47/15
**statement** [3] 6/1 23/12 25/24
**states** [5] 1/1 1/10 3/14 12/11 76/3
**statewide** [1] 56/15
**statistically** [1] 13/15
**statistics** [2] 12/25 39/9
**statute** [7] 4/16 9/11 12/23 33/14 51/5
61/21 70/1
**statutory** [1] 22/15
**stay** [2] 71/3 75/5
**step** [1] 17/25
**steps** [3] 54/15 60/4 64/15
**still** [11] 18/10 31/15 34/19 34/20 39/22
39/24 40/3 42/20 48/4 48/8 49/18
**stood** [1] 14/16
**stop** [4] 11/2 15/12 33/6 59/8
**store** [13] 24/21 24/23 41/6 44/21 52/5
52/6 52/7 57/22 57/23 58/2 59/6 59/7
59/9
**stores** [67] 10/8 10/9 10/22 10/23 11/4
11/6 11/10 13/17 13/18 19/19 19/22
20/1 20/2 20/5 20/6 20/20 22/12 24/4
24/15 24/17 24/25 25/1 25/1 25/2 26/25
27/3 27/9 27/24 28/10 28/12 29/7 29/25
30/21 31/1 31/15 31/15 37/19 37/22
39/25 40/15 41/18 44/12 50/25 51/3
52/18 52/18 52/20 52/21 52/21 54/14
56/24 56/25 57/1 57/3 57/14 57/19 58/3
58/3 58/7 58/10 58/12 58/12 58/15
58/17 58/19 59/12 59/17
**story** [2] 40/10 56/25
**strategy** [1] 32/4
**Street** [2] 1/16 47/24
**stress** [1] 51/8
**stressed** [1] 19/7
**strike** [1] 40/7
**strives** [1] 44/24
**striving** [1] 4/6
**strong** [1] 10/1

**S**

strongly [2] 70/23 71/5
subject [2] 21/2 52/24
submission [2] 11/8 28/24
submit [10] 7/22 8/24 9/13 12/8 16/17 36/24 42/23 54/10 55/7 73/15
submitted [6] 5/3 17/4 28/3 52/4 61/18 65/11
subscribed [1] 76/10
subsequent [3] 36/7 37/10 60/18
subsequently [2] 5/16 62/6
substance [6] 13/25 25/15 26/3 26/3 29/21 55/17
substances [12] 10/16 18/24 19/9 23/20 25/16 33/4 43/1 55/5 58/16 67/15 68/22 70/3
substantial [6] 11/10 14/17 17/25 45/14 66/16 73/22
succeed [1] 32/5
success [2] 66/16 73/22
such [5] 11/21 51/15 54/1 70/7 73/16
sued [1] 52/22
suffer [2] 48/5 49/16
suffering [1] 19/5
sufficiency [1] 47/4
sufficient [15] 6/11 21/17 21/19 26/5 30/9 47/6 65/12 66/3 66/12 67/11 67/12 68/4 68/16 69/1 69/2
suggest [4] 18/5 29/20 36/25 37/1
suggested [1] 35/25
suggesting [1] 34/5
suggestion [1] 72/16
Suite [1] 1/16
summary [2] 21/15 21/17
supplant [1] 53/2
supplemental [1] 28/8
supplies [1] 40/16
supply [5] 40/8 40/13 40/15 42/18 43/9
support [7] 12/5 14/14 17/16 19/22 67/13 67/18 68/11
supporting [1] 16/18
supports [3] 37/6 54/25 62/18
supposed [7] 13/8 44/11 44/11 44/12 44/12 44/14 46/21
Supreme [2] 4/22 11/17
sure [6] 10/2 13/23 29/16 53/20 64/10 64/17
surgeries [1] 73/8
survival [1] 47/16
survived [1] 48/2
suspend [2] 15/5 35/5
suspended [5] 37/19 37/22 38/18 44/18 45/3
suspending [4] 4/11 10/22 10/25 64/22
suspension [13] 14/21 21/14 22/6 23/3 23/5 37/20 39/3 45/8 47/7 47/24 67/18 71/19 74/9
suspensions [1] 48/10
suspicion [1] 63/6
suspicious [5] 45/23 45/24 46/7 46/9 46/11
system [4] 45/24 45/25 55/12 55/12

**T**

table [1] 3/14
take [14] 13/19 16/20 26/18 29/7 35/9 35/9 37/10 38/15 43/2 51/16 62/25 63/23 66/2 68/18
taken [18] 14/7 15/16 31/2 35/3 35/12 60/3 62/7 62/13 62/17 62/23 63/2 63/17 64/14 64/16 65/23 66/4 66/10 72/3
takes [1] 65/15
taking [19] 13/14 13/18 13/23 14/2 25/13 29/12 31/6 31/14 39/14 39/21

48/14 63/3 63/6 63/19 64/3 64/3 64/22 65/7 66/7
Tale [1] 25/5
talk [5] 20/10 44/21 49/6 58/11 58/11
talked [4] 24/16 30/4 31/6 44/19
talking [12] 6/9 14/23 17/13 23/1 24/13 24/16 25/14 29/8 32/23 48/14 63/7 65/24
talks [3] 18/20 24/11 24/15
teams [1] 58/6
telephone [1] 59/5
tell [4] 21/21 28/11 32/22 40/10
telling [2] 32/2 48/6
ten [5] 20/18 28/17 35/10 40/1 40/3
ten-minute [1] 35/10
tend [1] 67/18
term [2] 47/21 48/1
terminated [3] 4/4 10/16 56/23
termination [1] 51/3
terms [3] 6/5 6/7 6/9
testimony [2] 17/7 76/5
than [17] 6/6 7/5 17/4 17/7 27/3 29/9 29/11 30/14 30/20 35/7 36/17 37/24 40/19 48/15 52/1 55/18 62/22
Thank [10] 3/21 35/9 55/11 50/6 50/7 60/8 60/9 71/10 75/9 75/10
that [648]
that's [37] 5/2 5/11 6/15 10/9 11/16 11/23 12/5 12/12 12/16 12/20 13/18 15/2 17/5 19/19 19/20 20/23 20/24 23/15 25/23 28/14 35/18 36/17 37/9 43/11 44/7 44/8 44/14 49/7 58/10 61/14 66/4 67/9 68/4 68/19 69/8 71/15 75/2
their [13] 13/20 41/21 44/4 44/13 45/16 47/11 48/8 50/13 58/20 63/13 63/14 63/24 67/24
them [13] 5/18 10/25 15/11 16/10 25/21 30/24 31/1 44/10 49/13 52/25 72/15 74/17 74/19
themselves [4] 30/24 31/1 63/13 63/23
then [28] 7/11 8/1 8/13 8/14 8/14 8/21 9/23 10/11 14/15 15/13 16/8 17/22 17/23 18/15 19/17 22/2 22/12 24/15 28/17 34/17 36/2 52/22 52/23 55/3 57/18 61/22 65/21 69/5
there [99]
there's [47] 3/21 7/9 9/8 9/25 11/8 11/25 19/1 20/9 21/1 21/3 21/11 25/12 26/5 27/9 27/17 27/19 29/10 29/17 30/15 37/14 40/17 41/2 41/5 44/6 44/16 45/22 64/24 65/7 65/17 65/19 68/5 68/8 69/1 69/7 69/21 72/5 72/5 72/19 73/8 73/22
thereafter [1] 67/17
therefore [10] 9/5 14/5 15/12 47/1 65/7 67/14 67/21 68/10 68/13 70/8
Thereupon [2] 35/12 75/11
these [49] 9/5 10/7 13/2 15/16 18/24 21/21 24/4 25/20 25/23 26/24 30/5 32/3 32/18 34/10 35/20 35/22 38/19 40/19 40/25 44/5 44/7 45/21 46/2 46/6 46/17 46/23 47/1 50/4 50/25 53/19 54/14 55/11 56/18 56/20 58/2 58/3 59/19 63/21 64/12 64/12 64/13 64/17 65/3 65/15 69/13 69/23 70/2 70/20
they [68] 15/12 15/12 18/10 18/11 18/12 18/12 18/13 18/13 19/5 20/12 24/3 26/25 27/2 27/2 27/9 32/14 33/15 34/2 34/5 34/10 37/22 38/10 38/18 40/1 40/12 41/2 41/13 41/14 41/24 41/25 42/1 42/2 42/11 42/18 42/20 43/3 43/23 44/9 44/10 46/18 48/7 48/18 48/18 49/16 54/12 56/17 57/8 58/20 63/11 63/12 64/1 64/11 64/21 64/24 64/25 65/15 67/16 68/24 69/24 71/3 71/8 71/8 72/17

74/12 74/16 74/18 74/19 75/2
they're [15] 28/23 32/1 32/13 34/10 37/20 39/4 44/11 44/11 44/12 44/12 44/14 54/22 71/1 71/1 74/5
they've [3] 21/4 24/2 71/4
thing [10] 9/14 17/1 29/15 29/18 32/2 41/24 41/25 59/22 69/15 72/11
things [6] 12/9 21/24 23/7 32/23 32/24 51/23
think [67] 6/15 13/7 15/1 15/3 15/18 15/20 16/13 16/21 18/19 18/20 21/25 22/3 22/24 23/24 24/1 24/2 24/2 24/7 25/24 26/4 26/7 26/15 26/20 27/8 27/17 28/12 29/17 30/10 30/18 30/25 32/15 33/10 34/1 37/5 37/6 37/8 49/12 53/4 53/5 53/7 53/10 55/23 57/8 58/23 58/23 60/3 60/10 60/16 61/3 62/1 62/4 62/15 62/21 62/24 63/14 63/19 64/1 67/10 67/21 68/6 68/18 69/1 69/6 69/15 69/19 73/14 73/17
think that [1] 57/8
thinking [1] 74/1
thinks [1] 53/14
third [2] 34/15 48/21
Thirteenth [1] 1/16
this [128]
those [62] 4/8 5/23 6/20 6/25 10/23 11/10 13/18 14/6 17/12 18/1 18/4 19/22 20/2 20/5 20/5 20/11 25/16 26/4 26/13 27/3 28/10 28/12 29/6 29/21 29/25 30/11 31/14 34/11 34/18 34/20 36/10 36/15 36/15 40/24 41/22 43/6 43/14 43/15 44/19 45/15 51/3 52/8 52/12 52/13 52/20 54/20 56/22 56/24 56/25 57/1 58/6 58/10 58/11 58/12 58/15 58/17 58/19 64/7 64/16 68/14 74/12 75/3
though [5] 28/20 31/9 34/2 41/7 58/14
thought [2] 32/1 73/3
threat [1] 31/25
threatens [1] 47/16
threats [1] 60/6
three [8] 11/8 22/4 22/7 46/7 48/9 48/13 48/24 49/8
threshold [1] 46/20
thresholds [6] 46/16 46/17 46/19 46/24 46/25 47/2
threw [1] 73/23
through [10] 16/20 17/14 18/18 24/9 24/11 29/4 29/16 54/19 59/15 72/13
ties [1] 18/21
till [1] 39/1
time [35] 6/13 7/8 10/5 10/6 10/12 10/20 11/7 14/13 14/20 14/25 17/19 18/2 28/7 38/11 38/15 38/17 38/21 39/5 39/8 40/6 45/10 46/20 57/9 57/14 62/10 66/8 66/10 67/8 67/6 67/19 72/1 72/20 73/5 74/8 75/4
times [10] 38/7 40/1 40/3 40/3 40/9 40/19 46/24 51/9 51/20 52/13
tiny [1] 48/16
today [6] 3/8 4/9 14/14 14/20 14/25 17/16
told [3] 12/4 41/7 47/24
tomorrow [2] 54/9 55/5
tonight [1] 74/4
too [2] 23/24 48/16
took [3] 37/2 37/2 39/13
tools [1] 4/3
top [10] 38/7 45/20 45/25 46/1 46/7 56/6 56/6 56/8 56/8 57/13
total [1] 56/8
totality [1] 44/18
touch [1] 44/16
town [4] 40/12 40/13 51/18 51/21

# T

**transcribed** [1] 76/9
**transcript** [3] 1/8 2/17 76/8
**transcription** [1] 2/17
**transition** [1] 70/19
**treatment** [1] 25/3
**treatments** [1] 25/7
**tremendous** [1] 19/8
**tries** [2] 8/15 21/6
**truck** [1] 75/2
**trucks** [4] 74/6 74/10 74/12 74/16
**true** [5] 16/1 29/14 54/10 63/15 69/19
**truly** [4] 10/12 32/20 52/16 52/16
**try** [6] 17/25 53/22 53/25 54/16 59/23 60/11
**trying** [6] 9/23 37/20 39/9 53/24 63/19 72/23
**turn** [4] 22/3 22/7 51/11 52/24
**turned** [1] 52/22
**turns** [2] 8/11 52/24
**twist** [1] 8/11
**two** [32] 7/5 10/9 10/22 11/4 11/6 11/7 11/10 12/20 20/1 20/2 20/5 20/22 21/24 23/7 29/25 38/11 39/25 40/15 46/9 49/1 56/22 56/24 56/25 57/3 58/2 58/10 58/11 58/12 58/15 58/17 58/19 70/11
**type** [7] 13/1 59/13 65/15 65/16 66/2 69/23 70/2
**types** [3] 13/2 26/7 72/6

# U

**U.S** [4] 2/3 2/7 2/12 45/10
**ultimate** [1] 31/16
**unable** [2] 38/16 67/7
**unbelievable** [1] 42/13
**unclear** [1] 17/2
**under** [16] 7/1 7/6 12/6 14/6 16/8 22/17 36/23 40/4 43/15 44/10 53/10 60/24 61/4 61/20 61/21 61/21
**understand** [7] 7/10 18/23 25/10 27/5 28/19 30/22 58/19
**understanding** [6] 7/10 7/13 7/16 39/18 57/16 57/20
**understands** [2] 4/1 8/8
**understood** [1] 9/12
**underway** [1] 35/5
**undoubtedly** [1] 53/25
**unfortunately** [1] 33/20
**UNITED** [4] 1/1 1/10 3/14 76/3
**units** [1] 38/6
**unless** [4] 32/13 33/22 36/1 37/1
**unrecoverable** [1] 50/2
**unsympathetic** [2] 65/9 66/1
**until** [2] 41/6 44/9
**up** [19] 7/9 8/19 9/24 10/7 14/16 17/23 20/21 24/3 39/4 45/16 46/19 48/3 48/3 49/6 50/9 60/11 61/2 70/10 72/23
**upon** [13] 15/16 26/18 37/11 51/21 55/21 64/5 65/10 66/9 66/15 67/10 67/17 68/14 73/18
**urgent** [1] 51/14
**us** [7] 7/11 18/9 41/25 45/7 52/23 52/24 70/17
**use** [3] 13/2 13/9 50/19
**used** [1] 13/8
**uses** [2] 19/10 19/11
**using** [2] 33/11 39/9
**utility** [1] 69/24

# V

**VA** [1] 2/9
**validity** [2] 4/24 38/2
**value** [2] 39/21 48/14
**various** [3] 17/8 68/14 70/4

**versus** [7] 3/3 4/22 5/22 24/23 37/14 49/20 70/25
**very** [23] 3/18 4/10 10/1 10/1 14/17 17/24 24/22 24/25 32/24 33/10 33/11 36/17 39/22 39/24 50/12 52/5 52/6 54/15 54/16 59/13 63/21 70/25 73/9
**victory** [1] 70/25
**view** [9] 21/16 22/14 47/7 55/24 58/25 61/25 65/10 66/22 72/8
**views** [1] 4/7
**violated** [4] 9/5 18/7 18/13 22/10
**violating** [1] 46/13
**violation** [6] 7/15 9/1 18/8 46/8 46/12 61/24
**violations** [2] 18/10 18/21
**virtually** [3] 8/6 40/14 46/2
**visit** [1] 44/12
**visited** [1] 41/11
**visits** [3] 44/4 44/9 44/21
**volume** [21] 17/5 17/12 19/21 24/17 24/17 24/19 25/3 25/8 26/4 27/9 30/8 46/15 46/17 47/2 52/5 52/7 62/20 62/20 62/22 63/7 64/15
**volumes** [11] 19/18 38/1 38/4 38/9 39/11 40/5 40/10 40/10 41/19 44/7 44/20
**voluntarily** [2] 10/16 19/24

# W

**wait** [1] 51/15
**Walgreen's** [1] 40/17
**walk** [2] 16/20 18/18
**walking** [2] 24/9 24/10
**Wall** [1] 47/24
**Walmart** [1] 40/18
**WALTON** [1] 1/9
**want** [27] 28/16 28/19 29/15 44/5 50/9 51/8 52/25
**wants** [3] 54/16 54/17 73/15
**warehouse** [2] 75/4 75/6
**warrant** [6] 39/20 41/7 44/10 46/10 57/3 58/1
**warrants** [1] 10/19
**was** [88]
**wash** [1] 37/25
**Washington** [5] 1/5 1/14 1/16 2/5 2/13
**wasn't** [5] 20/19 27/13 28/6 30/7 47/25
**watching** [1] 39/24
**way** [11] 11/24 17/2 23/15 31/17 36/11 37/4 47/4 55/12 58/25 59/3 64/21
**we** [72] 4/6 5/5 7/8 7/10 9/1 9/4 9/15 10/4 12/8 13/10 14/6 14/9 18/12 18/12 18/23 23/11 23/14 23/18 23/19 23/19 24/1 24/11 26/22 26/25 28/2 28/3 28/4 28/5 28/11 28/22 30/4 30/10 31/4 32/17 32/24 33/12 33/20 33/21 33/23 34/15 36/24 37/16 37/21 37/24 40/9 40/21 47/23 48/1 48/14 49/20 50/22 50/22 51/15 52/11 52/25 53/5 55/10 55/11 56/16 59/14 59/17 60/3 60/3 70/23 71/5 71/14 73/4 73/19 74/9 74/11 74/9
**we'd** [2] 70/14 73/4
**we'll** [1] 60/11
**we're** [26] 3/19 6/9 12/3 14/23 15/19 23/12 24/9 26/21 26/24 29/8 32/21 33/1 33/1 33/5 33/24 39/9 39/10 42/1 42/14 42/15 44/25 45/1 49/13 52/14 52/14 63/7
**we've** [14] 8/4 11/8 13/24 14/1 14/4 14/5 19/21 24/16 32/23 45/19 52/4 55/10 59/5 73/1
**website** [1] 31/5
**week** [2] 23/14 70/11
**Weiser** [1] 56/24

**well** [46] 3/18 5/13 6/20 6/24 7/9 7/9 20/7 14/9 8/20 14/10 15/1 15/14 15/18 15/16 15/19 17/25 22/6 27/1 27/16 32/15 33/19 36/25 37/20 37/22 37/23 38/2 38/13 38/20 41/5 42/24 44/25 51/4 51/22 53/4 53/15 53/18 53/18 56/13 56/14 57/8 58/22 71/25 73/2 73/12 74/15
**went** [4] 28/2 40/15 41/1 57/13
**were** [30] 5/19 6/5 7/8 12/7 15/12 21/21 25/17 26/7 28/5 28/21 32/7 34/12 36/15 36/15 36/16 38/9 38/10 38/18 39/8 44/10 46/9 46/22 47/3 53/17 59/16 63/12 65/2 65/4 73/20 74/10
**what** [103]
**what's** [7] 16/22 19/20 27/15 27/19 50/25 59/24 72/8
**whatever** [4] 38/2 46/20 46/20 47/4
**whatsoever** [2] 49/2 72/21
**when** [34] 5/9 6/13 8/1 8/9 8/13 14/15 19/8 24/7 24/10 28/2 29/3 30/20 36/24 38/18 39/23 40/4 43/2 43/24 43/25 48/5 48/7 49/11 52/6 60/20 61/20 62/3 65/13 65/15 65/18 69/5 69/11 69/15 70/2 74/8
**where** [39] 4/12 4/23 5/15 5/20 6/21 7/23 8/6 8/12 8/20 8/25 9/7 13/17 14/2 18/21 22/2 23/17 24/10 24/11 25/13 26/11 27/9 33/15 33/16 34/5 34/16 34/16 37/9 51/11 52/15 52/19 52/21 52/21 53/22 54/6 56/18 58/4 58/4 63/2 73/8
**whereof** [1] 76/10
**whether** [32] 4/10 12/2 15/5 16/15 17/2 21/18 27/18 27/20 32/19 33/11 46/19 49/18 50/18 51/24 54/24 60/13 60/14 60/15 61/19 61/23 62/6 63/1 63/5 63/16 64/2 65/13 65/22 66/18 66/20 66/21 70/5 74/12
**which** [43] 5/14 5/17 6/16 9/20 11/9 11/20 14/16 16/25 17/11 23/4 23/7 23/9 23/13 23/21 24/21 24/24 26/22 26/24 28/24 38/17 45/12 46/3 46/10 48/24 51/9 52/4 52/7 52/13 53/22 53/25 54/2 54/11 54/21 56/22 58/2 58/14 60/24 65/3 65/9 66/21 68/17 71/2 71/2
**while** [6] 15/14 35/22 62/18 63/18 66/25 68/7
**who** [15] 19/4 19/5 19/5 21/2 25/20 31/16 34/9 34/17 43/19 53/20 54/11 67/24 67/24 73/7 74/4
**who's** [1] 44/5
**whole** [2] 9/3 37/12
**wholesaler** [2] 19/12 63/5
**why** [15] 5/7 6/13 9/25 20/24 23/25 35/5 36/23 37/2 42/9 42/18 44/6 53/14 54/8 65/9 72/9
**wielding** [1] 23/17
**will** [22] 4/12 4/13 32/5 47/21 47/25 48/5 49/3 49/15 49/16 51/1 54/11 55/10 55/11 58/16 59/8 60/10 70/9 70/10 72/15 72/17 73/10 75/7
**WILMER** [3] 1/13 3/7 3/10
**within** [6] 40/18 52/1 61/20 70/10 70/11 75/3
**without** [10] 7/24 10/14 16/6 31/24 33/13 34/23 34/24 35/6 50/21 54/4
**witness** [1] 76/10
**won** [1] 71/4
**won't** [1] 16/9
**word** [1] 16/1
**words** [2] 41/22 41/22
**work** [2] 43/8 59/1
**working** [1] 54/16
**works** [3] 4/5 23/16 55/12
**world** [4] 7/23 14/2 58/25 58/25

# W

**worst [1]**  48/17
**would [83]**
**wouldn't [2]**  25/6 39/2
**writing [10]**  31/18 31/21 34/9 34/10 34/19 43/14 43/19 44/5 44/7 52/7
**written [3]**  47/5 60/11 70/11
**wrong [2]**  37/14 58/18
**wrote [1]**  25/5

# Y

**yeah [2]**  27/7 57/8
**year [2]**  57/11 57/15
**years [7]**  4/4 24/14 30/18 31/4 35/3 39/10 53/15
**yes [8]**  38/19 42/7 44/2 47/14 54/7 55/4 56/11 62/12
**yet [5]**  42/19 46/1 48/4 51/19 72/23
**you [136]**
**you'd [1]**  47/13
**you're [15]**  6/12 13/12 14/7 15/13 16/9 25/11 26/11 32/13 33/22 34/16 34/16 37/23 42/5 52/6 57/5
**you've [6]**  18/7 43/18 49/11 51/18 53/24 62/20
**your [110]**
**yourself [1]**  3/4